ISIAH ROBINSON and LISA CLAYTON ROBINSON vs NATIONAL AUTOMOTIVE, INC. · August 15, 2025
Case 3:24-cv-00948-WWB-PDB Document 69-8 Filed 09/30/25 Page 1 of 204 PageID
2195
CR of NATIONAL AUTOMOTIVE, INC. (ROBIN BYLER-RAMAGHI)
1



```
 1                UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                   JACKSONVILLE DIVISION
                   CASE NO. 3:24-CV-00948
 3

 4   ISIAH ROBINSON and LISA CLAYTON
     ROBINSON, each an individual,
 5
          Plaintiffs,
 6
     vs
 7
     NATIONAL AUTOMOTIVE, INC., a
 8   Florida corporation,

 9        Defendant.
     _____/
10
     NATIONAL AUTOMOTIVE INC., a
11   Florida corporation,

12        Defendant/Counter-Plaintiff,

13   vs

14   ISIAH ROBINSON and LISA CLAYTON
     ROBINSON, each an individual
15
          Plaintiff's/Counter-Defendants.
16   _____/

17                       - - -

18       ZOOM VIDEO DEPOSITION OF ROBIN BYLER-RAMAGHI,

19     NATIONAL AUTOMOTIVE, INC., CORPORATE REPRESENTATIVE,

20          TAKEN AT THE INSTANCE OF THE PLAINTIFFS

21                       - - -

22                              Zoom Video
                                Friday, August 15, 2025
23                              10:46 a.m. - 3:48 p.m.

24   Stenographically Reported by
     Gwendolyn P. Smith
25   Notary Public, State of Florida
```

```
 1   APPEARANCES:

 2   SUE YOUR DEALER - A LAW FIRM
     1930 Harrison Street, Suite 208 F
 3   Hollywood, Florida  33020
     Counsel for the Plaintiffs
 4   josh@jfeyginesq.com
     (954)228-5674
 5   BY:  JOSHUA FEYGIN, ESQUIRE

 6   MCGLINCHEY STAFFORD
     10375 Centurion Pkwy. North, Suite 420
 7   Jacksonville, Florida  32256
     Counsel for the Defendant
 8   kisreal@mcglinchey.com
     (904)224-4449
 9   BY:  KIMBERLY H. ISRAEL, ESQUIRE

10   ALSO PRESENT:  Jordan Bruce, videographer

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                           INDEX

2    WITNESS                                        PAGE

3    Robin Byler-Ramaghi

4         Direct Examination by Mr. Feygin          5

5

6

7

8
```

```
9    EXHIBITS FOR IDENTIFICATION                    PAGE

10   Plaintiff's 1 (Depo notice)                    11
     Plaintiff's 2 (Wholesale order)                60
11   Plaintiff's 3 (Invoice)                        62
     Plaintiff's 4 (Certificate of title)          71
12   Plaintiff's 5 (Certificate of title)          74
     Plaintiff's 6 (Buyer's order)                  87
13   Plaintiff's 7 (RISC)                           93
     Plaintiff's 8 (Odometer disclosure)           97
14   Plaintiff's 9 (Certificate of title application)  98
     Plaintiff's 10 (HSMV Form 82053)              102
15   Plaintiff's 11 (Odometer disclosure statement)  104
     Plaintiff's 12 (Certificate of title application)  111
16   Plaintiff's 13 (Certificate of title application)  115
     Plaintiff's 14 (Odometer disclosure statement)  117
17   Plaintiff's 15 (Buyer's order form)           119
     Plaintiff's 16 (RISC)                         121
18   Plaintiff's 17 (Odometer disclosure statement)  122
     Plaintiff's 19 (Portal screen shot)          138
19   Plaintiff's 20 (Document with signatures)    149
     Plaintiff's 21 (GPS tracking history)        151
20   Plaintiff's 22 (GPS records)                 158
     Plaintiff's 23 (Copy of check)               163
21   Plaintiff's 24 (Payment history)             165
     Plaintiff's 25 (Demand package)              167
22   Plaintiff's 26 (Letter)                      169
     Plaintiff's 27 (Certificate of title history)  171
23
```

```
24

25
```

```
 1        The Zoom videotaped deposition of ROBIN BYLER-RAMAGHI
 2   was taken before me, GWENDOLYN P. SMITH, Notary Public,
 3   State of Florida at Large, beginning at the hour of
 4   10:46 a.m., on Friday, August 15, 2025, pursuant to Notice
 5   filed herein, at the instance of the Plaintiffs in the
 6   above-entitled cause pending before the above-named Court.
 7                          -  -  -
 8        THE VIDEOGRAPHER:  Good morning.  We are now on
 9        the video record at 10:36 a.m. on August 15, 2025.
10        This begins Media 1 in the video deposition of Robin
11        Byler-Ramaghi as corporate representative of National
12        Automotive, Incorporated.  Case filed as Isiah
13        Robinson and Lisa Clayton Robinson versus National
14        Automotive, Incorporated, case filed in the U.S.
15        District Court in the Middle District of Florida.
16        This deposition is being conducted remotely.
17        My name is Jordan Bruce and I am the
18        videographer, and the court reporter is Wendy Smith,
19        and we are both on behalf of Florida Court Reporting.
20        Would counsel please announce their appearances
21        and whom they represent, after which the court
22        reporter will please swear in the witness.
23        MR. FEYGIN:  Good morning.  Attorney Joshua
24        Feygin on behalf of the plaintiffs.
25        MS. ISRAEL:  Good morning.  Kim Israel on behalf
```

```
 1          of the defendants.
 2     THEREUPON,
 3                      ROBIN BYLER-RAMAGHI
 4     being by me first duly sworn to testify the whole truth,
 5     as hereinunder certified, testified as follows:
 6                      DIRECT EXAMINATION
 7     BY MR. FEYGIN:
 8          Q.  Good morning, Ms. Ramaghi.  How are you today?
 9          A.  I am good.  I have been sick.  So if I'm coughing
10     and I take a drink of water, just please excuse me.  It's
11     going around here.
12          Q.  It's quite all right.  I'm on -- I'm on my fourth
13     week of strep throat.  So I totally get it.
14          A.  Yeah.
15          Q.  So -- and I do apologize for having to make you
16     talk when you're sick, but obviously we need to get this
17     taken care of.
18               So just a few ground rules.  Have you ever been
19     deposed before?
20          A.  No, sir, I have not.
21          Q.  Okay.  So to hopefully aid us in, you know, going
22     through this nice and smoothly, if -- if I ask you a
23     question and it's unclear or confusing, just ask me to
24     rephrase it.  But if you answer it, I'm going to assume
25     that you understood my question.  Is that fair?
```

```
 1        A.   Yes, sir.

 2        Q.   Okay.  And because the court reporter can't

 3   record both of us talking at the same time, I'm going to

 4   ask that you please wait until I finish asking a question

 5   before you respond to it.  Okay?

 6        A.   No problem.

 7        Q.   And your responses should be audible responses,

 8   as you've been doing so far.  No huh-uhs or uh-uhs or

 9   anything like that, please.

10        A.   Yes, sir.

11        Q.   Occasionally your attorney may interject an

12   objection.  But unless you're instructed not to answer,

13   you will have to answer.  Okay?

14        A.   Yes, sir.

15        Q.   And today's deposition is under oath, just as it

16   would be -- just as your testimony would be in court.  So

17   you must give truthful testimony under penalties of

18   perjury.  Do you understand that?

19        A.   Yes, sir.

20        Q.   Okay.  This isn't a marathon by any stretch.  We

21   will be here for a while.  We have quite a bit of ground

22   to cover.  So if at any point you need a break -- if you

23   need a water break, restroom break, lunch break, just let

24   me know and we can certainly do that.  I just ask that if

25   there's a pending question that you let me finish asking
```

```
 1    the question, respond to it, and then we can take that

 2    break.  Okay?

 3         A.  Yes, sir.

 4             MS. ISRAEL:  Mr. Feygin, for planning purposes,

 5         we will definitely need a lunch break.  So if there is

 6         a natural break point as we approach the -- the noon

 7         hour --

 8             MR. FEYGIN:  Sure.  I'll try my best to do it

 9         around noon-ish.

10             MS. ISRAEL:  Thank you.

11    BY MR. FEYGIN:

12         Q.  All righty.  So I don't want you to think I'm

13    implying anything here, but I have to ask this.  Are you

14    under any sort of medications, either prescribed or

15    otherwise, or under the influence of alcohol such that it

16    would prevent you from giving truthful and accurate

17    testimony today?

18         A.  No, sir.

19         Q.  Okay.  What is your name?

20         A.  Robin Byler-Ramaghi.

21         Q.  What is your date of birth?

22         A.  January 1, 1983.

23         Q.  Have you ever been convicted of any felonies or

24    crimes of dishonesty?

25         A.  No, sir.
```

```
 1        Q.   Have you ever been accused of any crimes of

 2   dishonesty or anything that would amount to a felony?

 3        A.   No, sir.

 4        Q.   What is your educational background?

 5        A.   I completed high school.  I completed college.

 6        Q.   Where did you go to college?

 7        A.   Oklahoma State.

 8        Q.   What was your major?

 9        A.   Business management and business administration.

10        Q.   Okay.  Aside from that, do you hold any other

11   degrees?

12        A.   No, sir.

13        Q.   What do you do for a living?

14        A.   I sell cars, sir.

15        Q.   Okay.  And is that at the dealership that is at

16   issue, the defendant in this lawsuit?

17        A.   Yes, sir.

18        Q.   Okay.  And how long have you worked at National?

19        A.   Since July of 2020 -- July, 2013, when we were

20   issued our license by the State of Florida.

21        Q.   Okay.  And what is the dealership's address?

22        A.   6600 Blanding Boulevard.

23        Q.   Is this the same address that my clients

24   purchased the vehicle from?

25        A.   Yes, sir.
```

```
 1        Q.  Okay.  And what is your official position there

 2   at the dealership?

 3        A.  I have the title of general manager/owner.

 4        Q.  Okay.  Is there another owner?

 5        A.  Is there a what?

 6        Q.  Is there another owner?

 7        A.  No, sir.

 8        Q.  Okay.  And do you derive an income from any other

 9   source?

10             MS. ISRAEL:  Object to the form.  This is a

11        corporate rep depo, not a personal depo.

12             MR. FEYGIN:  Okay.

13             MS. ISRAEL:  So I'm going to instruct her not to

14        answer unless there's some relevance to that.  She's

15        not here in her individual capacity.

16   BY MR. FEYGIN:

17        Q.  Do you hold any professional licenses for this

18   business?

19        A.  Yes, sir.

20        Q.  What licenses?

21        A.  The -- I have a finance license, I have a

22   dealer's license, and I hold all of the certificates

23   to legally and lawfully do business in the county in the

24   state of Florida.

25        Q.  Okay.  You mentioned a finance license.  Is that
```

```
 1    through the Office of Financial Regulation?

 2         A.  Yes, sir.

 3         Q.  And you applied for that license yourself?

 4         A.  Yes, sir.

 5         Q.  And the license to operate the dealership, that's

 6    from the DMV?

 7         A.  Yes, sir.

 8         Q.  And you applied for that license yourself?

 9         A.  Yes, sir.

10         Q.  Have you ever been involved in a lawsuit?

11         A.  No, sir.

12         Q.  Has the dealership ever been sued before?

13         A.  No, sir.

14         Q.  Okay.  Did anyone help you prepare for today's

15    deposition, aside from your attorney?

16         A.  No, sir.

17         Q.  Did you speak with anybody to prepare for today's

18    deposition?

19         A.  No, sir.

20         Q.  Okay.  What documents did you review for today's

21    deposition?

22         A.  The file, the interrogatory questions that you

23    sent over through my attorney.

24         Q.  By file -- what do you mean by file?

25         A.  The purchasing file.
```

```
 1          Q.  What documents are in that purchasing file?

 2          A.  Can you please be specific as to what documents

 3   you're referring to?

 4          Q.  The documents that you referred to in that file.

 5          A.  Bill of sale, repossession agreements, finance

 6   agreements, odometer statements.  There are numerous

 7   amounts of documents within that file in which we are

 8   required to turn in and withhold for the DMV as for any

 9   time within our five-year inspection period.

10          Q.  Okay.  If this works as it should, I'm going to

11   try and share my screen.  And this is going to be

12   Plaintiff's Exhibit 1.

13              (Plaintiff's Exhibit 1 identified.)

14              MR. FEYGIN:  Do y'all see this?

15              MS. ISRAEL:  We can see it, but you'll have to

16          continue to scroll it up.  It -- it's kind of large on

17          our end.  That helps.  Although I'll let --

18              THE WITNESS:  That's very small to read.

19              MS. ISRAEL:  I'll let her tell you if she can

20          read it or not.  But yeah.  That --

21              MR. FEYGIN:  Tell me when to stop zooming --

22          zooming in.

23              THE WITNESS:  That's better, sir.

24   BY MR. FEYGIN:

25          Q.  Okay.  I'm on page 1 of plaintiff's notice of
```

```
 1    taking the videotaped deposition of National Automotive's

 2    corporate representative.

 3         A.  Yes, sir.

 4         Q.  I'm going to scroll through this slowly.  I just

 5    finished page 2, just went through page 3, just went

 6    through page 4, just finished page 5, and now I'm at

 7    Schedule A, matters of examination.  So far does this look

 8    familiar to you?

 9         A.  Yes, sir.

10         Q.  When did you first see this document?

11         A.  When my attorney sent it to me.

12         Q.  When was that?

13         A.  In the last approximate week.

14         Q.  Okay.  You are the corporate representative

15    designated by National to testify on these topics; is that

16    correct?

17         A.  Yes, sir.

18         Q.  Okay.  Did you review these topics?

19         A.  Yes, sir.

20         Q.  Is there any topic that you're not prepared to --

21    to -- to discuss today?

22             MS. ISRAEL:  Object to the form.  You can answer.

23    BY MR. FEYGIN:

24         Q.  Your answer?

25         A.  Please be specific in which document you're
```

```
 1    referring to.

 2         Q.  So you had mentioned that you reviewed these

 3    topics of examination.  Is there anything here that you

 4    are not prepared to discuss today?

 5              MS. ISRAEL:  Same objection.

 6    BY MR. FEYGIN:

 7         Q.  So I've just scrolled through all 67 topics.  Is

 8    there anything here you're not prepared to discuss today?

 9         A.  You're referring, sir, to all 67?

10         Q.  Yes, ma'am.

11         A.  I will do so to the best of my ability.

12         Q.  Okay.  I'm going to scroll down to Schedule B,

13    which is the duces tecum request.  Have you seen this

14    document -- or this schedule?

15         A.  Yes, sir.

16         Q.  Okay.  Has National provided us all responsive

17    records in response to these requests?

18         A.  To the best of my knowledge, yes.

19         Q.  Are you aware of any records that have been

20    withheld?

21         A.  No, sir.

22         Q.  Are there any documents with you today that have

23    not been provided to us in advance of this deposition so

24    far?

25         A.  No, sir.
```

```
 1            MS. ISRAEL:  Mr. Feygin, I e-mailed you this
 2       morning 12 additional pages of document production.
 3            MR. FEYGIN:  I did not see that.  I guess we'll
 4       have to deal with it as it comes.
 5            MS. ISRAEL:  That's fine.  I just wanted to flag
 6       that for you in case you had not seen it.
 7            MR. FEYGIN:  I do appreciate it.
 8            MS. ISRAEL:  Sure thing.  So take -- we do have a
 9       hard copy of those pages.  That's why I wanted to
10       mention that.
11            MR. FEYGIN:  Okay.
12  BY MR. FEYGIN:
13       Q.  As to --
14            THE WITNESS:  This thing?
15            MS. ISRAEL:  Yeah.
16       A.  Sorry.
17  BY MR. FEYGIN:
18       Q.  Not a problem.  What documents did you bring with
19  you today?
20            MS. ISRAEL:  We have the documents that we
21       produced.  Hard copies of those documents.
22  BY MR. FEYGIN:
23       Q.  Okay.  Aside from your -- your lawyer's
24  testimony, are there any other documents before you right
25  now?
```

ISIAH ... CR of NATIONAL AUTOM... ROBIN BYLER-RAMAGHI)

```
 1         A.   No, sir.

 2         Q.   How many locations does the dealership have?

 3         A.   One.

 4         Q.   Okay.  How many employees does the dealership

 5    have?

 6         A.   Currently on my payroll, I believe there is about

 7    seven of us total.

 8         Q.   What about at the time of my client's

 9    transaction?

10         A.   I'm sorry.  Can you repeat the question?

11         Q.   What about at the time of my client's

12    transaction?

13         A.   We had less staff at that point.  There may have

14    been five total.

15         Q.   Okay.  Approximately how many cars does the

16    dealership sell per year?

17         A.   300-ish.

18         Q.   Okay.  As the corporate representative for the

19    dealership here -- testifying here today, do you agree

20    that a dealership has a responsibility to know the laws

21    that govern its business?

22              MS. ISRAEL:  Object to the form.  You can answer.

23         A.   Can you please be specific in which laws you're

24    referring to?

25    BY MR. FEYGIN:
```

```
 1          Q.  Sure.  The laws that govern the dealership's
 2     operations.
 3               MS. ISRAEL:  Object to the form.
 4          A.  Can you please rephrase the question, sir?
 5     BY MR. FEYGIN:
 6          Q.  Does a dealership have a responsibility to know
 7     the laws by which it needs to operate under?
 8               MS. ISRAEL:  Same objection.
 9          A.  Again, I will ask respectfully, are you referring
10     to -- what part of operation that you are wanting me to
11     answer, Mr. Feygin?
12     BY MR. FEYGIN:
13          Q.  Sure.  The way in which it sells vehicles to
14     consumers.
15          A.  Yes.  I am aware of the sales laws under my
16     licensing.
17          Q.  Okay.  Does the dealership have a responsibility
18     to know those laws?
19               MS. ISRAEL:  Object to the form.  You can answer.
20          A.  Can you repeat the question?
21     BY MR. FEYGIN:
22          Q.  Do you agree that a dealership must know the laws
23     by which it needs to sell vehicles to consumers?
24               MS. ISRAEL:  Object to the form.
25          A.  If you would please be specific in your question,
```

```
 1    Mr. Feygin, I would be happy to answer that for you.

 2    BY MR. FEYGIN:

 3        Q.  The DMV sets forth regulations by which a

 4    dealership --

 5        A.  I can't understand you, sir.  I'm sorry to

 6    interrupt you.

 7        Q.  Yeah.

 8        A.  But it sounds like you're mumbling when you

 9    covered your face.

10        Q.  Is that better?

11        A.  Slightly.  I do have a -- hard of hearing.  So if

12    you could speak a little louder and clearer, I would very

13    much appreciate that respectfully.

14        Q.  Give me one second.  Let me see if I can alter my

15    audio settings.

16        A.  Thank you for your help.

17            MR. FEYGIN:  Okay.  Can everybody hear me?

18        A.  That's better.  Yes, sir.  It's much clearer.

19            MS. ISRAEL:  Thank you.

20    BY MR. FEYGIN:

21        Q.  So the DMV has regulations by which a dealership

22    can sell vehicles; is that correct?

23        A.  Yes.

24        Q.  Does the dealership need to know those

25    regulations?
```

```
 1        A.   Yes.

 2        Q.   There are regulations promulgated by the Office

 3   of Financial Regulation regarding the way in which

 4   vehicles can be financed; is that correct?

 5        A.   Yes.

 6        Q.   Does a dealership need to know those laws if it

 7   is financing vehicles?

 8        A.   Yes.

 9        Q.   And you have mentioned you are familiar with

10   these laws, correct?

11        A.   Yes.

12             MS. ISRAEL:   Object to the form.

13   BY MR. FEYGIN:

14        Q.   Is it important to National that it be considered

15   an honest company?

16        A.   I'm sorry.  Will you repeat the question?  You

17   phased out there, sir.  Like a glitch.

18        Q.   Is it important to National that its clients

19   trust the representations that are made during a

20   transaction?

21        A.   Yes.

22        Q.   Why?

23        A.   It adheres to our character and integrity, sir.

24        Q.   Is it important to National that it be considered

25   an honest company?
```

ISIAH HARRIS, JR. vs. MANHEIM INTERNATIONAL AUTO SALES     July 16, 2025
CR of NATIONAL AUTOMOTIVE (ROBIN BYLER-RAMAGHI)                    19

Case 3:24-cv-00948-WWB-PDB    Document 69-8    Filed 09/30/25    Page 19 of 204 PageID
2213

```
 1        A.  Yes.

 2        Q.  Why?

 3        A.  Again, it adheres to our integrity and the

 4   ability to sell a vehicle under ethics and just morale.  A

 5   good business practice.

 6        Q.  So in addition to selling vehicles, does the

 7   dealership prepare financing agreements?

 8        A.  Can you repeat that?

 9        Q.  In addition to selling vehicles, does the

10   dealership prepare financing agreements for the vehicles

11   it sells?

12        A.  Yes, sir.

13        Q.  Okay.  Does it assign these financing agreements

14   to third-party lenders?

15        A.  No.  We have not done that in many years.

16        Q.  Okay.  You are exclusively a buy here/pay here

17   dealership?

18        A.  Yes, sir.

19        Q.  Okay.  So regarding your licensure with the DMV,

20   does the DMV require the dealership to take ongoing

21   training courses?

22        A.  I have to complete dealership hours for my

23   licensing every two years, I believe.  Yes.

24        Q.  Okay.  Is this a formal course?

25        A.  Is it a what?
```

```
 1        Q.  Is it a course that you have to go and attend?

 2        A.  No.  It's online.

 3        Q.  Okay.  When was the last course that you took?

 4        A.  This year, sir, upon the renewal of my license.

 5        Q.  Okay.  And you did it personally?

 6        A.  Yes, I did it personally.

 7        Q.  What topics were covered?

 8        A.  I do not remember the time and the date that I

 9   did those credentials.  It was before the deadline.

10        Q.  What topics were covered?

11        A.  Again, I don't remember, sir.  It's updated laws.

12        Q.  Do you recall the name of the --

13            (Speaking at once.)

14        A.  -- et cetera.

15        Q.  My apologies.  Can you repeat that?

16        A.  I'm sorry.  I didn't hear your question.  You

17   were speaking when I was speaking.

18        Q.  Indeed.  And I apologize.  And I asked you to

19   repeat the end of your answer.

20        A.  The credentials that were required -- the

21   additional training hours that we are required to do is

22   usually online, and it is nothing more than updated laws,

23   regulations, things the DMV wants us to include or

24   disinclude from registering the vehicles, sir.

25        Q.  Do you recall the name of the course provider?
```

 1        A.  I do not remember the online course that I used.

 2        Q.  Okay.  Do you have access to those records?

 3        A.  Yes.

 4        Q.  Okay.  Are you able to produce that if asked?

 5        A.  I can absolutely produce those.  Those are

 6   certificates that I have to produce to the DMV.

 7        Q.  Okay.

 8        A.  Those are also obtainable from the Department of

 9   Motor Vehicles, as I have to have that before they can

10   issue my biannual license, sir.

11        Q.  Understood.  Switching gears a little bit.

12   Regarding the inventory, do you only sell used cars?

13        A.  Yes, sir.  It's all I sell.

14        Q.  And where do you get your inventory from?

15        A.  We primarily buy used vehicles from franchise

16   dealers in large packages.

17        Q.  Okay.  How does that sale go about?  Is -- how do

18   you get in contact with the dealership?

19            MS. ISRAEL:  Object to the form.

20        A.  I'd like you to please be specific.  Are you

21   asking --

22   BY MR. FEYGIN:

23        Q.  How do you find these vehicles?

24        A.  We have various franchise dealers, wholesale

25   managers, used car managers that we deal with, sir.

```
1        Q.  And do you use auctions?

2        A.  We rarely purchase from an auction.  We do run

3   our vehicles through the auction, sir.

4        Q.  What do you mean by run the vehicles through the

5   auction?

6        A.  We wholesale our higher-end vehicles to other

7   dealers through a dealer-only auction.

8        Q.  Would that be Manheim?

9        A.  Yes, sir.

10       Q.  Anything with IAAI?

11       A.  No, sir.

12       Q.  Copart?

13       A.  What?  What?

14       Q.  What about Copart?

15       A.  Did you say crow box?

16       Q.  Copart, C-O-P-A-R-T.

17       A.  No, sir.  That's an insurance auction.  We do not

18  sell anything through Copart.  Never have.

19       Q.  And when you purchase a vehicle wholesale from

20  another dealership, how do you remit payment usually?

21       A.  Can you please restate your question?

22       Q.  When you buy a vehicle wholesale from a

23  dealership, how do you pay for it?

24       A.  When the title is there, sir.

25       Q.  How do you pay for it?
```

 1          A.   By check or credit card.

 2          Q.   And these funds come from a business account of

 3     the business and not a loan, correct?

 4          A.   Correct.

 5          Q.   No floor plan?

 6          A.   No floor plan.

 7          Q.   So when you find a vehicle that you want to

 8     purchase for inventory purposes, does anybody at National

 9     personally inspect the vehicle prior to the purchase?

10          A.   No.

11          Q.   Does the dealership ever hire a third party to

12     inspect the vehicle?

13          A.   Prior to our purchase from a franchise dealer?

14          Q.   Yeah.

15          A.   Is that your specific question?

16          Q.   Yes, ma'am.

17          A.   The answer is no.

18          Q.   What does the dealership do to verify the mileage

19     on vehicles it purchases for resale?

20          A.   We do not verify the mileage, sir.

21          Q.   What criteria does the dealership use to select

22     used vehicles for its inventory?

23          A.   VIN, make, and model.

24          Q.   Does the dealership focus on a typical -- on a --

25     on a particular type of vehicle?

```
 1        A.  No, sir.

 2        Q.  Does the dealership focus on particular years?

 3        A.  No, sir.

 4        Q.  Does the dealership focus on consumer vehicles or

 5   commercial vehicles?

 6            MS. ISRAEL:  Object to the form.  You can answer.

 7   BY MR. FEYGIN:

 8        Q.  I can -- I can rephrase that.  Does the

 9   dealership purchase for resale any type of consumer

10   vehicles?

11        A.  Yes.

12        Q.  What about commercial vehicles?

13        A.  No.

14        Q.  When you first get a used car on your lot for

15   purposes of resale, what do you do with it?

16        A.  Are you asking what my step-by-step process is?

17        Q.  Yes.

18        A.  Such as an interrogatory for what is my business

19   practice?

20        Q.  No.  I'm asking you what your step-by-step

21   process is when you purchase a vehicle for resale and get

22   it on your lot.

23        A.  When the vehicle hits my lot, it is set in line.

24   It is then scheduled to go to the back, which means it

25   goes into our mechanical base.  As soon as our mechanic
```

```
 1   has the time, it is put on the lift to ensure there is no

 2   failures on engine, transmission, brakes, et cetera.  If

 3   those repairs are found to be excessive, we scrap

 4   the vehicle, send it to the auction to be resold.  If the

 5   vehicle has little refurbishments needed, we will change

 6   the oil, change the filter, put the GPS's on, detail the

 7   vehicle, make any minor repairs that may be needed, pull

 8   it back out.  It is then set in the line for our sales

 9   team to sticker the vehicle; meaning, a down payment goes

10   on the window in bright neon letters.  And it is pulled

11   out for sale, sir.

12        Q.  Okay.  Lots to unpack there.  So you're going to

13   have to bear with me.  Are there any written policies and

14   procedures regarding how dealership employees are to

15   complete this inspection?

16        A.  No, sir.  They're just trained verbally.

17        Q.  Okay.  And who does that training?

18        A.  I do.

19        Q.  Okay.  And what is your mechanical background?

20        A.  I --

21            MS. ISRAEL:  Object to the form.

22   BY MR. FEYGIN:

23        Q.  Go ahead.

24            MS. ISRAEL:  You can answer the question.

25        A.  I am not a licensed mechanic.
```

```
 1    BY MR. FEYGIN:

 2         Q.  How do you know what to train them to look for

 3    then?

 4         A.  I hire certified mechanics or mechanics that have

 5    a very vast background in mechanics.

 6         Q.  How many mechanics do you have on staff?

 7         A.  One.

 8         Q.  Okay.  How many mechanics did you have on staff

 9    during my clients' transaction?

10         A.  It's the same mechanic that is currently employed

11    with me.  One.

12         Q.  What is his certifications?

13         A.  ASC, Chevy.  He is two other certified.  He is

14    certified to install, repair AC systems.

15         Q.  What is his name?

16         A.  Pearson.

17         Q.  Is that his first name or last name?

18         A.  First name.

19         Q.  What is his last name?

20         A.  Sautterwausky.

21         Q.  You're going to have to spell that for me, ma'am.

22         A.  Sautterwausky.

23              MS. ISRAEL:  If you can.

24    BY MR. FEYGIN:

25         Q.  If you can't, then we'll -- we'll just ask you
```

 1    informally to provide it afterwards.

 2         A.   Are you asking me to spell his last name, sir?

 3         Q.   If you are able to, yes.

 4         A.   S-A-U-T-T-E-R-W-A-U-S-K-Y.

 5         Q.   I would have never in a million years gotten

 6    that.

 7              MS. ISRAEL:  I'm impressed.

 8    BY MR. FEYGIN:

 9         Q.   So one thing that you guys have -- when it seems

10    to be, like, repair bays -- how many repair bays do you

11    have?

12         A.   He is the only one that does the repairs.  If he

13    is unable to do the repairs, we have outsourced any and

14    all repairs or diagnostics or computers or tools that we

15    do not currently own to a franchise dealer locally.

16         Q.   All right.  And what franchise is that?

17         A.   I am in charge of that.

18         Q.   Which franchise dealership?

19         A.   We have used various dealerships, depending on

20    the make and the model of the vehicle, sir.  I would not

21    send a Mercedes to a Chevy dealership.

22         Q.   I certainly would hope so.  So, you know, taking

23    a step back here.  The question that I originally asked

24    was, how many bays do you have in your repair shop?

25         A.   I am sorry.  I couldn't hear you.  You were

ISIAH ... ... ... ... AL AU ...

CR of NATIONAL AUTOMOB... ROBIN BYLER-RAMAGHI)

```
 1    bleaking --

 2            MS. ISRAEL:  Yeah.

 3    A.  -- out a little bit.

 4            MS. ISRAEL:  Mr. Feygin, it's -- it's getting --

 5    it is a little fuzzy.  So there's a -- either some

 6    interference or it's just a little bit gargled.  I

 7    apologize.

 8            MR. FEYGIN:  Jordan, are you having any troubles

 9    with me?  You're nodding your head no.

10    Wendy, do you have any trouble with me?

11            COURT REPORTER:  I do.  I'm hearing what they are

12    hearing.

13            MR. FEYGIN:  Okay.  So what I am going to do is,

14    I'm going to turn my video off.  Maybe it's a

15    bandwidth issue.  If that's okay with everybody.

16            MS. ISRAEL:  Certainly.  Yeah.  I don't -- I

17    didn't know if it was a volume issue or -- but in any

18    event, thank you.  I'm sorry we are --

19            THE WITNESS:  I'm just hearing a blurb and then a

20    word and a blurb and a word.

21            MR. FEYGIN:  How about now?  Better?  Let me try

22    a different audio device.

23            MS. ISRAEL:  That -- whatever you're saying now

24    is coming through much clearer than your prior

25    question.  It's like as if you were in -- on top of a
```

```
 1        microphone and it starts to --

 2             THE WITNESS:  Fuzz out.

 3             MS. ISRAEL:  -- get fuzzy.  Yeah.

 4             MR. FEYGIN:  How about now?

 5             THE WITNESS:  That sounds like you're in a

 6        tunnel --

 7             MS. ISRAEL:  Now it's really low.

 8             THE WITNESS:  -- far away.

 9             MS. ISRAEL:  Yeah.

10             THE VIDEOGRAPHER:  Would you like to go off the

11        record and figure this out?

12             MS. ISRAEL:  Yes, please.  For a quick second.

13             THE VIDEOGRAPHER:  Off the record at 11:06.

14             (Off the record.)

15             THE VIDEOGRAPHER:  Back on the record at 11:06.

16             THE WITNESS:  Or like somebody is, like, a

17        kindergartner, going (making sound).

18             MS. ISRAEL:  Okay.  We're on the record.  So

19        yeah.

20   BY MR. FEYGIN:

21        Q.  All righty.  So back on the record here.  The

22   question that I was asking before we went off was, how

23   many repair bays do you have at the dealership?

24        A.  Five.  Monday through Friday.

25        Q.  Okay.  What I'm trying to find out is, how many
```

```
 1    spots do you have inside of the repair shop to service

 2    vehicles?

 3         A.  We have one repair space at the dealership, sir.

 4         Q.  How many lifts do you have?

 5         A.  Three.

 6         Q.  Okay.  Going to the inspection process.  You

 7    mentioned that there's a few things that are done.

 8    Obviously the vehicle is put on a lift, correct?

 9         A.  It's what?  I can't -- I can't hear.  It's so

10    fuzzy again.

11             MS. ISRAEL:  Okay.  Ask him -- ask him to repeat

12         it.

13         A.  Can you please repeat the question, sir?  You're

14    very fuzzy, like you're going in and out or like it's

15    (making sound) sounding.

16             MR. FEYGIN:  Is anybody else having that issue?

17             COURT REPORTER:  It sounds clear to me.

18             MS. ISRAEL:  Mr. Feygin, she told you she has --

19         she has a hearing disability.  So --

20             MR. FEYGIN:  I -- ma'am, I understand.  I'm

21         trying to figure out if there's something that I need

22         to do to alter my microphone again or if I just need

23         to start, you know, speaking closer to it, which

24         I'm --

25             THE WITNESS:  Maybe closer to the mic could be
```

 1          helpful, if that's at all possible to ask.

 2              MR. FEYGIN:  Yes, ma'am.  Yes, ma'am.  Is this

 3          better?  Is this --

 4              MS. ISRAEL:  Can you -- try one more time,

 5          please.

 6              MR. FEYGIN:  Is this better?

 7              THE WITNESS:  Yes, sir.  Thank you.

 8              MR. FEYGIN:  Certainly.  My apologies for that.

 9              THE WITNESS:  No worries.

10   BY MR. FEYGIN:

11          Q.  So you had mentioned the vehicles are put on the

12   lift for the inspection, correct?

13          A.  Yes, sir.

14          Q.  Is every vehicle put on a lift?

15          A.  Yes, sir.  Every vehicle that comes into my lot

16   does get an inspection.

17          Q.  Okay.  How is the vehicle inspected?

18          A.  Any vehicle or this particular vehicle?  Could

19   you please be specific in your question?

20          Q.  At this time, we're talking about the general

21   process, not the specific vehicle.

22          A.  Generalistically, every car comes in.  It is

23   lined up in our service lineup on a row.  As our mechanic

24   is able to finish or complete one customer's job, he will

25   then pull the vehicle in.  He looks at the undercarriage

 1    of the vehicle.  He looks at the engine.  He will ensure

 2    that the compression is holding.  He shifts the vehicle

 3    while it is on a lift to ensure that the transmission

 4    properly shifts.  We check the headlights and the

 5    taillights, safety issue, law issue.

 6            We then pull it off the lift.  It is driven

 7    fairly well, down gliding on the highway, around.

 8    Therefore, speed, agility, alignment, et cetera, are

 9    checked.  Comes back to the dealership.  It is put back on

10    a lift for an oil change, and any work order that could be

11    needed for that vehicle -- brakes, rotors, censors, plugs,

12    coils, et cetera -- should be made, is made, and is

13    ordered.  If the parts are not to be received the same

14    day, it is pulled back out onto the service line.  We wait

15    for the parts to be delivered from wherever that part

16    facility may be.  We have several.

17            Once the parts are there, the vehicle is fixed.

18    Once the vehicle is fixed, oil changed, any smaller

19    repairs, GPS is inserted into the vehicle.  Everything is

20    assumed safe for a customer to drive off, put their family

21    in.  We pull it out and put it on a detail line.  The

22    detailer comes three times a week.  That detailer then

23    cleans, shampoos, et cetera.  It is then pulled out for

24    our sales team, meaning Chris or I.  We put the stickers

25    for the down payment on the vehicle, and then it is put in

ISIAH ... (NATIONAL AUTOMOBILE ... AUTO ... 9/30/2025
CR of NATIONAL AUTOMOBILE (ROBIN BYLER-RAMAGHI)
Case 3:24-cv-00948-WWB-PDB    Document 69-8    Filed 09/30/25    Page 33 of 204 PageID
2227

33

```
 1   an appropriate space where the other like vehicles are on

 2   the lot.

 3        Q.  Okay.  You mentioned that there's a detailer.  Is

 4   it the same individual that you use every time, or is it a

 5   company that sends somebody out?

 6        A.  No, sir.  We have a mobile detailer we've used

 7   for three or four years, sir.

 8        Q.  Okay.  Would that --

 9        A.  We have an alternate source for general easy

10   cleanings.  It's very local to town.

11        Q.  Okay.  And this detailer, was he the one that

12   detailed my clients' car?

13        A.  I am unsure, sir.

14        Q.  And who would know?

15        A.  I would have to go back and look at records three

16   or four years ago.  That's not any real issue of things we

17   normally keep.

18        Q.  Okay.  The records may exist?

19        A.  I can look, sir, but I am unsure.

20        Q.  During the inspection process, is a checklist or

21   some sort of log used?

22        A.  We do have a very simple checklist that I ensure

23   the mechanics do.  Yes.

24        Q.  Okay.  How is this checklist kept?

25        A.  They -- he takes the car back.  He checks off
```

```
 1    mechanic is good; meaning, engine, transmission,

 2    headlights, taillights, tag lights, brakes, rotors,

 3    compression is being held, radio works.  Check, check,

 4    check.  It's done.  We keep those for approximately six to

 5    12 months and they are disposed.  There is nothing legal

 6    that says we need to keep them any longer than that.

 7         Q.  Are they ever scanned in?

 8         A.  I'm sorry, sir.  Will you repeat?

 9         Q.  Are they ever scanned in?

10         A.  Are they ever standing?

11         Q.  Scanned in.

12             MS. ISRAEL:  Scanned.

13             THE WITNESS:  Oh, scanned.

14             MS. ISRAEL:  Scanned in.  Yes.

15         A.  No, sir.  We are a very old-skill dealership.

16    Technology is not a forthcoming issue with us.

17    BY MR. FEYGIN:

18         Q.  So you had mentioned that some vehicles don't

19    pass the inspection process and they get resold at

20    auction.  Is that accurate?

21         A.  Yes.

22         Q.  At what points or at what -- where -- where is

23    the line as to what you're willing to repair versus what

24    goes to the auction?

25             MS. ISRAEL:  Object to the form.  You can answer.
```

```
 1        A.  Will you be specific in what you're asking me?

 2   BY MR. FEYGIN:

 3        Q.  Sure.  At what point does a vehicle end up going

 4   to the auction as opposed to being repaired?

 5            MS. ISRAEL:  Object to the form.

 6   BY MR. FEYGIN:

 7        Q.  Ma'am, you can answer.

 8            MS. ISRAEL:  Did you -- yeah.  You can answer if

 9        you --

10        A.  If repairs are too expensive, sir, or they

11   surpass the amount of the vehicle that we would be able to

12   purchase it for or anywhere close, it is not worth our

13   time, money, et cetera.  A second credential that would

14   qualify a vehicle to be pulled off the lift and sent back

15   to the auction is if parts are not readily available, car

16   exceeds a certain year, parts are back-ordered, et cetera.

17   BY MR. FEYGIN:

18        Q.  Is there a firm monetary percentage --

19        A.  If it --

20        Q.  -- that you rely upon?

21            MS. ISRAEL:  Object to the form.

22        A.  If any repair exceeds 50-plus percent of what I

23   have hard money in the vehicle, I will not repair it.

24   BY MR. FEYGIN:

25        Q.  Do you ever conduct a vehicle history search on
```

 1    used cars prior to putting them up for sale?

 2          A.  Did I what, sir?  Please rephrase the question or

 3    repeat.

 4          Q.  Do you ever conduct a vehicle history search such

 5    as a Carfax or AutoCheck report prior to putting a vehicle

 6    up for sale?

 7          A.  No, sir.

 8          Q.  Okay.  How difficult is it to obtain one of these

 9    reports?

10          A.  How what?

11          Q.  How difficult --

12          A.  I can't hear you.

13          Q.  How difficult is it to obtain one of these

14    reports?

15          A.  I have a very small staff, sir.  That is a lot of

16    time and labor.  It's not something that we do on a

17    regular basis.

18          Q.  But you do it occasionally?

19          A.  Maybe twice in almost 15 years of owning my

20    business, and those were a specialty vehicle, sir.

21          Q.  Fair to say that you do not have an account with

22    Carfax, AutoCheck, or a similar provider?

23          A.  That is correct.

24          Q.  Who determines the price that a vehicle is sold

25    for?

```
 1          A.   Please be specific in your question, sir.

 2          Q.   Who at the dealership determines the price that a

 3   vehicle gets put up for sale for?

 4          A.   I do.

 5          Q.   Anybody else?

 6          A.   No one else decides that number but me.

 7          Q.   What factors come into the decision for how much

 8   a vehicle is sold for?

 9          A.   How much I have in the vehicle to purchase it,

10   how much I have in transport, how much my overhead cost

11   is, what I expect the profitability to be, assuming that

12   the car would pay out over the term that is financed.

13          Q.   And where does the dealership usually advertise

14   its vehicles for sale?

15          A.   Facebook, Marketplace in particular.

16          Q.   Anywhere else?

17          A.   Not in ten-plus years, sir.

18          Q.   Who's responsible for putting the vehicles up on

19   ads?

20          A.   The last three and a half, almost four years,

21   Chris does.

22          Q.   Okay.  And it's safe to assume that Chris

23   advertised my clients' vehicle?

24          A.   I do not know for sure, sir.

25          Q.   Okay.  Who does know that?
```

```
 1        A.  Who what?  I'm sorry?

 2        Q.  Who would know?

 3            MS. ISRAEL:  Object to the form.

 4   BY MR. FEYGIN:

 5        Q.  You can answer.

 6        A.  It could possibly be him.

 7        Q.  I understand that.  But who would know for

 8   certain who advertised this vehicle?

 9        A.  I have no idea, sir.

10        Q.  Based upon your experience, are consumers drawn

11   to lower mileage vehicles?

12        A.  Is it -- that sound jumbled.

13            MS. ISRAEL:  I -- I agree.  Mr. Feygin, we were

14        not able to fully hear that question.  I apologize.

15   BY MR. FEYGIN:

16        Q.  Based upon your experience -- can you hear me

17   better now?

18            THE WITNESS:  Now it sounds like he's talking --

19            MS. ISRAEL:  It's worse on this end.  It got

20        lower.

21            THE WITNESS:  It almost sounds like you're using

22        a voice thing, sir, or you're in a very long tunnel.

23   BY MR. FEYGIN:

24        Q.  Based upon your experience, are consumers drawn

25   to lower mileage vehicles?
```

1          THE WITNESS:  I still can't hear him.

2          MS. ISRAEL:  She's not able to hear you, Mr.

3     Feygin.  It's gotten lower and as if you are in a

4     tunnel.

5          COURT REPORTER:  Can I go off the record for just

6     a second, please?

7          MS. ISRAEL:  Yes, of course.

8          THE VIDEOGRAPHER:  Off the record at 11:19.

9          (Off the record.)

10          THE VIDEOGRAPHER:  Back on the record at 11:27.

11   BY MR. FEYGIN:

12     Q.  So, Ms. Ramaghi, based upon your experience, are

13   consumers drawn to vehicles with lower miles?

14          MS. ISRAEL:  Object to the form.

15     A.  I would say that is a personal preference, sir.

16   BY MR. FEYGIN:

17     Q.  Okay.  And how does mileage affect a vehicle's

18   sales price?

19     A.  It does not always affect the sales price at my

20   dealership, sir.

21     Q.  Okay.  And in what instances would it?

22     A.  The -- it's more about the condition of the car.

23   A car is beat up crazy, it's not going to sell for as

24   much.  If it has a pretty body, which is the majority of

25   my clientele are looking for, something that looks nice,

```
 1    mileage doesn't always appear to be a concern to them.

 2        Q.  Okay.  So how are titles typically delivered to

 3    National for the vehicles that it purchases?

 4        A.  They are picked up on Mondays from one dealership

 5    or franchise dealership.  They're picked up on Saturdays

 6    from another dealership.  And they are held off-site, sir.

 7        Q.  Okay.  And is that a -- scratch that.  Who goes

 8    to pick those titles up?

 9        A.  There is -- a lot of times me.

10        Q.  Are titles ever delivered by mail?

11        A.  There have been in the past, yes, sir.  USPS,

12    FedEx.

13        Q.  Are titles ever left in the vehicle?

14        A.  No.

15        Q.  So what does National do once it receives a title

16    for a vehicle it intends on reselling?

17        A.  Are you asking my specific procedure once I

18    receive the title, sir?  Because what you're asking seems

19    to be a very vague question to me.

20        Q.  I'm asking for National's procedure.

21        A.  My procedure, once I receive title, I review it

22    to ensure everybody has properly signed, proper

23    endorsements, affidavits, et cetera, are there.  If there

24    are any concerns, those are immediately addressed, sir.

25        Q.  Who usually signs the title on behalf of
```

1    National?

2         A.  Me.

3         Q.  Who has authority to sign titles on behalf of

4    National?

5         A.  Me.

6         Q.  Anybody else?

7         A.  Not in the last several years, sir.

8         Q.  What about during my client's transaction?

9         A.  Nobody but me.

10        Q.  And once you get that title, is it scanned in and

11   saved somewhere?

12        A.  No, sir.

13        Q.  How is the hard copy held?

14        A.  It is held off-site, like I previously stated,

15   sir.

16        Q.  Where is this off-site storage?

17        A.  At my personal residence.

18        Q.  Okay.  And who has access to the title, aside

19   from you?

20        A.  Me.

21        Q.  Nobody else?

22        A.  No one else, sir.

23        Q.  Going through a purchase transaction generally.

24   When somebody walks into the dealership, who's the first

25   person that greets them usually?

ISIAH [illegible] (as [illegible] OF NATIONAL AUTO[illegible]      Case 3:24-cv-00948-WWB-PDB      Document 69-8      Filed 09/30/25      Page 42 of 204 PageID 2025

CR of NATIONAL AUTOM[illegible] (ROBIN BYLER-RAMAGHI)      2236

42

```
 1              MS. ISRAEL:  Object to the form.  You can answer.

 2         A.  A person walking in -- or on the dealership lot

 3    is generally met by a salesperson.

 4    BY MR. FEYGIN:

 5         Q.  Okay.  And then what happens?

 6         A.  We greet them, ask them how they are.  There may

 7    be small talk.  Ask them if they're looking to pay cash or

 8    finance, what they are interested in.  The same questions

 9    as any other dealership is going to ask.  Tell them to

10    look around.  We do not hover.  We do not babysit.  We

11    allow them their personal space.  If they have questions,

12    we kind of stay in the background and they will find us,

13    wave at us, get us their -- get us -- attention somehow.

14    Sometimes walk up to us.  Sometimes wave at us.  At that

15    point, we will reapproach the customer to answer any

16    questions they may have.

17         Q.  Okay.  And are they allowed to take the vehicle

18    on a test drive?

19         A.  Yes, sir.  I will not sell a vehicle --

20         Q.  Who --

21         A.  -- without their test driving.

22         Q.  Who accompanies the client on a test drive?

23         A.  The clients did not have an accompaniment on the

24    test drive.  They were allowed to go by themselves.

25         Q.  And just to clarify.  This is across the board
```

 1   generally?  Nobody accompanies the test drives?

 2        A.  Wait.  What did you ask?  I'm so sorry.

 3        Q.  With respect to the general process, okay, does

 4   somebody usually accompany a purchaser or are they allowed

 5   to go on the test drive by themselves?

 6        A.  Many times we allow our customers to leave their

 7   driver's license.  At least a copy of it.  They are given

 8   a dealer tag.  They are asked to test drive the vehicle.

 9   And so far we've had no issues with that.

10        Q.  Once a decision is made to buy a vehicle, where

11   does the consumer go to sign the paperwork?

12        A.  Where would the customer go to find the paper?

13            MS. ISRAEL:  Sign.  To sign.

14        A.  Sign.  I'm sorry.  To sign the paperwork?  Once

15   the test drive is done, they decide they would like to

16   purchase it, they are brought into a business office.

17   BY MR. FEYGIN:

18        Q.  And how many business offices are there?

19        A.  There is one, sir.

20        Q.  Okay.  Are the signing processees -- processes

21   recorded?

22        A.  We have cameras in the office.  But, no, they are

23   not recorded specifically.

24        Q.  Okay.  What is your video storage policy?  How

25   long do you retain those videos?

ISIAH [...] CR of NATIONAL AUTOM[...] ROBIN BYLER-RAMAGHI)

```
 1          A.   30-day loop, sir.

 2          Q.   And by any chance did you save the video from my

 3   client's transaction?

 4          A.   No, sir.  There would have been no reason to.

 5   There was nothing out of the ordinary with this

 6   transaction that would prompt me to do so.

 7          Q.   And you may have mentioned this before, or at

 8   least insinuated.  But I'm assuming that all of the

 9   contracts are presented in hard copy?

10          A.   All contracts are presented in hard copies, yes,

11   sir.

12          Q.   So there are absolutely no electronic records of

13   these documents?

14          A.   No, sir.

15          Q.   What's usually the first document that gets

16   presented?

17          A.   A credit application.

18          Q.   Okay.  After that?

19          A.   They are given a packet that has their insurance

20   information detailing what we do accept, what they are to

21   get, e-mails in which those binders or declarations page

22   can do.  There is a reference page in which they are

23   required to fill out.  There are referral bonus pages in

24   there.  And that is it, sir.

25          Q.   Okay.  What else -- what other documents are they
```

```
 1   provided?

 2        A.  After all of those are completed, we have two

 3   other documents that the customers are given to complete.

 4   That is a cover sheet for the DMV that has their private

 5   information -- name, driver's license, date of birth --

 6   and any previous tags that they would like to use for a

 7   tag credit, a new tag, transfer.  They need to fill in

 8   that tag information.  And the other one is -- should the

 9   customer need a replacement tag, the DMV now requires a

10   customer to sign a document that requires them to

11   acknowledge that that tag credit is being used.

12        Q.  Okay.  And after that set of documents?

13        A.  There are no other documents until the paperwork,

14   the contract, bill of sale, odometer statements, et

15   cetera, are generated.

16        Q.  Okay.  Who generates those documents usually?

17        A.  Either Chris or myself.

18        Q.  Once the odometer documents and all that is

19   generated, then what happens?

20        A.  I'm sorry.  I didn't get your question.  I didn't

21   hear it completely.

22        Q.  After -- after the last batch of documents that

23   you just referenced gets populated, what happens then?

24        A.  The customer is given documents to review.  We

25   highlight their signature areas.  Often clients ask to
```

ISIAH [illegible] NATIONAL AUTO[illegible] Case 3:24-cv-00948-WWB-PDB    Document 69-8    Filed 09/30/25    Page 46 of 204 PageID [illegible]2025
CR of NATIONAL AUTOM[illegible](ROBIN BYLER-RAMAGHI)
2240
46

```
 1    review those prior to signing.  Sometimes clients do not

 2    want to review.  They do not read what they are signing.

 3    They are too excited to get a vehicle and leave with it.

 4    So they sign.  Chris and I go over very explicit with what

 5    they are signing.  If they choose to listen, that is on

 6    them.  We ask them for their signatures in all of the

 7    legal appropriate places.  That is the end.

 8         Q.  Okay.  How long does it take usually to complete

 9    this entire process?

10         A.  From the time they walk in the building, sir, to

11    the time they are given copies and leave, approximately an

12    hour.  That is a give-or-take situation, depending on if

13    they have to shop for insurance and how long it takes them

14    to pay those down payments, premiums, et cetera, and the

15    insurance agent to send over declaration or binder pages.

16         Q.  So once the deal is signed, then what happens?

17         A.  What?  What?

18         Q.  Once those documents that we've just been

19    discussing have been signed, then what happens?

20         A.  The documents --

21              MS. ISRAEL:  Mr. Feygin, I'm going to repeat --

22         yeah.  I'm going to repeat it.  You can correct me if

23         I don't state it correctly.

24              He said once those documents are signed, then

25         what happens.
```

ISIAH _____ (CORPORATE _____AL AUTO _____ 2025
CR of NATIONAL AUTOM____(_____ROBIN BYLER-RAMAGHI)

Case 3:24-cv-00948-WWB-PDB    Document 69-8    Filed 09/30/25    Page 47 of 204 PageID
2241

47

```
 1        A.  Once those documents are signed, signatures are

 2   placed by the corporate representative, myself or Chris,

 3   then they are put in the copier for the customers to take

 4   copies.  We put the tag -- temporary tag or a hard plate,

 5   whichever one they have with them or need.  We fold up

 6   copies of their ID cards and their registration in which

 7   they are given.  We, as a courtesy, place that in the

 8   glove box for them or in their copied paperwork.  They are

 9   given that.  The customer generally leaves after that.

10   BY MR. FEYGIN:

11        Q.  Okay.  And going to take two steps backwards

12   here.  How long has Chris been working with you all?

13        A.  Approximately three years, sir.

14        Q.  Okay.  And what is his position there?  What is

15   his official title?

16        A.  Sales manager, salesman.  He kind of wears both

17   hats.

18        Q.  Okay.  So once the deal is done, consumer leaves,

19   how does the dealership submit the title documents to the

20   DMV?

21        A.  After all of the signed and executed documents

22   are brought to my office, the titles are pulled generally

23   within 48 hours when I pull them from my home residence.

24   They are completed, any boxes checked, dates filled in.

25   On our side.  Such as -- I didn't sign a date for the
```

```
 1    title application.  Just giving you that little, small

 2    piece of information.  Those are filled out.  Title is

 3    completed.  And we are -- make copies of those.  Copies

 4    are kept in the folder on a rack.  All of the originals

 5    are then paper clipped with a cover sheet and sent to the

 6    Department of Motor Vehicles for registering.

 7        Q.  Okay.  How often does the dealership complete

 8    title disclosures without the presence of the consumer?

 9        A.  How long --

10            MS. ISRAEL:  Hang on.  I need to object to the

11        form of that.  Sorry.

12        A.  Can you be very specific --

13    BY MR. FEYGIN:

14        Q.  How -- how -- you just mentioned that --

15        A.  -- in what you're asking me, sir?

16        Q.  I'm sorry?

17        A.  Can you rephrase that?

18        Q.  Sure.  You had just mentioned that you go through

19    the title documents and make sure that everything is

20    checked off before submitting to the DMV after you got

21    them from your personal residence.  Is that accurate?

22        A.  After everything is completed and the title is

23    completed, yes, it is put into a folder to go to the DMV.

24    Correct.

25        Q.  Okay.  How often does that occur?
```

```
 1              MS. ISRAEL:  Object to the form.

 2    BY MR. FEYGIN:

 3         Q.  You can answer.

 4         A.  Every situation is different, sir.  I may only

 5    have one a week.  I may have 40.  Depending on the season.

 6    My practice has been to do title work once a week and to

 7    drop it off at the DMV once a week.  The DMV then has

 8    their own timeline in which to execute, process, issue

 9    tags, decals, registrations, et cetera.

10         Q.  Okay.  What is the dealer management software

11    used by the dealership?

12         A.  What is the what?

13         Q.  DMS provider, the dealer management software.

14         A.  Wayne Reaves, sir.

15         Q.  You guys are not a licensed EFS agent, are you?

16         A.  Not a licensed what, sir?

17         Q.  EFS.

18         A.  I don't know what that is, sir.  Can you -- I

19    don't know what that is.

20         Q.  Are you -- are you able to electronically

21    transmit titles to the DMV?

22         A.  No, sir.

23         Q.  Are there any written policies and procedures

24    regarding how dealership employees are required to

25    complete the purchase and sale documents that we have just
```

1    discussed?

2        A.  Anybody that handles documents outside of myself

3    is trained that everything is signed in front of the

4    customer at all times.  Nobody leaves without properly

5    executed documents, sir.

6        Q.  Okay.  And is that policy written down anywhere?

7        A.  Is that policy what, sir?

8            MS. ISRAEL:  Written down.  Written down

9        anywhere.

10       A.  No, sir.  That is how I train my employees.

11   BY MR. FEYGIN:

12       Q.  How do you train the employees?  Do they shadow

13   you?

14       A.  Yes, sir.

15       Q.  Do you sit down with them and explain step by

16   step?

17       A.  Yes, sir.

18       Q.  How often does that occur?

19       A.  Whenever a new -- a new hire is employed.  I do

20   not have a high turnover, sir.

21       Q.  Okay.  So switching gears to my clients'

22   transaction.  How did you locate the Equinox?

23       A.  How did I locate the vehicle?

24           MS. ISRAEL:  The Equinox.

25   BY MR. FEYGIN:

```
 1          Q.   Yes.

 2          A.   I need you to be specific on your question, sir.

 3    Are you asking me for the title information?  Is -- that

 4    is what you were previously asking?  Are you asking me how

 5    did I locate the vehicle upon the original purchase?

 6          Q.   The original purchase.

 7          A.   That was in a lot of wholesale purchases from

 8    Murray Ford, sir.

 9          Q.   When did National purchase the Equinox from

10    Murray Ford?

11          A.   I'm unsure the exact date.

12          Q.   Who was responsible for that purchase?

13          A.   I have a representative, sir, that often helps

14    me.

15          Q.   Okay.  And did you speak with them to prepare for

16    today's deposition?

17          A.   Did I speak with them to prepare what?

18          Q.   For today's deposition.

19          A.   No, sir.

20          Q.   Are you able to if you wanted to?

21          A.   I could speak to a lot of people regarding today,

22    sir, but confidentiality is confidentiality.

23          Q.   I'm not sure that I understand the

24    confidentiality.  Can you explain that to me?

25               MS. ISRAEL:  Object to the form.
```

```
 1          MR. FEYGIN:  I'm trying to get clarification

 2      about what's confidential.

 3          MS. ISRAEL:  Can you restate -- well, re -- can

 4      you restate your original question then?  I thought

 5      you were asking about preparing for the deposition.

 6      But just restate it if you don't mind.

 7          THE WITNESS:  I thought too.

 8          MS. ISRAEL:  Yeah.  Well, let him -- let him

 9      resay it just in case we missed something.

10  BY MR. FEYGIN:

11      Q.  If you wanted to, are you able to contact this

12  agent?

13      A.  Am I able to contact the agent?  Yes.

14      Q.  Yes.  Okay.  What is this agent's name?

15      A.  Reza.

16      Q.  Okay.  Last name?

17      A.  Last name is Ramaghi.

18      Q.  Okay.  And what is his relationship to you?

19      A.  It's my husband.

20      Q.  Is he employed by the dealership?

21      A.  No.

22      Q.  Who is he employed by?

23      A.  He is not employed by National Automotive.

24      Q.  Okay.  But he acts as National's agent?

25      A.  He was given authority to buy these groups of
```

```
 1   wholesale.  Yes.

 2        Q.  So what factors influenced National to make the

 3   decision to purchase this Equinox?

 4        A.  I'm sorry.  I was coughing, sir.  Would you

 5   repeat?

 6        Q.  Sure.  What factors influenced National to make

 7   the decision to purchase the Equinox?

 8        A.  What factors does my agent use to purchase the

 9   Equinox?  Was that your question, sir?

10        Q.  Not quite.  What factors influenced National to

11   make the decision to purchase this Equinox?

12        A.  It was in a lot of cars in which the used car

13   manager offered us to purchase, sir.

14        Q.  Did price play into it?

15        A.  No.

16        Q.  Did the vehicle's condition play into it?

17        A.  No.

18        Q.  Did the vehicle's mileage play into it?

19        A.  No.

20        Q.  So what did?

21        A.  The fact that it was a part of a large group of

22   cars, our agreement with previous dealers.  Franchise

23   dealers in particular.  So when these wholesale groups are

24   available, it's an all or nothing.  We purchase all.  Some

25   of them are crap.  Some of them are home runs.  Some of
```

```
 1   them are great for resale.
 2        Q.  Okay.  So what influenced National's decision to
 3   keep the vehicle for resale?
 4        A.  It was a decent vehicle.  I have a lot of
 5   customers that come in through the dealership over many
 6   years that love mid-size SUV's, four doors.  That's it.
 7   It's a very large demand --
 8        Q.  Did anyone --
 9        A.  -- with our clientele for mid-size, four-door
10   SUV's.
11        Q.  Did anyone from National speak to Murray Ford
12   regarding the vehicle before it was purchased?
13        A.  No.
14        Q.  What written representations did Murray Ford make
15   regarding the Equinox?
16        A.  Nothing.
17        Q.  Did someone from National go to Murray Ford to
18   complete this purchase?
19        A.  A lot of our stuff is done over the phone and
20   text, sir.  That's all we have.  It's not always --
21        Q.  Okay.  What about this specific --
22            (Speaking at once.)
23        A.  -- meeting in person.
24        Q.  I -- I apologize.  We were speaking over each
25   other.  Can you please repeat your response?
```

```
 1        A.   A lot of our wholesale purchases are not done in
 2   person.   They are done over the phone, sir.
 3        Q.   Okay.   How was this particular vehicle purchased?
 4        A.   The same as I answered for you before, sir.   It
 5   was in a large group of vehicles.   At that point, we put a
 6   number on the whole package.   That was included in the
 7   package.   That's how it was purchased.   My answer will
 8   remain the same.
 9        Q.   Right.   And was that done remotely?
10        A.   It was done remotely.
11        Q.   By a text message?
12        A.   That is a very common practice in our world, sir.
13        Q.   Is that what happened here with this particular
14   lot?
15        A.   Yes.
16        Q.   Do you have copies of those text messages?
17        A.   Of those what?
18        Q.   Text messages.
19        A.   Not many is done over text messages, sir.   As I
20   stated before, most are done over the phone.
21        Q.   We're not -- respectfully, madam, we're not
22   talking about generally.   I'm trying to get down to the
23   bottom of this particular vehicle lot purchase.   And
24   I'm -- I'm not understanding how it was consummated.   So,
25   you know, was this particular vehicle lot purchased
```

```
 1    through text message?

 2         A.  This particular purchase was purchased in a group

 3    of multiple vehicles.  I am unsure of the amount, whether

 4    it was 10, 20, 5.  There was no known anything about a

 5    condition, odometer, et cetera.  We were given a year,

 6    make, model, and a VIN.  That is it, sir.  As well as the

 7    other vehicles.  Myself and Reza know over many years what

 8    the average price on these vehicles are worth in the

 9    current markets.  This is a number that we put in.  It's

10    agreed to or it's not agreed to.  End of story.  That's

11    all.

12              MR. FEYGIN:  Ms. Israel, were you able to hear my

13         question?

14              MS. ISRAEL:  Was I able to hear your question?

15         Yes.

16              MR. FEYGIN:  Would you mind repeating it to your

17         client?

18              MS. ISRAEL:  I can't tell you, Mr. Feygin, that I

19         memorized the question.  I am more than happy to have

20         you repeat it --

21              MR. FEYGIN:  The question --

22              MS. ISRAEL:  -- and I'll say it out loud.

23    BY MR. FEYGIN:

24         Q.  The question was, was this vehicle -- this

25    vehicle lot that we're discussing purchased through a text
```

Case 3:24-cv-00948-WWB-PDB    Document 69-8    Filed 09/30/25    Page 57 of 204 PageID 2251

ISIAH HENDERSON V. ATLANTIC NATIONAL AUTO INSURANCE COMPANY          09/09/2025
CR of NATIONAL AUTOMOTIVE (ROBIN BYLER-RAMAGHI)                           57

```
 1    message?

 2         A.  No, it was not.

 3              MS. ISRAEL:  Okay.  Okay.

 4         A.  It was purchased over the phone.

 5    BY MR. FEYGIN:

 6         Q.  Okay.  Who purchased this lot over the phone?

 7         A.  Reza.

 8         Q.  Okay.  Who was Reza communicating with at Murray

 9    Ford?

10         A.  I am unsure, sir.

11         Q.  Okay.  And you did not speak to Reza to prepare

12    for today, did you?

13         A.  No, sir.

14         Q.  Okay.  Did the vehicle -- I'm sorry.  Scratch

15    that.

16              Did the dealership pick up the vehicle by itself?

17         A.  No.

18         Q.  Was it delivered?

19         A.  No.

20         Q.  How did the vehicle get to your dealership?

21         A.  Manheim has a third-party transport service.

22    That transport service picked it up from Murray Ford to

23    get to the auction.  It ran there, was again transported

24    back to our lot.

25         Q.  Okay.  So the vehicle was ultimately put through
```

```
 1     the auction for purposes of the transaction?

 2          A.   Yes.

 3          Q.   Okay.  When was the vehicle delivered to the

 4     dealership?

 5          A.   I am unsure, sir.  I do not have an exact date

 6     for you.

 7          Q.   Who would know that information?

 8          A.   I don't think anyone.  I would have to possibly

 9     ask transport when it was.  I'm unsure if they would know

10     either.

11          Q.   Would you know the name of the company that

12     completed the delivery?

13          A.   I think it's called Four Runner Services.

14          Q.   Have you used them in the past?

15          A.   It is a transparty -- transport company

16     contracted through Manheim, sir.

17          Q.   And how much was the transportation cost?

18          A.   Transport -- are you asking a -- are you asking a

19     specific question of how much I paid for transport?

20          Q.   For this particular vehicle.

21          A.   I honestly do not remember.  Again, I'd have to

22     go back and look at their records.

23          Q.   And how much was paid for the vehicle to Murray

24     Ford?

25          A.   I do not remember off the top of my head, sir.
```

 1    There is a bill of sale that can be obtained, but I am

 2    unsure as of this moment an exact dollar amount.

 3        Q.   When the vehicle was purchased from Murray Ford,

 4    did National sign any documents for the purchase?

 5        A.   There is always a bill of sale, sir.  A wholesale

 6    order.

 7        Q.   And what else?

 8        A.   That's it.

 9        Q.   Does National maintain copies of this bill of

10    sale?

11        A.   We generally never see them.  No.

12        Q.   You don't see the bill of sale?

13        A.   Not generally, sir.  It's not our business

14    practice with Murray.

15        Q.   Did you get a vehicle history report before you

16    bought the Equinox?

17        A.   No, sir.

18        Q.   Did you get a Manheim condition report for the

19    Equinox?

20        A.   No.

21        Q.   Did National physically inspect the Equinox

22    before it was purchased?

23        A.   No.

24        Q.   I'm going to pull up what's going to be Exhibit

25    2.

```
 1              (Plaintiff's Exhibit 2 identified.)

 2       A.   What?

 3            MS. ISRAEL:  Mr. Feygin, pardon me.  What was

 4       Exhibit 1?

 5            MR. FEYGIN:  The (b)(6) notice.

 6            MS. ISRAEL:  Okay.  I missed it if you marked it

 7       earlier.  Thank you.

 8       A.   Are you able to share that, Mr. Feygin, such as

 9   Ms. Israel did previously?

10   BY MR. FEYGIN:

11       Q.   I'm sorry?

12            MS. ISRAEL:  Yeah.  He'll have to -- he has to

13       show you a -- yes.

14            THE WITNESS:  Okay.

15            MS. ISRAEL:  Yeah.

16       A.   Yeah.  Okay.

17   BY MR. FEYGIN:

18       Q.   Does this look familiar to you?

19       A.   Those are very generic wholesale orders from

20   dealer to dealer.  It's not unusual.  Yes, sir.

21       Q.   Okay.  Had you seen this particular wholesale

22   order before?

23       A.   No, sir.  With Murray, I do not generally see

24   these.  Those are back office documents.

25       Q.   Okay.  So you normally don't sign off on any
```

```
 1    wholesale orders --

 2         A.  Not generally.

 3         Q.  -- between National and --

 4              MS. ISRAEL:  Let him -- let him finish his

 5         question.

 6              MR. FEYGIN:  That will be Plaintiff's Exhibit

 7         Number 2.  It's 11:57, y'all.  I know you guys wanted

 8         a break around noon.

 9              MS. ISRAEL:  Yes, sir.

10              MR. FEYGIN:  I think now is a good time to break.

11              MS. ISRAEL:  Sure.  That's appreciated.

12              MR. FEYGIN:  30 minutes?

13              MS. ISRAEL:  Sure.

14              THE VIDEOGRAPHER:  This marks the end of Media

15         1 --

16              MS. ISRAEL:  Be back here at 12:30.

17              THE VIDEOGRAPHER:  Okay.  This marks the end of

18         Media 1.  We're off the record at 11:57.

19              (Recess for lunch.)

20              THE VIDEOGRAPHER:  We are now back on the video

21         record at 12:37.  This marks the beginning of Media 2.

22         You may proceed.

23              MR. FEYGIN:  All righty, everybody.  Hope

24         everybody had a great lunch.  Hopefully we're ready to

25         knock out the second half of this deposition.
```

```
 1    BY MR. FEYGIN:

 2         Q.  I'm going to be moving on to what's going to be

 3    Plaintiff's Exhibit Number 3.

 4              (Plaintiff's Exhibit 3 identified.)

 5         A.  I'll be sharing that now.  Hopefully y'all can

 6    see it.

 7              MS. ISRAEL:  Yeah.  Mr. Feygin, can you hold

 8         tight for one second?  She's asked me to turn up the

 9         volume, and I've got to try to figure out how to do

10         that.  Give me just one minute.

11              THE WITNESS:  Sorry.  I'm just asking if maybe

12         that will help.  Maybe I won't have to ask you to

13         repeat it so much.

14              MS. ISRAEL:  Mr. Feygin, would you mind saying

15         something, please?

16              MR. FEYGIN:  Sure thing.  Can you hear me?

17              THE WITNESS:  It's a little better.

18              MS. ISRAEL:  Try it one more time for me.

19              MR. FEYGIN:  Can you hear me?

20              MS. ISRAEL:  Okay.  That --

21              THE WITNESS:  That's better.

22              MS. ISRAEL:  Okay.  Thank you.  I had to figure

23         out which volume it was.  Thank you.

24              THE WITNESS:  Sorry.  I'm trying to --

25              MR. FEYGIN:  Certainly.
```

```
 1              THE WITNESS:  -- be less of a thorn in your side

 2        by asking you to repeat, sir.

 3              MR. FEYGIN:  No.  That's quite okay.

 4    BY MR. FEYGIN:

 5        Q.  So up on the screen is an invoice from Murray

 6    Ford.  Do y'all see that?

 7        A.  Yes, sir, I can see that.

 8        Q.  All righty.  And have you seen this before?

 9        A.  No, sir, I've never seen that before.

10        Q.  Okay.  I'll present to you that this is the

11    invoice that Murray Ford provided to us in response to a

12    subpoena.  Up top you'll see the 2011 Chevy Equinox noted

13    there.  Would it be fair to say that National paid $3,500

14    for this vehicle?

15        A.  I -- your invoice shows that, sir, but I was not

16    aware.

17        Q.  All right.  And who would be aware of how much

18    the vehicle was purchased for?

19        A.  The representative that purchased it, sir, and

20    the wholesale arrangement.

21        Q.  And that would be Reza?

22        A.  Yes, sir.

23        Q.  Okay.  And would it be fair to say that National

24    purchased this vehicle on August 11, 2023?

25        A.  I am unsure, sir.
```

```
 1      Q.  Do you have any reason to doubt that is the date
 2  of the purchase?
 3      A.  There are oftentimes that phone negotiations will
 4  happen and things are not booked out the same day.  It is
 5  often a few days a week up to before the title girls or
 6  the orders get up from the used car manager up to title.
 7      Q.  So based upon that, would it be fair to say that
 8  the vehicle was purchased sometime around August 11, 2023?
 9          MS. ISRAEL:  Object to the form.  You can answer.
10      A.  I --
11          MS. ISRAEL:  Did you hear his question?  Okay.
12      A.  I don't know an approximate date, sir.  So I
13  cannot truthfully answer that either way.
14  BY MR. FEYGIN:
15      Q.  Okay.  Do you have any reason to doubt the
16  vehicle was purchased in the beginning of August of 2023?
17          MS. ISRAEL:  Object to the form.
18      A.  Sir, again, I do not know the exact date that
19  Murray booked it out.  So I am unable to give you any
20  proximities or any exacts.
21  BY MR. FEYGIN:
22      Q.  Okay.  And that would be something that I would
23  have to discuss with Reza, correct?
24      A.  I don't think it would be Reza, sir.  I think
25  that would be more of the booking with a used car manager
```

ISIAH _____ L AUTO_____ 2025
CR of NATIONAL AUTOM____ ____ROBIN BYLER-RAMAGHI)

```
 1    and the title department in Murray.

 2         Q.  Okay.  Do you have records of the payments made

 3    to Murray Ford?

 4         A.  Not currently on me, no.  Not in front of me

 5    right now.

 6         Q.  Are they accessible?

 7            MS. ISRAEL:  Not in the -- do you mean in the

 8         middle of this depo?

 9            MR. FEYGIN:  No, no, no.  In general.

10            MS. ISRAEL:  Oh.  Okay.

11         A.  I was going to say I -- I don't even have a

12    computer to obtain any bank statements, sir.  I'm sure

13    that I could pull a bank statement.  Yes.

14    BY MR. FEYGIN:

15         Q.  Okay.  You had previously mentioned that there is

16    no loan involved.  This money came from the dealership's

17    bank account, correct?

18         A.  There is no what, sir?  Repeat that.

19         Q.  There is no floor plan --

20         A.  Nothing --

21         Q.  -- or a loan involved?

22         A.  No, sir.  We do not use a floor plan.

23         Q.  Okay.  And this vehicle was paid for with the

24    business' funds, correct?

25         A.  Yes.
```

```
 1        Q.  Okay.  So after National purchases this Equinox,

 2   was it inspected?

 3        A.  Not immediately, sir.  No.

 4        Q.  Okay.  When was it inspected?

 5        A.  As I previously cited, when the vehicle was

 6   transported to the dealership.  Within a week thereafter

 7   is when it was inspected, sir.

 8        Q.  Okay.  On what date did the dealership physically

 9   inspect this vehicle?

10        A.  I am unsure.

11        Q.  Who would know that?

12        A.  I don't know that anybody would remember the

13   exact date, sir.

14        Q.  Okay.  And you only had one mechanic at the time?

15        A.  Yes, sir.  As previously stated, I have only ever

16   had one mechanic.

17        Q.  Okay.  And Pearson was the mechanic at the time?

18        A.  Yes, sir.

19        Q.  Did you speak to him in preparation for today's

20   deposition?

21        A.  No, sir.

22        Q.  He is currently employed by the dealership,

23   though, correct?

24        A.  Yes.

25        Q.  Okay.  Was a checklist used during this
```

```
 1   inspection?

 2       A.  Yes.

 3       Q.  How do you know?

 4       A.  We do it for all vehicles, sir.

 5       Q.  Did you personally see this inspection list?

 6       A.  No.

 7       Q.  Okay.  Was the vehicle driven?

 8       A.  By the mechanic and by transport.  That is an

 9   accurate thing to say.  By myself, no.

10       Q.  How do you know the mechanic drove the vehicle?

11       A.  He is required to with all vehicles that he puts

12   on a lift.

13       Q.  Has he ever not driven a vehicle to the best of

14   your knowledge?

15       A.  No.

16       Q.  What was the condition of the vehicle?

17           MS. ISRAEL:  Object to the form.

18       A.  I am unsure, sir.  You're asking a question

19   regarding a vehicle that came in over two years ago.

20   BY MR. FEYGIN:

21       Q.  Who would know?

22       A.  I don't think anyone would remember the condition

23   of a vehicle that came in two years ago.  We get in a lot

24   of similar cars, similar everything.

25       Q.  And, again, the only person that would have
```

ISIAH *** *** *** ORIGINAL AUTHORED *** 09/30/2025
Case 3:24-cv-00948-WWB-PDB   Document 69-8   Filed 09/30/25   Page 68 of 204 PageID
2262

CR of NATIONAL AUTOM*** (ROBIN BYLER-RAMAGHI)

68

1    inspected it was Pearson, correct?

2         A.  Yes, sir.  As previously stated multiple times,

3    Pearson is the only mechanic at the time that this vehicle

4    has been purchased prior to it being put out.  Yes, sir.

5    He would have been the person to drive and inspect the

6    vehicle.

7         Q.  Okay.  What repairs were completed to the vehicle

8    prior to putting it up for sale?

9         A.  I am currently unaware of those.  I can pull past

10   reports.  But I am unwilling and unable to currently and

11   accurately give you those at the current tame.

12        Q.  Why not?

13        A.  That was not in your interrogatories, sir.  That

14   was not a question that you had asked me to be prepared to

15   answer.

16        Q.  So you're unable to discuss the inspection and/or

17   what you did with the vehicle following its purchase?

18            MS. ISRAEL:  Object to the form.  That

19        mischaracterizes her testimony, Mr. Feygin.

20            MR. FEYGIN:  Give me one second here, please.

21        I'm not sharing my screen, am I?

22            MS. ISRAEL:  No, you're not.

23            MR. FEYGIN:  Okay.

24            MS. ISRAEL:  And there were two documents I sent

25        this morning among the 12 pages that I believe were --

ISIAH ROBINSON vs. NATIONAL AUTOMOTIVE ... 9/5/2025
CR of NATIONAL AUTOMOTIVE (ROBIN BYLER-RAMAGHI)

```
 1          may be pertinent to your last question -- or two

 2          questions ago.

 3    BY MR. FEYGIN:

 4          Q.  Okay.  I'm going to share Exhibit 1 again.  Okay.

 5    Do you see -- give me one second.  Okay.  Do you see topic

 6    number 11?

 7          A.  Yes, sir.

 8          Q.  Okay.  So are you prepared to discuss topic 11?

 9          A.  Not at the current time, sir, no.

10              MS. ISRAEL:  Well --

11    BY MR. FEYGIN:

12          Q.  Okay.  But you reviewed this --

13              MR. FEYGIN:  I'm sorry.  What were you saying,

14          Ms. Israel?

15              MS. ISRAEL:  Go ahead.

16              MR. FEYGIN:  I didn't catch what you said.

17              MS. ISRAEL:  It's okay.  It doesn't matter.

18              MR. FEYGIN:  It certainly does.  What was that?

19          Ms. Israel, please repeat yourself.

20              MS. ISRAEL:  Hello?

21              MR. FEYGIN:  Ms. Israel, please repeat yourself.

22              MS. ISRAEL:  Mr. Feygin?

23              MR. FEYGIN:  Is there a reason why you're not

24          repeating yourself?

25              MS. ISRAEL:  Mr. -- do you have those cough
```

```
 1            drops?

 2                 THE WITNESS:  Huh?

 3                 MS. ISRAEL:  Did you have the cough --

 4                 THE WITNESS:  I do have the cough drop.

 5                 MS. ISRAEL:  Mr. Feygin, we can't hear you.  I'm

 6            not sure if you are intending to talk, but it's

 7            totally silent on our end.

 8                 MR. FEYGIN:  Jordan, did you hear me?  Wendy, did

 9            you hear me?

10                 COURT REPORTER:  I can hear you.  It's --

11                 MR. FEYGIN:  You're both nodding yes.  Thank you

12            for confirming.

13                 MS. ISRAEL:  Madam Court Reporter, are you

14            hearing?

15                 COURT REPORTER:  I hear everything.  Yes.  Can

16            you hear me?

17                 MS. ISRAEL:  We can't hear you either.

18                 THE WITNESS:  We can't hear anybody.

19                 MS. ISRAEL:  I'm sorry.  It is --

20                 COURT REPORTER:  It's something on --

21                 MS. ISRAEL:  We haven't touched anything on our

22            end.  But it's gone completely silent.

23                 MR. FEYGIN:  That is certainly convenient.  Can

24            you restart your systems?

25                 MS. ISRAEL:  It's still silent on our end.
```

```
 1              MR. FEYGIN:  I don't know what to do.  It's an

 2        issue on your end.

 3              THE VIDEOGRAPHER:  Ms. Israel, can you hear me?

 4        Counsel, would you like to go off the record?

 5              THE WITNESS:  I can't hear.

 6              MR. FEYGIN:  Might as well.

 7              MS. ISRAEL:  Bruce -- yeah.  We --

 8              THE VIDEOGRAPHER:  Off the record --

 9              MS. ISRAEL:  You want us to log out and --

10              THE VIDEOGRAPHER:  Hold on.  Off the record at

11        12:49.

12              (Off the record.)

13              THE VIDEOGRAPHER:  Back on the record at 12:54.

14   BY MR. FEYGIN:

15        Q.  All righty.  So picking back up.  I'm going to be

16   sharing what's going to be Plaintiff's Exhibit Number 4.

17              (Plaintiff's Exhibit 4 identified.)

18        Q.  Are you all able to see the certificate of title?

19        A.  I can see the screen.  Yes, sir.

20        Q.  Okay.  Does this look familiar to you?

21        A.  Yes, sir.

22        Q.  Okay.  Is this a truthful and accurate depiction

23   of how the title looked when you received it from Murray

24   Ford?

25        A.  I'm unsure if that was an exact, but most likely
```

 1    similar.  It's very blacked out in -- on the back.

 2         Q.  Okay.  And did you personally view this title

 3    when it came in from Murray Ford?

 4         A.  Yes, sir.  But it was not blacked out like that.

 5         Q.  Okay.  What was filled in when you received the

 6    title?

 7         A.  Exactly what you see now.

 8         Q.  Okay.  So the selling dealer license number was

 9    filled in?

10         A.  Yes, sir.  I can see their address and Murray

11    Ford and their VF102 number.  Yes.

12         Q.  Okay.  And then there was a seller agent

13    signature and -- and printed name as well, correct?

14         A.  Nothing else other than what you currently see.

15         Q.  Okay.  The mileage disclosure was not filled in,

16    correct?

17         A.  Correct.

18         Q.  Okay.  When did National get the title from

19    Murray Ford?

20         A.  To the best of my recollection, and I am unsure

21    of an exact date, but I believe it to be the Monday after

22    the sale.

23         Q.  And what was that date?

24         A.  Approximately 9/11.

25         Q.  Okay.  How was it delivered?

```
 1          A.  Hand-delivered.  Picked up --

 2          Q.  Who delivered --

 3          A.  -- in person.

 4          Q.  Who picked it up?

 5          A.  Reza.

 6          Q.  And where did he bring the title after he picked

 7   it up?

 8          A.  I met him to receive it so I could do title work.

 9          Q.  Where did you meet him?

10          A.  Sir, I don't remember.  That was three years ago,

11   unfortunately.

12          Q.  Going to the face of the title, the very first

13   page.  What is the mileage disclosure here?

14          A.  What does the mileage say on the screen you

15   are -- you're --

16          Q.  Yes, ma'am.

17          A.  -- showing, sir?  Is that your question?

18          Q.  Yes, ma'am.

19          A.  112 and some change.

20          Q.  1 -- 1 -- 112,990?

21          A.  It looks like two blobs and a zero to me.  So I'm

22   looking -- there you go.  112,990 0.

23          Q.  Okay.  And what was the date that was read?

24          A.  2/22/23.

25          Q.  And what does it say regarding the accuracy of
```

```
 1    the mileage?

 2         A.  What is the two words after the date?  Is that

 3    your specific question, sir?

 4         Q.  Sure.

 5         A.  Not actual.

 6         Q.  Okay.  No dispute that this is what you received

 7    when you got the title from Murray Ford?

 8         A.  Yes, sir.

 9         Q.  Going to move on to Exhibit 5.

10              (Plaintiff's Exhibit 5 identified.)

11         Q.  Does this look familiar?

12         A.  The front page of the same title you just showed

13    me, sir.

14         Q.  Yes, ma'am.  Now the back page?

15         A.  Yes, sir.  Now I recognize that.

16         Q.  Is this a true and correct copy of the

17    certificate of title for the Equinox that was submitted to

18    the DMV?

19         A.  Is that what, sir?  Please repeat your question.

20         Q.  Is that a true and correct copy of the

21    certificate of title that was submitted to the DMV?

22         A.  No.  There is no -- there are certain boxes

23    checked -- before I have to turn everything in, there are

24    certain boxes that have to be checked, sir.

25         Q.  Okay.  So is it your position --
```

```
 1          A.  Could have been done when I was walking things

 2    through, or it could have been done prior to putting it in

 3    a final envelope.  Un -- I'm unsure.

 4          Q.  Okay.  So you're unsure if this is the copy that

 5    was submitted to the DMV?

 6          A.  I am unsure, sir.

 7          Q.  Okay.  Would you know where the scanned

 8    transaction number would have came from?

 9          A.  No, sir.

10          Q.  That's not an internal numbering system, is it?

11          A.  I have no idea what those numbers are, sir.

12          Q.  Okay.  Who signed this title on behalf of the

13    dealership?

14          A.  Myself.

15          Q.  And that's both for the transfer from Murray and

16    then to my clients?

17          A.  I'm sorry.  I didn't hear what you said.

18          Q.  That's for the transfer from Murray Ford to the

19    dealership, correct?

20          MS. ISRAEL:  Object to the form.

21          A.  Sir, you're currently asking me did I sign on

22    behalf of National when it was transferred from Murray to

23    National?  My answer is yes.

24    BY MR. FEYGIN:

25          Q.  And, now, when the transfer was taken to my
```

```
 1   clients, did you also sign this?
 2        A.  On behalf of the seller, yes.  That is my
 3   signature.
 4        Q.  Whose handwriting is on the title where it says
 5   purchaser's name?
 6        A.  For your client, sir?
 7        Q.  Yes.
 8        A.  You have the mouse.  Would you please be willing
 9   to point to that?
10            THE WITNESS:  This is where I should have
11        glasses.
12            MS. ISRAEL:  I know.
13            THE WITNESS:  All the black --
14            MS. ISRAEL:  Oh, there we go.  There we go.
15            THE WITNESS:  That makes it worse.  I can't see
16        anything.  It's blacked out.
17            MS. ISRAEL:  Give him a second.  There we go.
18        Thank you, Mr. Feygin.
19   BY MR. FEYGIN:
20        Q.  Whose handwriting is highlighted?
21        A.  Isiah Robinson, POA by Robert Karr.
22        Q.  That handwriting, whose handwriting is this?
23        A.  That would be mine, sir.
24        Q.  Okay.  Up top where it says National Automotive
25   and the address for National Automotive?
```

```
 1        A.   That is the dealership address.  Yes, sir.

 2        Q.   Okay.  Who filled this in?  This being the

 3   mileage disclosure.

 4        A.   That again would be me, sir.

 5        Q.   Okay.  And this was filled in on September 5th?

 6        A.   No.  The pen went out.  It's actually an 8 but --

 7        Q.   Okay.  So this was filled in September 8th?

 8        A.   2023.  Yes, sir.  Matches the date of the

 9   temporary tag.

10        Q.   Okay.  Who filled in the mileage disclosure from

11   Murray Ford to National?

12        A.   That again would have been me, sir.

13        Q.   When was that filled out?

14        A.   I can only speculate, and I'm unwilling to give

15   you an exact answer at this point.

16        Q.   And why is that?

17        A.   Because I'm under oath and do not want to lie to

18   you.

19        Q.   Why are you unable to give a -- an answer?

20        A.   Because I am unable to tell you when I had an

21   exact phone call with Murray's title clerk, Miranda

22   Wilkerson, to fill in that information.

23        Q.   With respect to the transfer from Murray Ford to

24   National --

25        A.   Uh-huh.
```

1    Q.  -- which check box was -- which check box was

2    selected regarding the accuracy of the mileage?

3    A.  But that would have been Murray's responsibility,

4    sir.  As you notice, I personally --

5    Q.  That is not the question.

6    (Speaking at once.)

7    A.  -- did not check the box.

8    Q.  That is not the question I asked.  You have

9    testified that you filled out the mileage transfer up top.

10   Which box was selected regarding the accuracy of the

11   mileage?

12   A.  Not a box checked, sir.

13   Q.  Why?

14   A.  I do not know.  I'm unwilling to answer, sir.

15   Q.  Are you refusing to respond?

16   MS. ISRAEL:  Object to the form.  You can answer.

17   A.  There's no reason, sir.

18   BY MR. FEYGIN:

19   Q.  You previously testified that a dealership must

20   know the laws that govern the way in which it sells

21   vehicles, correct?

22   A.  Correct.

23   Q.  Is a dealership required to select one of these

24   boxes?

25   A.  Sir, human error happens.  There are oftentimes

```
 1    that --
 2              MS. ISRAEL:  Just answer his question.
 3         A.  Yes.
 4    BY MR. FEYGIN:
 5         Q.  Why did you fill in the mileage instead of Murray
 6    Ford?
 7         A.  I had explicit permission to do so by their title
 8    clerk.
 9         Q.  And what information did you base this mileage
10    disclosure on?
11         A.  What information?  What, sir?
12         Q.  What information did you base this mileage
13    disclosure upon?
14         A.  The mileage in which the title clerk at Murray
15    Ford disclosed.
16         Q.  So you did not personally view the odometer on
17    the vehicle when you put that mileage down on the title?
18         A.  You are correct.
19         Q.  Okay.  Does National often get titles without
20    mileage disclosures on them from the selling dealerships?
21         A.  Every day.
22         Q.  And it's a business practice of National to fill
23    in that mileage on behalf of a third party?
24              MS. ISRAEL:  Object to the form.  You can answer.
25         A.  It is a business practice that we communicate
```

1    with the other title clerks and/or fill those in based on

2    a power of attorney or an -- an odometer disclosure

3    attached to the title.

4    BY MR. FEYGIN:

5        Q.  Okay.  And did you have an odometer disclosure or

6    power of attorney attached to this title?

7        A.  No, sir.

8        Q.  Scrolling down again to my clients' signatures

9    here.  You had testified that this is your handwriting,

10   correct?

11       A.  Correct.

12       Q.  How much time would you say it takes to fill in

13   one of these transfer disclosures?

14       A.  A lot of that information is collected from

15   another form and the paperwork.  Five, ten minutes.

16       Q.  Okay.  Thank you.  Turning to my clients'

17   transaction a little bit more in detail.  Were you

18   personally involved with the sale of this vehicle?

19       A.  No.

20       Q.  Did you meet with my clients?

21       A.  No.

22           MS. ISRAEL:  Object to the form.  Go ahead.

23   BY MR. FEYGIN:

24       Q.  Did you speak to my clients?

25       A.  Will you --

| | |
|---|---|
| 1 | MS. ISRAEL:  Object to the form.  Go ahead. |
| 2 | A.  Will you please be exact on your question? |
| 3 | BY MR. FEYGIN: |
| 4 | Q.  Did you speak to my clients when they came into |
| 5 | the dealership to purchase the vehicle? |
| 6 | A.  No. |
| 7 | Q.  Who did? |
| 8 | A.  Chris. |
| 9 | Q.  And did you speak with him to prepare for today's |
| 10 | deposition? |
| 11 | A.  Did I what, sir?  I'm sorry.  I didn't hear your |
| 12 | question. |
| 13 | Q.  Did you speak with him to prepare for today's |
| 14 | deposition? |
| 15 | A.  No, sir. |
| 16 | Q.  So you're unable to testify what occurred during |
| 17 | that transaction with my clients, are you? |
| 18 | A.  That is correct. |
| 19 | Q.  Okay.  How did you advertise this vehicle? |
| 20 | A.  There were no advertisements of the vehicle, sir. |
| 21 | The vehicle was on our -- |
| 22 | (Speaking at once.) |
| 23 | Q.  So how did my clients find it?  I'm sorry? |
| 24 | A.  The lot -- the car was on the vehi -- the vehicle |
| 25 | was on our car lot for sale.  That is the advertisement. |

ISIAH... Case 3:24-cv-00948-WWB-PDB    Document 69-8    Filed 09/30/25    Page 82 of 204 PageID 2025
CR of NATIONAL AUTOM... (ROBIN BYLER-RAMAGHI)                                                      2276

82

 1        Q.  Remind me again who was responsible for

 2    advertising vehicles at that time period.

 3        A.  Can you repeat the question, sir?  It sounds like

 4    you're in a tunnel again.

 5        Q.  It seems like this is an issue on your end

 6    because it keeps on reoccurring.  And I have the court

 7    reporter nodding her head --

 8            MS. ISRAEL:  Mr. Feygin.

 9        Q.  -- saying that she can hear us.

10            MS. ISRAEL:  Mr. Feygin, she said she has a

11        hearing issue.  You -- you can criticize her for it or

12        you can repeat the question.

13            MR. FEYGIN:  Respectfully, madam, that's not what

14        I'm saying at all, and that's not the narrative that I

15        appreciate you trying to paint here.  The issue is

16        that you're having a technical issue that has delayed

17        the progress of this deposition repeatedly.  I'm

18        asking you to bring in your tech --

19            MS. ISRAEL:  We are not having a tech -- would

20        you like to repeat the question so she can hear you?

21        Or how do you want to proceed?

22    BY MR. FEYGIN:

23        Q.  During the time period of my clients'

24    transaction, who was responsible for advertising vehicles?

25        A.  Chris.

```
 1        Q.  Was he given free range to advertise vehicles, or
 2   was he provided explicit instructions?
 3        A.  He's given an outline of what is to be posted on
 4   Facebook, and that is that.
 5        Q.  Who determines what vehicles get posted to
 6   Facebook?
 7        A.  I do.
 8        Q.  Why wasn't this vehicle posted to Facebook?
 9        A.  Our Facebook Marketplace account will only allow
10   us to post so many vehicles at one time under our account.
11   I do not care to pay for additional costs.  We're a small
12   dealership with a small budget, sir.
13        Q.  And how do you know that's what happened three
14   years ago?
15            MS. ISRAEL:  Object to the form.
16        A.  I have been a small dealership from the
17   beginning, Mr. Feygin.  I've had the same budget for the
18   same length of time I have been open.  I am quite
19   conservative in what I do.  There is the answer that I can
20   give you.
21   BY MR. FEYGIN:
22        Q.  The question is, how do you know that you were
23   prevented from posting this vehicle up on Facebook?
24            MS. ISRAEL:  Object to the form.
25   BY MR. FEYGIN:
```

ISIAH...    CR of NATIONAL AUTO...(ROBIN BYLER-RAMAGHI)

```
 1          Q.  How do you recall that you were prevented from
 2    posting the vehicle on Facebook because you reached the
 3    limit of your account?
 4               MS. ISRAEL:  Object to the form.
 5    BY MR. FEYGIN:
 6          Q.  You can answer.
 7          A.  Sir, there were already vehicles listed.  This is
 8    not a priority to list since we already had other
 9    advertisements out.
10          Q.  When you list a vehicle on Facebook, do you
11    include a lot number?
12          A.  No.  Not generally at all.  No.  I don't know
13    that we have ever.
14          Q.  Do you -- do you list the VIN number?
15          A.  Not generally, no.  Our website, yes.  Facebook,
16    no.
17          Q.  So you advertise on your website as well?
18          A.  Yes, Mr. Feygin.  My business has a website.  Any
19    customer visiting --
20          Q.  Okay.  Where --
21          A.  -- that website can gain -- can obtain that
22    information.
23          Q.  Okay.  So you previously testified you only
24    advertised on Facebook.  Now it's Facebook and your
25    website.  Are there any other avenues by which you
```

```
 1    advertise the vehicles?

 2         A.  No, sir.

 3         Q.  Are you certain?

 4         A.  Yes.

 5         Q.  When you put a vehicle up for sale -- all right.

 6    When you advertise a vehicle for sale on Facebook, what

 7    identifying information do you put in the advertisement?

 8         A.  VIN.  Not even the VIN.  I'm so sorry.  I

 9    misspoke.  Make, the model, down payment, a few pictures

10    of the vehicle, and everybody is guaranteed an approval.

11    Very general advertisement, sir.

12         Q.  Was this vehicle advertised on your website?

13         A.  I do not remember.

14         Q.  Who would know?

15         A.  I don't know.

16         Q.  You don't know who would know?

17              MS. ISRAEL:  Object to the form.  She's answered.

18    BY MR. FEYGIN:

19         Q.  Who manages your website?

20         A.  I do.

21         Q.  Who is your web host?

22         A.  Dealerwebsites.com.

23         Q.  And when you advertise a vehicle on the website,

24    do you use the VIN number?

25         A.  I previously stated, Mr. Feygin, that on our
```

```
 1   website, a customer is able to obtain the VIN number.

 2   Yes, sir.

 3        Q.  So which one of my clients was present at the

 4   dealership to purchase the Equinox?

 5        A.  Sir, as I previously stated, I had no interaction

 6   with your customer when they initially approached the

 7   dealership.  So I am unable to answer that question.

 8        Q.  On what day did they come to the dealership?

 9        A.  Again, I am assuming it was a few days before

10   they were there the second time.  So that Friday or

11   Saturday before, 9/8-ish.  My best --

12        Q.  Who did they speak --

13        A.  -- answer would be the same date that they dated

14   the paperwork, sir.

15        Q.  Who did they speak with at the dealership?

16        A.  As I previously stated, Chris was the one that

17   spoke with them.

18        Q.  Who else would have been at the dealership that

19   day?

20        A.  Myself.

21        Q.  So you were at the dealership that day?

22        MS. ISRAEL:  Object to the form.  Go ahead and

23        answer.

24        A.  Yes, sir.  I'm at the dealership most days.  I do

25   own the business.
```

```
 1    BY MR. FEYGIN:

 2         Q.  I'm going to pull up what's the buyer's order

 3    here.  It should be Exhibit Number 6.

 4              (Plaintiff's Exhibit 6 identified.)

 5         Q.  Does this look familiar to you?

 6         A.  Yes, sir.

 7         Q.  Scrolling through page 2 and scrolling through

 8    page 3.  Did National prepare this document for my clients

 9    to sign?

10         A.  Did we prepare the document?

11         Q.  Correct.

12         A.  Yes, sir.

13         Q.  Okay.  Who prepared this document?

14         A.  Chris would have prepared the document, sir.

15         Q.  Is it a true and correct copy of the buyer's

16    order form from my clients' transaction?

17         A.  Can you scroll down, sir?  There is two different

18    buyer's orders, sir, that seem to be in question.  The

19    buyer's order that was valid has highlights for both

20    signatories and has a dealership signature.  So, no, sir,

21    I am unsure if this is the true and valid copy.

22         Q.  Okay.  There's no dispute, though, that this is a

23    copy that was prepared by the dealership and presented to

24    my clients, correct?

25         A.  Sir, there were multiple copies prepared by the
```

ISIAH                                         AL AU
CR of NATIONAL AUTO                ROBIN BYLER-RAMAGHI)

```
 1    dealership.  Your client took a blank copy of paperwork
 2    when they test drove the vehicle.
 3         Q.  Again, is this a true copy of the buyer's order
 4    form that National prepared for my clients?
 5         A.  National Automotive would have printed this
 6    document, sir.  If that is the question that you're
 7    asking, the answer is yes.
 8         Q.  When was this contract presented to my clients?
 9         A.  When was it presented to your client?  Would have
10    been --
11         Q.  Yes.
12         A.  -- on the date of the original purchase, sir.
13    The date listed right under salesperson is 9/8/2023.
14         Q.  How much did my clients agree to pay for this
15    vehicle?
16         A.  The sticker price at the time was over 10 5.
17    Chris, I believe, gave a discount.  So they paid 10,000
18    for the vehicle, plus sales tax and dealer fee, doc
19    stamps.
20         Q.  There's a predelivery service charge of 599 here.
21    What is the --
22         A.  That is the dealer --
23         Q.  -- fee for?
24         A.  -- service.
25              MS. ISRAEL:  Let him -- let him ask his
```

```
 1          questions.

 2   BY MR. FEYGIN:

 3          Q.  What is the fee for?

 4          A.  The predelivery service fee, sir, is a dealer

 5   fee.

 6          Q.  And what is a dealer fee?

 7          A.  The dealer fee is a fee that we are legally able

 8   to recoup that pays for things such as our administrative

 9   costs, our DMS software, overhead fees, printing a temp

10   tag, et cetera.

11          Q.  What services are performed in connection with

12   this fee?

13          A.  I'm sorry.  I didn't --

14              MS. ISRAEL:  Object to the form.

15          A.  I didn't hear what you said, Mr. Feygin.

16   BY MR. FEYGIN:

17          Q.  What services are performed in connection with

18   this fee?

19          A.  With the predelivery service fee?

20          Q.  Correct.

21          A.  As I stated, Mr. Feygin, respectfully, our DMS

22   software cost money, printing ink cost money.  In order

23   for us to have the Adobe software to print this stuff cost

24   money.  The temp tags in which your client was given to

25   leave with cost money.  To print those and register it
```

```
 1    with the State cost money.  Overhead expenses in which the

 2    dealership must pay, such as heating, air, mortgages, et

 3    cetera, all of those play into the amount that I charge

 4    for a predeliver -- predelivery service fee, processing

 5    fee, a dealer fee, however you should choose to word it.

 6        Q.  Is any portion of that fee paid toward the

 7    inspection of the vehicle?

 8        A.  No, sir.

 9        Q.  On line 29, it discloses a cash down payment of

10    $2,000.  Is that accurate?

11        A.  Correct.

12        Q.  Did my clients actually pay $2,000 as a down

13    payment?

14        A.  Yes.

15        Q.  Was this contract explained to my clients?

16        A.  Yes.  It was attempted, Mr. Feygin.

17        Q.  Who explained --

18            MS. ISRAEL:  Let him -- let him -- answer his

19        questions.

20            MR. FEYGIN:  What was that?  I couldn't hear you.

21            MS. ISRAEL:  I said --

22        A.  I said yes, sir.

23            MS. ISRAEL:  I'm sorry.  And I said just answer

24        his questions.

25    BY MR. FEYGIN:
```

```
 1          Q.  Who explained it?

 2          A.  Chris.

 3          Q.  What was explained?

 4          A.  Exactly the numbers that you see on the right

 5     side of that page, sir.

 6          Q.  And how do you know that happened?

 7          A.  Because I have trained that gentleman, and he

 8     closes every client the same way.

 9          Q.  You don't have personal knowledge, though, do

10     you?

11          A.  I have no personal knowledge as I did not sit

12     next to him when he closed the Robinsons.  No, sir.

13          Q.  Going to the top here.  What's the odometer

14     reading?

15          A.  118,245, sir.

16          Q.  Where was that obtained from?

17          A.  The actual visual odometer on the car when it was

18     brought up to prepare paperwork.

19          Q.  And how do you know that?

20          A.  Because that's the only place we can get the

21     odometer, sir.

22          Q.  And that's an assumption that somebody read it

23     off the odometer.  It's not based on personal knowledge,

24     is it?

25               MS. ISRAEL:  Object to the form.
```

 1       A.  The odometer reading in which is put into the DMS

 2   software that prints on paperwork, Mr. Feygin, is taken

 3   directly from the odometer on the vehicle.

 4   BY MR. FEYGIN:

 5       Q.  Do you have personal knowledge that that's what

 6   happened here?

 7       A.  I have personal experience of that happening

 8   several times in which I have created paperwork and looked

 9   and taken the odometer off many vehicles.  Yes, sir.

10       Q.  But you don't have personal knowledge if that's

11   what occurred here, do you?

12       A.  Correct.  As I previously stated, I was not a

13   part of this sale.

14       Q.  How long does it take to fill out a buyer's order

15   form?

16       A.  To create --

17           MS. ISRAEL:  Object to the form.  Go ahead.

18       A.  To create the paperwork in our DMS software, sir,

19   can take approximately 20 to 30 minutes.

20   BY MR. FEYGIN:

21       Q.  Moving on to the retail installment sales

22   contract.

23           MR. FEYGIN:  Madam Court Reporter, you'll hear

24       the acronym RISC, which is R-I-S-C.

25           THE WITNESS:  I don't know what he's saying.

ISIAH JALEN McQUEEN, et al v. NATIONAL AUTOMOBILE... Document 69-8    Filed 09/30/25    Page 93 of 204 PageID 2025
Case 3:24-cv-00948-WWB-PDB    Document 69-8    Filed 09/30/25    Page 93 of 204 PageID 2287
CR of NATIONAL AUTOMO... (ROBIN BYLER-RAMAGHI)
93

```
 1            MR. FEYGIN:  It's Exhibit Number 7.
 2            (Plaintiff's Exhibit 7 identified.)
 3            MS. ISRAEL:  Mr. Feygin, can you pause for one
 4       second, please?  He --
 5            MR. FEYGIN:  Sure.
 6            MS. ISRAEL:  He's -- he was telling the court
 7       reporter that the -- the phrase "retail installment
 8       sales contract", he may use the acronym RISC --
 9            THE WITNESS:  Oh.  RISC.  Okay.
10            MS. ISRAEL:  -- R-I-S-C --
11            THE WITNESS:  Okay.
12            MS. ISRAEL:  -- and was explaining to the court
13       reporter if he uses that phrase.
14            THE WITNESS:  Okay.  Okay.  Thank you for --
15            MS. ISRAEL:  Sorry, Mr. Feygin.  Thank you.
16            MR. FEYGIN:  Thank you for clarifying.
17            MS. ISRAEL:  Yes, sir.
18  BY MR. FEYGIN:
19       Q.  Ms. Ramaghi, does this look familiar to you?
20       A.  Yes, sir.
21       Q.  Okay.  Is this a true and correct copy of the
22  retail installment sales contract National prepared for my
23  clients?
24            MS. ISRAEL:  Object to the form.  Are you going
25       to scroll through it all, or do you want her to answer
```

ISIAH ROBINSON VS. NATIONAL AUTOMOTIVE (30(b)(6) AUTOMOTIVE
CR of NATIONAL AUTOMOTIVE (ROBIN BYLER-RAMAGHI)

```
 1              based on what's visible on the screen?
 2                   MR. FEYGIN:  She already said that she is
 3              familiar with this document.  But if she would like me
 4              to, I can certainly do so.
 5                   MS. ISRAEL:  She said she recognized it.
 6         A.   I do recognize this as a set of paperwork that
 7    was given to Mr. and Mrs. Robinson when they asked to test
 8    drive the vehicle and review our paperwork, Mr. Feygin.
 9    BY MR. FEYGIN:
10         Q.   When was this contract presented to my clients?
11         A.   Where did this contract come from?
12         Q.   When -- on what date was this presented to them?
13         A.   According to the date at the top right, sir,
14    9/8/23.
15         Q.   Who at National prepared this document?
16         A.   As previously stated, with all other documents,
17    Chris.
18         Q.   Can you explain what this document is?
19         A.   It's a retail installment contract or security
20    agreement, sir.  This is -- explains to the customer how
21    much they will be paying for the vehicle, what their
22    biweekly payments are, and the terms in which they can
23    create their own default.
24         Q.   Effectively the loan agreement then?
25         A.   You can call it a loan agreement if you would
```

```
 1   like.  We do not call it the loan agreement.

 2         Q.  What's the difference between this document --

 3         A.  You didn't let me answer the question,

 4   Mr. Feygin.  You asked me would I call this a loan

 5   agreement.  I'm trying to answer your question.  Your

 6   question was would I call this a loan agreement.  I do not

 7   refer to this as a loan agreement.  I refer to it at -- at

 8   its legal terminology, a retail installment contract and

 9   security agreement.  I do not refer to my contracts as

10   loan agreements.

11         Q.  Is there any reason why?

12         A.  I call things what they are, sir.  Your name is

13   Mr. Feygin.  I call you Mr. Feygin.  This is a retail

14   installment contract.  I call it a retail installment

15   contract.  Logistics says logistics.

16         Q.  So it's important to be accurate?

17         A.  I'm so sorry?

18         Q.  It's important to be accurate?

19         A.  As best as one can be.

20         Q.  What is the difference between this contract and

21   the buyer's order form that we just saw?

22         A.  Buyer's order simply states for the buyer what

23   they are purchasing and the amount in which they are

24   purchasing.  This is an actual finance contract or retail

25   installment contract that depicts for the customer what
```

1  their percentage rate or what their rate of purchase is,

2  what their interest rate, what their finance charge, the

3  amount of interest that they will pay through the loan

4  assuming they only make the minimum payment, when their

5  payments start, how much those payments are, and the

6  number of payments in which they are required to make in

7  order to complete the payoff of said vehicle.

8        Q.  According to this document, what was the agreed

9  upon monthly rate?

10        A.  According to the document -- I'm sorry.  You fell

11  off.

12        Q.  What is the amount of the monthly payment?

13        A.  177.89, sir.

14        Q.  Did my clients sign any other documents that

15  defined how much they had to pay to finance this vehicle?

16        A.  They signed a buyer's order, bill of sale,

17  technicality that says they agree to purchase the vehicle

18  at 10,000, plus taxes and dealer fee, minus their down

19  payment.  That's what they would be making payments on.

20  Then they entered into the retail installment contract

21  that depicts their interest rate, number of payments,

22  amount of those payments, when those payments should

23  start.

24        Q.  You previously testified that it takes

25  approximately 20 minutes to fill out a set of documents.

```
 1    Would this be one of the documents in that set?

 2              MS. ISRAEL:  Object to the form.

 3              THE WITNESS:  I didn't even hear what he said.

 4              MS. ISRAEL:  Mr. Feygin, please repeat your

 5         question.

 6    BY MR. FEYGIN:

 7         Q.  You had previously testified that it takes

 8    roughly 20 minutes to populate the documents.  Would this

 9    be one of the documents that you are referring to?

10         A.  Yes, sir.

11         Q.  And, again, you had no personal knowledge as to

12    what was explained to my clients in this document?

13         A.  Correct.

14         Q.  So moving on to Exhibit 8.

15              (Plaintiff's Exhibit 8 identified.)

16              THE WITNESS:  What?

17              MS. ISRAEL:  He's moving on to Exhibit 8.

18              THE WITNESS:  Oh.  To --

19              MS. ISRAEL:  He's going --

20              THE WITNESS:  Oh, okay.

21              MS. ISRAEL:  -- to show a different document.

22    BY MR. FEYGIN:

23         Q.  Does this look familiar to you?

24         A.  It is an odometer disclosure.  Yes, sir.

25         Q.  Did National prepare this document for my clients
```

ISIAH... Case 3:24-cv-00948-WWB-PDB    Document 69-8    Filed 09/30/25    Page 98 of 204 PageID 2025
CR of NATIONAL AUTOM... ROBIN BYLER-RAMAGHI)    2292

98

```
 1   to sign?

 2        A.  Yes, sir.

 3        Q.  Who at National prepared this document?

 4        A.  As previously stated with the other documents,

 5   Chris.

 6        Q.  What was the mileage disclosure?

 7        A.  I can't read that far away with that small print.

 8   If you could please blow that up, I would appreciate it.

 9   118,245, Mr. Feygin.

10        Q.  And was either check box one or two selected?

11        A.  No, sir.

12        Q.  When was this presented to my clients?

13        A.  At the same time the other blank documents were

14   presented to them with no National Automotive signature,

15   when they asked to review blank documents when they went

16   on their test drive, Mr. Feygin.

17        Q.  What date was that?

18        A.  9/8.

19        Q.  That would be 9/8/2023?

20        A.  Yes, sir.

21        Q.  Okay.  And you have no personal knowledge of

22   what, if anything, was explained to them in this document?

23        A.  Correct.

24        Q.  Moving on to Exhibit 9.

25            (Plaintiff's Exhibit 9 identified.)
```

 1          Q.  Does this document look familiar?

 2          A.  That is a certificate of title application.  Yes,

 3   sir.

 4          Q.  Did somebody at National prepare this document?

 5          A.  As with all the previous documents, yes, sir.

 6          Q.  Was it Chris?

 7          A.  Yes, sir.

 8          Q.  Can you explain what this document is for?

 9          A.  This is a certificate of title application, sir.

10   As I'm sure you're previously aware, this document allows

11   a dealer to transfer accurately and properly the title out

12   of the dealer's name and into purchaser's name or names

13   shall there be a co-buyer.  It also will depict for the

14   DMV the VIN, make, mileage of the vehicle and question

15   or -- and request to be transferred to a purchaser's name

16   and out of a dealer's name.  It does give dealer

17   information, if there is a trade-in, and/or sales tax

18   information.

19          If you want to keep scrolling to page 2, I will

20   continue to explain to you.  If there is an out-of-state

21   title, there is a section for that in which we will depict

22   for that and sign off on it.  And then purchaser or

23   purchasers shall sign stating that they understand the

24   title is being transferred to their name, that they do

25   have a lien with the dealer on such and such date or

```
 1   whatever the executed date may be of the date of their

 2   purchase.

 3        Q.  What was the mileage disclosure made by National

 4   on this document?

 5        A.  Same mileage as the other documents, sir,

 6   118,245.

 7        Q.  What selection was made regarding the accuracy of

 8   that disclosure?

 9        A.  The same thing that was given on all the other

10   blank documents to your client, reflects actual mileage.

11        Q.  And what was this disclosure based upon?

12        A.  I'm sorry, sir.  I didn't hear you.

13        Q.  What was this disclosure based upon?

14            MS. ISRAEL:  Object to the form.  You can answer.

15        A.  When was this disclosure made to them or how?

16   BY MR. FEYGIN:

17        Q.  When did National --

18        A.  I'm sorry.  I am not understanding your question,

19   Mr. Feygin.

20        Q.  Where did National get 118,245 from?

21        A.  As I previously stated, off of the exact picture

22   of the odometer on the physical vehicle in front of us at

23   the time of test drive.

24        Q.  You mentioned now that there is a picture of the

25   odometer.  Did you save that picture?
```

```
 1        A.  No, sir.

 2        Q.  Okay.  Do you have personal knowledge --

 3        A.  I never said I took a picture either.

 4            (Speaking at once.)

 5        Q.  I'm sorry.  Repeat that.

 6        A.  I never said I took a picture of that odometer,

 7   sir.

 8        Q.  You have no personal knowledge, though, that that

 9   reading was taken directly from the odometer, do you?

10        A.  No, sir.  As I previously stated, I was not

11   engaged in any conversation with the Robinsons and Chris

12   at the present time of the sale.

13        Q.  Is this document populated through your DMS

14   system, or is this something that you need to populate by

15   hand?

16        A.  No, sir.  It is populated with all of the other

17   documents that you have previously shown.

18        Q.  So this is one of the documents that takes 20

19   minutes overall?

20        A.  Yes.

21            MS. ISRAEL:  Object to the form.  Go ahead.

22        A.  Yes, sir.  It is part of the group of documents

23   through our DMS.

24   BY MR. FEYGIN:

25        Q.  I'm going to pull up Exhibit 10, which is HSMV
```

```
 1    Form 82053.
 2           (Plaintiff's Exhibit 10 identified.)
 3       Q.  Does this document look familiar to you?
 4       A.  Yes, sir.
 5       Q.  Okay.  Is this a true and correct copy of the
 6    power of attorney for motor vehicle mobile home vessel or
 7    vessel with trailer submitted to the DMV?
 8       A.  That might be the only true thing that you have
 9    shown me thus far that was submitted to the DMV
10    accurately.  Yes, sir.
11       Q.  What is this form used for?
12       A.  The DMV several years ago started requiring
13    third-party power of attorney, sir.
14       Q.  Why do you use a third-party power of attorney?
15       A.  I am unsure, sir.  That's a question for the
16    Department of Motor Vehicles.
17       Q.  Is it your position that the Department of Motor
18    Vehicle requires the use of this form?
19       A.  Yes, sir.
20       Q.  Do you use this form in every transaction?
21       A.  In the recent year, yes.
22       Q.  What changed?  Why in the recent year?
23       A.  Again, there has been no clear explanation from
24    the Department of Motor Vehicles as to why this is now
25    required.  That is a question that you could defer to the
```

```
 1    Department of Motor Vehicles for further explanation.
 2         Q.  At the time that this document was signed, was
 3    the title physically being held by a lienholder?
 4         A.  No.
 5         Q.  Was the title lost?
 6         A.  No.
 7         Q.  Who is Robert Karr?
 8         A.  Robert Karr is a person that a lot of us dealers
 9    use for a third-party name.  Everybody seems to have their
10    own.
11         Q.  Does he work for the dealership?
12         A.  No.
13         Q.  Does he get paid by the dealership?
14         A.  No.
15         Q.  Is he somebody that actually exists?
16         A.  I'm sorry.  I didn't hear what your question was,
17    sir.
18         Q.  Does he actually exist?
19         A.  No.
20         Q.  Who filled this out for my clients?
21         A.  That is not National Automotive.  That would have
22    been done at the Department of Motor Vehicles.  At the
23    time your client purchased, we used Clay County.
24         Q.  It's your position as we sit here today that
25    somebody from Clay County DMV filled this out?
```

```
 1        A.  I'm sorry.  What about the Clay County DMV?

 2        Q.  It is your position as we sit here today that

 3   this box where it says under penalties of perjury I/we

 4   declare that I/we have read the foregoing document and the

 5   facts stated in it are true was completed by somebody at

 6   the Clay County DMV?

 7        A.  Yes, sir.  That is not my handwriting.  There

 8   are -- oftentimes the DMV ladies will complete forms that

 9   are not included in the packet or that they began using.

10   That is something you would have to clear through the Clay

11   County Department of Motor Vehicles or the tax collector's

12   office where the dealer work is cleared.

13        Q.  And just to pull this up once more.  I just

14   wanted to clarify something.  Is it your position that my

15   clients did not sign this document and it was somebody at

16   the DMV that signed it?

17        A.  No, sir.  Those are your clients' signatures.

18   They match all of their signatures on all of their forms,

19   sir.

20        Q.  I'll pull up Exhibit 11, if my admittedly bad

21   arithmetic is correct.

22             (Plaintiff's Exhibit 11 identified.)

23             MR. FEYGIN:  There's a reason why Ms. Israel and

24        I became attorneys.  It's not because of our splendid

25        ability to complete math well.
```

```
 1            MS. ISRAEL:  Well, I appreciate you lumping me

 2        into that, but you're absolutely right in this

 3        instance.  I'm abysmal in math.

 4            MR. FEYGIN:  Listen, it seems to be something

 5        that's true across the board, unless you're a tax

 6        attorney.

 7            MS. ISRAEL:  I take -- I take no offense.  Yeah.

 8    BY MR. FEYGIN:

 9        Q.  So looking at this separate odometer disclosure

10    statement and acknowledgement, does this look familiar to

11    you?

12        A.  It does look familiar, sir.  But, again, I will

13    state my position that that is not the formal odometer

14    disclosure that was turned in with Mr. and Mrs. Robinsons'

15    paperwork to the Department of Motor Vehicles.

16        Q.  This is a document that was prepared by National?

17        A.  Yes, sir.

18        Q.  Chris prepared it?

19        A.  Yes, sir.

20        Q.  What is the mileage disclosure?

21        A.  118,245.  All other documents preceding have the

22    same.

23        Q.  Regarding the accuracy, which box is selected?

24        A.  On this one, the box that reflects actual mileage

25    is currently checked.
```

```
 1        Q.  And that was something that National checked off?

 2        A.  No, sir.  It's done electronically.  We have the

 3   ability to change.

 4        Q.  It was a selection that was made by National

 5   then?

 6        A.  As you previously asked, this is an automatically

 7   generated check box when generic paperwork, giving the

 8   customer's name, address, phone number.  Private

 9   information is selected and inputted.  This is -- that

10   particular box is something National Automotive is able to

11   change.

12        Q.  Okay.  And you had previously mentioned you had a

13   policy of highlighting where the client's signature should

14   go, correct?

15            MS. ISRAEL:  Object to the form.  You can answer.

16        A.  I never said that was a policy.  I said that was

17   something we often do.

18   BY MR. FEYGIN:

19        Q.  Did that occur with my clients' transaction?

20        A.  I'm sorry, sir.

21        Q.  Did that occur during my clients' transaction?

22        A.  If you look at the true form, there is two

23   different highlights and two different colors, Mr. Feygin.

24   This one only has one highlight or one person, not both.

25   This, again, is the generic paperwork that your clients
```

```
 1   were given that brought back signed.  My speculation is

 2   that this is the paperwork they gave you and only gave you

 3   pieces of the other stuff that was truly turned into the

 4   DMV.

 5       Q.  So explain to me why National would give my

 6   clients incomplete or inaccurate documents then.

 7           MS. ISRAEL:  Object to the form.

 8       A.  I think, Mr. Feygin, the better question is why

 9   would your client want a blank set of paperwork to review

10   on their test drive.  If that is the question that you

11   would like me to answer, I'm happy to do so.

12   BY MR. FEYGIN:

13       Q.  Thank you but I'm not here to answer your

14   questions or have you present questions to be answered.  I

15   would like you to answer the questions that I'm presenting

16   to you.  What I'm trying to do is, I'm trying to figure

17   out why is it that my clients received these documents

18   that were incorrectly completed from the get-go.

19           MS. ISRAEL:  Object to the form.

20       A.  Simplest answer I can give you, Mr. Feygin, is

21   Mrs. Robinson asked for blank documents at the time to

22   review prior to her purchase.  Chris stepped back to my

23   office after having a conversation with them, asked if he

24   was able and within his rights to give them a blank set of

25   documents to review while they were on a test drive so
```

```
 1   that they could inform themselves, is my speculation, read

 2   over, educate themselves -- I am unsure of their

 3   position -- so that they would be ready -- should they

 4   choose to purchase the vehicle, they would be ready to

 5   sign proper documentation.

 6   BY MR. FEYGIN:

 7        Q.  And none of the documents that we reviewed so far

 8   were blank, were they?

 9        A.  Of all the documents we've reviewed so far, what,

10   sir?

11        Q.  None of them were blank, were they?

12        A.  None of them have National Automotive's

13   signature, sir.

14        Q.  But all the other information is there, correct?

15        A.  Correct.

16        Q.  And same thing for this separate odometer

17   disclosure statement acknowledgment, correct?

18        A.  This is what the customer asked.  This is what we

19   provided at their request.  In a business setting, if a

20   customer asks you something and we're able to provide, we

21   are happy to oblige.

22        Q.  I just want to go back to Number 5 real quick,

23   which is going to be the transfer title.  And remind me.

24   Is this the one that you submitted to the DMV or is it

25   not?
```

 1          MS. ISRAEL:  We don't have a screen share yet,

 2     Mr. Feygin.

 3          MR. FEYGIN:  That would certainly help.

 4          MS. ISRAEL:  It would.  Thank you.

 5     A.  No, sir.  If you will refer to the documents

 6     subpoenaed from the DMV, then you will see that there were

 7     other boxes checked.  This is not a complete and accurate

 8     document, sir.

 9     BY MR. FEYGIN:

10     Q.  And what boxes were checked on the ones submitted

11     to the DMV?

12     A.  What, sir?

13     Q.  Which boxes were checked on the one that was

14     submitted to the DMV?

15     A.  On my side, the six digit and then the not

16     actual.

17     Q.  So you're saying that the only difference here is

18     that the six-digit box isn't selected?

19     A.  The six-digit odometer now reads, that box is not

20     checked, sir.  And then you have a checkmark right there

21     next to the not actual mileage.  On the front of your

22     title, if you'd like to scroll up, the one that was

23     submitted to the DMV you will notice is circled around the

24     mileage and not actual, sir.  This is not the one that was

25     submitted with their legally binding registration

ISIAH ROBINSON vs. CITY OF BOYNTON BEACH & PULLE AUTOMOTIVE CR of NATIONAL TOLL (KELLY BYLER-RAMAGHI)

Case 3:24-cv-00948-WWB-PDB    Document 69-8    Filed 09/30/25    Page 110 of 204 5/2025
PageID 2304
110

```
 1    paperwork.

 2        Q.  This is a copy of the title that was obtained

 3    through the DMV's investigation.  Why would this title be

 4    different than the one that was submitted to the DMV?

 5        A.  Because we're required to check all boxes, sir.

 6    Our work will be kicked back for an I not being dotted, a

 7    T not being crossed, Mr. Feygin.

 8        Q.  I'm just a little confused here.

 9        A.  What was what here?

10        Q.  You're saying that it -- I'm slightly confused,

11    and you're going to have to work with me here.  But this

12    was presented during the DMV's examination following my

13    clients' DMV complaint.  This was the one that was

14    presented to the DMV examiner.  The scanned transaction

15    number up top is the DMV's documentation system.  Why

16    would this title that was presented to the DMV examiner be

17    different than the one that was submitted to the DMV?

18          MS. ISRAEL:  Object to the form.  You can answer

19       if you understand his question.

20        A.  I don't understand your question, Mr. Feygin.

21    Because that is not what I have in my file.  It's also not

22    what I have in my file when Mr. Robinson submitted his DMV

23    complaint and I got copies of things.  So I'm unsure what

24    your question is, sir.  If you'd like to be very blunt and

25    specific, I would be happy to help you answer -- by
```

ISIAH ROBINSON vs. WESTLAKE SERVICES, LLC d/b/a WESTLAKE FINANCIAL SERVICES AND NATIONAL AUTO PROMOTERS     9/25/2025
CR of NATIONAL AUTO PROMOTERS (HAYLE BYLER-RAMAGHI)                        111
Case 3:24-cv-00948-WWB-PDB    Document 69-8    Filed 09/30/25    Page 111 of 204 PageID 2305

```
 1    answering that.

 2    BY MR. FEYGIN:

 3        Q.  Okay.  We'll get to that in a little bit then.

 4            MS. ISRAEL:  Mr. Feygin, can we take a short

 5        break when you get to a natural stopping point or

 6        transition?  I would like to use the restroom.

 7            MR. FEYGIN:  Let's do a five-minute now.

 8            MS. ISRAEL:  Are you sure?

 9            MR. FEYGIN:  Yeah.

10            MS. ISRAEL:  Okay.  All right.  Thank you.

11            THE VIDEOGRAPHER:  Off the record at 1:49.

12            (Recess taken.)

13            THE VIDEOGRAPHER:  We are -- we are now back on

14        the video record at 2:00.  This marks the beginning of

15        Media 3.  You may proceed.

16    BY MR. FEYGIN:

17        Q.  All right, everybody.  I'm going to share what's

18    going to be -- this is Plaintiff's 12.

19            (Plaintiff's Exhibit 12 identified.)

20        Q.  Ms. Ramaghi, does this look familiar to you?

21        A.  Yes, sir.  A different page of the certificate of

22    title application.

23        Q.  Is this a true and correct copy of the

24    certificate of title application completed by National?

25        A.  It looks like something, yes, that could have
```

```
 1   been provided.  Yes, sir.

 2        Q.  Up top --

 3            MS. ISRAEL:  Mr. Feygin --

 4   BY MR. FEYGIN:

 5        Q.  -- to the right-hand cor --

 6            MR. FEYGIN:  Go ahead.

 7            THE WITNESS:  He sounds like he's in a tunnel

 8        again.

 9            MS. ISRAEL:  I know.  I'm sorry.  Is this a

10        different document from Exhibit 9?

11            MR. FEYGIN:  Yes.  We're up to 12.

12            MS. ISRAEL:  Sir, I meant by title.  I didn't

13        mean by number.

14            MR. FEYGIN:  Yes, it is.

15            MS. ISRAEL:  Okay.  Thank you.

16   BY MR. FEYGIN:

17        Q.  Ms. Ramaghi, up in the right-hand corner on the

18   second page, whose signature is that?

19        A.  It's Chris'.

20        Q.  Okay.  Scrolling up to the -- or the bottom of

21   page 1.  What is the mileage disclosure here?

22        A.  If you could blow it up again, sir, that would be

23   helpful.  118,245.

24        Q.  And what is the check box selected -- or which

25   check boxes are selected regarding the accuracy of the
```

ISIAH ROBINSON vs. DANIEL RAMAGHI and RODNEY RAMAGHI PROMOTION, INC. ... 9/10/2025
Case 3:24-cv-00948-WWB-PDB    Document 69-8    Filed 09/30/25    Page 113 of 204
CR of NATIONAL ... (BYLER-RAMAGHI)
PageID 2307
113

1    mileage?

2        A.  It reflects actual mileage, and this is not the

3    actual mileage.

4        Q.  Why are there two separate selections?

5        A.  Because they're both in and about themselves as

6    accurate.  The 118,245 was the actual numerical amount we

7    could see on the odometer.  And after we got the title and

8    disclosed that to the Robinsons, it's not the actual

9    mileage.  We disclosed both.

10       Q.  Is it your position as you sit here today that

11   you are allowed to make two disclosures on one form?

12       A.  It was my understanding from previous DMV

13   inspectors that you could do anything that would

14   sufficiently and accurately suggest that you disclose to

15   the customer all legalities and truths.  Yes.

16       Q.  And what date was this second disclosure made?

17       A.  This document was actually done when they came

18   back a few days later.  This is not --

19       Q.  What date was that?

20           (Speaking at once.)

21       A.  -- date of 9/8/23.  The same form that was done

22   that day.

23       Q.  What date did they come back?

24       A.  I believe it to be 9/13, 9/14.  I am not 100

25   percent accurate, Mr. Feygin.  Not right now.  I don't

 1    have the --

 2         Q.  Was that --

 3             (Speaking at once.)

 4         A.  -- in front of me.

 5         Q.  I couldn't hear you, madam.  So I'm going to have

 6    to ask you to repeat.  Was that September 13th you said?

 7         A.  I don't recall whether it was 9/13 or 9/14 in

 8    front of me.  I don't have those actual specifics.

 9         Q.  Who checked off in handwriting the second

10    selection?

11         A.  I'm assuming it was the DMV, sir.  I do not know

12    without certainty.

13         Q.  So is it your position as we sit here today that

14    somebody else outside of National selected this box?

15         A.  I'm unwilling to say that it was anybody other

16    than not me, sir.  I will say that I did not.

17         Q.  Did you speak to Chris about this form?

18         A.  No, sir.  He does not do the tight work.

19         Q.  Who else does the title work?

20         A.  I drop off packets to the Department of Motor

21    Vehicles.  And what happens to those packets after I leave

22    them with the dealer drop-off, I am unsure, sir, until the

23    work is completed and I am called that it's ready to be

24    picked up.

25         Q.  And when was this executed by my clients?

```
 1          A.   When was it what?

 2          Q.   When was this signed by my clients?

 3          A.   This one shows -- well, one person shows 9/8.

 4     One person shows no date at all.  But it looks like

 5     Mrs. Robinson signed both for her and her husband.

 6          Q.   How would you know that?

 7          A.   Speculation, sir.

 8          Q.   Pulling up Exhibit 13, application for

 9     certificate of title.

10               (Plaintiff's Exhibit 13 identified.)

11          Q.   Does this look familiar?

12          A.   It does look like a familiar document we use,

13     sir.

14          Q.   Is this a document that was created by National

15     for my clients' transaction?

16          A.   Yes, sir.

17          Q.   Okay.  What is the mileage reading on this

18     document?

19               (Speaking at once.)

20          A.   Hold on, sir, please.  You asked me if the

21     document was created by National.  Then you launched into

22     another question which I did not hear.  The answer to your

23     first question, was the document created by National

24     Automotive, that answer is yes, sir.

25          Q.   What is the mileage -- I'm sorry.  What is the --
```

```
 1    on the bottom here -- I'm going to zoom in for you.  What

 2    is the mileage disclosure on this form?

 3         A.  118,245, as all previous documents.

 4         Q.  Which boxes are selected regarding the accuracy

 5    of the mileage?

 6         A.  Number one, number two, and number three, sir.

 7         Q.  Why are all three checked off?

 8         A.  I'm unsure, sir.  Maybe that's a question that we

 9    could refer to the DMV or whoever was doing the dealer

10    work at that time.

11         Q.  In the bottom right-hand corner, can you please

12    read off the number string starting off with NAI?

13         A.  NAI115.

14         Q.  This is a document that you provided to us in

15    discovery.  Where did this document come from?

16         A.  That would have been the copies of the documents

17    that were received from the DMV when I was asked for by

18    the attorney.

19         Q.  Same signature set as the previous document by my

20    clients?

21              MS. ISRAEL:  Object to the form.  You can answer.

22              THE WITNESS:  I didn't hear what he said.  He

23         sounds like he's in a tunnel again.

24    BY MR. FEYGIN:

25         Q.  Are these the exact same signatures that appear
```

```
 1    on the previous form?
 2            MS. ISRAEL:  Object to the form.  You can answer.
 3        A.  They could be.  Yes, sir.  I am not Mr. and
 4    Mrs. Robinson to attest to those certain signatures.
 5    So --
 6    BY MR. FEYGIN:
 7        Q.  Up top to the right, is that Chris' signature?
 8        A.  Yes.  I do recognize his signature.
 9        Q.  I'm going to pull up Exhibit 14, which is the
10    odometer disclosure statement.
11            (Plaintiff's Exhibit 14 identified.)
12        Q.  Does this document look familiar to you?
13        A.  That is the one that I did in front of your
14    clients.  Yes, sir.
15        Q.  When was this signed?
16        A.  These were signed a few days after they came back
17    again.  I'm not sure exact in front of me.  It could have
18    been 9/13, 9/14.  I don't have that exact date.  It was a
19    few days after his original purchase.  Their original
20    purchase.  Excuse me.
21        Q.  Whose handwriting is at the top where it says
22    TMU?
23        A.  That is mine, sir.
24        Q.  Who signed this on behalf of the dealership?
25        A.  Chris.
```

```
 1         Q.  When did Chris sign this?

 2         A.  The same time.  We were all sitting at the same

 3    desk explaining the title.  When Isiah and Mrs. Robinson

 4    looked at the title, it was circled.  It was explained to

 5    them it was not actual, and it was explained to them in a

 6    very KISS method of what TMU and not actual means, sir.

 7    Prior to them or Chris signing them, I explained to them

 8    that all documents would be labeled TMU.  They were okay

 9    with that.

10         Q.  Do you have the wet ink signed copy of this

11    document?

12         A.  Do I have a wet signature?

13         Q.  Do you have the wet ink original of this

14    document?

15         A.  The DMV has that, sir.

16         Q.  Where did you produce this document from?

17         A.  Where did I produce the document from?

18         Q.  Correct.  Where did you get this document from?

19         A.  We keep copies of documents in the file which are

20    sent to the DMV.

21         Q.  How were those copies kept?

22         A.  In the actual deal jacket, sir.

23         Q.  They are in paper format?

24         A.  Yes, sir.

25         Q.  And I may have missed it.  But who's the -- which
```

```
 1    -- was it you or Chris that checked off box number two?

 2         A.  I'm uncertain either one of us could have done

 3    that, sir.  You're asking me who checked off the box

 4    almost two and a half years ago.  I -- sorry, sir.  I

 5    cannot answer that with certainty.

 6         Q.  It's okay.  Does this document look familiar to

 7    you?

 8              (Plaintiff's Exhibit 15 identified.)

 9         A.  Yes, sir.

10         Q.  Is this a copy of the buyer's order form you

11    provided in discovery?

12         A.  Yep.

13         Q.  Up top, who wrote that TMU near the odometer

14    reading?

15         A.  I wrote that in front of your customers -- or

16    your clients, sir.

17         Q.  When did that occur?

18         A.  The same date that that previous document was

19    signed again with the TMU.  A few days after the original

20    purchase.

21         Q.  Going down to my client's signatures here.

22         A.  Those appear to be --

23         Q.  When did --

24              MS. ISRAEL:  There's not a question yet.

25              THE WITNESS:  Sorry.
```

```
 1                   MS. ISRAEL:  Go ahead.

 2    BY MR. FEYGIN:

 3         Q.  When did my clients sign the documents?

 4         A.  Did both of your clients sign the documents?  Is

 5    that your question?

 6                   MS. ISRAEL:  He said when.  When.

 7                   THE WITNESS:  Oh, when.

 8                   MS. ISRAEL:  Yeah.  I apologize.  I'm sorry.  I

 9         thought you asked --

10                   MS. ISRAEL:  No worries.

11                   THE WITNESS:  -- did they.

12         A.  When they came back the second time, when we

13    explained to them the title situation, sir.

14    BY MR. FEYGIN:

15         Q.  So it's your position as you sit here today that

16    my clients applied their signature to this document --

17         A.  Yes.

18         Q.  -- at a different date than what is written on

19    the contract?

20         A.  Correct.  They were explained why as well.

21         Q.  Okay.  And it's your position as you sit here

22    today that my clients applied their signatures after you

23    wrote TMU next to the mileage?

24         A.  Correct.

25         Q.  Who was present other than Chris for this
```

```
 1    process?

 2         A.  Nobody.  Your clients, Chris, and I were the only

 3    ones at the dealership.

 4         Q.  And your testimony is the same for the remaining

 5    signatures?

 6         A.  Yes, sir.

 7         Q.  Does this document look familiar to you?

 8              (Plaintiff's Exhibit 16 identified.)

 9         A.  Yes, sir.

10         Q.  Is this a copy of the retail installment sales

11    contract you provided in discovery?

12         A.  Correct.

13         Q.  Who wrote the TMU acronym?

14         A.  I did.

15         Q.  You did?

16         A.  Yes, sir.

17         Q.  When did that occur?

18         A.  In front of your clients.

19         Q.  When?

20         A.  Same dates they came in to sign the second set of

21    documents as previously stated.

22         Q.  Is it your position as you sit here today that my

23    clients signed a second retail installment sales contract?

24         A.  The signature is on the bottom right-hand side.

25    Is that your specific question?
```

ISIAH ROBINSON and CHRISTOPHER ROBINSON vs NATIONAL AUTOMOTIVE PROMOTION...    09/25/2025
CR of NATIONAL AUTOMOTIVE (BRANDY SKYLER-RAMAGHI)
122

Case 3:24-cv-00948-WWB-PDB    Document 69-8    Filed 09/30/25    Page 122 of 204
PageID 2316

1     Q.  My question is, was a second retail installment

2  sales contract signed by my clients?

3     A.  Yes.

4     Q.  And that wasn't on September 8th, was it?

5     A.  No, sir.

6     Q.  Is it your position as you sit here under oath

7  today that my clients signed this document after you wrote

8  in TMU?

9     A.  Yes.  They were present when TMU -- on all of

10  these documents.  They sat right there in front of the

11  desk, watched me do it, approved me do it, knew I was

12  doing it, saw me do it.

13     Q.  And, again, this is Chris' signature on the

14  bottom left of the last page?

15     A.  Yes, sir.  I believe so.  You would need to ask

16  him for sure.  But I do believe that is his signature.

17     Q.  I'm pulling up Exhibit 17.

18         (Plaintiff's Exhibit 17 identified.)

19     Q.  Does this document look familiar to you?

20     A.  Yes, sir.

21     Q.  Is this the separate odometer disclosure

22  statement and acknowledgment prepared by National

23  Automotive?

24     A.  Yes, sir, it is a separate odometer disclosure.

25  Yes, sir.

```
 1        Q.  What was the mileage reading on this document?

 2        A.  Would you please be kind enough to blow it up so

 3   that I can see?  118,245.  This one is typed in.

 4        Q.  Who handwrote TMU on both sides?

 5        A.  I did.

 6        Q.  Who selected box number one?

 7        A.  That is a computer-generated X.

 8        Q.  Who selected box number three?

 9        A.  That was me in front of your client.

10        Q.  Chris signed on behalf of the dealership?

11        A.  Yes, sir.

12        Q.  What date was this executed by the dealership?

13        A.  9/8/23 is what is currently listed on that.  It

14   is not when it was signed.  It was a few days later.

15        Q.  So the mileage reading that's on this document

16   was not actually read on September 8th of 2023, was it?

17        A.  It could not be.  Your client did not come back

18   with the car, Mr. Feygin.  So no.  The 118,245 stood as of

19   the date of 9/8 when they originally purchased.

20        Q.  So, again, this was filled in on 9/8?

21             MS. ISRAEL:  Object to the form.

22   BY MR. FEYGIN:

23        Q.  What date was this filled in on?

24             MS. ISRAEL:  Object to the form.  Answer it if

25        you're able to.
```

 1    A.  As previously stated, Mr. Feygin, your clients

 2   came back a few days after 9/8, after they were made aware

 3   of the title in hand of not being actual.  They chose for

 4   a reason, which I am sure you will ask, why the dates are

 5   remaining as 9/8.  They were present at all times.  No

 6   bathroom breaks.  No cigarette breaks.  Nothing.  They

 7   were present at all times when TMU, not actual, et cetera,

 8   was written in on the second set of paperwork, sir.

 9   BY MR. FEYGIN:

10    Q.  So on this second set of paperwork, when was the

11   date actually entered for the date read?

12        MS. ISRAEL:  Object to the form.

13   BY MR. FEYGIN:

14    Q.  It's a simple question.  When did you put

15   9/8/2023 on this document?

16        MS. ISRAEL:  Object to the form.  You can answer

17        to the best of your ability.

18    A.  The best of my ability, sir, until you get to

19   your follow-up question, which I'm sure you will ask, 9/8

20   was the original date of purchase.  This is a second set

21   of paperwork when your clients came back after being told

22   that the title showed not actual.  There is a reason for

23   that.  I'm sure, Mr. Feygin, you will ask me that, and I

24   will let you do the asking.

25   BY MR. FEYGIN:

 1    Q.  Until we get to that point, I need clarity as to

 2  when you put 9/8/2023 on this document, which I have not

 3  received to date.

 4         MS. ISRAEL:  Object to the form.  Do you

 5      understand his -- his question?  If not, it's okay.

 6         THE WITNESS:  No, I do not understand his

 7      question.  He keeps asking the same question --

 8  BY MR. FEYGIN:

 9    Q.  You were saying my --

10         (Speaking at once.)

11         THE WITNESS:  -- understand.

12  BY MR. FEYGIN:

13    Q.  Okay.  Let me highlight to make it easier.  Do

14  you see the highlighting?

15    A.  I do see the 9/8/23, Mr. Feygin.

16    Q.  When -- on what date did National Automotive put

17  9/8/2023 onto this form?

18    A.  Again, my answer will stay the same, Mr. Feygin.

19  The dates throughout all of this second set of paperwork

20  match the original date of purchase of 9/8/2023.  There is

21  a very logical and reasonable and legal explanation for

22  that.

23         MS. ISRAEL:  He's just asking you about the date,

24      if you know when that date was put on that document.

25    A.  9/8/2023.  It was copied over from the original

 1   date of purchase.

 2   BY MR. FEYGIN:

 3        Q.  And what date was it copied over on?

 4        A.  Approximately 9 -- I believe it was a Wednesday,

 5   9/13, 9/14.  I would have to look at the calendar to be

 6   specific, sir.  I don't have a calendar in front of me.

 7        Q.  Thank you.

 8        A.  No problem.

 9        Q.  Bear with me here.

10        MS. ISRAEL:  No worries.  Take your time.

11   BY MR. FEYGIN:

12        Q.  Okay.  All righty.  On the screen is Exhibit 9,

13   Exhibit 12, and Exhibit 13.  Do you see these exhibits?

14        A.  Partially.

15        MS. ISRAEL:  Not fully.

16   BY MR. FEYGIN:

17        Q.  Well, it's going to be difficult for me to show

18   them fully.  If you want, I can scroll --

19        A.  I understand.

20        Q.  -- through them just to verify.

21        MS. ISRAEL:  It was more just to let you know

22        that they're only -- only portions are visible.

23   BY MR. FEYGIN:

24        Q.  Okay.  These are all three applications of

25   certificate of title we had just discussed.  Is it your

 1   position here that these three documents are different

 2   from one another?

 3            MS. ISRAEL:  Object to the form.

 4       A.  How would I know that?  No idea, Mr. Feygin.  I'm

 5   sorry.  I'm unable to answer that question.

 6   BY MR. FEYGIN:

 7       Q.  Okay.

 8            THE WITNESS:  It's my fault.  I left my inhaler

 9        in my car.  So --

10            MS. ISRAEL:  Do you want to take a break to go

11        get it?

12            THE WITNESS:  It's fine.

13   BY MR. FEYGIN:

14       Q.  I'm pulling up Exhibits 8 and 14 again for

15   review.  These are the odometer disclosure statements we

16   had just discussed.  Is it your position as we sit here

17   today that these are two completely separate documents?

18            MS. ISRAEL:  Object to the form.  You can answer.

19       A.  The document themself is the same.  The logistics

20   or the specific of what is written on each document, yes,

21   is different, Mr. Feygin.

22   BY MR. FEYGIN:

23       Q.  And it is your position as we sit here today that

24   my clients signed Exhibit 14 with the TMU on top on a

25   completely different date than they signed the one without

ISIAH ROBINSON vs. LEE COUNTY BOARD OF COUNTY COMMISSIONERS - PROMOTIONS
CR of NATIONAL DEPOSITION SERVICES (CHYLER-RAMAGHI)

Case 3:24-cv-00948-WWB-PDB    Document 69-8    Filed 09/30/25    Page 128 of 204

9/5/2025
128
PageID 2322

```
 1    TMU?

 2        A.  That is true.

 3        Q.  How do you explain the identical signatures?

 4            MS. ISRAEL:  Object to the form.

 5        A.  How do I explain the identical signature?

 6    BY MR. FEYGIN:

 7        Q.  Correct.

 8        A.  Just like anyone else's signature, Mr. Feygin.  A

 9    signature is a signature.  I sign my name every day.  My

10    signature doesn't change.

11        Q.  So it's your position --

12            (Speaking at once.)

13        A.  The --

14        Q.  -- that signatures remain identical?

15            MS. ISRAEL:  She was trying to finish --

16            MR. FEYGIN:  I'm sorry?

17            MS. ISRAEL:  -- her answer.  She was -- she was

18        still talking, Mr. Feygin.

19    BY MR. FEYGIN:

20        Q.  Please finish, madam.  I didn't mean to cut you

21    off.  I thought you were finished.

22        A.  You will also notice, Mr. Feygin -- I'll just

23    point it out for you -- on 1, on the left-hand side, there

24    is only one highlight mark.  If you look and you blow up

25    the one where your clients came back and I wrote in TMU --
```

```
 1   again, I'd like to state for the record, in front of them,

 2   with their acknowledgment -- go to the left side.  Scroll

 3   over to your clients.  You will see that there is

 4   highlights of different colors against both of them.  I

 5   can state it --

 6        Q.  Are we talking about these little -- my

 7   apologies.  Go ahead.

 8        A.  You will see that there is a lighter colored

 9   highlight behind Ms. Lisa's.  You will see that there is

10   just a shade darker beside Isiah's on the right-hand side.

11        Q.  Are we talking about these little dots that

12   appear on both sides?  These?

13        A.  On the right-hand side.  Yes.  On the left side,

14   looks like her signature to me.  I'm sorry.  I don't --

15        Q.  It's okay.  We have experts for that.  I'm going

16   to pull up Exhibit 16 and Exhibit 7, which are the retail

17   installment sales contracts that we had discussed.  The

18   one on the left is 16.  The one on the right is 7.  And

19   just to clarify, 16 is the one that you're currently

20   servicing for the payments, correct?

21        A.  The one on the left, sir?  Is that what you're

22   saying is 15?

23            MS. ISRAEL:  He said 16.

24        A.  16.  I apologize.

25   BY MR. FEYGIN:
```

ISIAH ROBINSON vs. JEREMY CAITLAN CAINS d/b/a PROMOTION 4/15/2025
CR of NATIONAL ADJUSTMENT BUREAU (BYLER-RAMAGHI)
Page 130 of 204
130

Case 3:24-cv-00948-WWB-PDB   Document 69-8   Filed 09/30/25   Page 130 of 204
PageID 2324

1      Q.  16, yes.

2      A.  Yes, sir.

3      Q.  Yes, ma'am.

4      A.  Yes, sir.

5      Q.  Okay.  That's the operative loan agreement?  I'm

6  sorry.  The operative retail installment sales contract?

7      A.  Yes, sir.

8      Q.  Okay.  And is it your position here, as you sit

9  here today, that this was executed by my clients on a

10  completely different day than the one on the right-hand

11  side?

12      A.  Yes, sir.

13      Q.  Okay.  So it's your position that the signatures

14  are also different?

15          MS. ISRAEL:  Object to the form.

16      A.  I wouldn't know your client's signature from day

17  to day.  They seem similar to me.  That's a client

18  question between you and them.  I -- I'm not here to tell

19  you if they want to change their signature from day to

20  day.  I'm telling you that the one with TMU on the

21  left-hand side is a true and valid copy that was signed in

22  front of them.  It was explained to them.  It was marked

23  in front of them.  That's all I can tell you, Mr. Feygin,

24  as truthfully, as honestly as I can possibly do so under

25  oath today.

ISIAH ROBINSON vs UNIVERSAL UNDERWRITERS INSURANCE COMPANY PROMOTIVE
CR of NATIONAL GENERAL (ROSIE BYLER-RAMAGHI)

 1    BY MR. FEYGIN:

 2        Q.  Pulling up Exhibits 17 and 11.  These are the

 3    separate odometer disclosure statements and

 4    acknowledgements.  The one on the left is obviously the

 5    one that's not actual TMU.  The one on the right is the

 6    one my clients contend is the one that they received.

 7    Same question.  Is it your position as we sit here today

 8    that the one on the left with the TMU was signed on a

 9    different date than the one on the right without the TMU?

10        A.  Yes, sir.

11        Q.  And that date is sometime around the 13th or the

12    14th of September?

13        A.  Yes, sir.

14        Q.  Thank you.

15            MR. FEYGIN:  Madam Court Reporter, we're going to

16        be skipping Exhibit 18.  So we'll be moving on to 19

17        just for -- to make things easier.

18            MS. ISRAEL:  What do you mean by skipping it?

19        You had -- you had premarked documents?

20            MR. FEYGIN:  Yes.  And I'm not going to be

21        relying on them.

22            MS. ISRAEL:  Okay.  I -- I just didn't have that

23        set.  So no problem.  I just want to make a note to

24        myself.  So you're -- you're intentionally skipping

25        the Number 18 or re -- renumbering?

```
 1              MR. FEYGIN:  Yes, I'm intentionally skipping.

 2              MS. ISRAEL:  Okay.

 3    BY MR. FEYGIN:

 4         Q.  So did National install a GPS device on this

 5    vehicle?

 6         A.  Yes, we do.

 7         Q.  One or more than one?

 8         A.  Depends on the customer, depends on the vehicle,

 9    sir.  Please be specific with your question.

10         Q.  With respect to my clients' vehicle, how many GPS

11    devices were installed by the dealership?

12         A.  One.

13         Q.  Who -- what manufacturer -- what is -- who is the

14    manufacturer of that GPS device?

15         A.  GoldStar, SVR.  Same company.  They were bought

16    out.  But SVR is what it is currently known at.

17         Q.  It's GoldStar you said?

18         A.  GoldStar was the old company.  SVR is the new

19    company that bought it out kind of thing.

20         Q.  Okay.  Who installed this GPS device?

21         A.  Pearson.

22         Q.  When did he install it?

23         A.  The date of -- I believe my best memory and

24    recollection, the first hit on the GPS was on 9/4, sir.

25         Q.  When was it installed?
```

 1      A.  When we had the heartbeat of the first spot, the

 2   first tracking was on 9/4, sir.

 3      Q.  Do you own or lease this device?

 4      A.  Own.

 5      Q.  Do you know the model number?

 6      A.  I do.

 7      Q.  What is the model number?

 8      A.  That was provided to my attorney, in which I do

 9   believe she sent over to you this morning, sir.

10         MS. ISRAEL:  Actually, Mr. Feygin --

11   BY MR. FEYGIN:

12      Q.  Please respond to the question.

13         MS. ISRAEL:  If you know the model number, tell

14      him what it is.

15      A.  The model number is also called the IMEI or the

16   serial number, sir.  If you'd like to blow up the exhibit

17   you have on the screen, it's listed right there in the

18   center.  It's called serial number.  That is also called a

19   model number on these GPS's.  I'm sorry.  I don't mean to

20   be condescending in my answer.  I just assumed that a

21   dealer -- somebody that dealt with dealers such as myself

22   or represented people to Sue Your Dealer would know the

23   GPS's and stuff.  I apologize, sir.  I wasn't trying to be

24   disrespectful.

25   BY MR. FEYGIN:

```
 1        Q.  Uh-huh.  950BZMT, what is that?

 2        A.  IMEI or the IMEIC, that is also located as a

 3   serial number.  This is the log-in or the interface in

 4   which we see when we log in.  So for logistical

 5   simplistics, if somebody is our repossession or my front

 6   office staff, Chris or I, we just -- we prefer to use

 7   serial number.

 8        Q.  So the serial number is the same as the model

 9   number you're saying?

10        A.  To my knowledge, yes, sir.

11        Q.  Okay.  Where is this device located?

12        A.  That's a question for Pearson, sir.  We have five

13   or six different locations, depending on the vehicles, as

14   to where those would be hidden or installed at.  Every

15   vehicle is different.

16        Q.  Did you speak to him to prepare for today?

17        A.  I apologize.  I didn't hear what you said.

18        Q.  Did you speak to him to prepare for today?

19        A.  As I previously stated when you asked the same

20   question, Mr. Feygin, no, I did not speak with Pearson in

21   prep -- in preposition for this deposition today in any

22   way, in any --

23        Q.  So does --

24        A.  -- any situation, in any circumstance.

25        Q.  Does the device have an internal battery?
```

```
 1        A.  It lasts for approximately 48 hours.

 2        Q.  So, yes, it does?

 3        A.  That is a yes, sir.

 4        Q.  How does the battery get charged?

 5        A.  When it is -- when the car runs.  It's through

 6   the battery, the alternator.

 7        Q.  What happens if the vehicle doesn't run?

 8        A.  The internal battery kicks in.

 9        Q.  What happens when the internal battery dies and

10   the vehicle isn't charging the internal battery?

11        A.  It is recharged once the battery kicks back on.

12   The car is started.  The car is running.

13        Q.  And if the car does not start or run?

14        A.  We've never had that issue, sir.  So I'm -- I'm

15   unsure of how to respond.  I -- I don't know.

16        Q.  Okay.  So based on your testimony, the internal

17   battery gets charged by the vehicle, correct?

18        A.  Correct.

19        Q.  And it gets charged off the vehicle's battery

20   and/or alternator, correct?

21        A.  Correct.

22        Q.  And if the vehicle's battery and/or alternator

23   are not working, the battery can't get charged then,

24   correct?

25        A.  As far as my knowledge with the system, yes.  I
```

```
 1   cannot --

 2        Q.  Does the device --

 3            (Speaking at once.)

 4        A.  Hold on, sir.  You asked me a question.  I'm

 5   trying to respond.  To the best of my knowledge, it

 6   replenishes its power source when that car starts and

 7   goes.  My understanding from using this GPS system is that

 8   it goes for approximately 48 hours.  I have never been in

 9   a situation with this particular company or GPS that I

10   have not had a GPS work after 48 hours.  It is -- unless

11   the car is wrecked and totaled and we know that it has

12   been sent to the junkyard or whatever for insurance

13   purposes, then we know where the vehicle is at.  Again, at

14   that point, we no longer really care about the GPS because

15   we now have an insurance claim on the vehicle.  That's the

16   best I can answer for you, sir.

17        Q.  Does the device monitor the vehicle's battery

18   voltage?

19        A.  It does not monitor the battery voltage of the

20   vehicle.  To my knowledge, it's more the internal battery.

21        Q.  What voltage does the device need to run?

22        A.  I am not sure, sir.  I don't get into that

23   specifics.  That would --

24        Q.  How long have you --

25        A.  -- be a question for Pearson.
```

 1          Q.  My -- my apologies.  There's a delay, I guess.

 2     So that's why we keep on talking over each other.  I don't

 3     mean to interrupt you, and I'm certainly not trying to.

 4               With respect to SVR, how long have you been using

 5     their services?

 6          A.  We no longer use SVR.  We used SVR maybe three,

 7     four years, give or take some.  I -- honestly, I'm not

 8     prepared to answer that.  I'm unsure.  I cannot give you a

 9     true definite date, sir, timely.

10          Q.  Does the device control the vehicle's ability to

11     be turned on?

12          A.  No.

13          Q.  Does the device control the vehicle's ability to

14     be driven?

15          A.  No.

16          Q.  Based on your experience, was the device

17     accurate?

18          A.  Fairly, yes.

19          Q.  How can you access the tracking records for this

20     device?

21          A.  How can we what, sir?

22               MS. ISRAEL:  Access.

23          A.  Access?

24               MS. ISRAEL:  The tracking records.

25          A.  I have a log-in as a dealer for all of my GPS's,

 1   and I can pull a GPS report -- or a historical report,

 2   maybe is a better way to say it, from the date of install.

 3   BY MR. FEYGIN:

 4        Q.  Is this an application or is this a web portal?

 5        A.  It's a web portal.

 6        Q.  Who has access to that portal?

 7        A.  Myself, SVR, and Chris.

 8        Q.  Are logs kept of who has --

 9        A.  Pearson does have access.  He -- once he

10   installs, he also does check the system to ensure that it

11   is locating and that it is properly working.

12        Q.  Are logs kept of who has accessed the tracking

13   records?

14        A.  Do I keep a log of who logs in and who logs out

15   to look at the GPS's?  Is that --

16        Q.  Not necessarily you -- not necessarily you

17   individually.  But is there a log somewhere of who logged

18   in?

19        A.  No.

20        Q.  And up on the screen now, Exhibit 19.

21            (Plaintiff's Exhibit 19 identified.)

22        Q.  Is this a screenshot of the portal?

23        A.  Yes.

24        Q.  Is this a screenshot of the particular -- my

25   clients' particular vehicle or the tracking for that

 1  vehicle?

 2      A.  Could you please blow this up?  It just looks

 3  like a map to me.  Yes, sir.

 4      Q.  Who prepared this screenshot?

 5      A.  I did.

 6      Q.  When?

 7      A.  When my attorney asked for it.

 8      Q.  When was that?

 9      A.  I am unsure of the date, sir.  That is a better

10  question suited for my attorney as to when she asked for

11  it.  My best guess would be when interrogatories -- or

12  when we needed to confirm that there could possibly be

13  alleging with the tampering of the GPS's.

14      Q.  And you used Chris Caldwell's account to access

15  this page?

16      A.  Chris and I have the same access.  Yes.  He has

17  his.  I have mine.  We both have the exact same address.

18  So regardless of what computer is being logged on or who's

19  being -- using what computer, it's the same everything.

20      Q.  Under my clients' name, in the middle of the

21  screen here, it says depleted battery 37.6 days.  What

22  does that mean?

23      A.  It means that the internal battery has been

24  depleted for 37.6, 5.  I don't know what it says.  37

25  point something days.

```
 1        Q.  Safe to assume that the battery was dead for 37

 2   days?

 3             MS. ISRAEL:  Object to the form.  You can answer.

 4        A.  Could be a number of things, sir.

 5   BY MR. FEYGIN:

 6        Q.  What things could it be?

 7        A.  That's a better suited question for SVR, sir.

 8        Q.  The bottom right-hand corner, it says 3.4V.  What

 9   does that mean?

10        A.  I don't know, sir.  I don't worry about those

11   other places.  I don't even look at it.  I worry about a

12   serial number, the VIN number, customer's name, and to be

13   able to locate.

14        Q.  So in your counterclaim, you allege the

15   plaintiffs tampered with this device.  Is that accurate?

16        A.  Yes.

17        Q.  Does the device provide a notification if it is

18   tampered with?

19        A.  Yes.

20        Q.  Did it provide you with a notification the device

21   was tampered with?

22        A.  It did say disconnected.  Yes.

23        Q.  Disconnected, not tampered, though?

24        A.  There is nothing in the GPS system that comes up

25   in a neon sign that says customer tampered with GPS,
```

```
1    Mr. Feygin.  It says disconnected or it says rebooted,

2    power source lost, et cetera.  Disconnected means

3    disconnected, Mr. Feygin.

4        Q.  So it could have been disconnected when the

5    battery died, correct?

6        A.  No.

7            MS. ISRAEL:  Object to the form.

8    BY MR. FEYGIN:

9        Q.  Go ahead.

10           MS. ISRAEL:  She answered.  She can repeat her

11       answer.  I was talking.  I'm sorry.

12       A.  I said no, sir.

13   BY MR. FEYGIN:

14       Q.  How do you know that?

15       A.  It would have said power lost.

16       Q.  So there is different alerts if it's disconnected

17   versus power loss?

18       A.  Yes, sir.

19       Q.  And you have proof that it said that the pow --

20   that the device was disconnected, correct?

21       A.  Yes, sir.

22       Q.  Okay.  In what form?

23       A.  Based on what?

24       Q.  In what form?  How did you get this notification?

25       A.  When we log in to look at the GPS, Mr. Feygin.
```

ISIAH ROBINSON vs GENERAL MOTORS LLC and EXPERIAN INFORMATION SOLUTIONS, INC.
CR of NATIONAL MOTORS (TYLER-RAMAGHI)
Case 3:24-cv-00948-WWB-PDB    Document 69-8    Filed 09/30/25    Page 142 of 204 5/2025
PageID 2336
142

```
 1    My staff will --

 2         Q.  Did you inspect --

 3              MS. ISRAEL:  Just hold on.

 4    BY MR. FEYGIN:

 5         Q.  Go ahead.

 6         A.  No.  It's okay.  Please ask your question,

 7    Mr. Feygin.  I apologize for interrupting.

 8         Q.  Did you inspect the vehicle prior to filing the

 9    counterclaim?

10         A.  Mr. Feygin, your client would not make that

11    available for me to do so.

12         Q.  The answer is no?

13         A.  The answer is no.

14         Q.  Did you inspect the GPS before filing the

15    counterclaim?

16         A.  Again, Mr. Feygin, the answer is no.

17         Q.  Did you contact the manufacturer of the device to

18    see if there was an issue internally with the device?

19         A.  Yes, sir.

20         Q.  What did they say?

21         A.  Reboot.  We did.  Reboot.  We did.  The device

22    needs to be inspection -- needs to be inspected.  Please

23    contact your client, which we did, Mr. Feygin.

24         Q.  When did you contact them?

25         A.  Several times over several-month period.
```

```
 1        Q.  My apologies.  When did you contact the

 2   manufacturer?

 3        A.  Prior to contacting your client.

 4        Q.  You just testified that the manufacturer told you

 5   to contact my client to inspect.  When did you contact the

 6   manufacturer?

 7        A.  I contacted the manufacturer first to assist in

 8   rebooting possibly any kind of a technology issue.  Once

 9   that had been done not once but twice at least, that was

10   unsuccessful.  We attempted to contact your client again.

11   Was unsuccessful, Mr. Feygin.

12        Q.  When did you contact the manufacturer?

13        A.  I do not have a call log in front of me, sir.

14   I'm not prepared to exactly answer those dates.

15        Q.  How did you contact the manufacturer?

16        A.  By reaching out to our rep.

17        Q.  Phone?  E-mail?  How did it occur?

18        A.  Both.

19        Q.  What is your rep's number?

20        A.  What is my what?

21        Q.  You called the rep, correct?

22        A.  Correct.

23        Q.  What is their name?

24        A.  You have it at the top of your list, sir.  If you

25   go back to your exhibit.  His full name and his e-mail is
```

```
 1   at the top of that.

 2        Q.  Jim Shumacher (phonetic)?

 3        A.  Correct.  Same person you subpoenaed.

 4        Q.  And you e-mailed him as well?

 5        A.  I did, in fact, e-mail him, I do believe, for any

 6   assistance and several devices that are currently

 7   dislocating, disconnected, or having technical issues.

 8   Yes, sir.  Did I narrow it down --

 9        Q.  Do you still have --

10        A.  Go ahead, Mr. Feygin.

11        Q.  Do you still have access to that e-mail account?

12        A.  Mr. Shimbacher (as spoken) should have access to

13   his e-mail, if that's what you're asking.

14            MS. ISRAEL:  No.  Just answer his question.

15   BY MR. FEYGIN:

16        Q.  I'm asking if you -- I'm asking if you have

17   access to your e-mail address that you e-mailed

18   Mr. Shumacher from.

19        A.  I'm sure I could go back through e-mails.  Yes,

20   sir.

21        Q.  How does this device operate?  Does it use a cell

22   phone service?

23        A.  It's off the cellular towers.  Yes, sir.

24        Q.  And if there's no cell service, what happens to

25   the connection?
```

 1        A.  That would be a better fitted question for the

 2    technology department or the IT with SVR.

 3        Q.  What evidence do you have that my clients

 4    actually tampered with this device?

 5        A.  Again, my answer will remain the same.  Your

 6    clients have not made the vehicle nor the GPS device

 7    available for an inspection after many requests.  So I

 8    cannot answer that, Mr. Feygin.

 9        Q.  Are you aware that we provided the opportunity to

10    have the vehicle inspected during the course of this

11    litigation?

12            MS. ISRAEL:  I'm going to object and instruct her

13        not to answer to the extent it requires her to

14        disclose attorney/client privileged communications.

15        And I believe that it does.

16    BY MR. FEYGIN:

17        Q.  Were you given an opportunity to inspect this

18    vehicle after the litigation started?

19        A.  Not by your client, sir, no.

20        Q.  Who gave you an opportunity to inspect the

21    vehicle after the litigation started?

22        A.  I am not sure, Mr. Feygin.

23        Q.  Did anybody?

24        A.  Nobody has currently, regarding your client,

25    reached out to me to say Mr. and Mrs. Robinson are on

```
 1    their way with the vehicle to allow you to inspect the

 2    vehicle and the GPS.  That scheduled --

 3         Q.  Since my clients purchased --

 4         A.  -- meeting has not been made.

 5         Q.  Can you repeat that last part?  I'm sorry.

 6         A.  I said through you and our counsel, that

 7    appointment stating that Mr. and Mrs. Robinson are on

 8    their way to the dealership to allow us to inspect the

 9    vehicle, in particular the GPS, that has not been offered

10    to me.  No, sir.  That has not been made.  That --

11         Q.  And would --

12         A.  -- appointment has not been told to me such and

13    such date at such and such time this vehicle will be here

14    for you to inspect.

15         Q.  Have my clients provided the opportunity to

16    inspect it at their home?

17         A.  Have they?

18             MS. ISRAEL:  I'm -- I'm going to object and

19         instruct you not to answer to the extent that your

20         answer requires you to disclose privileged

21         communications between you and your counsel.

22    BY MR. FEYGIN:

23         Q.  A simple yes or no will do so we don't have to

24    disclose attorney/client privileged communication.

25         A.  I'm again going to state, Mr. Feygin, that an
```

```
 1   exact date and time has not been brought to my attention

 2   of a vehicle being brought to me under however situation

 3   needs to happen for the GPS to be inspected.

 4        Q.  The question wasn't whether my clients made

 5   arrangements to bring it to you.  The question was, have

 6   they offered you to inspect it at their home?

 7            MS. ISRAEL:  You can answer with a simple yes or

 8        no without disclosing attorney/client communications.

 9        To the best of your ability.

10        A.  I was told by counsel that --

11            MS. ISRAEL:  You can't -- no.  So you can't

12        disclose attorney/client communication.  So if you're

13        not able to answer his question without revealing

14        those, just simply say I'm unable to answer.

15        A.  I'm unable to answer that currently, Mr. Feygin.

16   BY MR. FEYGIN:

17        Q.  Yes or no, was an opportunity provided to inspect

18   the vehicle at my clients' home?

19            MS. ISRAEL:  Mr. Feygin, I'm -- it's the same

20        question and I'm giving the same instruction.  It's

21        the exact same question as your prior one.  She just

22        told you she's not able to answer it without

23        disclosing privileged communications.

24            MR. FEYGIN:  I would assume that a yes or no

25        answer would be simple enough, and you don't have to
```

```
 1              disclose anything beyond that.

 2                   MS. ISRAEL:  Well, I understand.  She's answered

 3              to the best of her ability while trying to follow

 4              counsel's instructions.  We need to move on.

 5    BY MR. FEYGIN:

 6         Q.  If given the opportunity -- if given the

 7    opportunity to inspect the vehicle at my clients' home,

 8    would you take that opportunity?

 9                   MS. ISRAEL:  I'm going to object to the form of

10              the question.  Can we go off the record?  I need to

11              instruct her not to answer that.  I'm objecting to

12              that and I'm -- I -- let me make sure the record is

13              clear.  I object to the form of the question as it

14              would require the disclosure of attorney/client

15              privileged information and correspondingly instruct

16              her not to answer.

17                   Are we off?  Okay.  We can keep going or -- or we

18              can talk off -- off the record, Mr. Feygin.  Your

19              preference.

20                   MR. FEYGIN:  It doesn't matter to me.

21                   MS. ISRAEL:  Okay.

22                   THE VIDEOGRAPHER:  Mr. Feygin, do you want to go

23              off the record?

24                   MS. ISRAEL:  Go on then.

25                   MR. FEYGIN:  Yeah.
```

```
 1              THE VIDEOGRAPHER:  Off the record at 2:56.

 2              (Off the record.)

 3              THE VIDEOGRAPHER:  Back on the record at 2:57.

 4    BY MR. FEYGIN:

 5         Q.  Pulling up what's going to be Exhibit 20.

 6              (Plaintiff's Exhibit 20 identified.)

 7         Q.  Does this document look familiar to you?

 8         A.  Yes, sir.

 9         Q.  Who created the -- or who -- whose handwriting

10    appears on this document?

11         A.  That is -- who generated this document?

12              MS. ISRAEL:  Whose handwriting --

13              THE WITNESS:  Oh.  Whose handwriting.

14              MS. ISRAEL:  -- appears -- yeah.

15         A.  Those -- that's handwriting of various people

16    that have been employed by my dealership over the last few

17    years.

18    BY MR. FEYGIN:

19         Q.  Such as?

20         A.  Collections personnel.

21         Q.  What are their names and which one corresponds to

22    which?

23         A.  I have had four different people in the

24    collections office prior to the two that are there now.

25         Q.  On 2/15/24, whose handwriting is that?
```

```
 1        A.  That appears to be Hannah's or Natasha's.

 2        Q.  On 2 --

 3        A.  I'm unsure.

 4        Q.  On 2/20/24, whose handwriting is that?

 5        A.  Again, I am unsure, Mr. Feygin.  It could be one

 6   of the two females that I previously employed.

 7        Q.  Fair to say that you're unsure about the

 8   remaining entries?

 9        A.  Correct.

10        Q.  On 6/11/24, what does that "N" stand for?

11        A.  Depleted battery, 54, in Palm Coast.  That is a

12   depleted internal battery.  The "N" means not locating,

13   disconnected for us.

14        Q.  And depleted battery means that the battery died?

15        A.  Internal battery died.

16        Q.  Okay.  Where was this information obtained from?

17        A.  As previously stated, in your GPS locations.

18        Q.  And that's through the SVR portal that we've been

19   discussing?

20        A.  The what?  I'm sorry?

21            MS. ISRAEL:  He said is that from the SVR portal

22        that --

23        A.  Yes.

24            MS. ISRAEL:  -- we've been discussing.

25        A.  Yes.
```

ISIAH ROBINSON vs GEICO / CAROL MOORE 5/5/2025
Case 3:24-cv-00948-WWB-PDB   Document 69-8   Filed 09/30/25   Page 151 of 204
CR of NATIONAL GUARD (PROMOTED by BYLER-RAMAGHI)
PageID 2345
151

```
 1    BY MR. FEYGIN:

 2         Q.  Is this document stored in your normal business

 3    records?

 4         A.  Is this part of our business records?

 5              MS. ISRAEL:  Is it stored in your normal business

 6         records?

 7         A.  We have started keeping these the last two years

 8    for everyone.  It's how we make sure the GPS's are active.

 9    BY MR. FEYGIN:

10         Q.  I'll move on to the GPS tracking history.  This

11    should be 21.

12              (Plaintiff's Exhibit 21 identified.)

13         Q.  Does this look familiar to you?

14         A.  Yeah.

15         Q.  What is this?

16         A.  That is location reports.

17         Q.  It's fair to say that this is a tracking history

18    for the GPS installed on my clients' car?

19         A.  Some of it.  Yes, sir.

20         Q.  Okay.  What isn't?

21         A.  What?  What, sir?

22         Q.  I'm trying to make sure that I understand.  Are

23    all of these entries related to my clients' vehicle?

24         A.  It's all under the same GPS number, which is on

25    your clients' vehicle.  Yes, sir.
```

1    Q.  There are no entries from other vehicles on this

2    report, correct?

3    A.  Correct.

4    Q.  Who created this document?

5    A.  It is derived directly out of SVR.

6    Q.  Out of what?

7        MS. ISRAEL:  She said --

8    BY MR. FEYGIN:

9    Q.  I didn't hear that acronym.

10       MS. ISRAEL:  Yeah.  Out of SVR.

11   BY MR. FEYGIN:

12   Q.  And is this information provided to you in an

13   Excel sheet?  Or how does this come to you?

14   A.  It populates a new window when you pull the

15   report, and it shows up like this.  All I did was print

16   it.

17   Q.  And this is something you pulled yourself?

18   A.  Through the history of the SVR on that GPS.  Yes,

19   sir.

20   Q.  Okay.  And when was this report created?

21   A.  Last year.  I'm not for certain.

22   Q.  Is there any way to find out when it was created?

23   A.  I don't know.  I -- there's, to my knowledge, no

24   report in SVR to see who pulled what report at what day

25   and what time.  I -- I don't know.

ISIAH ROBINSON v. CLEAN JUICE FRANCHISING, LLC, PROMOTIONS, INC. 09/25/2025
CR of NATIONAL REGISTERED AGENTS (BYLER-RAMAGHI)
153

Case 3:24-cv-00948-WWB-PDB    Document 69-8    Filed 09/30/25    Page 153 of 204
PageID 2347

 1       Q.  Okay.  So looking at this, the logs track the

 2  speed of the vehicle, correct?

 3       A.  The proximities.

 4       Q.  The address, correct?

 5       A.  Within 100 feet.

 6       Q.  The distance?

 7       A.  Since it was inserted onto the vehicle.  Yes.

 8       Q.  The vehicle's battery voltage, correct?

 9       A.  Approximate.  Yes.

10       Q.  And then the device's internal battery, correct?

11       A.  Yes.

12       Q.  Okay.  What date do you contend that my clients

13  tampered and disabled the device?

14       A.  In May.  The first part of May, sir.

15       Q.  What is the vehicle's battery voltage reading on

16  May 2nd, the very first entry?

17       A.  I can't see through your yellow --

18          MS. ISRAEL:  Yeah.

19       A.  -- sir.  You're going to need to blow it up, if

20  you could kindly.  It looks like 11.8, sir.

21  BY MR. FEYGIN:

22       Q.  And what was the internal battery reading at that

23  time?

24       A.  100 percent.

25       Q.  And from May 2nd, the second -- or the last

ISIAH ROBINSON v. CITY OF CLEARWATER, et al. / PROMOTION TO LIEUTENANT 09/05/2025
CR of NATIONAL SIGNIFICANCE (BYLER-RAMAGHI)
Case 3:24-cv-00948-WWB-PDB    Document 69-8    Filed 09/30/25    Page 154 of 204
PageID 2348
154

```
 1    reading on May 2nd, what was the voltage of the vehicle

 2    battery?

 3         A.   On when?

 4         Q.   May 2, 2024, at 2341.

 5         A.   Looks like 96, 100 percent.

 6         Q.   And the 100 percent is the internal battery?

 7         A.   Yes, sir.

 8         Q.   On May 3rd at 3:02, what was the voltage of my

 9    clients' battery?

10         A.   5.3.

11         Q.   And what was the internal capacity of the GPS

12    device at that time?

13         A.   100 percent.

14         Q.   On May 3rd at 2341, what was the vehicle

15    battery's voltage?

16         A.   4.0.

17         Q.   And what was the device battery capacity at that

18    time?

19         A.   65 percent.

20         Q.   And on May 4th at 3:41, what was the vehicle

21    battery voltage?

22         A.   3.9.

23         Q.   And what was the internal device battery

24    capacity?

25         A.   65 percent.
```

 1      Q.  And on May 4th at 1929, what was the vehicle

 2  battery voltage?

 3      A.  3.4.

 4      Q.  And what was the device battery capacity?

 5      A.  Your paper states 25 percent.

 6      Q.  Do you have any reason to doubt the accuracy of

 7  this document?

 8          MS. ISRAEL:  Object to the form.

 9      A.  Mr. Feygin, all I will say is there is a reason I

10  do not use this company anymore nor their devices.

11  BY MR. FEYGIN:

12      Q.  And why is that?

13      A.  I did not care for this product, Mr. Feygin.

14      Q.  So it's fair to say, based on what we just

15  reviewed, the vehicle's battery voltage dropped from 11.8

16  volts to 3.4 volts over these two days, correct?

17          MS. ISRAEL:  Object to the form.

18      A.  I'm unsure --

19          MS. ISRAEL:  Answer to the best of your ability.

20      A.  It appears so, but I'm unsure of what you're

21  asking from me.  I'm not a mechanic, Mr. Feygin.

22  BY MR. FEYGIN:

23      Q.  That's fine.  Fair to say that the GPS's device

24  battery dropped from 100 percent to 25 percent based upon

25  these records over the span of two days?

```
 1              MS. ISRAEL:  Object to the form.  Answer to the

 2        best of your ability.

 3        A.  Again, Mr. Feygin, I am not a mechanic nor am I

 4   an IT guy on behalf of SVR.

 5   BY MR. FEYGIN:

 6        Q.  I'm just asking you to recap what we just

 7   discussed.  I'm not asking for technical information.

 8              MS. ISRAEL:  Is that a question?  If so, I object

 9        to it.

10              MR. FEYGIN:  Yes.

11   BY MR. FEYGIN:

12        Q.  And you may answer.

13              MS. ISRAEL:  Repeat the question.

14   BY MR. FEYGIN:

15        Q.  Based upon these records that we just reviewed,

16   is it accurate that these records reflect that the

17   vehicles -- or the device battery for the GPS installed in

18   this vehicle dropped from 100 percent to 25 percent in the

19   span of two days?

20              MS. ISRAEL:  Object to the form.

21        A.  Mr. Feygin, I will say that that is an alleged

22   suspicion.  I am not a mechanic nor am I an IT guy for

23   SVR.  That is the best answer I can give you.

24   BY MR. FEYGIN:

25        Q.  After May 4th, were you ever able to access any
```

```
 1   GPS records for this vehicle?

 2        A.  No.

 3        Q.  Have you tried to do so?

 4        A.  Yes.

 5        Q.  When did you try to do so?

 6        A.  Several days after we noticed that there was no

 7   heartbeat, the power was completely disconnected, and it

 8   was reconnected per the form that you're looking at at 54

 9   15-30.  We attempted to reboot several times.  At that

10   point thereafter is when we began trying to attempt to

11   contact your client.

12        Q.  And when was this record -- or when did you pull

13   this information again?  I'm sorry?

14            MS. ISRAEL:  Object to the form.  Asked and

15        answered multiple times.  Go ahead and answer.

16        A.  When did we what, Mr. Feygin?

17   BY MR. FEYGIN:

18        Q.  When did you access these records?

19        A.  Every day thereafter that we saw that the GPS was

20   no longer locating after 5/4.

21        Q.  When was the last time you attempted to search

22   these records?

23        A.  Sir, I'm unsure.  You're asking me a date that

24   happened two years -- over two and a half years ago.  I --

25   I'm unsure.  I am not going to speculate or guess an
```

ISIAH ROBINSON -v- ZEPP SOLUTIONS / ARC AUTOMOTIVE / NATIONAL
CR of NATIONAL (BYLER-RAMAGHI)

```
 1    answer for you.

 2         Q.  Is it fair to say that you have not recently

 3    attempted to search for the GPS status or the location of

 4    this vehicle?

 5         A.  That is not true.

 6         Q.  Okay.  When did you last attempt to do so?

 7         A.  I do not know the exact date, Mr. Feygin.  As I

 8    stated before, I will not speculate or guess a date.  I

 9    will simply tell you that I do not know.

10         Q.  Who would know?

11         A.  I'm sure that Mr. Shumacher and SVR will be able

12    to get those to you under your subpoena.  They should have

13    access to every time this portal has been logged into,

14    Mr. Feygin.  I'm sure that would give you your exact,

15    would be my best and most honest answer.

16         Q.  Do you still have access to this portal?

17         A.  Yes, sir.

18         Q.  Are you still able to track vehicles through this

19    portal?

20         A.  Yes.

21         Q.  Okay.  Moving on.  I'm going to pull up Number

22    22, which is the second batch -- or technically the first

23    batch of GPS records we received.

24              (Plaintiff's Exhibit 22 identified.)

25         Q.  Does this look familiar to you?
```

```
 1        A.  It's the same report, Mr. Feygin.  Just different

 2   dates.

 3            MS. ISRAEL:  Are you able to enlarge that for us

 4        just a little bit, though, please?  Thank you.

 5   BY MR. FEYGIN:

 6        Q.  And if I'm -- looks like it starts at 12/15/2023.

 7   And if I scroll all the way down, it appears as if it ends

 8   at 9/4/2023.

 9            MS. ISRAEL:  I think that was me putting it in --

10        it was in reverse order -- reverse date order.

11            MR. FEYGIN:  Can you expand on that?

12            MS. ISRAEL:  Can I expand on that?  Yes, sir.

13        When I printed it to produce it to you and Bates

14        number it first, it printed in reverse date order.  So

15        when you said it starts in December of 2023 and ends

16        in September, that's obviously dates in reverse.

17        That's all I meant.

18            MR. FEYGIN:  Understood.  Thank you.

19            MS. ISRAEL:  Yes, sir.  Of course.

20   BY MR. FEYGIN:

21        Q.  I'm going to ask some of the same -- or similar

22   questions.  Largely the information on this report is

23   identical to what's on the last report and the type of

24   content that's provided.  Is that accurate?

25        A.  I'm sorry.  I don't understand your question,
```

```
 1    Mr. Feygin.  Could you please be specific and blunt with

 2    your question?

 3         Q.  Sure.  Like the last report, this report provides

 4    the device battery capacity reading, correct?

 5         A.  Provide -- are you asking if it provides the

 6    vehicle and the device battery?

 7         Q.  We can answer it that way as well.  Sure.

 8         A.  No, sir.  I'm asking you your question.  Will you

 9    please repeat --

10         Q.  My question --

11         A.  -- your question specifically?

12         Q.  Sure thing.  Does this disclose the device

13    battery capacity reading?

14         A.  Yes.

15         Q.  Does this disclose the vehicle battery capacity

16    reading?

17         A.  Yes.

18         Q.  Does this disclose the address of the device?

19         A.  Yes.

20         Q.  Does this disclose the dates of the reading?

21         A.  Yes.

22         Q.  Who created this document?

23         A.  SVR.

24         Q.  How did you get a copy of this document?

25         A.  Same way the other document was obtained.
```

```
 1    Through the device history, Mr. Feygin.  The devices

 2    create a historical record just like the other one.  You

 3    can put in a date order.  I'm sure all of that will be

 4    given to you in your subpoena to SVR or Mr. Shinbacher

 5    (phonetic).

 6         Q.  Is this information copied over into an Excel

 7    sheet?

 8         A.  This is how it prints from SVR for me, sir.

 9         Q.  What type of file do they provide this in?  Is it

10    a PDF?  Is it a Word document?  Is it an Excel sheet?

11         A.  Populates a history, populates a window.  I hit

12    print.  I don't know, sir.  I am unable to answer that any

13    further than that.

14         Q.  When you printed it out, did you print it through

15    a PDF or did you print it to a hard copy?

16              MS. ISRAEL:  I printed it.

17              MR. FEYGIN:  I'm sorry.  Who -- who responded to

18         that?

19              MS. ISRAEL:  Kim Israel.  I printed it to produce

20         it to you, Mr. Feygin.

21              MR. FEYGIN:  Thank you.

22              MS. ISRAEL:  Yes, sir.

23    BY MR. FEYGIN:

24         Q.  Ms. Ramaghi, is this document stored in your

25    normal business records?
```

```
 1        A.  Is this what, sir?

 2        Q.  Is it stored in your business records?

 3            MS. ISRAEL:  Is this document stored in your

 4        normal business records?

 5        A.  It is stored in the portal under the GPS.  We do

 6   not normally print unless there is a specific need such as

 7   your request, Mr. Feygin.

 8   BY MR. FEYGIN:

 9        Q.  Can you point to the date entry where my clients

10   appeared at the dealership to sign new documents with TMU

11   disclosures?

12        A.  They did not come to the dealership in the car,

13   Mr. Feygin.  That has never come out of my mouth.  And I

14   appreciate you trying to word it as such.

15        Q.  That's not what I was asking but okay.

16            MS. ISRAEL:  Just answer his questions.  Be here

17        all night.

18        A.  I am not sure, sir.

19   BY MR. FEYGIN:

20        Q.  Did the vehicle ever come back to the dealership

21   following the transaction?

22        A.  Not to my knowledge.

23        Q.  Who would know?

24        A.  The customer, I assume.  That's my best guess.

25   Our GPS report does not put that vehicle back at my lot
```

ISIAH ROBINSON, et al. v. GALT OCEAN MILE, et al. [PROMOTIONAL...]
CR of NATIONAL [...] (TYLER-RAMAGHI)
Case 3:24-cv-00948-WWB-PDB    Document 69-8    Filed 09/30/25    Page 163 of 204    5/2025
PageID 2357
163

```
 1   since it left.

 2       Q.  Pulling up what's Exhibit 23, which is a ripped

 3   check.

 4           (Plaintiff's Exhibit 23 identified.)

 5       Q.  Does this look familiar to you?

 6       A.  Yep.

 7       Q.  What is this?

 8       A.  It is the check that I tried to return to your

 9   client, that Mrs. Robinson told me she had had such

10   hardships and she did not want to return the vehicle.

11   Therefore, that's why they did not drive the vehicle.

12   They loved the vehicle.  They wanted to keep the vehicle.

13   They were totally happy to sign the documents.  Tore the

14   check up and tossed it on the ground.

15       Q.  Whose handwriting is on this check?

16       A.  Mr. Feygin, that is mine.

17       Q.  When was this check prepared?

18       A.  9 -- it was the same date as they came back.  We

19   tried to make everything match.  So it was around the 13th

20   or the 14th, Mr. Feygin.

21       Q.  Why is it postdated then?

22       A.  It's not postdated.  It was a clerical human

23   error, Mr. Feygin.  I am human and I do make mistakes.

24       Q.  I am aware.  Do you still have access to the bank

25   account with Ameris Bank?
```

 1        A.  Of course I do.

 2        Q.  And which branch do you use?  The Town Center

 3   Parkway one?

 4        A.  Sir, I use multiple branches.

 5        Q.  Okay.  Which branches?

 6            MS. ISRAEL:  The addresses.  I don't -- answer to

 7        the best of your ability.  Answer to the best of your

 8        ability.

 9        A.  There are five different branches within the City

10   of Jacksonville that we use, Mr. Feygin.

11   BY MR. FEYGIN:

12        Q.  Okay.  So you use all five?

13        A.  At various points, yes, all five have been used.

14        Q.  Why did you save a copy of a torn check?

15        A.  Why did I what, Mr. Feygin?

16        Q.  Why did you save a copy of a torn check?

17        A.  I do that with many clients that I have issued

18   returned deposits or that option back, Mr. Feygin.  I try

19   to operate in a very ethical, morale manner.  That's it.

20   Plain and simple.  Face value.

21        Q.  Do you still have a copy of the physical check

22   itself?

23        A.  I don't know.  I turned the file over to legal

24   counsel for quite a while.

25        Q.  Okay.  We'll pull up 24, which is a payment

ISIAH ROBINSON vs SUNSHINE STATE ECONOMICAL SUPER STOP MOTOR SALES [PROMOTIONS], et al. 8/25/2025
CR of NATIONAL VENTURES (COREY BYLER-RAMAGHI)

Case 3:24-cv-00948-WWB-PDB    Document 69-8    Filed 09/30/25    Page 165 of 204
PageID 2359
165

```
 1    history.
 2              (Plaintiff's Exhibit 24 identified.)
 3         A.  A what?  I'm sorry?
 4              MS. ISRAEL:  A payment history.  He's putting up
 5         another document.
 6              THE WITNESS:  Oh.  Okay.
 7              MS. ISRAEL:  Yeah.
 8    BY MR. FEYGIN:
 9         Q.  Does this document look familiar to you?
10         A.  That is Mr. and Mrs. Robinson's payment history.
11    Yes, sir.
12         Q.  Okay.  Who created this document?
13         A.  It comes out of our DMS software, sir.  I am the
14    one that ran that report and turned it over to counsel.
15         Q.  When was this report ran?
16         A.  7/23/25 at 1:31 p.m., Mr. Feygin.
17         Q.  And this is through the Wayne Reaves software
18    that you mentioned?
19         A.  Was this what?
20         Q.  Is this through your DMS provider, Wayne Reaves?
21         A.  Yes, sir.  That's what I just previously stated.
22         Q.  Looking at this document, were my clients charged
23    late fees on several occasions?
24         A.  They had occurred several late fees.
25         Q.  What is the amount of the late fee?
```

ISIAH ROBINSON [illegible] vs. [illegible] PROMOTIONS... Case 3:24-cv-00948-WWB-PDB    Document 69-8    Filed 09/30/25    Page 166 of 204 [illegible]5/2025

CR of NATIONAL [illegible] (BYLER-RAMAGHI)
PageID 2360

166

```
 1        A.  In the column marked late fee, slash, charges.

 2   If you'd like to scroll down.  $225.

 3        Q.  How much was each late fee?

 4        A.  $25 for each payment that was late, Mr. Feygin.

 5        Q.  Out of curiosity, is this specific to just my

 6   clients' account or --

 7             MS. ISRAEL:  Object to the form.

 8   BY MR. FEYGIN:

 9        Q.  -- does everybody get charged?

10             MS. ISRAEL:  I apologize.  I thought you were

11        finished with your question.  My apologies.

12             MR. FEYGIN:  That's fine.

13   BY MR. FEYGIN:

14        Q.  Is this particular to my client's account?

15        A.  This is only regarding Isiah and Lisa Robinson's

16   account.

17        Q.  Probably a bad question.  But were my clients

18   charged the standard $25 late fee, or was it specific

19   because of their accounts?

20        A.  Everybody late on my books.  If they are late

21   gets the same $25 fee.  Your clients were not treated any

22   differently than anyone else on my books.

23        Q.  Okay.  Exhibit 29 is going to be the demand

24   package that we sent to y'all.

25             MS. ISRAEL:  I'm so sorry.  Did you -- I'm so
```

```
 1          sorry, Mr. Feygin.  Did you mean 25 or have you

 2          skipped from 24 to 29?

 3               MR. FEYGIN:  No, no.  You're right.  You're

 4          right.  You're right.  There's the bad math.  25.

 5               (Plaintiff's Exhibit 25 identified.)

 6               MS. ISRAEL:  No, worries.  I just am trying to

 7          keep track.  Thank you.

 8     BY MR. FEYGIN:

 9          Q.  Ms. Ramaghi, does this look familiar to you?

10          A.  Yes, sir.

11          Q.  Okay.  I'm going to scroll through all of this

12     just to make sure.

13               THE WITNESS:  This is the original package I sent

14          to you.

15     BY MR. FEYGIN:

16          Q.  And I will represent that we did receive all of

17     these in discovery from your counsel.  But those copies

18     were a little bit harder to read than these.  Coming down

19     to page 56 on Exhibit 25.  I'm just scrolling through all

20     of these.

21               So there's no dispute that you received this

22     demand package, correct?

23          A.  Yes, sir.

24          Q.  Okay.  And what did National do once it received

25     these demands?
```

1   A.  There was an immediate call to legal counsel, and

2   those documents were sent to her.

3   Q.  Okay.  And did National pay any of the amounts

4   demanded in these letters to my clients?

5   A.  Did National what?

6   Q.  Did National pay any of the amounts that were

7   demanded in these letters?

8   A.  No.

9   Q.  Did National pay anything at all to the

10  plaintiffs to settle their claims?

11  A.  No.

12  Q.  I'll pull up what is going to be 26.  Actually,

13  hold off on that for a second.

14      At some point in time, did the plaintiffs file a

15  complaint with the Florida Department of Highway Safety

16  and Motor Vehicles?

17  A.  At what point what, sir?

18  Q.  At some point in time, did the plaintiffs file a

19  complaint with the Florida Department of Highway Safety

20  and Motor Vehicles?

21  A.  I am unsure of the date, sir.

22  Q.  The question is whether they did or they didn't,

23  not when.

24      MS. ISRAEL:  Yeah.  He said did they.

25  A.  Oh.  Yes, they did.

```
 1    BY MR. FEYGIN:

 2         Q.  Did an examiner from the DMV reach out to you in

 3    regards to the complaint?

 4         A.  This is a generic e-mail to submit the file.

 5    That was it.

 6         Q.  How -- how did you communicate with the DMV

 7    examiner?

 8         A.  I submitted all documents through e-mail.

 9         Q.  Do you still have copies of those e-mail

10    communications?

11         A.  Yes.

12         Q.  Are you able to produce those e-mail

13    communications?

14         A.  Yes.

15         Q.  What was the outcome of the DMV complaint?

16         A.  They sent me a letter three -- two, three,

17    four-ish months later that said I improperly completed the

18    odometer statement.

19         Q.  Okay.  Pulling up what's now 26.

20             (Plaintiff's Exhibit 26 identified.)

21         Q.  Is this the letter that you're describing?

22         A.  Yes.

23         Q.  What did you do when you received that letter?

24         A.  I called the examiner.

25         Q.  And what was the substance of that conversation?
```

```
 1        A.  They stated that while he understood why both

 2   boxes were checked, the current examiner felt that I

 3   should not have checked both boxes.  But he did understand

 4   why the dealer would have done such.  That was it.  End of

 5   story.

 6        Q.  Did you try to escalate the issue to the regional

 7   manager?

 8        A.  This is the compliance examiner.  That's it.  Why

 9   would I do anything else --

10             MS. ISRAEL:  Just answer his question.

11        A.  No.

12   BY MR. FEYGIN:

13        Q.  Did this go any further with the DMV?

14        A.  No.

15        Q.  Did this go any further with the Department of

16   Agriculture and Consumer Services?

17        A.  No.

18        Q.  Okay.

19             MR. FEYGIN:  I need about five minutes to review

20        the records.  I should have a few more questions, and

21        then I'll be done.

22             MS. ISRAEL:  No problem at all.

23             MR. FEYGIN:  Let's go off the record briefly.

24             THE VIDEOGRAPHER:  Off the record at 3:27.

25             (Off the record.)
```

```
 1              THE VIDEOGRAPHER:  Back on the record at 3:40.

 2   BY MR. FEYGIN:

 3       Q.  All right.  I think this is going to be Exhibit

 4   27.  And this will be pretty quick.  I want to clarify a

 5   few things.

 6              (Plaintiff's Exhibit 27 identified.)

 7              MS. ISRAEL:  Hang on.  I'm -- hang on.

 8          Mr. Feygin, I'm so sorry.  What was Exhibit 26?  I

 9          stopped at 25.  Forgive me.

10              MR. FEYGIN:  The DMV citation.

11              MS. ISRAEL:  Oh.  Got you.  The May 3, 2024,

12          letter?

13              MR. FEYGIN:  With the citation.  Yes.

14              MS. ISRAEL:  Okay.  Thank you.

15   BY MR. FEYGIN:

16       Q.  So previously --

17              MR. FEYGIN:  Certainly.

18   BY MR. FEYGIN:

19       Q.  Ms. Ramaghi, previously you testified with

20   respect to the transfer title, which was Exhibit Number 5,

21   that it wasn't a true and correct copy submitted to the

22   DMV because the six-digit odometer box was not selected.

23   Is that an accurate representation?

24       A.  That's what I previously said.  Yes, sir.

25       Q.  Okay.  I'm going to pull up the certified title
```

 1   history that your attorney provided me.  Have you seen

 2   this before?

 3       A.  Yes, sir.

 4       Q.  Okay.  I'm going to scroll to page 26.

 5           MS. ISRAEL:  Can you enlarge it, please?

 6           MR. FEYGIN:  Sure.

 7   BY MR. FEYGIN:

 8       Q.  This is page 27 of that document that was

 9   provided.  Does this look familiar to you?

10       A.  It's the same thing you showed earlier,

11   Mr. Feygin.

12       Q.  Okay.  And it's fair to say that Number 5 --

13   Exhibit 5, the application for certificate of title, is

14   the exact same one that you submitted to the DMV?

15           MS. ISRAEL:  Object to the form.

16       A.  I apologize.  I was -- excuse me.  I apologize.

17   I didn't hear what you said.

18   BY MR. FEYGIN:

19       Q.  You had previously testified Number 5 wasn't an

20   accurate copy of what was submitted to the DMV because the

21   check box for the six-digit odometer now read selection

22   wasn't selected, correct?

23       A.  Correct.

24       Q.  And this is a copy of what the DMV produced,

25   correct?

ISIAH ROBINSON vs DAG ENTERPRISES, INC. d/b/a AUTOMOTIVE DEPOT
Case 3:24-cv-00948-WWB-PDB    Document 69-8    Filed 09/30/25    Page 173 of 204 09/15/2025
CR of NATIONAL TRUCK (SAYLER-RAMAGHI)
PageID 2367
173

```
 1         A.  I'm un --

 2              MS. ISRAEL:  Object to the form.

 3         A.  I'm unsure what the DMV gave me, Mr. Feygin.

 4    BY MR. FEYGIN:

 5         Q.  Okay.  Do you have any reason to doubt that this

 6    isn't what was submitted to the DMV?

 7         A.  Mr. Feygin, after I drop off my title work, I'm

 8    unsure of what happens to the title work until they call

 9    me and tell me that it's ready or it's being kicked back

10    and denied and I need corrections made.  I can't --

11         Q.  Do you have --

12         A.  I can't answer that.

13         Q.  Did you submit this to the DMV?

14         A.  I dropped off a lot of title work that day to the

15    DMV, Mr. Feygin.

16         Q.  So you don't know what you dropped off?

17         A.  There is a lot of title work that I dropped off

18    that day, Mr. Feygin.  There are a lot of forms that go

19    down.  And you're talking about --

20         Q.  Okay.

21         A.  -- something two and a half years ago.  Sorry I

22    cannot answer that as if it was yesterday.

23         Q.  So how do you recall that the check box for six

24    digit was checked off?

25         A.  Because there have been many times in the 15
```

 1    years that they need me to do certain things.  It all

 2    depends on who processes the title work.

 3         Q.  That's a nonanswer.

 4         A.  Everybody has their own --

 5         Q.  The question was, you previously testified that

 6    the title I showed you wasn't the one that you submitted

 7    to the DMV because you recall selecting the six-digit

 8    odometer now reads check box.  How do you remember that?

 9         A.  The generalistics, Mr. Feygin.  I do a lot of

10    title work.  Since '23 I've probably processed six, seven,

11    800 deals.  It's generalistics.

12         Q.  Okay.  So you don't know whether or not you

13    actually selected that box?

14              MS. ISRAEL:  Object to the form.  You can answer.

15         A.  Mr. Feygin, I will stick with my answer.  I have

16    done many title works.  This one could have been kicked

17    back.  It could not have been kicked back.  I don't

18    remember.

19    BY MR. FEYGIN:

20         Q.  But you do remember selecting the six-digit

21    odometer now reads box?

22         A.  I remember that you said it was not checked.  And

23    then for me to send it to the DMV, generally I will check

24    it.  Yes, sir.

25         Q.  Okay.  You previously testified that it's

 1  important for National to be viewed as trustworthy and

 2  honest, correct?

 3      A.  Repeat that.  I'm sorry.  I didn't hear that.  I

 4  previously testified what?

 5      Q.  Yeah.  This morning when we started off, you

 6  previously testified that it's important for National to

 7  be viewed as trustworthy and honest.  Is that accurate?

 8      A.  Yes.

 9      Q.  And you also testified that your client should be

10  able to rely on the representations made by National,

11  correct?

12          MS. ISRAEL:  Object to the form.  You can answer

13      to the best of your ability.

14      A.  My response to that respectfully, Mr. Feygin, as

15  I also -- I also expect my clients be honest and faithful

16  with their intentions of buying a vehicle as well.

17  BY MR. FEYGIN:

18      Q.  Okay.  So the answer is yes?

19      A.  Yes.

20      Q.  You also testified that National doesn't verify a

21  vehicle's mileage before it gets purchased, correct?

22      A.  No.  That's not what you asked me earlier,

23  Mr. Feygin.

24      Q.  Okay.  Then let's go back to it.  What does

25  National do to verify a vehicle's mileage when it

```
 1   purchases a vehicle for resale?

 2        A.  When we get a -- I don't purchase -- let me --

 3   let me say this, Mr. Feygin.  Please be very specific on

 4   your question in which you're asking.  You are framing it

 5   in a very perceptive manner, and everybody's perception of

 6   your question could be vastly different.  So I'm asking

 7   you to be very specific in what you are asking me.

 8        Q.  What part of the question was confusing so I can

 9   rephrase it?

10        MS. ISRAEL:  Object to the form.  Are you able to

11        answer?

12        THE WITNESS:  I don't have an answer.  He's --

13        A.  Mr. Feygin, I feel like your answer (as spoken)

14   is very open-ended.  You have not asked a very specific

15   and blatant question.  If you're willing to do so, I would

16   be very happy to comply and answer for you.

17   BY MR. FEYGIN:

18        Q.  What does the dealership do to verify a vehicle's

19   mileage when it gets purchased to be resold by the

20   dealership?

21        A.  I look at the odometer when it comes in,

22   Mr. Feygin, and then I verify that against the title.  If

23   there are issues, I do as I did in this case.  I

24   immediately contact the customer.

25        Q.  Is that all that you do?
```

```
 1        A.  Yes.

 2             MR. FEYGIN:  Nothing further at this time.

 3             MS. ISRAEL:  Does that mean you have no further

 4        questions, sir?

 5             MR. FEYGIN:  Yes, ma'am.

 6             MS. ISRAEL:  Okay.  Thank you.  I just -- I

 7        wanted to make sure I was clear.  We'll read if it's

 8        ordered.

 9             THE VIDEOGRAPHER:  Mr. Feygin, any orders?

10             MR. FEYGIN:  It will be -- it will be ordered

11        without video for now.  I will contact you regarding

12        the timing of the transcript delivery.

13             THE VIDEOGRAPHER:  Understood.  This concludes

14        the deposition of Robin Byler-Ramaghi.  We are now off

15        the video record at 3:48.

16             (Proceedings concluded at 3:48 p.m.)

17

18

19

20

21

22

23

24

25
```

```
 1                      CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA

 4   COUNTY OF PALM BEACH

 5

 6        I, Gwendolyn P. Smith, the undersigned authority,

 7   certify that ROBIN BYLER-RAMAGHI remotely appeared before

 8   me and was duly sworn.

 9

10        WITNESS my hand and official seal this 26th day of

11   August, 2025.

12

13

14

15

16

17

18        _____

19        Gwendolyn P. Smith

20        Notary Public, State of Florida

21        My Commission #HH 240708

22        Expires:  March 14, 2026

23

24

25
```

```
 1                        CERTIFICATE

 2

 3   STATE OF FLORIDA

 4   COUNTY OF PALM BEACH

 5

 6       I, GWENDOLYN P. SMITH, do hereby certify that I was

 7   authorized to and did stenographically report the

 8   foregoing deposition; and that the transcript is a true

 9   and correct transcription of the testimony given by the

10   witness.

11       I further certify that I am not a relative, employee,

12   attorney or counsel of any of the parties, nor am I a

13   relative or employee of any of the parties' attorney or

14   counsel connected with the action, nor am I financially

15   interested in the action.

16            Dated this 26th of August, 2025.

17

18

19

20

21

22

23   _____

24            Gwendolyn P. Smith

25
```

ISIAH ROBINSON vs BYTEDANCE, INC. f/k/a MUSICAL.LY... PROMOTION ET AL.
CR of NATIONAL ... (MARYAM BYLER-RAMAGHI)
Case 3:24-cv-00948-WWB-PDB   Document 69-8   Filed 09/30/25   Page 180 of 204 5/2025
PageID 2374
1

**WORD INDEX**

**< $ >**
**$2,000**  90:*10, 12*
**$225**  166:*2*
**$25**  166:*4, 18, 21*
**$3,500**  63:*13*

**< 0 >**
**0**  73:*22*

**< 1 >**
**1**  3:*10*  4:*10*  7:*22*
  11:*12, 13, 25*  60:*4*
  61:*15, 18*  69:*4*  73:*20*
  112:*21*  128:*23*
**1:31**  165:*16*
**1:49**  111:*11*
**10**  3:*14*  56:*4*  88:*16*
  101:*25*  102:*2*
**10,000**  88:*17*  96:*18*
**10:36**  4:*9*
**10:46**  1:*23*  4:*4*
**100**  113:*24*  153:*5, 24*
  154:*5, 6, 13*  155:*24*
  156:*18*
**102**  3:*14*
**10375**  2:*6*
**104**  3:*15*
**11**  3:*10, 15*  63:*24*
  64:*8*  69:*6, 8*  104:*20,*
  *22*  131:*2*
**11.8**  153:*20*  155:*15*
**11:06**  29:*13, 15*
**11:19**  39:*8*
**11:27**  39:*10*
**11:57**  61:*7, 18*
**111**  3:*15*
**112**  73:*19*
**112,990**  73:*20, 22*
**115**  3:*16*
**117**  3:*16*
**118,245**  91:*15*  98:*9*
  100:*6, 20*  105:*21*
  112:*23*  113:*6*  116:*3*
  123:*3, 18*
**119**  3:*17*
**12**  3:*15*  14:*2*  34:*5*
  68:*25*  111:*18, 19*

112:*11*  126:*13*
**12/15/2023**  159:*6*
**12:30**  61:*16*
**12:37**  61:*21*
**12:49**  71:*11*
**12:54**  71:*13*
**121**  3:*17*
**122**  3:*18*
**13**  3:*16*  115:*8, 10*
  126:*13*
**138**  3:*18*
**13th**  114:*6*  131:*11*
  163:*19*
**14**  3:*16*  117:*9, 11*
  127:*14, 24*  178:*22*
**149**  3:*19*
**14th**  131:*12*  163:*20*
**15**  1:*22*  3:*17*  4:*4, 9*
  36:*19*  119:*8*  129:*22*
  173:*25*
**151**  3:*19*
**15-30**  157:*9*
**158**  3:*20*
**16**  3:*17*  121:*8*
  129:*16, 18, 19, 23, 24*
  130:*1*
**163**  3:*20*
**165**  3:*21*
**167**  3:*21*
**169**  3:*22*
**17**  3:*18*  122:*17, 18*
  131:*2*
**171**  3:*22*
**177.89**  96:*13*
**18**  131:*16, 25*
**19**  3:*18*  131:*16*
  138:*20, 21*
**1929**  155:*1*
**1930**  2:*2*
**1983**  7:*22*

**< 2 >**
**2**  3:*10*  12:*5*  59:*25*
  60:*1*  61:*7, 21*  87:*7*
  99:*19*  150:*2*  154:*4*
**2/15/24**  149:*25*
**2/20/24**  150:*4*
**2/22/23**  73:*24*
**2:00**  111:*14*

**2:56**  149:*1*
**2:57**  149:*3*
**20**  3:*19*  56:*4*  92:*19*
  96:*25*  97:*8*  101:*18*
  149:*5, 6*
**2011**  63:*12*
**2013**  8:*19*
**2020**  8:*19*
**2023**  63:*24*  64:*8, 16*
  77:*8*  123:*16*  159:*15*
**2024**  154:*4*  171:*11*
**2025**  1:*22*  4:*4, 9*
  178:*11*  179:*16*
**2026**  178:*22*
**208**  2:*2*
**21**  3:*19*  151:*11, 12*
**22**  3:*20*  158:*22, 24*
**23**  3:*20*  163:*2, 4*
  174:*10*
**2341**  154:*4, 14*
**24**  3:*21*  164:*25*
  165:*2*  167:*2*
**240708**  178:*21*
**25**  3:*21*  155:*5, 24*
  156:*18*  167:*1, 4, 5, 19*
  171:*9*
**26**  3:*22*  168:*12*
  169:*19, 20*  171:*8*
  172:*4*
**26th**  178:*10*  179:*16*
**27**  3:*22*  171:*4, 6*
  172:*8*
**29**  90:*9*  166:*23*
  167:*2*
**2nd**  153:*16, 25*  154:*1*

**< 3 >**
**3**  3:*11*  12:*5*  62:*3, 4*
  87:*8*  111:*15*  171:*11*
**3.4**  155:*3, 16*
**3.4V**  140:*8*
**3.9**  154:*22*
**3:02**  154:*8*
**3:24-CV-00948**  1:*2*
**3:27**  170:*24*
**3:40**  171:*1*
**3:41**  154:*20*
**3:48**  1:*23*  177:*15, 16*
**30**  61:*12*  92:*19*

**300-ish**  15:*17*
**30-day**  44:*1*
**32256**  2:*7*
**33020**  2:*3*
**37**  139:*24*  140:*1*
**37.6**  139:*21, 24*
**3rd**  154:*8, 14*

**< 4 >**
**4**  3:*11*  12:*6*  71:*16,*
  *17*
**4.0**  154:*16*
**40**  49:*5*
**420**  2:*6*
**48**  47:*23*  135:*1*
  136:*8, 10*
**4th**  154:*20*  155:*1*
  156:*25*

**< 5 >**
**5**  3:*4, 12*  12:*6*  56:*4*
  74:*9, 10*  88:*16*
  108:*22*  139:*24*
  171:*20*  172:*12, 13, 19*
**5.3**  154:*10*
**5/4**  157:*20*
**50-plus**  35:*22*
**54**  150:*11*  157:*8*
**56**  167:*19*
**599**  88:*20*
**5th**  77:*5*

**< 6 >**
**6**  3:*12*  87:*3, 4*
**6/11/24**  150:*10*
**60**  3:*10*
**62**  3:*11*
**65**  154:*19, 25*
**6600**  8:*22*
**67**  13:*7, 9*

**< 7 >**
**7**  3:*13*  93:*1, 2*
  129:*16, 18*
**7/23/25**  165:*16*
**71**  3:*11*
**74**  3:*12*

**< 8 >**

**8** 3:13 77:6 97:14, 15, 17 127:14
**800** 174:11
**82053** 3:14 102:1
**87** 3:12
**8th** 77:7 122:4 123:16

**< 9 >**
**9** 3:14 98:24, 25 112:10 126:4, 12 163:18
**9/11** 72:24
**9/13** 113:24 114:7 117:18 126:5
**9/14** 113:24 114:7 117:18 126:5
**9/4** 132:24 133:2
**9/4/2023** 159:8
**9/8** 98:18 115:3 123:19, 20 124:2, 5, 19
**9/8/2023** 88:13 98:19 124:15 125:2, 17, 20, 25
**9/8/23** 94:14 113:21 123:13 125:15
**9/8-ish** 86:11
**904)224-4449** 2:8
**93** 3:13
**950BZMT** 134:1
**954)228-5674** 2:4
**96** 154:5
**97** 3:13
**98** 3:14

**< A >**
**a.m** 1:23 4:4, 9
**ability** 13:11 19:4 104:25 106:3 124:17, 18 137:10, 13 147:9 148:3 155:19 156:2 164:7, 8 175:13
**able** 21:4 27:3 31:24 35:11 38:14 39:2 49:20 51:20 52:11, 13 56:12, 14 60:8 71:18 86:1 89:7 106:10 107:24 108:20 123:25

**140:**13 147:13, 22 156:25 158:11, 18 159:3 169:12 175:10 176:10
**above-entitled** 4:6
**above-named** 4:6
**absolutely** 21:5 44:12 105:2
**abysmal** 105:3
**AC** 26:14
**accept** 44:20
**access** 21:2 41:18 137:19, 22, 23 138:6, 9 139:14, 16 144:11, 12, 17 156:25 157:18 158:13, 16 163:24
**accessed** 138:12
**accessible** 65:6
**accompanies** 42:22 43:1
**accompaniment** 42:23
**accompany** 43:4
**account** 23:2 36:21 65:17 83:9, 10 84:3 139:14 144:11 163:25 166:6, 14, 16
**accounts** 166:19
**accuracy** 73:25 78:2, 10 100:7 105:23 112:25 116:4 155:6
**accurate** 7:16 34:20 48:21 67:9 71:22 90:10 95:16, 18 109:7 113:6, 25 137:17 140:15 156:16 159:24 171:23 172:20 175:7
**accurately** 68:11 99:11 102:10 113:14
**accused** 8:1
**acknowledge** 45:11
**acknowledgement** 105:10
**acknowledgements** 131:4
**acknowledgment** 108:17 122:22 129:2 121:13 152:9
**acronym** 92:24 93:8

**action** 179:14, 15
**active** 151:8
**acts** 52:24
**actual** 74:5 91:17 95:24 100:10 105:24 109:16, 21, 24 113:2, 3, 6, 8 114:8 118:5, 6, 22 124:3, 7, 22 131:5
**addition** 19:6, 9
**additional** 14:2 20:21 83:11
**address** 8:21, 23 72:10 76:25 77:1 106:8 139:17 144:17 153:4 160:18
**addressed** 40:24
**addresses** 164:6
**adheres** 18:23 19:3
**administration** 8:9
**administrative** 89:8
**admittedly** 104:20
**Adobe** 89:23
**ads** 37:19
**advance** 13:23
**advertise** 37:13 81:19 83:1 84:17 85:1, 6, 23
**advertised** 37:23 38:8 84:24 85:12
**advertisement** 81:25 85:7, 11
**advertisements** 81:20 84:9
**advertising** 82:2, 24
**affect** 39:17, 19
**affidavits** 40:23
**agent** 46:15 49:15 52:12, 13, 24 53:8 72:12
**agent's** 52:14
**agility** 32:8
**ago** 33:16 67:19, 23 69:2 73:10 83:14 102:12 119:4 157:24 173:21
**agree** 15:19 16:22 38:13 88:14 96:17
**agreed** 56:10 96:8

**agreement** 53:22 94:20, 24, 25 95:1, 5, 6, 7, 9 130:5
**agreements** 11:5, 6 19:7, 10, 13 95:10
**Agriculture** 170:16
**ahead** 25:23 69:15 80:22 81:1 86:22 92:17 101:21 112:6 120:1 129:7 141:9 142:5 144:10 157:15
**aid** 5:21
**air** 90:2
**alcohol** 7:15
**alerts** 141:16
**alignment** 32:8
**allege** 140:14
**alleged** 156:21
**alleging** 139:13
**allow** 42:11 43:6 83:9 146:1, 8
**allowed** 42:17, 24 43:4 113:11
**allows** 99:10
**alter** 17:14 30:22
**alternate** 33:9
**alternator** 135:6, 20, 22
**Ameris** 163:25
**amount** 8:2 35:11 56:3 59:2 90:3 95:23 96:3, 12, 22 113:6 165:25
**amounts** 11:7 168:3, 6
**and/or** 68:16 80:1 99:17 135:20, 22
**announce** 4:20
**answer** 5:24 6:12, 13 9:14 12:22, 25 15:22 16:11, 19 17:1 20:19 23:17 24:6 25:24 34:25 35:7, 8 38:5 42:1, 15 49:3 55:7 64:9, 13 68:15 75:23 77:15, 19 78:14, 16 79:2, 24 83:19 84:6 86:7, 13, 23 88:7 90:18, 23 93:25 95:3, 5 100:14 106:15

107:*11, 13, 15, 20*
110:*18, 25*  115:*22, 24*
116:*21*  117:*2*  119:*5*
123:*24*  124:*16*
125:*18*  127:*5, 18*
128:*17*  133:*20*
136:*16*  137:*8*  140:*3*
141:*11*  142:*12, 13, 16*
143:*14*  144:*14*  145:*5,*
*8, 13*  146:*19, 20*
147:*7, 13, 14, 15, 22,*
*25*  148:*11, 16*  155:*19*
156:*1, 12, 23*  157:*15*
158:*1, 15*  160:*7*
161:*12*  162:*16*  164:*6,*
*7*  170:*10*  173:*12, 22*
174:*14, 15*  175:*12, 18*
176:*11, 12, 13, 16*
**answered**  55:*4*  85:*17*
107:*14*  141:*10*  148:*2*
157:*15*
**answering**  111:*1*
**anybody**  10:*17*  23:*8*
30:*16*  37:*5*  41:*6*
50:*2*  66:*12*  70:*18*
114:*15*  145:*23*
**anymore**  155:*10*
**apologies**  20:*15*  31:*8*
129:*7*  137:*1*  143:*1*
166:*11*
**apologize**  5:*15*  20:*18*
28:*7*  38:*14*  54:*24*
120:*8*  129:*24*  133:*23*
134:*17*  142:*7*  166:*10*
172:*16*
**appear**  40:*1*  116:*25*
119:*22*  129:*12*
**APPEARANCES**  2:*1*
4:*20*
**appeared**  162:*10*
178:*7*
**appears**  149:*10, 14*
150:*1*  155:*20*  159:*7*
**application**  3:*14, 15,*
*16*  44:*17*  48:*1*  99:*2,*
*9*  111:*22, 24*  115:*8*
138:*4*  172:*13*
**applications**  126:*24*
**applied**  10:*3, 8*
120:*16, 22*

**appointment**  146:*7,*
*12*
**appreciate**  14:*7*
17:*13*  82:*15*  98:*8*
105:*1*  162:*14*
**appreciated**  61:*11*
**approach**  7:*6*
**approached**  86:*6*
**appropriate**  33:*1*
46:*7*
**approval**  85:*10*
**approved**  122:*11*
**approximate**  12:*13*
64:*12*  153:*9*
**Approximately**  15:*15*
34:*4*  46:*11*  47:*13*
72:*24*  92:*19*  96:*25*
126:*4*  135:*1*  136:*8*
**areas**  45:*25*
**arithmetic**  104:*21*
**arrangement**  63:*20*
**arrangements**  147:*5*
**ASC**  26:*13*
**Aside**  8:*10*  10:*15*
14:*23*  41:*18*
**asked**  20:*18*  21:*4*
27:*23*  43:*8*  62:*8*
68:*14*  78:*8*  94:*7*
95:*4*  98:*15*  106:*6*
107:*21, 23*  108:*18*
115:*20*  116:*17*  120:*9*
134:*19*  136:*4*  139:*7,*
*10*  157:*14*  175:*22*
176:*14*
**asking**  6:*4, 25*  21:*21*
24:*16, 20*  27:*2*  29:*22*
35:*1*  40:*17, 18, 20*
48:*15*  51:*3, 4*  52:*5*
58:*18*  62:*11*  63:*2*
67:*18*  75:*21*  82:*18*
88:*7*  119:*3*  124:*24*
125:*7, 23*  144:*13, 16*
155:*21*  156:*6, 7*
157:*23*  160:*5, 8*
162:*15*  176:*4, 6, 7*
**asks**  108:*20*
**assign**  19:*13*
**assist**  143:*7*
**assistance**  144:*6*

**assume**  5:*24*  37:*22*
140:*1*  147:*24*  162:*24*
**assumed**  32:*20*
133:*20*
**assuming**  37:*11*  44:*8*
86:*9*  96:*4*  114:*11*
**assumption**  91:*22*
**attached**  80:*3, 6*
**attempt**  157:*10*  158:*6*
**attempted**  90:*16*
143:*10*  157:*9, 21*
158:*3*
**attend**  20:*1*
**attention**  42:*13*  147:*1*
**attest**  117:*4*
**Attorney**  4:*23*  6:*11*
10:*15, 23*  12:*11*  80:*2,*
*6*  102:*6, 13, 14*  105:*6*
116:*18*  133:*8*  139:*7,*
*10*  172:*1*  179:*12, 13*
**attorney/client**
145:*14*  146:*24*  147:*8,*
*12*  148:*14*
**attorneys**  104:*24*
**auction**  22:*2, 3, 5, 7,*
*17*  25:*4*  34:*20, 24*
35:*4, 15*  57:*23*  58:*1*
**auctions**  22:*1*
**audible**  6:*7*
**audio**  17:*15*  28:*22*
**August**  1:*22*  4:*4, 9*
63:*24*  64:*8, 16*
178:*11*  179:*16*
**authority**  41:*3*  52:*25*
178:*6*
**authorized**  179:*7*
**AutoCheck**  36:*5, 22*
**automatically**  106:*6*
**AUTOMOTIVE**  1:*4,*
*9, 19*  4:*12, 14*  52:*23*
76:*24, 25*  88:*5*  98:*14*
103:*21*  106:*10*
115:*24*  122:*23*
125:*16*
**Automotive's**  12:*1*
108:*12*
**available**  35:*15*
53:*24*  142:*11*  145:*7*
**avenues**  84:*25*
**average**  56:*8*

**aware**  13:*19*  16:*15*
63:*16, 17*  99:*10*
124:*2*  145:*9*  163:*24*

**< B >**
**b)(6**  60:*5*
**babysit**  42:*10*
**back**  24:*24*  25:*8*
27:*23*  29:*15, 21*  32:*9,*
*14*  33:*15, 25*  35:*14*
39:*10*  57:*24*  58:*22*
60:*24*  61:*16, 20*
71:*13, 15*  72:*1*  74:*14*
107:*1, 22*  108:*22*
110:*6*  111:*13*  113:*18,*
*23*  117:*16*  120:*12*
123:*17*  124:*2, 21*
128:*25*  135:*11*
143:*25*  144:*19*  149:*3*
162:*20, 25*  163:*18*
164:*18*  171:*1*  173:*9*
174:*17*  175:*24*
**background**  8:*4*
25:*19*  26:*5*  42:*12*
**back-ordered**  35:*16*
**backwards**  47:*11*
**bad**  104:*20*  166:*17*
167:*4*
**bandwidth**  28:*15*
**bank**  65:*12, 13, 17*
163:*24, 25*
**base**  24:*25*  79:*9, 12*
**Based**  38:*10, 16, 24*
39:*12*  64:*7*  80:*1*
91:*23*  94:*1*  100:*11,*
*13*  135:*16*  137:*16*
141:*23*  155:*14, 24*
156:*15*
**basis**  36:*17*
**batch**  45:*22*  158:*22,*
*23*
**Bates**  159:*13*
**bathroom**  124:*6*
**battery**  134:*25*  135:*4,*
*6, 8, 9, 10, 11, 17, 19,*
*22, 23*  136:*17, 19, 20*
139:*21, 23*  140:*1*
141:*5*  150:*11, 12, 14,*
*15*  153:*8, 10, 15, 22*
154:*2, 6, 9, 17, 21, 23*

155:2, *4, 15, 24*
156:*17* 160:*4, 6, 13, 15*
**battery's** 154:*15*
**bays** 27:*10, 24* 29:*23*
**BEACH** 178:*4* 179:*4*
**bear** 25:*13* 126:*9*
**beat** 39:*23*
**began** 104:*9* 157:*10*
**beginning** 4:*3* 61:*21*
64:*16* 83:*17* 111:*14*
**begins** 4:*10*
**behalf** 4:*19, 24, 25*
40:*25* 41:*3* 75:*12, 22*
76:*2* 79:*23* 117:*24*
123:*10* 156:*4*
**believe** 15:*6* 19:*23*
68:*25* 72:*21* 88:*17*
113:*24* 122:*15, 16*
126:*4* 132:*23* 133:*9*
144:*5* 145:*15*
**best** 7:*8* 13:*11, 18*
67:*13* 72:*20* 86:*11*
95:*19* 124:*17, 18*
132:*23* 136:*5, 16*
139:*11* 147:*9* 148:*3*
155:*19* 156:*2, 23*
158:*15* 162:*24* 164:*7*
175:*13*
**better** 11:*23* 17:*10,*
*18* 28:*21* 31:*3, 6*
38:*17* 62:*17, 21*
107:*8* 138:*2* 139:*9*
140:*7* 145:*1*
**beyond** 148:*1*
**biannual** 21:*10*
**Bill** 11:*5* 45:*14* 59:*1,*
*5, 9, 12* 96:*16*
**binder** 46:*15*
**binders** 44:*21*
**binding** 109:*25*
**birth** 7:*21* 45:*5*
**bit** 6:*21* 21:*11* 28:*3,*
*6* 80:*17* 111:*3* 159:*4*
167:*18*
**biweekly** 94:*22*
**black** 76:*13*
**blacked** 72:*1, 4* 76:*16*
**Blanding** 8:*22*

**blank** 88:*1* 98:*13, 15*
100:*10* 107:*9, 21, 24*
108:*8, 11*
**blatant** 176:*15*
**bleaking** 28:*1*
**blobs** 73:*21*
**blow** 98:*8* 112:*22*
123:*2* 128:*24* 133:*16*
139:*2* 153:*19*
**blunt** 110:*24* 160:*1*
**blurb** 28:*19, 20*
**board** 42:*25* 105:*5*
**body** 39:*24*
**bonus** 44:*23*
**booked** 64:*4, 19*
**booking** 64:*25*
**books** 166:*20, 22*
**bottom** 55:*23* 112:*20*
116:*1, 11* 121:*24*
122:*14* 140:*8*
**bought** 59:*16* 132:*15,*
*19*
**Boulevard** 8:*22*
**box** 22:*15* 47:*8* 78:*1,*
*7, 10, 12* 98:*10* 104:*3*
105:*23, 24* 106:*7, 10*
109:*18, 19* 112:*24*
114:*14* 119:*1, 3*
123:*6, 8* 171:*22*
172:*21* 173:*23* 174:*8,*
*13, 21*
**boxes** 47:*24* 74:*22,*
*24* 78:*24* 109:*7, 10,*
*13* 110:*5* 112:*25*
116:*4* 170:*2, 3*
**brakes** 25:*2* 32:*11*
34:*2*
**branch** 164:*2*
**branches** 164:*4, 5, 9*
**break** 6:*22, 23* 7:*2, 5,*
*6* 61:*8, 10* 111:*5*
127:*10*
**breaks** 124:*6*
**briefly** 170:*23*
**bright** 25:*10*
**bring** 14:*18* 73:*6*
82:*18* 147:*5*
**brought** 43:*16* 47:*22*
91:*18* 107:*1* 147:*1, 2*

**Bruce** 2:*10* 4:*17*
71:*7*
**budget** 83:*12, 17*
**building** 46:*10*
**Business** 8:*9* 9:*18,*
*23* 15:*21* 19:*5* 23:*2,*
*3* 24:*18* 36:*20* 43:*16,*
*18* 59:*13* 65:*24*
79:*22, 25* 84:*18*
86:*25* 108:*19* 151:*2,*
*4, 5* 161:*25* 162:*2, 4*
**buy** 19:*16* 21:*15*
22:*22* 43:*10* 52:*25*
**buyer** 95:*22*
**Buyer's** 3:*12, 17*
87:*2, 15, 18, 19* 88:*3*
92:*14* 95:*21, 22*
96:*16* 119:*10*
**buying** 175:*10*
**BYLER-RAMAGHI**
1:*18* 3:*3* 4:*1, 11* 5:*3*
7:*20* 177:*14* 178:*7*

**< C >**
**Caldwell's** 139:*14*
**calendar** 126:*5, 6*
**call** 77:*21* 94:*25*
95:*1, 4, 6, 12, 13, 14*
143:*13* 168:*1* 173:*8*
**called** 58:*13* 114:*23*
133:*15, 18* 143:*21*
169:*24*
**cameras** 43:*22*
**capacity** 9:*15* 154:*11,*
*17, 24* 155:*4* 160:*4,*
*13, 15*
**car** 21:*25* 24:*14*
31:*22* 33:*12, 25*
35:*15* 37:*12* 39:*22,*
*23* 53:*12* 64:*6, 25*
81:*24, 25* 91:*17*
123:*18* 127:*9* 135:*5,*
*12, 13* 136:*6, 11*
151:*18* 162:*12*
**card** 23:*1*
**cards** 47:*6*
**care** 5:*17* 83:*11*
136:*14* 155:*13*
**Carfax** 36:*5, 22*

**cars** 8:*14* 15:*15*
21:*12* 36:*1* 53:*12, 22*
67:*24*
**CASE** 1:*2* 4:*12, 14*
14:*6* 52:*9* 176:*23*
**cash** 42:*7* 90:*9*
**catch** 69:*16*
**cause** 4:*6*
**cell** 144:*21, 24*
**cellular** 144:*23*
**censors** 32:*11*
**center** 133:*18* 164:*2*
**Centurion** 2:*6*
**certain** 35:*16* 38:*8*
74:*22, 24* 85:*3* 117:*4*
152:*21* 174:*1*
**certainly** 6:*24* 27:*22*
28:*16* 31:*8* 62:*25*
69:*18* 70:*23* 94:*4*
109:*3* 137:*3* 171:*17*
**certainty** 114:*12*
119:*5*
**Certificate** 3:*11, 12,*
*14, 15, 16, 22* 71:*18*
74:*17, 21* 99:*2, 9*
111:*21, 24* 115:*9*
126:*25* 172:*13* 178:*1*
179:*1*
**certificates** 9:*22* 21:*6*
**certifications** 26:*12*
**certified** 5:*5* 26:*4, 13,*
*14* 171:*25*
**certify** 178:*7* 179:*6,*
*11*
**cetera** 20:*14* 25:*2*
32:*8, 12, 23* 35:*13, 16*
40:*23* 45:*15* 46:*14*
49:*9* 56:*5* 89:*10*
90:*3* 124:*7* 141:*2*
**chance** 44:*2*
**change** 25:*5, 6* 32:*10*
73:*19* 106:*3, 11*
128:*10* 130:*19*
**changed** 32:*18*
102:*22*
**character** 18:*23*
**charge** 27:*17* 88:*20*
90:*3* 96:*2*
**charged** 135:*4, 17, 19,*

*23* 165:*22* 166:*9*, *18*
**charges** 166:*1*
**charging** 135:*10*
**check** 3:*20* 23:*1*
32:*4* 34:*3*, *4* 78:*1*, *7*
98:*10* 106:*7* 110:*5*
112:*24*, *25* 138:*10*
163:*3*, *8*, *14*, *15*, *17*
164:*14*, *16*, *21* 172:*21*
173:*23* 174:*8*, *23*
**checked** 32:*9* 47:*24*
48:*20* 74:*23*, *24*
78:*12* 105:*25* 106:*1*
109:*7*, *10*, *13*, *20*
114:*9* 116:*7* 119:*1*, *3*
170:*2*, *3* 173:*24*
174:*22*
**checklist** 33:*20*, *22*,
*24* 66:*25*
**checkmark** 109:*20*
**checks** 33:*25*
**Chevy** 26:*13* 27:*21*
63:*12*
**choose** 46:*5* 90:*5*
108:*4*
**chose** 124:*3*
**Chris** 32:*24* 37:*21*,
*22* 45:*17* 46:*4* 47:*2*,
*12* 81:*8* 82:*25* 86:*16*
87:*14* 88:*17* 91:*2*
94:*17* 98:*5* 99:*6*
101:*11* 105:*18*
107:*22* 112:*19*
114:*17* 117:*7*, *25*
118:*1*, *7* 119:*1*
120:*25* 121:*2* 122:*13*
123:*10* 134:*6* 138:*7*
139:*14*, *16*
**cigarette** 124:*6*
**circled** 109:*23* 118:*4*
**circumstance** 134:*24*
**citation** 171:*10*, *13*
**cited** 66:*5*
**City** 164:*9*
**claim** 136:*15*
**claims** 168:*10*
**clarification** 52:*1*
**clarify** 42:*25* 104:*14*
129:*19* 171:*4*

**clarifying** 93:*16*
**clarity** 125:*1*
**Clay** 103:*23*, *25*
104:*1*, *6*, *10*
**CLAYTON** 1:*4*, *14*
4:*13*
**cleanings** 33:*10*
**cleans** 32:*23*
**clear** 30:*17* 102:*23*
104:*10* 148:*13* 177:*7*
**cleared** 104:*12*
**clearer** 17:*12*, *18*
28:*24*
**clerical** 163:*22*
**clerk** 77:*21* 79:*8*, *14*
**clerks** 80:*1*
**client** 42:*22* 56:*17*
76:*6* 88:*1*, *9* 89:*24*
91:*8* 100:*10* 103:*23*
107:*9* 123:*9*, *17*
130:*17* 142:*10*, *23*
143:*3*, *5*, *10* 145:*19*,
*24* 157:*11* 163:*9*
175:*9*
**clientele** 39:*25* 54:*9*
**clients** 8:*23* 18:*18*
26:*9* 33:*12* 37:*23*
42:*23* 45:*25* 46:*1*
50:*21* 75:*16* 76:*1*
80:*8*, *16*, *20*, *24* 81:*4*,
*17*, *23* 82:*23* 86:*3*
87:*8*, *16*, *24* 88:*4*, *8*,
*14* 90:*12*, *15* 93:*23*
94:*10* 96:*14* 97:*12*,
*25* 98:*12* 103:*20*
104:*15*, *17* 106:*19*, *21*,
*25* 107:*6*, *17* 110:*13*
114:*25* 115:*2*, *15*
116:*20* 117:*14*
119:*16* 120:*3*, *4*, *16*,
*22* 121:*2*, *18*, *23*
122:*2*, *7* 124:*1*, *21*
127:*24* 128:*25* 129:*3*
130:*9* 131:*6* 132:*10*
138:*25* 139:*20* 145:*3*,
*6* 146:*3*, *15* 147:*4*, *18*
148:*7* 151:*18*, *23*, *25*
153:*12* 154:*9* 162:*9*
164:*17* 165:*22* 166:*6*,
*17*, *21* 168:*4* 175:*15*

**client's** 15:*8*, *11* 41:*8*
44:*3* 106:*13* 119:*21*
130:*16* 166:*14*
**clipped** 48:*5*
**close** 35:*12*
**closed** 91:*12*
**closer** 30:*23*, *25*
**closes** 91:*8*
**Coast** 150:*11*
**co-buyer** 99:*13*
**coils** 32:*12*
**collected** 80:*14*
**Collections** 149:*20*, *24*
**collector's** 104:*11*
**college** 8:*5*, *6*
**colored** 129:*8*
**colors** 106:*23* 129:*4*
**column** 166:*1*
**come** 23:*2* 37:*7*
54:*5* 86:*8* 94:*11*
113:*23* 116:*15*
123:*17* 152:*13*
162:*12*, *13*, *20*
**comes** 14:*4* 31:*15*, *22*
32:*9*, *22* 140:*24*
165:*13* 176:*21*
**coming** 28:*24* 167:*18*
**commercial** 24:*5*, *12*
**Commission** 178:*21*
**common** 55:*12*
**communicate** 79:*25*
169:*6*
**communicating** 57:*8*
**communication**
146:*24* 147:*12*
**communications**
145:*14* 146:*21* 147:*8*,
*23* 169:*10*, *13*
**company** 18:*15*, *25*
33:*5* 58:*11*, *15*
132:*15*, *18*, *19* 136:*9*
155:*10*
**complaint** 110:*13*, *23*
168:*15*, *19* 169:*3*, *15*
**complete** 19:*22*
25:*15* 31:*24* 45:*3*
46:*8* 48:*7* 49:*25*
54:*18* 96:*7* 104:*8*, *25*
109:*7*

**completed** 8:*5* 45:*2*
47:*24* 48:*3*, *22*, *23*
58:*12* 68:*7* 104:*5*
107:*18* 111:*24*
114:*23* 169:*17*
**completely** 45:*21*
70:*22* 127:*17*, *25*
130:*10* 157:*7*
**compliance** 170:*8*
**comply** 176:*16*
**compression** 32:*2*
34:*3*
**computer** 65:*12*
139:*18*, *19*
**computer-generated**
123:*7*
**computers** 27:*14*
**concern** 40:*1*
**concerns** 40:*24*
**concluded** 177:*16*
**concludes** 177:*13*
**condescending** 133:*20*
**condition** 39:*22*
53:*16* 56:*5* 59:*18*
67:*16*, *22*
**conduct** 35:*25* 36:*4*
**conducted** 4:*16*
**confidential** 52:*2*
**confidentiality** 51:*22*,
*24*
**confirm** 139:*12*
**confirming** 70:*12*
**confused** 110:*8*, *10*
**confusing** 5:*23* 176:*8*
**connected** 179:*14*
**connection** 89:*11*, *17*
144:*25*
**conservative** 83:*19*
**considered** 18:*14*, *24*
**consumer** 24:*4*, *9*
43:*11* 47:*18* 48:*8*
170:*16*
**consumers** 16:*14*, *23*
38:*10*, *24* 39:*13*
**consummated** 55:*24*
**contact** 21:*18* 52:*11*,
*13* 142:*17*, *23*, *24*
143:*1*, *5*, *10*, *12*, *15*
157:*11* 176:*24*

ISIAH ROBI...
CR of NATIONAL...ISA ...(BYLER-RAMAGHI)

177:*11*
**contacted** 143:*7*
**contacting** 143:*3*
**contend** 131:*6*
153:*12*
**content** 159:*24*
**continue** 11:*16* 99:*20*
**contract** 45:*14* 88:*8*
90:*15* 92:*22* 93:*8, 22*
94:*10, 11, 19* 95:*8, 14,*
*15, 20, 24, 25* 96:*20*
120:*19* 121:*11, 23*
122:*2* 130:*6*
**contracted** 58:*16*
**contracts** 44:*9, 10*
95:*9* 129:*17*
**control** 137:*10, 13*
**convenient** 70:*23*
**conversation** 101:*11*
107:*23* 169:*25*
**convicted** 7:*23*
**Copart** 22:*12, 14, 16,*
*18*
**C-O-P-A-R-T** 22:*16*
**copied** 47:*8* 125:*25*
126:*3* 161:*6*
**copier** 47:*3*
**copies** 14:*21* 44:*10*
46:*11* 47:*4, 6* 48:*3*
55:*16* 59:*9* 87:*25*
110:*23* 116:*16*
118:*19, 21* 167:*17*
169:*9*
**Copy** 3:*20* 14:*9*
41:*13* 43:*7* 44:*9*
74:*16, 20* 75:*4* 87:*15,*
*21, 23* 88:*1, 3* 93:*21*
102:*5* 110:*2* 111:*23*
118:*10* 119:*10*
121:*10* 130:*21*
160:*24* 161:*15*
164:*14, 16, 21* 171:*21*
172:*20, 24*
**cor** 112:*5*
**corner** 112:*17*
116:*11* 140:*8*
**CORPORATE** 1:*19*
4:*11* 9:*11* 12:*2, 14*
15:*18* 47:*2*
**corporation** 1:*8, 11*

**correct** 12:*16* 17:*22*
18:*4, 10* 23:*3, 4* 30:*8*
31:*12* 36:*23* 46:*22*
48:*24* 64:*23* 65:*17,*
*24* 66:*23* 68:*1* 72:*13,*
*16, 17* 74:*16, 20*
75:*19* 78:*21, 22*
79:*18* 80:*10, 11*
81:*18* 87:*11, 15, 24*
89:*20* 90:*11* 92:*12*
93:*21* 97:*13* 98:*23*
102:*5* 104:*21* 106:*14*
108:*14, 15, 17* 111:*23*
118:*18* 120:*20, 24*
121:*12* 128:*7* 129:*20*
135:*17, 18, 20, 21, 24*
141:*5, 20* 143:*21, 22*
144:*3* 150:*9* 152:*2, 3*
153:*2, 4, 8, 10* 155:*16*
160:*4* 167:*22* 171:*21*
172:*22, 23, 25* 175:*2,*
*11, 21* 179:*9*
**corrections** 173:*10*
**correctly** 46:*23*
**correspondingly**
148:*15*
**corresponds** 149:*21*
**cost** 37:*10* 58:*17*
89:*22, 23, 25* 90:*1*
**costs** 83:*11* 89:*9*
**cough** 69:*25* 70:*3, 4*
**coughing** 5:*9* 53:*4*
**Counsel** 2:*3, 7* 4:*20*
71:*4* 146:*6, 21*
147:*10* 164:*24*
165:*14* 167:*17* 168:*1*
179:*12, 14*
**counsel's** 148:*4*
**counterclaim** 140:*14*
142:*9, 15*
**county** 9:*23* 103:*23,*
*25* 104:*1, 6, 11* 178:*4*
179:*4*
**course** 19:*24* 20:*1, 3,*
*25* 21:*1* 39:*7* 145:*10*
159:*19* 164:*1*
**courses** 19:*21*
**COURT** 1:*1* 4:*6, 15,*
*18, 19, 21* 6:*2, 16*
28:*11* 30:*17* 39:*5*

70:*10, 13, 15, 20* 82:*6*
92:*23* 93:*6, 12*
131:*15*
**courtesy** 47:*7*
**cover** 6:*22* 45:*4* 48:*5*
**covered** 17:*9* 20:*7, 10*
**crap** 53:*25*
**crazy** 39:*23*
**create** 92:*16, 18*
94:*23* 161:*2*
**created** 92:*8* 115:*14,*
*21, 23* 149:*9* 152:*4,*
*20, 22* 160:*22* 165:*12*
**credential** 35:*13*
**credentials** 20:*9, 20*
**credit** 23:*1* 44:*17*
45:*7, 11*
**crimes** 7:*24* 8:*1*
**criteria** 23:*21*
**criticize** 82:*11*
**crossed** 110:*7*
**crow** 22:*15*
**curiosity** 166:*5*
**current** 56:*9* 68:*11*
69:*9* 170:*2*
**Currently** 15:*6*
26:*10* 27:*15* 65:*4*
66:*22* 68:*9, 10* 72:*14*
75:*21* 105:*25* 123:*13*
129:*19* 132:*16* 144:*6*
145:*24* 147:*15*
**customer** 32:*20*
42:*15* 43:*12* 45:*9, 10,*
*24* 47:*9* 50:*4* 84:*19*
86:*1, 6* 94:*20* 95:*25*
108:*18, 20* 113:*15*
132:*8* 140:*25* 162:*24*
176:*24*
**customers** 43:*6* 45:*3*
47:*3* 54:*5* 119:*15*
**customer's** 31:*24*
106:*8* 140:*12*
**cut** 128:*20*

**< D >**
**darker** 129:*10*
**date** 7:*21* 20:*8* 45:*5*
47:*25* 51:*11* 58:*5*
64:*1, 12, 18* 66:*8, 13*
72:*21, 23* 73:*23* 74:*2*

77:*8* 86:*13* 88:*12, 13*
94:*12, 13* 98:*17*
99:*25* 100:*1* 113:*16,*
*19, 21, 23* 115:*4*
117:*18* 119:*18*
120:*18* 123:*12, 19, 23*
124:*11, 20* 125:*3, 16,*
*20, 23, 24* 126:*1, 3*
127:*25* 131:*9, 11*
132:*23* 137:*9* 138:*2*
139:*9* 146:*13* 147:*1*
153:*12* 157:*23* 158:*7,*
*8* 159:*10, 14* 161:*3*
162:*9* 163:*18* 168:*21*
**dated** 86:*13* 179:*16*
**dates** 47:*24* 121:*20*
124:*4* 125:*19* 143:*14*
159:*2, 16* 160:*20*
**day** 32:*14* 64:*4*
79:*21* 86:*8, 19, 21*
113:*22* 128:*9* 130:*10,*
*16, 17, 19, 20* 152:*24*
157:*19* 173:*14, 18*
178:*10*
**days** 64:*5* 86:*9, 24*
113:*18* 117:*16, 19*
119:*19* 123:*14* 124:*2*
139:*21, 25* 140:*2*
155:*16, 25* 156:*19*
157:*6*
**dead** 140:*1*
**deadline** 20:*9*
**deal** 14:*4* 21:*25*
46:*16* 47:*18* 118:*22*
**DEALER** 2:*2* 23:*13*
27:*15* 43:*8* 49:*10, 13*
60:*20* 72:*8* 88:*18, 22*
89:*4, 6, 7* 90:*5* 96:*18*
99:*11, 16, 25* 104:*12*
114:*22* 116:*9* 133:*21,*
*22* 137:*25* 170:*4*
**dealer-only** 22:*7*
**dealers** 21:*16, 24*
22:*7* 53:*22, 23* 103:*8*
133:*21*
**dealer's** 9:*22* 99:*12,*
*16*
**dealership** 8:*15* 9:*2*
10:*5, 12* 15:*2, 4, 16,*
*19, 20* 16:*6, 17, 22*

17:4, 21, 24   18:6
19:7, 10, 17, 20, 22
21:18   22:20, 23
23:11, 18, 21, 24   24:2,
4, 9   25:14   27:18, 21
29:23   30:3   32:9
34:15   37:2, 13   39:20
40:4, 5, 6   41:24   42:2,
9   47:19   48:7   49:11,
24   52:20   54:5   57:16,
20   58:4   66:6, 8, 22
75:13, 19   77:1   78:19,
23   81:5   83:12, 16
86:4, 7, 8, 15, 18, 21,
24   87:20, 23   88:1
90:2   103:11, 13
117:24   121:3   123:10,
12   132:11   146:8
149:16   162:10, 12, 20
176:18, 20
**dealerships**   27:19
79:20
**dealership's**   8:21
16:1   65:16
**Dealerwebsites.com**
85:22
**deals**   174:11
**dealt**   133:21
**decals**   49:9
**December**   159:15
**decent**   54:4
**decide**   43:15
**decides**   37:6
**decision**   37:7   43:10
53:3, 7, 11   54:2
**declaration**   46:15
**declarations**   44:21
**declare**   104:4
**default**   94:23
**Defendant**   1:9   2:7
8:16
**Defendant/Counter-**
**Plaintiff**   1:12
**defendants**   5:1
**defer**   102:25
**defined**   96:15
**definite**   137:9
**definitely**   7:5
**degrees**   8:11

**delay**   137:1
**delayed**   82:16
**delivered**   32:15   40:2,
10   57:18   58:3   72:25
73:2
**delivery**   58:12
177:12
**Demand**   3:21   54:7
166:23   167:22
**demanded**   168:4, 7
**demands**   167:25
**denied**   173:10
**Department**   21:8
48:6   65:1   102:16, 17,
24   103:1, 22   104:11
105:15   114:20   145:2
168:15, 19   170:15
**depending**   27:19
46:12   49:5   134:13
**Depends**   132:8   174:2
**depict**   99:13, 21
**depiction**   71:22
**depicts**   95:25   96:21
**depleted**   139:21, 24
150:11, 12, 14
**Depo**   3:10   9:11   65:8
**deposed**   5:19
**DEPOSITION**   1:18
4:1, 10, 16   6:15
10:15, 18, 21   12:1
13:23   51:16, 18   52:5
61:25   66:20   81:10,
14   82:17   134:21
177:14   179:8
**deposits**   164:18
**derive**   9:8
**derived**   152:5
**describing**   169:21
**designated**   12:15
**desk**   118:3   122:11
**detail**   25:6   32:21
80:17
**detailed**   33:12
**detailer**   32:22   33:3,
6, 11
**detailing**   44:20
**determines**   36:24
37:2   83:5
**device**   28:22   132:4,
14, 20   133:3   134:11,

25   136:2, 17, 21
137:10, 13, 16, 20
140:15, 17, 20   141:20
142:17, 18, 21   144:21
145:4, 6   153:13
154:12, 17, 23   155:4,
23   156:17   160:4, 6,
12, 18   161:1
**devices**   132:11   144:6
155:10   161:1
**device's**   153:10
**diagnostics**   27:14
**died**   141:5   150:14, 15
**dies**   135:9
**difference**   95:2, 20
109:17
**different**   28:22   49:4
87:17   97:21   106:23
110:4, 17   111:21
112:10   120:18   127:1,
21, 25   129:4   130:10,
14   131:9   134:13, 15
141:16   149:23   159:1
164:9   176:6
**differently**   166:22
**difficult**   36:8, 11, 13
126:17
**digit**   109:15   173:24
**Direct**   3:4   5:6
**directly**   92:3   101:9
152:5
**disability**   30:19
**disabled**   153:13
**disclose**   113:14
145:14   146:20, 24
147:12   148:1   160:12,
15, 18, 20
**disclosed**   79:15
113:8, 9
**discloses**   90:9
**disclosing**   147:8, 23
**disclosure**   3:13, 15,
16, 18   72:15   73:13
77:3, 10   79:10, 13
80:2, 5   97:24   98:6
100:3, 8, 11, 13, 15
105:9, 14, 20   108:17
112:21   113:16   116:2
117:10   122:21, 24
127:15   131:3   148:14

**disclosures**   48:8
79:20   80:13   113:11
162:11
**disconnected**   140:22,
23   141:1, 2, 3, 4, 16,
20   144:7   150:13
157:7
**discount**   88:17
**discovery**   116:15
119:11   121:11
167:17
**discuss**   12:21   13:4, 8
64:23   68:16   69:8
**discussed**   50:1
126:25   127:16
129:17   156:7
**discussing**   46:19
56:25   150:19, 24
**dishonesty**   7:24   8:2
**disinclude**   20:24
**dislocating**   144:7
**disposed**   34:5
**dispute**   74:6   87:22
167:21
**disrespectful**   133:24
**distance**   153:6
**DISTRICT**   1:1   4:15
**DIVISION**   1:2
**DMS**   49:13   89:9, 21
92:1, 18   101:13, 23
165:13, 20
**DMV**   10:6   11:8
17:3, 21   19:19, 20
20:23   21:6   45:4, 9
47:20   48:20, 23   49:7,
21   74:18, 21   75:5
99:14   102:7, 9, 12
103:25   104:1, 6, 8, 16
107:4   108:24   109:6,
11, 14, 23   110:4, 13,
14, 16, 17, 22   113:12
114:11   116:9, 17
118:15, 20   169:2, 6,
15   170:13   171:10, 22
172:14, 20, 24   173:3,
6, 13, 15   174:7, 23
**DMV's**   110:3, 12, 15
**doc**   88:18
**Document**   3:19
12:10, 25   13:14   14:2

44:15  45:10  87:8, 10,
13, 14  88:6  94:3, 15,
18  95:2  96:8, 10
97:12, 21, 25  98:3, 22
99:1, 4, 8, 10  100:4
101:13  102:3  103:2
104:4, 15  105:16
109:8  112:10  113:17
115:12, 14, 18, 21, 23
116:14, 15, 19  117:12
118:11, 14, 16, 17, 18
119:6, 18  120:16
121:7  122:7, 19
123:1, 15  124:15
125:2, 24  127:19, 20
149:7, 10, 11  151:2
152:4  155:7  160:22,
24, 25  161:10, 24
162:3  165:5, 9, 12, 22
172:8
**documentation** 108:5
110:15
**documents** 10:20
11:1, 2, 4, 7  13:22
14:18, 20, 21, 24
44:13, 25  45:3, 12, 13,
16, 18, 22, 24  46:18,
20, 24  47:1, 19, 21
48:19  49:25  50:2, 5
59:4  60:24  68:24
94:16  96:14, 25  97:1,
8, 9  98:4, 13, 15  99:5
100:5, 10  101:17, 18,
22  105:21  107:6, 17,
21, 25  108:7, 9  109:5
116:3, 16  118:8, 19
120:3, 4  121:21
122:10  127:1, 17
131:19  162:10
163:13  168:2  169:8
**doing** 6:8  116:9
122:12
**dollar** 59:2
**doors** 54:6
**dots** 129:11
**dotted** 110:6
**doubt** 64:1, 15  155:6
173:5
**drawn** 38:10, 24

39:13
**drink** 5:10
**drive** 32:20  42:18,
22, 24  43:5, 8, 15
68:5  94:8  98:16
100:23  107:10, 25
163:11
**driven** 32:6  67:7, 13
137:14
**driver's** 43:7  45:5
**drives** 43:1
**driving** 42:21
**drop** 49:7  70:4
114:20  173:7
**drop-off** 114:22
**dropped** 155:15, 24
156:18  173:14, 16, 17
**drops** 70:1
**drove** 67:10  88:2
**duces** 13:13
**duly** 5:4  178:8

< E >
**earlier** 60:7  172:10
175:22
**easier** 125:13  131:17
**easy** 33:9
**educate** 108:2
**educational** 8:4
**Effectively** 94:24
**EFS** 49:15, 17
**either** 7:14  28:5
45:17  58:10  64:13
70:17  98:10  101:3
119:2
**electronic** 44:12
**electronically** 49:20
106:2
**else's** 128:8
**E-mail** 143:17, 25
144:5, 11, 13, 17
169:4, 8, 9, 12
**e-mailed** 14:1  144:4,
17
**e-mails** 44:21  144:19
**employed** 26:10
50:19  52:20, 22, 23
66:22  149:16  150:6
**employee** 179:11, 13

**employees** 15:4
25:14  49:24  50:10,
12
**endorsements** 40:23
**ends** 159:7, 15
**engaged** 101:11
**engine** 25:2  32:1
34:1
**enlarge** 159:3  172:5
**ensure** 25:1  32:1, 3
33:22  40:22  138:10
**entered** 96:20  124:11
**entire** 46:9
**entries** 150:8  151:23
152:1
**entry** 153:16  162:9
**envelope** 75:3
**Equinox** 50:22, 24
51:9  53:3, 7, 9, 11
54:15  59:16, 19, 21
63:12  66:1  74:17
86:4
**error** 78:25  163:23
**escalate** 170:6
**ESQUIRE** 2:5, 9
et  20:14  25:2  32:8,
12, 23  35:13, 16
40:23  45:14  46:14
49:9  56:5  89:10
90:2  124:7  141:2
**ethical** 164:19
**ethics** 19:4
**event** 28:18
**everybody** 17:17
28:15  40:22  61:23,
24  85:10  103:9
111:17  166:9, 20
174:4
**everybody's** 176:5
**evidence** 145:3
**exact** 51:11  58:5
59:2  64:18  66:13
71:25  72:21  77:15,
21  81:2  100:21
116:25  117:17, 18
139:17  147:1, 21
158:7, 14  172:14
**Exactly** 72:7  91:4
143:14
**exacts** 64:20

**Examination** 3:4  5:6
12:7  13:3  110:12
**examiner** 110:14, 16
169:2, 7, 24  170:2, 8
**exceeds** 35:16, 22
**Excel** 152:13  161:6,
10
**excessive** 25:3
**excited** 46:3
**exclusively** 19:16
**excuse** 5:10  117:20
172:16
**execute** 49:8
**executed** 47:21  50:5
100:1  114:25  123:12
130:9
**Exhibit** 11:12, 13
59:24  60:1, 4  61:6
62:3, 4  69:4  71:16,
17  74:9, 10  87:3, 4
93:1, 2  97:14, 15, 17
98:24, 25  101:25
102:2  104:20, 22
111:19  112:10  115:8,
10  117:9, 11  119:8
121:8  122:17, 18
126:12, 13  127:24
129:16  131:16
133:16  138:20, 21
143:25  149:5, 6
151:12  158:24  163:2,
4  165:2  166:23
167:5, 19  169:20
171:3, 6, 8, 20  172:13
**EXHIBITS** 3:9
126:13  127:14  131:2
**exist** 33:18  103:18
**exists** 103:15
**expand** 159:11, 12
**expect** 37:11  175:15
**expenses** 90:1
**expensive** 35:10
**experience** 38:10, 16,
24  39:12  92:7
137:16
**experts** 129:15
**Expires** 178:22
**explain** 50:15  51:24
94:18  99:8, 20  107:5
128:3, 5

ISIAH ROBINSON vs DEPARTMENT OF ECONOMIC OPPORTUNITY, ET AL.
CR of NATIONAL... (BYLER-RAMAGHI)

**explained** 90:*15, 17*
91:*1, 3* 97:*12* 98:*22*
118:*4, 5, 7* 120:*13, 20*
130:*22*
**explaining** 93:*12*
118:*3*
**explains** 94:*20*
**explanation** 102:*23*
103:*1* 125:*21*
**explicit** 46:*4* 79:*7*
83:*2*
**extent** 145:*13* 146:*19*

< F >
**face** 17:*9* 73:*12*
164:*20*
**Facebook** 37:*15*
83:*4, 6, 8, 9, 23* 84:*2,
10, 15, 24* 85:*6*
**facility** 32:*16*
**fact** 53:*21* 144:*5*
**factors** 37:*7* 53:*2, 6,
8, 10*
**facts** 104:*5*
**failures** 25:*2*
**fair** 5:*25* 36:*21*
63:*13, 23* 64:*7* 150:*7*
151:*17* 155:*14, 23*
158:*2* 172:*12*
**fairly** 32:*7* 137:*18*
**faithful** 175:*15*
**familiar** 12:*8* 18:*9*
60:*18* 71:*20* 74:*11*
87:*5* 93:*19* 94:*3*
97:*23* 99:*1* 102:*3*
105:*10, 12* 111:*20*
115:*11, 12* 117:*12*
119:*6* 121:*7* 122:*19*
149:*7* 151:*13* 158:*25*
163:*5* 165:*9* 167:*9*
172:*9*
**family** 32:*20*
**far** 6:*8* 12:*7* 13:*24*
29:*8* 43:*9* 98:*7*
102:*9* 108:*7, 9*
135:*25*
**fault** 127:*8*
**FedEx** 40:*12*
**fee** 88:*18, 23* 89:*3, 4,
5, 6, 7, 12, 18, 19* 90:*4,*

5, 6* 96:*18* 165:*25*
166:*1, 3, 18, 21*
**feel** 176:*13*
**fees** 89:*9* 165:*23, 24*
**feet** 153:*5*
**fell** 96:*10*
**felonies** 7:*23*
**felony** 8:*2*
**felt** 170:*2*
**females** 150:*6*
**FEYGIN** 2:*5* 3:*4*
4:*23, 24* 5:*7* 7:*4, 8,
11* 9:*12, 16* 11:*14, 21,
24* 12:*23* 13:*6* 14:*1,
3, 7, 11, 12, 17, 22*
15:*25* 16:*5, 11, 12, 21*
17:*1, 2, 17, 20* 18:*13*
21:*22* 24:*7* 25:*22*
26:*1, 24* 27:*8* 28:*4, 8,
13, 21* 29:*4, 20* 30:*16,
18, 20* 31:*2, 6, 8, 10*
34:*17* 35:*2, 6, 17, 24*
38:*4, 13, 15, 23* 39:*3,
11, 16* 42:*4* 43:*17*
46:*21* 47:*10* 48:*13*
49:*2* 50:*11, 25* 52:*1,
10* 56:*12, 16, 18, 21,
23* 57:*5* 60:*3, 5, 8, 10,
17* 61:*6, 10, 12, 23*
62:*1, 7, 14, 16, 19, 25*
63:*3, 4* 64:*14, 21*
65:*9, 14* 67:*20* 68:*19,
20, 23* 69:*3, 11, 13, 16,
18, 21, 22, 23* 70:*5, 8,
11, 23* 71:*1, 6, 14*
75:*24* 76:*18, 19*
78:*18* 79:*4* 80:*4, 23*
81:*3* 82:*8, 10, 13, 22*
83:*17, 21, 25* 84:*5, 18*
85:*18, 25* 87:*1* 89:*2,
15, 16, 21* 90:*16, 20,
25* 92:*2, 4, 20, 23*
93:*1, 3, 5, 15, 16, 18*
94:*2, 8, 9* 95:*4, 13*
97:*4, 6, 22* 98:*9, 16*
100:*16, 19* 101:*24*
104:*23* 105:*4, 8*
106:*18, 23* 107:*8, 12,
20* 108:*6* 109:*2, 3, 9*
110:*7, 20* 111:*2, 4, 7,*

9, 16* 112:*3, 4, 6, 11,
14, 16* 113:*25* 116:*24*
117:*6* 120:*2, 14*
123:*18, 22* 124:*1, 9,
13, 23, 25* 125:*8, 12,
15, 18* 126:*2, 11, 16,
23* 127:*4, 6, 13, 21, 22*
128:*6, 8, 16, 18, 19, 22*
129:*25* 130:*23* 131:*1,
15, 20* 132:*1, 3*
133:*10, 11, 25* 134:*20*
138:*3* 140:*5* 141:*1, 3,
8, 13, 25* 142:*4, 7, 10,
16, 23* 143:*11* 144:*10,
15* 145:*8, 16, 22*
146:*22, 25* 147:*15, 16,
19, 24* 148:*5, 18, 20,
22, 25* 149:*4, 18*
150:*5* 151:*1, 9* 152:*8,
11* 153:*21* 155:*9, 11,
13, 21, 22* 156:*3, 5, 10,
11, 14, 21, 24* 157:*16,
17* 158:*7, 14* 159:*1, 5,
11, 18, 20* 160:*1*
161:*1, 17, 20, 21, 23*
162:*7, 8, 13, 19*
163:*16, 20, 23* 164:*10,
11, 15, 18* 165:*8, 16*
166:*4, 8, 12, 13* 167:*1,
3, 8, 15* 169:*1* 170:*12,
19, 23* 171:*2, 8, 10, 13,
15, 17, 18* 172:*6, 7, 11,
18* 173:*3, 4, 7, 15, 18*
174:*9, 15, 19* 175:*14,
17, 23* 176:*3, 13, 17,
22* 177:*2, 5, 9, 10*
**figure** 29:*11* 30:*21*
62:*9, 22* 107:*16*
**file** 10:*22, 24, 25*
11:*1, 4, 7* 110:*21, 22*
118:*19* 161:*9* 164:*23*
168:*14, 18* 169:*4*
**filed** 4:*5, 12, 14*
**filing** 142:*8, 14*
**fill** 44:*23* 45:*7*
77:*22* 79:*5, 22* 80:*1,
12* 92:*14* 96:*25*
**filled** 47:*24* 48:*2*
72:*5, 9, 15* 77:*2, 5, 7,*

10, 13* 78:*9* 103:*20,
25* 123:*20, 23*
**filter** 25:*6*
**final** 75:*3*
**finance** 9:*21, 25*
11:*5* 42:*8* 95:*24*
96:*2, 15*
**financed** 18:*4* 37:*12*
**Financial** 10:*1* 18:*3*
**financially** 179:*14*
**financing** 18:*7* 19:*7,
10, 13*
**find** 21:*23* 23:*7*
29:*25* 42:*12* 43:*12*
81:*23* 152:*22*
**fine** 14:*5* 127:*12*
155:*23* 166:*12*
**finish** 6:*4, 25* 31:*24*
61:*4* 128:*15, 20*
**finished** 12:*5, 6*
128:*21* 166:*11*
**FIRM** 2:*2* 35:*18*
**first** 5:*4* 12:*10*
24:*14* 26:*17, 18*
41:*24* 44:*15* 73:*12*
115:*23* 132:*24* 133:*1,
2* 143:*7* 153:*14, 16*
158:*22* 159:*14*
**fitted** 145:*1*
**five** 15:*14* 29:*24*
80:*15* 134:*12* 164:*9,
12, 13* 170:*19*
**five-minute** 111:*7*
**five-year** 11:*9*
**fixed** 32:*17, 18*
**flag** 14:*5*
**floor** 23:*5, 6* 65:*19,
22*
**FLORIDA** 1:*1, 8, 11,
25* 2:*3, 7* 4:*3, 15, 19*
8:*20* 9:*24* 168:*15, 19*
178:*3, 20* 179:*3*
**focus** 23:*24* 24:*2, 4*
**fold** 47:*5*
**folder** 48:*4, 23*
**follow** 148:*3*
**following** 68:*17*
110:*12* 162:*21*
**follows** 5:*5*
**follow-up** 124:*19*

**Ford** 51:*8, 10* 54:*11, 14, 17* 57:*9, 22* 58:*24* 59:*3* 63:*6, 11* 65:*3* 71:*24* 72:*3, 11, 19* 74:*7* 75:*18* 77:*11, 23* 79:*6, 15*
**foregoing** 104:*4* 179:*8*
**Forgive** 171:*9*
**Form** 3:*14, 17* 9:*10* 12:*22* 15:*22* 16:*3, 19, 24* 18:*12* 21:*19* 24:*6* 25:*21* 34:*25* 35:*5, 21* 38:*3* 39:*14* 42:*1* 48:*11* 49:*1* 51:*25* 64:*9, 17* 67:*17* 68:*18* 75:*20* 78:*16* 79:*24* 80:*15, 22* 81:*1* 83:*15, 24* 84:*4* 85:*17* 86:*22* 87:*16* 88:*4* 89:*14* 91:*25* 92:*15, 17* 93:*24* 95:*21* 97:*2* 100:*14* 101:*21* 102:*1, 11, 18, 20* 106:*15, 22* 107:*7, 19* 110:*18* 113:*11, 21* 114:*17* 116:*2, 21* 117:*1, 2* 119:*10* 123:*21, 24* 124:*12, 16* 125:*4, 17* 127:*3, 18* 128:*4* 130:*15* 140:*3* 141:*7, 22, 24* 148:*9, 13* 155:*8, 17* 156:*1, 20* 157:*8, 14* 166:*7* 172:*15* 173:*2* 174:*14* 175:*12* 176:*10*
**formal** 19:*24* 105:*13*
**format** 118:*23*
**forms** 104:*8, 18* 173:*18*
**forth** 17:*3*
**forthcoming** 34:*16*
**found** 25:*3*
**four** 33:*7, 16* 37:*20* 54:*6* 58:*13* 137:*7* 149:*23*
**four-door** 54:*9*
**four-ish** 169:*17*
**fourth** 5:*12*
**framing** 176:*4*

**franchise** 21:*15, 24* 23:*13* 27:*15, 16, 18* 40:*5* 53:*22*
**free** 83:*1*
**Friday** 1:*22* 4:*4* 29:*24* 86:*10*
**front** 50:*3* 65:*4* 74:*12* 100:*22* 109:*21* 114:*4, 8* 117:*13, 17* 119:*15* 121:*18* 122:*10* 123:*9* 126:*6* 129:*1* 130:*22, 23* 134:*5* 143:*13*
**full** 143:*25*
**fully** 38:*14* 126:*15, 18*
**funds** 23:*2* 65:*24*
**further** 103:*1* 161:*13* 170:*13, 15* 177:*2, 3* 179:*11*
**Fuzz** 29:*2*
**fuzzy** 28:*5* 29:*3* 30:*10, 14*

**< G >**
**gain** 84:*21*
**gargled** 28:*6*
**gears** 21:*11* 50:*21*
**general** 9:*3* 31:*20* 33:*9* 43:*3* 65:*9* 85:*11*
**Generalistically** 31:*22*
**generalistics** 174:*9, 11*
**generally** 41:*23* 42:*3* 43:*1* 47:*9, 22* 55:*22* 59:*11, 13* 60:*23* 61:*2* 84:*12, 15* 174:*23*
**generated** 45:*15, 19* 106:*7* 149:*11*
**generates** 45:*16*
**generic** 60:*19* 106:*7, 25* 169:*4*
**gentleman** 91:*7*
**get-go** 107:*18*
**getting** 28:*4*
**girls** 64:*5*
**give** 6:*17* 17:*14* 62:*10* 64:*19* 68:*11, 20* 69:*5* 76:*17* 77:*14, 19* 83:*20* 99:*16*

107:*5, 20, 24* 137:*7, 8* 156:*23* 158:*14*
**given** 43:*7* 44:*19* 45:*3, 24* 46:*11* 47:*7, 9* 52:*25* 56:*5* 83:*1, 3* 89:*24* 94:*7* 100:*9* 107:*1* 145:*17* 148:*6* 161:*4* 179:*9*
**give-or-take** 46:*12*
**giving** 7:*16* 48:*1* 106:*7* 147:*20*
**glasses** 76:*11*
**gliding** 32:*7*
**glitch** 18:*17*
**glove** 47:*8*
**go** 8:*6* 20:*1* 21:*17* 24:*24* 25:*23* 29:*10* 33:*15* 39:*5* 42:*24* 43:*5, 11, 12* 46:*4* 48:*18, 23* 54:*17* 58:*22* 69:*15* 71:*4* 73:*22* 76:*14, 17* 80:*22* 81:*1* 86:*22* 92:*17* 101:*21* 106:*14* 108:*22* 112:*6* 120:*1* 127:*10* 129:*2, 7* 141:*9* 142:*5* 143:*25* 144:*10, 19* 148:*10, 22, 24* 157:*15* 170:*13, 15, 23* 173:*18* 175:*24*
**goes** 24:*25* 25:*9* 34:*24* 40:*7* 136:*7, 8*
**going** 5:*11, 21, 24* 6:*3* 9:*13* 11:*10, 11* 12:*4* 13:*12* 25:*12* 26:*21* 28:*13, 14* 29:*17* 30:*6, 14* 35:*3* 39:*23* 41:*23* 42:*9* 46:*21, 22* 47:*11* 59:*24* 62:*2* 65:*11* 69:*4* 71:*15, 16* 73:*12* 74:*9* 87:*2* 91:*13* 93:*24* 97:*19* 101:*25* 108:*23* 110:*11* 111:*17, 18* 114:*5* 116:*1* 117:*9* 119:*21* 126:*17* 129:*15* 131:*15, 20* 145:*12* 146:*18, 25* 148:*9, 17* 149:*5* 153:*19* 157:*25*

158:*21* 159:*21* 166:*23* 167:*11* 168:*12* 171:*3, 25* 172:*4*
**GoldStar** 132:*15, 17, 18*
**Good** 4:*8, 23, 25* 5:*8, 9* 19:*5* 34:*1* 61:*10*
**gotten** 27:*5* 39:*3*
**govern** 15:*21* 16:*1* 78:*20*
**GPS** 3:*19, 20* 32:*19* 132:*4, 10, 14, 20, 24* 136:*7, 9, 10, 14* 138:*1* 140:*24, 25* 141:*25* 142:*14* 145:*6* 146:*2, 9* 147:*3* 150:*17* 151:*10, 18, 24* 152:*18* 154:*11* 156:*17* 157:*1, 19* 158:*3, 23* 162:*5, 25*
**GPS's** 25:*6* 133:*19, 23* 137:*25* 138:*15* 139:*13* 151:*8* 155:*23*
**great** 54:*1* 61:*24*
**greet** 42:*6*
**greets** 41:*25*
**ground** 5:*18* 6:*21* 163:*14*
**group** 53:*21* 55:*5* 56:*2* 101:*22*
**groups** 52:*25* 53:*23*
**guaranteed** 85:*10*
**guess** 14:*3* 137:*1* 139:*11* 157:*25* 158:*8* 162:*24*
**guy** 156:*4, 22*
**guys** 27:*9* 49:*15* 61:*7*
**Gwendolyn** 1:*24* 4:*2* 178:*6, 19* 179:*6, 24*

**< H >**
**half** 37:*20* 61:*25* 119:*4* 157:*24* 173:*21*
**hand** 101:*15* 124:*3* 178:*10*
**Hand-delivered** 73:*1*
**handles** 50:*2*

**handwriting** 76:4, 20, 22 80:9 104:7 114:9 117:21 149:9, 12, 13, 15, 25 150:4 163:15
**handwrote** 123:4
**Hang** 48:10 171:7
**Hannah's** 150:1
**happen** 64:4 147:3
**happened** 55:13 83:13 91:6 92:6 157:24
**happening** 92:7
**happens** 42:5 45:19, 23 46:16, 19, 25 78:25 114:21 135:7, 9 144:24 173:8
**happy** 17:1 56:19 107:11 108:21 110:25 163:13 176:16
**hard** 14:9, 21 17:11 35:23 41:13 44:9, 10 47:4 161:15
**harder** 167:18
**hardships** 163:10
**Harrison** 2:2
**hats** 47:17
**head** 28:9 58:25 82:7
**headlights** 32:4 34:2
**hear** 17:17 20:16 27:25 30:9 36:12 38:14, 16 39:1, 2 45:21 56:12, 14 62:16, 19 64:11 70:5, 8, 9, 10, 15, 16, 17, 18 71:3, 5 75:17 81:11 82:9, 20 89:15 90:20 92:23 97:3 100:12 103:16 114:5 115:22 116:22 134:17 152:9 172:17 175:3
**hearing** 17:11 28:11, 12, 19 30:19 70:14 82:11
**heartbeat** 133:1 157:7
**heating** 90:2
**held** 34:3 40:6

**He'll** 60:12
**Hello** 69:20
**help** 10:14 17:16 62:12 109:3 110:25
**helpful** 31:1 112:23
**helps** 11:17 51:13
**here/pay** 19:16
**hereinunder** 5:5
**HH** 178:21
**hidden** 134:14
**high** 8:5 50:20
**higher-end** 22:6
**highlight** 45:25 106:24 125:13 128:24 129:9
**highlighted** 76:20
**highlighting** 106:13 125:14
**highlights** 87:19 106:23 129:4
**highway** 32:7 168:15, 19
**hire** 23:11 26:4 50:19
**historical** 138:1 161:2
**history** 3:19, 21, 22 35:25 36:4 59:15 151:10, 17 152:18 161:1, 11 165:1, 4, 10 172:1
**hit** 132:24 161:11
**hits** 24:23
**hold** 8:10 9:17, 22 62:7 71:10 115:20 136:4 142:3 168:13
**holding** 32:2
**Hollywood** 2:3
**home** 47:23 53:25 102:6 146:16 147:6, 18 148:7
**honest** 18:15, 25 158:15 175:2, 7, 15
**honestly** 58:21 130:24 137:7
**hope** 27:22 61:23
**hopefully** 5:21 61:24 62:5

**host** 85:21
**hour** 4:3 7:7 46:12
**hours** 19:22 20:21 47:23 135:1 136:8, 10
**hover** 42:10
**HSMV** 3:14 101:25
**Huh** 70:2
**huh-uhs** 6:8
**human** 78:25 163:22, 23
**husband** 52:19 115:5

**< I >**
**I/we** 104:3, 4
**IAAI** 22:10
**ID** 47:6
**idea** 38:9 75:11 127:4
**identical** 128:3, 5, 14 159:23
**IDENTIFICATION** 3:9
**identified** 11:13 60:1 62:4 71:17 74:10 87:4 93:2 97:15 98:25 102:2 104:22 111:19 115:10 117:11 119:8 121:8 122:18 138:21 149:6 151:12 158:24 163:4 165:2 167:5 169:20 171:6
**identifying** 85:7
**IMEI** 133:15 134:2
**IMEIC** 134:2
**immediate** 168:1
**immediately** 40:24 66:3 176:24
**implying** 7:13
**important** 18:14, 18, 24 95:16, 18 175:1, 6
**impressed** 27:7
**improperly** 169:17
**inaccurate** 107:6
**include** 20:23 84:11
**included** 55:6 104:9
**income** 9:8
**incomplete** 107:6

**Incorporated** 4:12, 14
**incorrectly** 107:18
**INDEX** 3:1
**individual** 1:4, 14 9:15 33:4
**individually** 138:17
**influence** 7:15
**influenced** 53:2, 6, 10 54:2
**inform** 108:1
**informally** 27:1
**information** 44:20 45:5, 8 48:2 51:3 58:7 77:22 79:9, 11, 12 80:14 84:22 85:7 99:17, 18 106:9 108:14 148:15 150:16 152:12 156:7 157:13 159:22 161:6
**inhaler** 127:8
**initially** 86:6
**ink** 89:22 118:10, 13
**inputted** 106:9
**inserted** 32:19 153:7
**inside** 30:1
**insinuated** 44:8
**inspect** 23:9, 12 59:21 66:9 68:5 142:2, 8, 14 143:5 145:17, 20 146:1, 8, 14, 16 147:6, 17 148:7
**inspected** 31:17 66:2, 4, 7 68:1 142:22 145:10 147:3
**inspection** 11:9 25:15 30:6 31:12, 16 33:20 34:19 67:1, 5 68:16 90:7 142:22 145:7
**inspectors** 113:13
**install** 26:14 132:4, 22 138:2
**installed** 132:11, 20, 25 134:14 151:18 156:17
**installment** 92:21 93:7, 22 94:19 95:8, 14, 25 96:20 121:10,

*23* 122:*1* 129:*17*
130:*6*
**installs** 138:*10*
**INSTANCE** 1:*20*
4:*5* 105:*3*
**instances** 39:*21*
**instruct** 9:*13* 145:*12*
146:*19* 148:*11, 15*
**instructed** 6:*12*
**instruction** 147:*20*
**instructions** 83:*2*
148:*4*
**insurance** 22:*17*
44:*19* 46:*13, 15*
136:*12, 15*
**integrity** 18:*23* 19:*3*
**intending** 70:*6*
**intends** 40:*16*
**intentionally** 131:*24*
132:*1*
**intentions** 175:*16*
**interaction** 86:*5*
**interest** 96:*2, 3, 21*
**interested** 42:*8*
179:*15*
**interface** 134:*3*
**interference** 28:*6*
**interject** 6:*11*
**internal** 75:*10*
134:*25* 135:*8, 9, 10,*
*16* 136:*20* 139:*23*
150:*12, 15* 153:*10, 22*
154:*6, 11, 23*
**internally** 142:*18*
**interrogatories** 68:*13*
139:*11*
**interrogatory** 10:*22*
24:*18*
**interrupt** 17:*6* 137:*3*
**interrupting** 142:*7*
**inventory** 21:*12, 14*
23:*8, 22*
**investigation** 110:*3*
**Invoice** 3:*11* 63:*5,*
*11, 15*
**involved** 10:*10*
65:*16, 21* 80:*18*
**ISIAH** 1:*4, 14* 4:*12*
76:*21* 118:*3* 166:*15*
**Isiah's** 129:*10*

**ISRAEL** 2:*9* 4:*25*
7:*4, 10* 9:*10, 13*
11:*15, 19* 12:*22* 13:*5*
14:*1, 5, 8, 15, 20*
15:*22* 16:*3, 8, 19, 24*
17:*19* 18:*12* 21:*19*
24:*6* 25:*21, 24* 26:*23*
27:*7* 28:*2, 4, 16, 23*
29:*3, 7, 9, 12, 18*
30:*11, 18* 31:*4* 34:*12,*
*14, 25* 35:*5, 8, 21*
38:*3, 13, 19* 39:*2, 7,*
*14* 42:*1* 43:*13* 46:*21*
48:*10* 49:*1* 50:*8, 24*
51:*25* 52:*3, 8* 56:*12,*
*14, 18, 22* 57:*3* 60:*3,*
*6, 9, 12, 15* 61:*4, 9, 11,*
*13, 16* 62:*7, 14, 18, 20,*
*22* 64:*9, 11, 17* 65:*7,*
*10* 67:*17* 68:*18, 22,*
*24* 69:*10, 14, 15, 17,*
*19, 20, 21, 22, 25* 70:*3,*
*5, 13, 17, 19, 21, 25*
71:*3, 7, 9* 75:*20*
76:*12, 14, 17* 78:*16*
79:*2, 24* 80:*22* 81:*1*
82:*8, 10, 19* 83:*15, 24*
84:*4* 85:*17* 86:*22*
88:*25* 89:*14* 90:*18,*
*21, 23* 91:*25* 92:*17*
93:*3, 6, 10, 12, 15, 17,*
*24* 94:*5* 97:*2, 4, 17,*
*19, 21* 100:*14* 101:*21*
104:*23* 105:*1, 7*
106:*15* 107:*7, 19*
109:*1, 4* 110:*18*
111:*4, 8, 10* 112:*3, 9,*
*12, 15* 116:*21* 117:*2*
119:*24* 120:*1, 6, 8, 10*
123:*21, 24* 124:*12, 16*
125:*4, 23* 126:*10, 15,*
*21* 127:*3, 10, 18*
128:*4, 15, 17* 129:*23*
130:*15* 131:*18, 22*
132:*2* 133:*10, 13*
137:*22, 24* 140:*3*
141:*7, 10* 142:*3*
144:*14* 145:*12*
146:*18* 147:*7, 11, 19*
148:*2, 9, 21, 24*

149:*12, 14* 150:*21, 24*
151:*5* 152:*7, 10*
153:*18* 155:*8, 17, 19*
156:*1, 8, 13, 20*
157:*14* 159:*3, 9, 12,*
*19* 161:*16, 19, 22*
162:*3, 16* 164:*6*
165:*4, 7* 166:*7, 10, 25*
167:*6* 168:*24* 170:*10,*
*22* 171:*7, 11, 14*
172:*5, 15* 173:*2*
174:*14* 175:*12*
176:*10* 177:*3, 6*
**issue** 8:*16* 21:*10*
28:*15, 17* 30:*16* 32:*5*
33:*16* 34:*16* 49:*8*
71:*2* 82:*5, 11, 15, 16*
135:*14* 142:*18* 143:*8*
170:*6*
**issued** 8:*20* 164:*17*
**issues** 43:*9* 144:*7*
176:*23*
**its** 15:*21* 18:*18*
23:*22* 37:*14* 68:*17*
95:*8* 136:*6*

**< J >**
**jacket** 118:*22*
**JACKSONVILLE**
1:*2* 2:*7* 164:*10*
**January** 7:*22*
**Jim** 144:*2*
**job** 31:*24*
**Jordan** 2:*10* 4:*17*
28:*8* 70:*8*
**josh@jfeyginesq.com**
2:*4*
**JOSHUA** 2:*5* 4:*23*
**July** 8:*19*
**jumbled** 38:*12*
**junkyard** 136:*12*

**< K >**
**Karr** 76:*21* 103:*7, 8*
**keep** 33:*17* 34:*4, 6*
54:*3* 99:*19* 118:*19*
137:*2* 138:*14* 148:*17*
163:*12* 167:*7*
**keeping** 151:*7*
**keeps** 82:*6* 125:*7*

**kept** 33:*24* 48:*4*
118:*21* 138:*8, 12*
**kicked** 110:*6* 173:*9*
174:*16, 17*
**kicks** 135:*8, 11*
**Kim** 4:*25* 161:*19*
**KIMBERLY** 2:*9*
**kind** 11:*16* 42:*12*
47:*16* 123:*2* 132:*19*
143:*8*
**kindergartner** 29:*17*
**kindly** 153:*20*
**kisreal@mcglinchey.co**
**m** 2:*8*
**KISS** 118:*6*
**knew** 122:*11*
**knock** 61:*25*
**know** 5:*21* 6:*24*
15:*20* 16:*6, 18, 22*
17:*24* 18:*6* 26:*2*
27:*22* 28:*17* 30:*23*
33:*14* 37:*24, 25* 38:*2,*
*7* 49:*18, 19* 55:*25*
56:*7* 58:*7, 9, 11* 61:*7*
64:*12, 18* 66:*11, 12*
67:*3, 10, 21* 71:*1*
75:*7* 76:*12* 78:*14, 20*
83:*13, 22* 84:*12*
85:*14, 15, 16* 91:*6, 19*
92:*25* 112:*9* 114:*11*
115:*6* 125:*24* 126:*21*
127:*4* 130:*16* 133:*5,*
*13, 22* 135:*15* 136:*11,*
*13* 139:*24* 140:*10*
141:*14* 152:*23, 25*
158:*7, 9, 10* 161:*12*
162:*23* 164:*23*
173:*16* 174:*12*
**knowledge** 13:*18*
67:*14* 91:*9, 11, 23*
92:*5, 10* 97:*11* 98:*21*
101:*2, 8* 134:*10*
135:*25* 136:*5, 20*
152:*23* 162:*22*
**known** 56:*4* 132:*16*

**< L >**
**labeled** 118:*8*
**labor** 36:*16*
**ladies** 104:*8*

**Large** 4:3 11:16
21:16 53:21 54:7
55:5
**Largely** 159:22
**lasts** 135:1
**late** 165:23, 24, 25
166:1, 3, 4, 18, 20
**launched** 115:21
**LAW** 2:2 32:5
**lawfully** 9:23
**laws** 15:20, 23 16:1,
7, 15, 18, 22 18:6, 10
20:11, 22 78:20
**lawsuit** 8:16 10:10
**lawyer's** 14:23
**lease** 133:3
**leave** 43:6 46:3, 11
89:25 114:21
**leaves** 47:9, 18 50:4
**left** 40:13 122:14
127:8 129:2, 13, 18,
21 131:4, 8 163:1
**left-hand** 128:23
130:21
**legal** 34:5 46:7 95:8
125:21 164:23 168:1
**legalities** 113:15
**legally** 9:23 89:7
109:25
**lenders** 19:14
**length** 83:18
**Letter** 3:22 169:16,
21, 23 171:12
**letters** 25:10 168:4, 7
**license** 8:20 9:21, 22,
25 10:3, 5, 8 20:4
21:10 43:7 45:5
72:8
**licensed** 25:25 49:15,
16
**licenses** 9:17, 20
**licensing** 16:16 19:23
**licensure** 19:19
**lie** 77:17
**lien** 99:25
**lienholder** 103:3
**lift** 25:1 30:8 31:12,
14 32:3, 6, 10 35:14
67:12

**lifts** 30:4
**lighter** 129:8
**lights** 34:2
**limit** 84:3
**line** 24:23 25:8
32:14, 21 34:23 90:9
**lined** 31:23
**lineup** 31:23
**LISA** 1:4, 14 4:13
166:15
**Lisa's** 129:9
**list** 67:5 84:8, 10, 14
143:24
**listed** 84:7 88:13
123:13 133:17
**listen** 46:5 105:4
**litigation** 145:11, 18,
21
**little** 17:12 21:11
25:5 28:3, 5, 6 48:1
62:17 80:17 110:8
111:3 129:6, 11
159:4 167:18
**living** 8:13
**loan** 23:3 65:16, 21
94:24, 25 95:1, 4, 6, 7,
10 96:3 130:5
**local** 33:10
**locally** 27:15
**locate** 50:22, 23 51:5
140:13
**located** 134:2, 11
**locating** 138:11
150:12 157:20
**location** 151:16
158:3
**locations** 15:2
134:13 150:17
**log** 33:21 71:9
134:4 138:14, 17
141:25 143:13
**logged** 138:17
139:18 158:13
**logical** 125:21
**log-in** 134:3 137:25
**logistical** 134:4
**Logistics** 95:15
127:19
**logs** 138:8, 12, 14
153:1

**long** 8:18 38:22
43:25 46:8, 13 47:12
48:9 92:14 136:24
137:4
**longer** 34:6 136:14
137:6 157:20
**look** 12:7 26:2
33:15, 19 42:10
58:22 60:18 71:20
74:11 87:5 93:19
97:23 99:1 102:3
105:10, 12 106:22
111:20 115:11, 12
117:12 119:6 121:7
122:19 126:5 128:24
138:15 140:11
141:25 149:7 151:13
158:25 163:5 165:9
167:9 172:9 176:21
**looked** 71:23 92:8
118:4
**looking** 39:25 42:7
73:22 105:9 153:1
157:8 165:22
**looks** 31:25 32:1
39:25 73:21 111:25
115:4 129:14 139:2
153:20 154:5 159:6
**loop** 44:1
**loss** 141:17
**lost** 103:5 141:2, 15
**lot** 24:14, 22, 23
31:15 33:2 36:15
40:9 42:2 51:7, 21
53:12 54:4, 19 55:1,
14, 23, 25 56:25 57:6,
24 67:23 80:14
81:24, 25 84:11
103:8 162:25 173:14,
17, 18 174:9
**Lots** 25:12
**loud** 56:22
**louder** 17:12
**love** 54:6
**loved** 163:12
**low** 29:7
**lower** 38:11, 20, 25
39:3, 13
**lumping** 105:1

**lunch** 6:23 7:5
61:19, 24

**< M >**
**ma'am** 13:10 23:16
26:21 30:20 31:2
35:7 73:16, 18 74:14
130:3 177:5
**madam** 55:21 70:13
82:13 92:23 114:5
128:20 131:15
**mail** 40:10
**maintain** 59:9
**major** 8:8
**majority** 39:24
**making** 29:17 30:15
96:19
**management** 8:9
49:10, 13
**manager** 47:16
53:13 64:6, 25 170:7
**manager/owner** 9:3
**managers** 21:25
**manages** 85:19
**Manheim** 22:8
57:21 58:16 59:18
**manner** 164:19 176:5
**manufacturer** 132:13,
14 142:17 143:2, 4, 6,
7, 12, 15
**map** 139:3
**marathon** 6:20
**March** 178:22
**mark** 128:24
**marked** 60:6 130:22
166:1
**Marketplace** 37:15
83:9
**markets** 56:9
**marks** 61:14, 17, 21
111:14
**match** 104:18
125:20 163:19
**Matches** 77:8
**math** 104:25 105:3
167:4
**matter** 69:17 148:20
**matters** 12:7
**MCGLINCHEY** 2:6

**mean** 10:*24* 22:*4*
65:*7* 112:*13* 128:*20*
131:*18* 133:*19* 137:*3*
139:*22* 140:*9* 167:*1*
177:*3*
**meaning** 25:*9* 32:*24*
34:*1*
**means** 24:*24* 118:*6*
139:*23* 141:*2* 150:*12*,
*14*
**meant** 112:*12* 159:*17*
**mechanic** 24:*25*
25:*25* 26:*10* 31:*23*
34:*1* 66:*14*, *16*, *17*
67:*8*, *10* 68:*3* 155:*21*
156:*3*, *22*
**mechanical** 24:*25*
25:*19*
**mechanics** 26:*4*, *5*, *6*,
*8* 33:*23*
**Media** 4:*10* 61:*14*,
*18*, *21* 111:*15*
**medications** 7:*14*
**meet** 73:*9* 80:*20*
**meeting** 54:*23* 146:*4*
**memorized** 56:*19*
**memory** 132:*23*
**mention** 14:*10*
**mentioned** 9:*25* 13:*2*
18:*9* 30:*7* 31:*11*
33:*3* 34:*18* 44:*7*
48:*14*, *18* 65:*15*
100:*24* 106:*12*
165:*18*
**Mercedes** 27:*21*
**message** 55:*11* 56:*1*
57:*1*
**messages** 55:*16*, *18*, *19*
**met** 42:*3* 73:*8*
**method** 118:*6*
**mic** 30:*25*
**microphone** 29:*1*
30:*22*
**MIDDLE** 1:*1* 4:*15*
65:*8* 139:*20*
**mid-size** 54:*6*, *9*
**mileage** 23:*18*, *20*
38:*11*, *25* 39:*17* 40:*1*
53:*18* 72:*15* 73:*13*,
*14* 74:*1* 77:*3*, *10*

78:*2*, *9*, *11* 79:*5*, *9*, *12*,
*14*, *17*, *20*, *23* 98:*6*
99:*14* 100:*3*, *5*, *10*
105:*20*, *24* 109:*21*, *24*
112:*21* 113:*1*, *2*, *3*, *9*
115:*17*, *25* 116:*2*, *5*
120:*23* 123:*1*, *15*
175:*21*, *25* 176:*19*
**miles** 39:*13*
**million** 27:*5*
**mind** 52:*6* 56:*16*
62:*14*
**mine** 76:*23* 117:*23*
139:*17* 163:*16*
**minimum** 96:*4*
**minor** 25:*7*
**minus** 96:*18*
**minute** 62:*10*
**minutes** 61:*12* 80:*15*
92:*19* 96:*25* 97:*8*
101:*19* 170:*19*
**Miranda** 77:*21*
**mischaracterizes**
68:*19*
**missed** 52:*9* 60:*6*
118:*25*
**misspoke** 85:*9*
**mistakes** 163:*23*
**mobile** 33:*6* 102:*6*
**model** 23:*23* 27:*20*
56:*6* 85:*9* 133:*5*, *7*,
*13*, *15*, *19* 134:*8*
**moment** 59:*2*
**Monday** 29:*24* 72:*21*
**Mondays** 40:*4*
**monetary** 35:*18*
**money** 35:*13*, *23*
65:*16* 89:*22*, *24*, *25*
90:*1*
**monitor** 136:*17*, *19*
**monthly** 96:*9*, *12*
**months** 34:*5* 169:*17*
**morale** 19:*4* 164:*19*
**morning** 4:*8*, 23, *25*
5:*8* 14:*2* 68:*25*
133:*9* 175:*5*
**mortgages** 90:*2*
**Motor** 21:*9* 48:*6*
102:*6*, *16*, *17*, *24*
103:*1*, *22* 104:*11*

105:*15* 114:*20*
168:*16*, 20
**mouse** 76:*8*
**mouth** 162:*13*
**move** 74:*9* 148:*4*
151:*10*
**moving** 62:*2* 92:*21*
97:*14*, *17* 98:*24*
131:*16* 158:*21*
**multiple** 56:*3* 68:*2*
87:*25* 157:*15* 164:*4*
**mumbling** 17:*8*
**Murray** 51:*8*, *10*
54:*11*, *14*, *17* 57:*8*, *22*
58:*23* 59:*3*, *14* 60:*23*
63:*5*, *11* 64:*19* 65:*1*,
*3* 71:*23* 72:*3*, *10*, *19*
74:*7* 75:*15*, *18*, *22*
77:*11*, *23* 79:*5*, *14*
**Murray's** 77:*21* 78:*3*

**< N >**
**NAI** 116:*12*
**NAI115** 116:*13*
**name** 4:*17* 7:*19*
20:*12*, *25* 26:*15*, *17*,
*18*, *19* 27:*2* 45:*5*
52:*14*, *16*, *17* 58:*11*
72:*13* 76:*5* 95:*12*
99:*12*, *15*, *16*, *24*
103:*9* 106:*8* 128:*9*
139:*20* 140:*12*
143:*23*, *25*
**names** 99:*12* 149:*21*
**narrative** 82:*14*
**narrow** 144:*8*
**Natasha's** 150:*1*
**NATIONAL** 1:*4*, 9,
*19* 4:*11*, 13 8:*18*
12:*1*, *15* 13:*16* 18:*14*,
*18*, *24* 23:*8* 40:*3*, *15*
41:*1*, *4* 51:*9* 52:*23*
53:*2*, *6*, *10* 54:*11*, *17*
59:*4*, *9*, *21* 61:*3*
63:*13*, *23* 66:*1* 72:*18*
75:*22*, *23* 76:*24*, *25*
77:*11*, *24* 79:*19*, *22*
87:*8* 88:*4*, *5* 93:*22*
94:*15* 97:*25* 98:*3*, *14*
99:*4* 100:*3*, *17*, *20*

103:*21* 105:*16* 106:*1*,
4, *10* 107:*5* 108:*12*
111:*24* 114:*14*
115:*14*, *21*, *23* 122:*22*
125:*16* 132:*4* 167:*24*
168:*3*, *5*, *6*, *9* 175:*1*, *6*,
*10*, 20, *25*
**National's** 40:*20*
52:*24* 54:*2*
**natural** 7:*6* 111:*5*
**near** 119:*13*
**necessarily** 138:*16*
**need** 5:*16* 6:*22*, *23*
7:*5* 17:*24* 18:*6*
30:*21*, *22* 34:*6* 45:*7*,
*9* 47:*5* 48:*10* 51:*2*
101:*14* 122:*15* 125:*1*
136:*21* 148:*4*, *10*
153:*19* 162:*6* 170:*19*
173:*10* 174:*1*
**needed** 25:*5*, *7* 32:*11*
139:*12*
**needs** 16:*7*, *23*
142:*22* 147:*3*
**negotiations** 64:*3*
**neon** 25:*10* 140:*25*
**Never** 22:*18* 27:*5*
59:*11* 63:*9* 101:*3*, *6*
106:*16* 135:*14* 136:*8*
162:*13*
**new** 45:*7* 50:*19*
132:*18* 152:*14*
162:*10*
**nice** 5:*22* 39:*25*
**night** 162:*17*
**nodding** 28:*9* 70:*11*
82:*7*
**nonanswer** 174:*3*
**noon** 7:*6* 61:*8*
**noon-ish** 7:*9*
**normal** 151:*2*, *5*
161:*25* 162:*4*
**normally** 33:*17*
60:*25* 162:*6*
**North** 2:*6*
**Notary** 1:*25* 4:*2*
178:*20*
**note** 131:*23*
**noted** 63:*12*

ISIAH ROBINSON -30(b)(6) -vs- CSX INTERMODAL TERMINALS, INC., PROMOTION AUTHORITY
CR of NATIONAL (XXX 9/XXXX) (BAHMAN KABYLER-RAMAGHI)

Case 3:24-cv-00948-WWB-PDB    Document 69-8    Filed 09/30/25    Page 194 of 204 5/2025
PageID 2388

15

notice  3:*10*  4:*4*
11:*25*  60:*5*  78:*4*
109:*23*  128:*22*
noticed  157:*6*
notification  140:*17,*
*20*  141:*24*
number  37:*6*  55:*6*
56:*9*  61:*7*  62:*3*  69:*6*
71:*16*  72:*8, 11*  75:*8*
84:*11, 14*  85:*24*  86:*1*
87:*3*  93:*1*  96:*6, 21*
106:*8*  108:*22*  110:*15*
112:*13*  116:*6, 12*
119:*1*  123:*6, 8*
131:*25*  133:*5, 7, 13,*
*15, 16, 18, 19*  134:*3, 7,*
*8, 9*  140:*4, 12*  143:*19*
151:*24*  158:*21*
159:*14*  171:*20*
172:*12, 19*
numbering  75:*10*
numbers  75:*11*  91:*4*
numerical  113:*6*
numerous  11:*6*

< O >
oath  6:*15*  77:*17*
122:*6*  130:*25*  178:*1*
Object  9:*10*  12:*22*
15:*22*  16:*3, 19, 24*
18:*12*  21:*19*  24:*6*
25:*21*  34:*25*  35:*5, 21*
38:*3*  39:*14*  42:*1*
48:*10*  49:*1*  51:*25*
64:*9, 17*  67:*17*  68:*18*
75:*20*  78:*16*  79:*24*
80:*22*  81:*1*  83:*15, 24*
84:*4*  85:*17*  86:*22*
89:*14*  91:*25*  92:*17*
93:*24*  97:*2*  100:*14*
101:*21*  106:*15*  107:*7,*
*19*  110:*18*  116:*21*
117:*2*  123:*21, 24*
124:*12, 16*  125:*4*
127:*3, 18*  128:*4*
130:*15*  140:*3*  141:*7*
145:*12*  146:*18*  148:*9,*
*13*  155:*8, 17*  156:*1, 8,*
*20*  157:*14*  166:*7*

172:*15*  173:*2*  174:*14*
175:*12*  176:*10*
objecting  148:*11*
objection  6:*12*  13:*5*
16:*8*
oblige  108:*21*
obtain  36:*8, 13*
65:*12*  84:*21*  86:*1*
obtainable  21:*8*
obtained  59:*1*  91:*16*
110:*2*  150:*16*  160:*25*
obviously  5:*16*  30:*8*
131:*4*  159:*16*
Occasionally  6:*11*
36:*18*
occasions  165:*23*
occur  48:*25*  50:*18*
106:*19, 21*  119:*17*
121:*17*  143:*17*
occurred  81:*16*
92:*11*  165:*24*
Odometer  3:*13, 15,*
*16, 18*  11:*6*  45:*14, 18*
56:*5*  79:*16*  80:*2, 5*
91:*13, 17, 21, 23*  92:*1,*
*3, 9*  97:*24*  100:*22, 25*
101:*6, 9*  105:*9, 13*
108:*16*  109:*19*  113:*7*
117:*10*  119:*13*
122:*21, 24*  127:*15*
131:*3*  169:*18*  171:*22*
172:*21*  174:*8, 21*
176:*21*
offense  105:*7*
offered  53:*13*  146:*9*
147:*6*
Office  10:*1*  18:*2*
43:*16, 22*  47:*22*
60:*24*  104:*12*  107:*23*
134:*6*  149:*24*
offices  43:*18*
official  9:*1*  47:*15*
178:*10*
off-site  40:*6*  41:*14,*
*16*
oftentimes  64:*3*
78:*25*  104:*8*
Oh  34:*13*  65:*10*
76:*14*  93:*9*  97:*18, 20*

120:*7*  149:*13*  165:*6*
168:*25*  171:*11*
oil  25:*6*  32:*10, 18*
Okay  5:*21*  6:*2, 5, 13,*
*20*  7:*2, 19*  8:*10, 15,*
*18, 21*  9:*1, 4, 8, 12, 25*
10:*14, 20*  11:*10, 25*
12:*14, 18*  13:*12, 16*
14:*11, 23*  15:*4, 15, 18*
16:*17*  17:*17*  19:*13,*
*16, 19, 24*  20:*3, 5*
21:*2, 4, 7, 17*  25:*12,*
*17, 19*  26:*8*  28:*13, 15*
29:*18, 25*  30:*6, 11*
31:*17*  33:*3, 8, 11, 18,*
*24*  36:*8*  37:*22, 25*
39:*17, 21*  40:*2, 7*
41:*18*  42:*5, 17*  43:*3,*
*20, 24*  44:*18, 25*
45:*12, 16*  46:*8*  47:*11,*
*14, 18*  48:*7, 25*  49:*10*
50:*6, 21*  51:*15*  52:*14,*
*16, 18, 24*  54:*2, 21*
55:*3*  57:*3, 6, 8, 11, 14,*
*25*  58:*3*  60:*6, 14, 16,*
*21, 25*  61:*17*  62:*20,*
*22*  63:*3, 10, 23*  64:*11,*
*15, 22*  65:*2, 10, 15, 23*
66:*1, 4, 8, 14, 17, 25*
67:*7*  68:*7, 23*  69:*4, 5,*
*8, 12, 17*  71:*20, 22*
72:*2, 5, 8, 12, 15, 18,*
*25*  73:*23*  74:*6, 25*
75:*4, 7, 12*  76:*24*
77:*2, 5, 7, 10*  79:*19*
80:*5, 16*  81:*19*  84:*20,*
*23*  87:*13, 22*  93:*9, 11,*
*14, 21*  97:*20*  98:*21*
101:*2*  102:*5*  106:*12*
111:*3, 10*  112:*15, 20*
115:*17*  118:*8*  119:*6*
120:*21*  125:*5, 13*
126:*12, 24*  127:*7*
129:*15*  130:*5, 8, 13*
131:*22*  132:*2, 20*
134:*11*  135:*16*
141:*22*  142:*6*  148:*17,*
*21*  150:*16*  151:*20*
152:*20*  153:*1, 12*
158:*6, 21*  162:*15*

164:*5, 12, 25*  165:*6,*
*12*  166:*23*  167:*11, 24*
168:*3*  169:*19*  170:*18*
171:*14, 25*  172:*4, 12*
173:*5, 20*  174:*12, 25*
175:*18, 24*  177:*6*
Oklahoma  8:*7*
old  132:*18*
old-skill  34:*15*
once  20:*13*  32:*17, 18*
40:*15, 17, 21*  41:*10*
43:*10, 14*  45:*18*
46:*16, 18, 24*  47:*1, 18*
49:*6, 7*  54:*22*  78:*6*
81:*22*  101:*4*  104:*13*
113:*20*  114:*3*  115:*19*
125:*10*  128:*12*
135:*11*  136:*3*  138:*9*
143:*8, 9*  167:*24*
ones  109:*10*  121:*3*
ongoing  19:*20*
online  20:*2, 22*  21:*1*
open  83:*18*
open-ended  176:*14*
operate  10:*5*  16:*7*
144:*21*  164:*19*
operation  16:*10*
operations  16:*2*
operative  130:*5, 6*
opportunity  145:*9, 17,*
*20*  146:*15*  147:*17*
148:*6, 7, 8*
opposed  35:*4*
option  164:*18*
order  3:*10, 12, 17*
32:*10*  59:*6*  60:*22*
87:*2, 16, 19*  88:*3*
89:*22*  92:*14*  95:*21,*
*22*  96:*7, 16*  119:*10*
159:*10, 14*  161:*3*
ordered  32:*13*  177:*8,*
*10*
orders  60:*19*  61:*1*
64:*6*  87:*18*  177:*9*
ordinary  44:*5*
original  51:*5, 6*  52:*4*
88:*12*  117:*19*  118:*13*
119:*19*  124:*20*
125:*20, 25*  167:*13*

originally 27:23
123:19
originals 48:4
outcome 169:15
outline 83:3
out-of-state 99:20
outside 50:2 114:14
outsourced 27:13
overall 101:19
overhead 37:10 89:9
90:1
owner 9:4, 6
owning 36:19

< P >
p.m 1:23 165:16
177:16
package 3:21 55:6, 7
166:24 167:13, 22
packages 21:16
packet 44:19 104:9
packets 114:20, 21
PAGE 3:2, 9 11:25
12:5, 6 44:21, 22
73:13 74:12, 14 87:7,
8 91:5 99:19 111:21
112:18, 21 122:14
139:15 167:19 172:4,
8
pages 14:2, 9 44:23
46:15 68:25
paid 58:19, 23 63:13
65:23 88:17 90:6
103:13
paint 82:15
Palm 150:11 178:4
179:4
paper 43:12 48:5
118:23 155:5
paperwork 43:11, 14
45:13 47:8 80:15
86:14 88:1 91:18
92:2, 8, 18 94:6, 8
105:15 106:7, 25
107:2, 9 110:1 124:8,
10, 21 125:19
pardon 60:3
Parkway 164:3
part 16:10 32:15
53:21 92:13 101:22

146:5 151:4 153:14
176:8
Partially 126:14
particular 23:25
24:2 31:18 37:15
53:23 55:3, 13, 23, 25
56:2 58:20 60:21
106:10 136:9 138:24,
25 146:9 166:14
parties 179:12, 13
parts 32:13, 15, 17
35:15, 16
party 23:11 79:23
pass 34:19
pause 93:3
pay 22:23, 25 37:12
42:7 46:14 83:11
88:14 90:2, 12 96:3,
15 168:3, 6, 9
paying 94:21
Payment 3:21 22:20
25:9 32:25 85:9
90:9, 13 96:4, 12, 19
164:25 165:4, 10
166:4
payments 46:14
65:2 94:22 96:5, 6,
19, 21, 22 129:20
payoff 96:7
payroll 15:6
pays 89:8
PDF 161:10, 15
Pearson 26:16 66:17
68:1, 3 132:21
134:12, 20 136:25
138:9
pen 77:6
penalties 6:17 104:3
pending 4:6 6:25
people 51:21 133:22
149:15, 23
percent 35:22
113:25 153:24 154:5,
6, 13, 19, 25 155:5, 24
156:18
percentage 35:18
96:1
perception 176:5
perceptive 176:5
performed 89:11, 17

period 11:9 82:2, 23
142:25
perjury 6:18 104:3
permission 79:7
person 41:25 42:2
54:23 55:2 67:25
68:5 73:3 103:8
106:24 115:3, 4
144:3
personal 9:11 39:15
41:17 42:11 48:21
91:9, 11, 23 92:5, 7,
10 97:11 98:21
101:2, 8
personally 20:5, 6
23:9 67:5 72:2 78:4
79:16 80:18
personnel 149:20
pertinent 69:1
phased 18:17
phone 54:19 55:2,
20 57:4, 6 64:3
77:21 106:8 143:17
144:22
phonetic 144:2 161:5
phrase 93:7, 13
physical 100:22
164:21
physically 59:21
66:8 103:3
pick 40:8 57:16
picked 40:4, 5 57:22
73:1, 4, 6 114:24
picking 71:15
picture 100:21, 24, 25
101:3, 6
pictures 85:9
piece 48:2
pieces 107:3
Pkwy 2:6
place 47:7 91:20
placed 47:2
places 46:7 140:11
Plain 164:20
Plaintiffs 1:4, 20 2:3
4:5, 24 140:15
168:10, 14, 18
Plaintiff's 3:10, 11,
12, 13, 14, 15, 16, 17,
18, 19, 20, 21, 22

11:12, 13, 25 60:1
61:6 62:3, 4 71:16,
17 74:10 87:4 93:2
97:15 98:25 102:2
104:22 111:18, 19
115:10 117:11 119:8
121:8 122:18 138:21
149:6 151:12 158:24
163:4 165:2 167:5
169:20 171:6
Plaintiff's/Counter-
Defendants 1:14
plan 23:5, 6 65:19,
22
planning 7:4
plate 47:4
play 53:14, 16, 18
90:3
please 4:20, 22 5:10
6:4, 9 11:2 12:25
15:23 16:4, 25 21:20
22:21 29:12 30:13
31:5, 19 36:2 37:1
39:6 54:25 62:15
68:20 69:19, 21
74:19 76:8 81:2
93:4 97:4 98:8
115:20 116:11 123:2
128:20 132:9 133:12
139:2 142:6, 22
159:4 160:1, 9 172:5
176:3
plugs 32:11
plus 88:18 96:18
POA 76:21
point 6:22 7:6
15:13 35:3 42:15
55:5 76:9 77:15
111:5 125:1 128:23
136:14 139:25
157:10 162:9 168:14,
17, 18
points 34:22 164:13
policies 25:13 49:23
policy 43:24 50:6, 7
106:13, 16
populate 97:8 101:14
populated 45:23
101:13, 16

**populates** 152:*14*
161:*11*
**Portal** 3:*18* 138:*4, 5,
6, 22* 150:*18, 21*
158:*13, 16, 19* 162:*5*
**portion** 90:*6*
**portions** 126:*22*
**position** 9:*1* 47:*14*
74:*25* 102:*17* 103:*24*
104:*2, 14* 105:*13*
108:*3* 113:*10* 114:*13*
120:*15, 21* 121:*22*
122:*6* 127:*1, 16, 23*
128:*11* 130:*8, 13*
131:*7*
**possible** 31:*1*
**possibly** 38:*6* 58:*8*
130:*24* 139:*12* 143:*8*
**post** 83:*10*
**postdated** 163:*21, 22*
**posted** 83:*3, 5, 8*
**posting** 83:*23* 84:*2*
**pow** 141:*19*
**power** 80:*2, 6* 102:*6,
13, 14* 136:*6* 141:*2,
15, 17* 157:*7*
**practice** 19:*5* 24:*19*
49:*6* 55:*12* 59:*14*
79:*22, 25*
**preceding** 105:*21*
**predeliver** 90:*4*
**predelivery** 88:*20*
89:*4, 19* 90:*4*
**prefer** 134:*6*
**preference** 39:*15*
148:*19*
**premarked** 131:*19*
**premiums** 46:*14*
**prep** 134:*21*
**preparation** 66:*19*
**prepare** 10:*14, 17*
19:*7, 10* 51:*15, 17*
57:*11* 81:*9, 13* 87:*8,
10* 91:*18* 97:*25* 99:*4*
134:*16, 18*
**prepared** 12:*20* 13:*4,
8* 68:*14* 69:*8* 87:*13,
14, 23, 25* 88:*4* 93:*22*
94:*15* 98:*3* 105:*16,*

18 122:*22* 137:*8*
139:*4* 143:*14* 163:*17*
**preparing** 52:*5*
**preposition** 134:*21*
**prescribed** 7:*14*
**presence** 48:*8*
**PRESENT** 2:*10*
63:*10* 86:*3* 101:*12*
107:*14* 120:*25* 122:*9*
124:*5, 7*
**presented** 44:*9, 10,
16* 87:*23* 88:*8, 9*
94:*10, 12* 98:*12, 14*
110:*12, 14, 16*
**presenting** 107:*15*
**pretty** 39:*24* 171:*4*
**prevent** 7:*16*
**prevented** 83:*23* 84:*1*
**previous** 45:*6* 53:*22*
99:*5* 113:*12* 116:*3,
19* 117:*1* 119:*18*
**previously** 41:*14*
51:*4* 60:*9* 65:*15*
66:*5, 15* 68:*2* 78:*19*
84:*23* 85:*25* 86:*5, 16*
92:*12* 94:*16* 96:*24*
97:*7* 98:*4* 99:*10*
100:*21* 101:*10, 17*
106:*6, 12* 121:*21*
124:*1* 134:*19* 150:*6,
17* 165:*21* 171:*16, 19,
24* 172:*19* 174:*5, 25*
175:*4, 6*
**price** 36:*24* 37:*2*
39:*18, 19* 53:*14* 56:*8*
88:*16*
**primarily** 21:*15*
**print** 89:*23, 25* 98:*7*
152:*15* 161:*12, 14, 15*
162:*6*
**printed** 72:*13* 88:*5*
159:*13, 14* 161:*14, 16,
19*
**printing** 89:*9, 22*
**prints** 92:*2* 161:*8*
**prior** 23:*9, 13* 28:*24*
36:*1, 5* 46:*1* 68:*4, 8*
75:*2* 107:*22* 118:*7*
142:*8* 143:*3* 147:*21*

149:*24*
**priority** 84:*8*
**private** 45:*4* 106:*8*
**privileged** 145:*14*
146:*20, 24* 147:*23*
148:*15*
**Probably** 166:*17*
174:*10*
**problem** 6:*6* 14:*18*
126:*8* 131:*23* 170:*22*
**procedure** 40:*17, 20,
21*
**procedures** 25:*14*
49:*23*
**proceed** 61:*22* 82:*21*
111:*15*
**Proceedings** 177:*16*
**process** 24:*16, 21*
30:*6* 31:*21* 33:*20*
34:*19* 43:*3* 46:*9*
49:*8* 121:*1*
**processed** 174:*10*
**processees** 43:*20*
**processes** 43:*20*
174:*2*
**processing** 90:*4*
**produce** 21:*4, 5, 6*
118:*16, 17* 159:*13*
161:*19* 169:*12*
**produced** 14:*21*
172:*24*
**product** 155:*13*
**production** 14:*2*
**professional** 9:*17*
**profitability** 37:*11*
**progress** 82:*17*
**prompt** 44:*6*
**promulgated** 18:*2*
**proof** 141:*19*
**proper** 40:*22* 108:*5*
**properly** 32:*4* 40:*22*
50:*4* 99:*11* 138:*11*
**provide** 27:*1* 108:*20*
140:*17, 20* 160:*5*
161:*9*
**provided** 13:*16, 23*
45:*1* 63:*11* 83:*2*
108:*19* 112:*1* 116:*14*
119:*11* 121:*11* 133:*8*
145:*9* 146:*15* 147:*17*

152:*12* 159:*24* 172:*1,
9*
**provider** 20:*25*
36:*22* 49:*13* 165:*20*
**provides** 160:*3, 5*
**proximities** 64:*20*
153:*3*
**Public** 1:*25* 4:*2*
178:*20*
**pull** 25:*7* 31:*25*
32:*6, 21* 47:*23* 59:*24*
65:*13* 68:*9* 87:*2*
101:*25* 104:*13, 20*
117:*9* 129:*16* 138:*1*
152:*14* 157:*12*
158:*21* 164:*25*
168:*12* 171:*25*
**pulled** 25:*10* 32:*14,
23* 35:*14* 47:*22*
152:*17, 24*
**Pulling** 115:*8* 122:*17*
127:*14* 131:*2* 149:*5*
163:*2* 169:*19*
**purchase** 22:*2, 19*
23:*8, 9, 13* 24:*9, 21*
35:*12* 37:*9* 41:*23*
43:*16* 49:*25* 51:*5, 6,
9, 12* 53:*3, 7, 8, 11, 13,
24* 54:*18* 55:*23* 56:*2*
59:*4* 64:*2* 68:*17*
81:*5* 86:*4* 88:*12*
96:*1, 17* 100:*2*
107:*22* 108:*4* 117:*19,
20* 119:*20* 124:*20*
125:*20* 126:*1* 176:*2*
**purchased** 8:*24*
54:*12* 55:*3, 7, 25*
56:*2, 25* 57:*4, 6* 59:*3,
22* 63:*18, 19, 24* 64:*8,
16* 68:*4* 103:*23*
123:*19* 146:*3* 175:*21*
176:*19*
**purchaser** 43:*4* 99:*22*
**purchasers** 99:*23*
**purchaser's** 76:*5*
99:*12, 15*
**purchases** 23:*19*
40:*3* 51:*7* 55:*1* 66:*1*
176:*1*

**purchasing** 10:*25* 11:*1* 95:*23, 24*

**purposes** 7:*4* 23:*8* 24:*15* 58:*1* 136:*13*

**pursuant** 4:*4*

**put** 25:*1, 6* 30:*8* 31:*11, 14* 32:*9, 20, 21, 24, 25* 37:*3* 47:*3, 4* 48:*23* 55:*5* 56:*9* 57:*25* 68:*4* 79:*17* 85:*5, 7* 92:*1* 124:*14* 125:*2, 16, 24* 161:*3* 162:*25*

**puts** 67:*11*

**putting** 36:*1, 5* 37:*18* 68:*8* 75:*2* 159:*9* 165:*4*

**< Q >**

**qualify** 35:*14*

**question** 5:*23, 25* 6:*4, 25* 7:*1* 15:*10* 16:*4, 20, 25* 18:*16* 20:*16* 22:*21* 23:*15* 25:*24* 27:*23* 28:*25* 29:*22* 30:*13* 31:*19* 36:*2* 37:*1* 38:*14* 40:*19* 45:*20* 51:*2* 52:*4* 53:*9* 56:*13, 14, 19, 21, 24* 58:*19* 61:*5* 64:*11* 67:*18* 68:*14* 69:*1* 73:*17* 74:*3, 19* 78:*5, 8* 79:*2* 81:*2, 12* 82:*3, 12, 20* 83:*22* 86:*7* 87:*18* 88:*6* 95:*3, 5, 6* 97:*5* 99:*14* 100:*18* 102:*15, 25* 103:*16* 107:*8, 10* 110:*19, 20, 24* 115:*22, 23* 116:*8* 119:*24* 120:*5* 121:*25* 122:*1* 124:*14, 19* 125:*5, 7* 127:*5* 130:*18* 131:*7* 132:*9* 133:*12* 134:*12, 20* 136:*4, 25* 139:*10* 140:*7* 142:*6* 144:*14* 145:*1* 147:*4, 5, 13, 20, 21* 148:*10, 13* 156:*8, 13* 159:*25* 160:*2, 8, 10, 11* 166:*11, 17*

168:*22* 170:*10* 174:*5* 176:*4, 6, 8, 15*

**questions** 10:*22* 42:*8, 11, 16* 69:*2* 89:*1* 90:*19, 24* 107:*14, 15* 159:*22* 162:*16* 170:*20* 177:*4*

**quick** 29:*12* 108:*22* 171:*4*

**quite** 5:*12* 6:*21* 53:*10* 63:*3* 83:*18* 164:*24*

**< R >**

**rack** 48:*4*

**radio** 34:*3*

**Ramaghi** 5:*8* 39:*12* 52:*17* 93:*19* 111:*20* 112:*17* 161:*24* 167:*9* 171:*19*

**ran** 57:*23* 165:*14, 15*

**range** 83:*1*

**rarely** 22:*2*

**rate** 96:*1, 2, 9, 21*

**reach** 169:*2*

**reached** 84:*2* 145:*25*

**reaching** 143:*16*

**read** 11:*18, 20* 46:*2* 73:*23* 91:*22* 98:*7* 104:*4* 108:*1* 116:*12* 123:*16* 124:*11* 167:*18* 172:*21* 177:*7*

**readily** 35:*15*

**reading** 91:*14* 92:*1* 101:*9* 115:*17* 119:*14* 123:*1, 15* 153:*15, 22* 154:*1* 160:*4, 13, 16, 20*

**reads** 109:*19* 174:*8, 21*

**ready** 61:*24* 108:*3, 4* 114:*23* 173:*9*

**real** 33:*16* 108:*22*

**really** 29:*7* 136:*14*

**reapproach** 42:*15*

**reason** 44:*4* 64:*1, 15* 69:*23* 78:*17* 95:*11* 104:*23* 124:*4, 22* 155:*6, 9* 173:*5*

**reasonable** 125:*21*

**Reaves** 49:*14* 165:*17, 20*

**Reboot** 142:*21* 157:*9*

**rebooted** 141:*1*

**rebooting** 143:*8*

**recall** 20:*12, 25* 84:*1* 114:*7* 173:*23* 174:*7*

**recap** 156:*6*

**receive** 40:*18, 21* 73:*8* 167:*16*

**received** 32:*13* 71:*23* 72:*5* 74:*6* 107:*17* 116:*17* 125:*3* 131:*6* 158:*23* 167:*21, 24* 169:*23*

**receives** 40:*15*

**Recess** 61:*19* 111:*12*

**recharged** 135:*11*

**recognize** 74:*15* 94:*6* 117:*8*

**recognized** 94:*5*

**recollection** 72:*20* 132:*24*

**reconnected** 157:*8*

**record** 4:*9* 6:*3* 29:*11, 13, 14, 15, 18, 21* 39:*5, 8, 9, 10* 61:*18, 21* 71:*4, 8, 10, 12, 13* 111:*11, 14* 129:*1* 148:*10, 12, 18, 23* 149:*1, 2, 3* 157:*12* 161:*2* 170:*23, 24, 25* 171:*1* 177:*15*

**recorded** 43:*21, 23*

**records** 3:*20* 13:*17, 19* 21:*2* 33:*15, 18* 44:*12* 58:*22* 65:*2* 137:*19, 24* 138:*13* 151:*3, 4, 6* 155:*25* 156:*15, 16* 157:*1, 18, 22* 158:*23* 161:*25* 162:*2, 4* 170:*20*

**recoup** 89:*8*

**refer** 95:*7, 9* 109:*5* 116:*9*

**reference** 44:*22*

**referenced** 45:*23*

**referral** 44:*23*

**referred** 11:*4*

**referring** 11:*3* 13:*1, 9* 15:*24* 16:*9* 97:*9*

**reflect** 156:*16*

**reflects** 100:*10* 105:*24* 113:*2*

**refurbishments** 25:*5*

**refusing** 78:*15*

**regarding** 18:*3* 19:*19* 21:*12* 25:*14* 49:*24* 51:*21* 54:*12, 15* 67:*19* 73:*25* 78:*2, 10* 100:*7* 105:*23* 112:*25* 116:*4* 145:*24* 166:*15* 177:*11*

**regardless** 139:*18*

**regards** 169:*3*

**regional** 170:*6*

**register** 89:*25*

**registering** 20:*24* 48:*6*

**registration** 47:*6* 109:*25*

**registrations** 49:*9*

**regular** 36:*17*

**Regulation** 10:*1* 18:*3*

**regulations** 17:*3, 21, 25* 18:*2* 20:*23*

**related** 151:*23*

**relationship** 52:*18*

**relative** 179:*11, 13*

**relevance** 9:*14*

**rely** 35:*20* 175:*10*

**relying** 131:*21*

**remain** 55:*8* 128:*14* 145:*5*

**remaining** 121:*4* 124:*5* 150:*8*

**remember** 20:*8, 11* 21:*1* 58:*21, 25* 66:*12* 67:*22* 73:*10* 85:*13* 174:*8, 18, 20, 22*

**Remind** 82:*1* 108:*23*

**remit** 22:*20*

**remotely** 4:*16* 55:*9, 10* 178:*7*

**renewal** 20:*4*

**renumbering** 131:*25*

**reoccurring** 82:*6*

**rep** 9:*11* 143:*16, 21*

**repair** 26:*14* 27:*10,
*24* 29:*23* 30:*1, 3*
34:*23* 35:*22, 23*
**repaired** 35:*4*
**repairs** 25:*3, 7* 27:*12,
13, 14* 32:*19* 35:*10*
68:*7*
**repeat** 15:*10* 16:*20*
18:*16* 19:*8* 20:*15, 19*
30:*11, 13* 34:*8* 36:*3*
46:*21, 22* 53:*5* 54:*25*
56:*20* 62:*13* 63:*2*
65:*18* 69:*19, 21*
74:*19* 82:*3, 12, 20*
97:*4* 101:*5* 114:*6*
141:*10* 146:*5* 156:*13*
160:*9* 175:*3*
**repeatedly** 82:*17*
**repeating** 56:*16*
69:*24*
**rephrase** 5:*24* 16:*4*
24:*8* 36:*2* 48:*17*
176:*9*
**replacement** 45:*9*
**replenishes** 136:*6*
**report** 36:*5* 59:*15,
18* 138:*1* 152:*2, 15,
20, 24* 159:*1, 22, 23*
160:*3* 162:*25* 165:*14,
15* 179:*7*
**Reported** 1:*24*
**reporter** 4:*18, 22* 6:*2*
28:*11* 30:*17* 39:*5*
70:*10, 13, 15, 20* 82:*7*
92:*23* 93:*7, 13*
131:*15*
**Reporting** 4:*19*
**reports** 36:*9, 14*
68:*10* 151:*16*
**repossession** 11:*5*
134:*5*
**represent** 4:*21*
167:*16*
**representation** 171:*23*
**representations** 18:*19*
54:*14* 175:*10*
**REPRESENTATIVE**
1:*19* 4:*11* 12:*2, 14*
15:*18* 47:*2* 51:*13*

63:*19*
**represented** 133:*22*
**rep's** 143:*19*
**request** 13:*13* 99:*15*
108:*19* 162:*7*
**requests** 13:*17* 145:*7*
**require** 19:*20* 148:*14*
**required** 11:*8* 20:*20,
21* 44:*23* 49:*24*
67:*11* 78:*23* 96:*6*
102:*25* 110:*5*
**requires** 45:*9, 10*
102:*18* 145:*13*
146:*20*
**requiring** 102:*12*
**resale** 23:*19* 24:*9, 15,
21* 54:*1, 3* 176:*1*
**resay** 52:*9*
**reselling** 40:*16*
**residence** 41:*17*
47:*23* 48:*21*
**resold** 25:*4* 34:*19*
176:*19*
**respect** 43:*3* 77:*23*
132:*10* 137:*4* 171:*20*
**respectfully** 16:*9*
17:*13* 55:*21* 82:*13*
89:*21* 175:*14*
**respond** 6:*5* 7:*1*
78:*15* 133:*12* 135:*15*
136:*5*
**responded** 161:*17*
**response** 13:*17*
54:*25* 63:*11* 175:*14*
**responses** 6:*7*
**responsibility** 15:*20*
16:*6, 17* 78:*3*
**responsible** 37:*18*
51:*12* 82:*1, 24*
**responsive** 13:*16*
**restart** 70:*24*
**restate** 22:*21* 52:*3, 4,
6*
**restroom** 6:*23* 111:*6*
**retail** 92:*21* 93:*7, 22*
94:*19* 95:*8, 13, 14, 24*
96:*20* 121:*10, 23*
122:*1* 129:*16* 130:*6*
**retain** 43:*25*

**return** 163:*8, 10*
**returned** 164:*18*
**revealing** 147:*13*
**reverse** 159:*10, 14, 16*
**review** 10:*20* 12:*18*
40:*21* 45:*24* 46:*1, 2*
94:*8* 98:*15* 107:*9, 22,
25* 127:*15* 170:*19*
**reviewed** 13:*2* 69:*12*
108:*7, 9* 155:*15*
156:*15*
**Reza** 52:*15* 56:*7*
57:*7, 8, 11* 63:*21*
64:*23, 24* 73:*5*
**right** 5:*12* 14:*24*
27:*16* 55:*9* 63:*17*
65:*5* 85:*5* 88:*13*
91:*4* 94:*13* 105:*2*
109:*20* 111:*10, 17*
113:*25* 117:*7* 122:*10*
129:*18* 131:*5, 9*
133:*17* 167:*3, 4*
171:*3*
**right-hand** 112:*5, 17*
116:*11* 121:*24*
129:*10, 13* 130:*10*
140:*8*
**rights** 107:*24*
**righty** 7:*12* 29:*21*
61:*23* 63:*8* 71:*15*
126:*12*
**ripped** 163:*2*
**RISC** 3:*13, 17* 92:*24*
93:*8, 9*
**R-I-S-C** 92:*24* 93:*10*
**Robert** 76:*21* 103:*7,
8*
**ROBIN** 1:*18* 3:*3*
4:*1, 10* 5:*3* 7:*20*
177:*14* 178:*7*
**ROBINSON** 1:*4, 14*
4:*13* 76:*21* 94:*7*
107:*21* 110:*22* 115:*5*
117:*4* 118:*3* 145:*25*
146:*7* 163:*9*
**Robinsons** 91:*12*
101:*11* 105:*14* 113:*8*
**Robinson's** 165:*10*
166:*15*

**rotors** 32:*11* 34:*2*
**roughly** 97:*8*
**row** 31:*23*
**rules** 5:*18*
**run** 22:*2, 4* 135:*7, 13*
136:*21*
**Runner** 58:*13*
**running** 135:*12*
**runs** 53:*25* 135:*5*

**< S >**
**safe** 32:*20* 37:*22*
140:*1*
**safety** 32:*5* 168:*15,
19*
**sale** 11:*5* 21:*17*
25:*11* 36:*1, 6* 37:*3,
14* 45:*14* 49:*25* 59:*1,
5, 10, 12* 68:*8* 72:*22*
80:*18* 81:*25* 85:*5, 6*
92:*13* 96:*16* 101:*12*
**sales** 16:*15* 25:*8*
32:*24* 39:*18, 19*
47:*16* 88:*18* 92:*21*
93:*8, 22* 99:*17*
121:*10, 23* 122:*2*
129:*17* 130:*6*
**salesman** 47:*16*
**salesperson** 42:*3*
88:*13*
**sat** 122:*10*
**Saturday** 86:*11*
**Saturdays** 40:*5*
**Sautterwausky** 26:*20,
22*
**S-A-U-T-T-E-R-W-A-
U-S-K-Y** 27:*4*
**save** 44:*2* 100:*25*
164:*14, 16*
**saved** 41:*11*
**saw** 95:*21* 122:*12*
157:*19*
**saying** 28:*23* 62:*14*
69:*13* 82:*9, 14* 92:*25*
109:*17* 110:*10* 125:*9*
129:*22* 134:*9*
**says** 34:*6* 76:*4, 24*
95:*15* 96:*17* 104:*3*
117:*21* 139:*21, 24*
140:*8, 25* 141:*1*

**scanned** 34:7, 9, 11, 12, 13, 14  41:10  75:7  110:14

**Schedule** 12:7  13:12, 14

**scheduled** 24:24  146:2

**school** 8:5

**scrap** 25:3

**scratch** 40:7  57:14

**screen** 3:18  11:11  63:5  68:21  71:19  73:14  94:1  109:1  126:12  133:17  138:20  139:21

**screenshot** 138:22, 24  139:4

**scroll** 11:16  12:4  13:12  87:17  93:25  109:22  126:18  129:2  159:7  166:2  167:11  172:4

**scrolled** 13:7

**Scrolling** 80:8  87:7  99:19  112:20  167:19

**seal** 178:10

**search** 35:25  36:4  157:21  158:3

**season** 49:5

**second** 17:14  29:12  35:13  39:6  61:25  62:8  68:20  69:5  76:17  86:10  93:4  112:18  113:16  114:9  120:12  121:20, 23  122:1  124:8, 10, 20  125:19  153:25  158:22  168:13

**section** 99:21

**security** 94:19  95:9

**see** 11:14, 15  12:10  14:3  17:14  59:11, 12  60:23  62:6  63:6, 7, 12  67:5  69:5  71:18, 19  72:7, 10, 14  76:15  91:4  109:6  113:7  123:3  125:14, 15  126:13  129:3, 8, 9  134:4  142:18  152:24  153:17

**seen** 13:13  14:6  60:21  63:8, 9  172:1

**select** 23:21  78:23

**selected** 78:2, 10  98:10  105:23  106:9  109:18  112:24, 25  114:14  116:4  123:6, 8  171:22  172:22  174:13

**selecting** 174:7, 20

**selection** 100:7  106:4  114:10  172:21

**selections** 113:4

**sell** 8:14  15:16  16:23  17:22  19:4  21:12, 13  22:18  39:23  42:19

**seller** 72:12  76:2

**selling** 19:6, 9  72:8  79:20

**sells** 16:13  19:11  78:20

**send** 25:4  27:21  46:15  174:23

**sends** 33:5

**sent** 10:23  12:11  35:14  48:5  68:24  118:20  133:9  136:12  166:24  167:13  168:2  169:16

**separate** 105:9  108:16  113:4  122:21, 24  127:17  131:3

**September** 77:5, 7  114:6  122:4  123:16  131:12  159:16

**serial** 133:16, 18  134:3, 7, 8  140:12

**service** 30:1  31:23  32:14  57:21, 22  88:20, 24  89:4, 19  90:4  144:22, 24

**Services** 58:13  89:11, 17  137:5  170:16

**servicing** 129:20

**set** 24:23  25:8  45:12  94:6  96:25  97:1  107:9, 24  116:19  121:20  124:8,

10, 20  125:19  131:23

**sets** 17:3

**setting** 108:19

**settings** 17:15

**settle** 168:10

**seven** 15:7  174:10

**several-month** 142:25

**shade** 129:10

**shadow** 50:12

**shampoos** 32:23

**share** 11:11  60:8  69:4  109:1  111:17

**sharing** 62:5  68:21  71:16

**sheet** 45:4  48:5  152:13  161:7, 10

**shifts** 32:2, 4

**Shimbacher** 144:12

**Shinbacher** 161:4

**shop** 27:24  30:1  46:13

**short** 111:4

**shot** 3:18

**show** 60:13  97:21  126:17

**showed** 74:12  124:22  172:10  174:6

**showing** 73:17

**shown** 101:17  102:9

**shows** 63:15  115:3, 4  152:15

**Shumacher** 144:2, 18  158:11

**sick** 5:9, 16

**side** 47:25  63:1  91:5  109:15  121:24  128:23  129:2, 10, 13  130:11, 21

**sides** 123:4  129:12

**sign** 41:3  43:11, 13, 14  45:10  46:4  47:25  59:4  60:25  75:21  76:1  87:9  96:14  98:1  99:22, 23  104:15  108:5  118:1  120:3, 4  121:20  128:9  140:25  162:10  163:13

**signatories** 87:20

**signature** 45:25  72:13  76:3  87:20  98:14  106:13  108:13  112:18  116:19  117:7, 8  118:12  120:16  121:24  122:13, 16  128:5, 8, 9, 10  129:14  130:16, 19

**signatures** 3:19  46:6  47:1  80:8  104:17, 18  116:25  117:4  119:21  120:22  121:5  128:3, 14  130:13

**signed** 40:22  46:16, 19, 24  47:1, 21  50:3  75:12  96:16  103:2  104:16  107:1  115:2, 5  117:15, 16, 24  118:10  119:19  121:23  122:2, 7  123:10, 14  127:24, 25  130:21  131:8

**signing** 43:20  46:1, 2, 5  118:7

**signs** 40:25

**silent** 70:7, 22, 25

**similar** 36:22  67:24  72:1  130:17  159:21

**simple** 33:22  124:14  146:23  147:7, 25  164:20

**Simplest** 107:20

**simplistics** 134:5

**simply** 95:22  147:14  158:9

**sir** 5:20  6:1, 10, 14, 19  7:3, 18, 25  8:3, 12, 14, 17, 25  9:7, 19  10:2, 4, 7, 9, 11, 13, 16, 19  11:23  12:3, 9, 17, 19  13:9, 15, 21, 25  15:1  16:4  17:5, 18  18:17, 23  19:12, 18  20:4, 11, 24  21:10, 13, 25  22:3, 9, 11, 17, 24  23:20  24:1, 3  25:11, 16  27:2, 20  30:3, 13  31:7, 13, 15  33:6, 7, 13, 19  34:8, 15  35:10  36:2, 7, 15, 20  37:1,

17, 24  38:9, 22  39:15,
20  40:6, 11, 18, 24
41:7, 12, 15, 22  42:19
43:19  44:1, 4, 11, 14,
24  46:10  47:13
48:15  49:4, 14, 16, 18,
22  50:5, 7, 10, 14, 17,
20  51:2, 8, 13, 19, 22
53:4, 9, 13  54:20
55:2, 4, 12, 19  56:6
57:10, 13  58:5, 16, 25
59:5, 13, 17  60:20, 23
61:9  63:2, 7, 9, 15, 19,
22, 25  64:12, 18, 24
65:12, 18, 22  66:3, 7,
13, 15, 18, 21  67:4, 18
68:2, 4, 13  69:7, 9
71:19, 21  72:4, 10
73:10, 17  74:3, 8, 13,
15, 19, 24  75:6, 9, 11,
21  76:6, 23  77:1, 4, 8,
12  78:4, 12, 14, 17, 25
79:11  80:7  81:11, 15,
20  82:3  83:12  84:7
85:2, 11  86:2, 5, 14,
24  87:6, 12, 14, 17, 18,
20, 25  88:6, 12  89:4
90:8, 22  91:5, 12, 15,
21  92:9, 18  93:17, 20
94:13, 20  95:12
96:13  97:10, 24  98:2,
11, 20  99:3, 5, 7, 9
100:5, 12  101:1, 7, 10,
16, 22  102:4, 10, 13,
15, 19  103:17  104:7,
17, 19  105:12, 17, 19
106:2, 20  108:10, 13
109:5, 8, 12, 20, 24
110:5, 24  111:21
112:1, 12, 22  114:11,
16, 18, 22  115:7, 13,
16, 20, 24  116:6, 8
117:3, 14, 23  118:6,
15, 22, 24  119:3, 4, 9,
16  120:13  121:6, 9,
16  122:5, 15, 20, 24,
25  123:11  124:8, 18
126:6  129:21  130:2,
4, 7, 12  131:10, 13
132:9, 24  133:2, 9, 16,

23  134:10, 12  135:3,
14  136:4, 16, 22
137:9, 21  139:3, 9
140:4, 7, 10  141:12,
18, 21  142:19  143:13,
24  144:8, 20, 23
145:19  146:10  149:8
151:19, 21, 25  152:19
153:14, 19, 20  154:7
157:23  158:17
159:12, 19  160:8
161:8, 12, 22  162:1,
18  164:4  165:11, 13,
21  167:10, 23  168:17,
21  171:24  172:3
174:24  177:4
**sit**  50:15  91:11
103:24  104:2  113:10
114:13  120:15, 21
121:22  122:6  127:16,
23  130:8  131:7
**sitting**  118:2
**situation**  46:12  49:4
120:13  134:24  136:9
147:2
**six**  34:4  109:15
134:13  173:23
174:10
**six-digit**  109:18, 19
171:22  172:21  174:7,
20
**skipped**  167:2
**skipping**  131:16, 18,
24  132:1
**slash**  166:1
**Slightly**  17:11  110:10
**slowly**  12:4
**small**  11:18  36:15
42:7  48:1  83:11, 12,
16  98:7
**smaller**  32:18
**Smith**  1:24  4:2, 18
178:6, 19  179:6, 24
**smoothly**  5:22
**software**  49:10, 13
89:9, 22, 23  92:2, 18
165:13, 17
**sold**  36:24  37:8
**somebody**  29:16
33:5  41:24  43:4

91:22  99:4  103:15,
25  104:5, 15  114:14
133:21  134:5
**soon**  24:25
**Sorry**  14:16  15:10
17:5  18:16  20:16
27:25  28:18  34:8
38:1  43:2, 14  45:20
48:11, 16  53:4  57:14
60:11  62:11, 24
69:13  70:19  75:17
81:11, 23  85:8  89:13
90:23  93:15  95:17
96:10  100:12, 18
101:5  103:16  104:1
106:20  112:9  115:25
119:4, 25  120:8
127:5  128:16  129:14
130:6  133:19  141:11
146:5  150:20  157:13
159:25  161:17  165:3
166:25  167:1  171:8
173:21  175:3
**sort**  7:14  33:21
**sound**  29:17  30:15
38:12
**sounding**  30:15
**sounds**  17:8  29:5
30:17  38:18, 21  82:3
112:7  116:23
**source**  9:9  33:9
136:6  141:2
**space**  30:3  33:1
42:11
**span**  155:25  156:19
**speak**  10:17  17:12
51:15, 17, 21  54:11
57:11  66:19  80:24
81:4, 9, 13  86:12, 15
114:17  134:16, 18, 20
**Speaking**  20:13, 17
30:23  54:22, 24  78:6
81:22  101:4  113:20
114:3  115:19  125:10
128:12  136:3
**specialty**  36:20
**specific**  11:2  12:25
15:23  16:25  21:20
23:15  31:19, 21  35:1
37:1  40:17  48:12

51:2  54:21  58:19
74:3  110:25  121:25
126:6  127:20  132:9
160:1  162:6  166:5,
18  176:3, 7, 14
**specifically**  43:23
160:11
**specifics**  114:8
136:23
**speculate**  77:14
157:25  158:8
**speculation**  107:1
108:1  115:7
**speed**  32:8  153:2
**spell**  26:21  27:2
**splendid**  104:24
**spoke**  86:17
**spoken**  144:12
176:13
**spot**  133:1
**spots**  30:1
**staff**  15:13  26:6, 8
36:15  134:6  142:1
**STAFFORD**  2:6
**stamps**  88:19
**stand**  150:10
**standard**  166:18
**standing**  34:10
**start**  30:23  96:5, 23
135:13
**started**  102:12
135:12  145:18, 21
151:7  175:5
**starting**  116:12
**starts**  29:1  136:6
159:6, 15
**State**  1:25  4:3  8:7,
20  9:24  46:23  90:1
105:13  129:1, 5
146:25  178:3, 20
179:3
**stated**  41:14  55:20
66:15  68:2  85:25
86:5, 16  89:21  92:12
94:16  98:4  100:21
101:10  104:5  121:21
124:1  134:19  150:17
158:8  165:21  170:1
**statement**  3:15, 16,
18  65:13  105:10

ISIAH ROBINSON v. CITY OF NORTH MIAMI BEACH, a political subdivision; OFFICER PROMOTIONAL EXAMINATION
CR of NATIONAL INDEX (MARCELLE BYLER-RAMAGHI)

Case 3:24-cv-00948-WWB-PDB   Document 69-8   Filed 09/30/25   Page 201 of 204 5/2025
PageID 2395
22

108:*17*  117:*10*
122:*22*  169:*18*
**statements**  11:*6*
45:*14*  65:*12*  127:*15*
131:*3*
**STATES**  1:*1*  95:*22*
155:*5*
**stating**  99:*23*  146:*7*
**status**  158:*3*
**stay**  42:*12*  125:*18*
**Stenographically**
1:*24*  179:*7*
**step**  27:*23*  50:*15*, *16*
**step-by-step**  24:*16*, *20*
**stepped**  107:*22*
**steps**  47:*11*
**stick**  174:*15*
**sticker**  25:*9*  88:*16*
**stickers**  32:*24*
**stood**  123:*18*
**stop**  11:*21*
**stopped**  171:*9*
**stopping**  111:*5*
**storage**  41:*16*  43:*24*
**stored**  151:*2*, *5*
161:*24*  162:*2*, *3*, *5*
**story**  56:*10*  170:*5*
**Street**  2:*2*
**strep**  5:*13*
**stretch**  6:*20*
**string**  116:*12*
**stuff**  54:*19*  89:*23*
107:*3*  133:*23*
**submit**  47:*19*  169:*4*
173:*13*
**submitted**  74:*17*, *21*
75:*5*  102:*7*, *9*  108:*24*
109:*10*, *14*, *23*, *25*
110:*4*, *17*, *22*  169:*8*
171:*21*  172:*14*, *20*
173:*6*  174:*6*
**submitting**  48:*20*
**subpoena**  63:*12*
158:*12*  161:*4*
**subpoenaed**  109:*6*
144:*3*
**substance**  169:*25*
**SUE**  2:*2*  133:*22*
**sued**  10:*12*

**sufficiently**  113:*14*
**suggest**  113:*14*
**Suite**  2:*2*, *6*
**suited**  139:*10*  140:*7*
**Sure**  7:*8*  14:*8*  16:*1*,
*13*  35:*3*  37:*24*  48:*18*,
*19*  51:*23*  53:*6*  61:*11*,
*13*  62:*16*  65:*12*  70:*6*
74:*4*  93:*5*  99:*10*
111:*8*  117:*17*  122:*16*
124:*4*, *19*, *23*  136:*22*
144:*19*  145:*22*
148:*12*  151:*8*, *22*
158:*11*, *14*  160:*3*, *7*,
*12*  161:*3*  162:*18*
167:*12*  172:*6*  177:*7*
**surpass**  35:*11*
**suspicion**  156:*22*
**SUV's**  54:*6*, *10*
**SVR**  132:*15*, *16*, *18*
137:*4*, *6*  138:*7*  140:*7*
145:*2*  150:*18*, *21*
152:*5*, *10*, *18*, *24*
156:*4*, *23*  158:*11*
160:*23*  161:*4*, *8*
**swear**  4:*22*
**Switching**  21:*11*
50:*21*
**sworn**  5:*4*  178:*8*
**system**  75:*10*  101:*14*
110:*15*  135:*25*  136:*7*
138:*10*  140:*24*
**systems**  26:*14*  70:*24*

**< T >**
**tag**  34:*2*  43:*8*  45:*7*,
*8*, *9*, *11*  47:*4*  77:*9*
89:*10*
**tags**  45:*6*  49:*9*  89:*24*
**taillights**  32:*5*  34:*2*
**take**  5:*10*  7:*1*  14:*8*
19:*20*  42:*17*  46:*8*
47:*3*, *11*  92:*14*, *19*
105:*7*  111:*4*  126:*10*
127:*10*  137:*7*  148:*8*
**TAKEN**  1:*20*  4:*2*
5:*17*  75:*25*  92:*2*, *9*
101:*9*  111:*12*

**takes**  33:*25*  46:*13*
80:*12*  96:*24*  97:*7*
101:*18*
**talk**  5:*16*  42:*7*  70:*6*
148:*18*
**talking**  6:*3*  31:*20*
38:*18*  55:*22*  128:*18*
129:*6*, *11*  137:*2*
141:*11*  173:*19*
**tame**  68:*11*
**tampered**  140:*15*, *18*,
*21*, *23*, *25*  145:*4*
153:*13*
**tampering**  139:*13*
**tax**  88:*18*  99:*17*
104:*11*  105:*5*
**taxes**  96:*18*
**team**  25:*9*  32:*24*
**tech**  82:*18*, *19*
**technical**  82:*16*
144:*7*  156:*7*
**technicality**  96:*17*
**technically**  158:*22*
**Technology**  34:*16*
143:*8*  145:*2*
**tecum**  13:*13*
**tell**  11:*19*, *21*  42:*9*
56:*18*  77:*20*  130:*18*,
*23*  133:*13*  158:*9*
173:*9*
**telling**  93:*6*  130:*20*
**temp**  89:*9*, *24*
**temporary**  47:*4*  77:*9*
**ten**  80:*15*
**ten-plus**  37:*17*
**term**  37:*12*
**terminology**  95:*8*
**terms**  94:*22*
**test**  42:*18*, *21*, *22*, *24*
43:*1*, *5*, *8*, *15*  88:*2*
94:*7*  98:*16*  100:*23*
107:*10*, *25*
**testified**  5:*5*  78:*9*, *19*
80:*9*  84:*23*  96:*24*
97:*7*  143:*4*  171:*19*
172:*19*  174:*5*, *25*
175:*4*, *6*, *9*, *20*
**testify**  5:*4*  12:*15*
81:*16*
**testifying**  15:*19*

**testimony**  6:*16*, *17*
7:*17*  14:*24*  68:*19*
121:*4*  135:*16*  179:*9*
**text**  54:*20*  55:*11*, *16*,
*18*, *19*  56:*1*, *25*
**Thank**  7:*10*  17:*16*,
*19*  28:*18*  31:*7*  60:*7*
62:*22*, *23*  70:*11*
76:*18*  80:*16*  93:*14*,
*15*, *16*  107:*13*  109:*4*
111:*10*  112:*15*  126:*7*
131:*14*  159:*4*, *18*
161:*21*  167:*7*  171:*14*
177:*6*
**themself**  127:*19*
**thing**  14:*8*, *14*  27:*9*
38:*22*  62:*16*  67:*9*
100:*9*  102:*8*  108:*16*
132:*19*  160:*12*
172:*10*
**things**  20:*23*  30:*7*
33:*16*  64:*4*  75:*1*
89:*8*  95:*12*  110:*23*
131:*17*  140:*4*, *6*
171:*5*  174:*1*
**think**  7:*12*  58:*8*, *13*
61:*10*  64:*24*  67:*22*
107:*8*  159:*9*  171:*3*
**third**  23:*11*  79:*23*
**third-party**  19:*14*
57:*21*  102:*13*, *14*
103:*9*
**thorn**  63:*1*
**thought**  52:*4*, *7*
120:*9*  128:*21*  166:*10*
**Three**  30:*5*  32:*22*
33:*7*, *15*  37:*20*  47:*13*
73:*10*  83:*13*  116:*6*, *7*
123:*8*  126:*24*  127:*1*
137:*6*  169:*16*
**throat**  5:*13*
**tight**  62:*8*  114:*18*
**time**  6:*3*  11:*9*  15:*8*,
*11*  20:*8*  25:*1*  31:*4*,
*20*  33:*4*  35:*13*  36:*16*
46:*10*, *11*  61:*10*
62:*18*  66:*14*, *17*  68:*3*
69:*9*  80:*12*  82:*2*, *23*
83:*10*, *18*  86:*10*
88:*16*  98:*13*  100:*23*

101:*12*  103:2, *23*
107:*21*  116:*10*  118:2
120:*12*  126:*10*
146:*13*  147:*1*  152:25
153:*23*  154:*12, 18*
157:*21*  158:*13*
168:*14, 18*  177:2
**timeline**  49:*8*
**timely**  137:*9*
**times**  32:22  40:*9*
43:*6*  50:*4*  68:2  92:8
124:5, *7*  142:*25*
157:*9, 15*  173:25
**timing**  177:*12*
**title**  3:*11, 12, 14, 15,*
*16, 22*  9:3  22:24
40:*15, 18, 21, 25*
41:*10, 18*  47:*15, 19*
48:*1, 2, 8, 19, 22*  49:6
51:*3*  64:5, *6*  65:*1*
71:*18, 23*  72:2, *6, 18*
73:*6, 8, 12*  74:*7, 12,*
*17, 21*  75:*12*  76:4
77:*21*  79:*7, 14, 17*
80:*1, 3, 6*  99:2, *9, 11,*
*21, 24*  103:3, *5*
108:*23*  109:*22*  110:*2,*
*3, 16*  111:*22, 24*
112:*12*  113:7  114:*19*
115:9  118:*3, 4*
120:*13*  124:*3, 22*
126:*25*  171:*20, 25*
172:*13*  173:7, *8, 14,*
*17*  174:*2, 6, 10, 16*
176:*22*
**titles**  40:*2, 8, 10, 13*
41:*3*  47:22  49:*21*
79:*19*
**TMU**  117:*22*  118:*6,*
*8*  119:*13, 19*  120:*23*
121:*13*  122:8, *9*
123:*4*  124:7  127:*24*
128:*1, 25*  130:*20*
131:5, *8, 9*  162:*10*
**today**  5:*8*  7:*17*
12:*21*  13:*4, 8, 22*
14:*19*  15:*19*  51:*21*
57:*12*  103:*24*  104:2
113:*10*  114:*13*
120:*15, 22*  121:22

122:7  127:*17, 23*
130:*9, 25*  131:7
134:*16, 18, 21*
**today's**  6:*15*  10:*14,*
*17, 20*  51:*16, 18*
66:*19*  81:9, *13*
**told**  30:*18*  124:*21*
143:*4*  146:*12*  147:*10,*
*22*  163:*9*
**tools**  27:*14*
**top**  28:25  58:25
63:*12*  76:24  78:9
91:*13*  94:*13*  110:*15*
112:*2*  117:7, *21*
119:*13*  127:*24*
143:*24*  144:*1*
**topic**  12:*20*  69:5, *8*
**topics**  12:*15, 18*  13:*3,*
*7*  20:7, *10*
**Tore**  163:*13*
**torn**  164:*14, 16*
**tossed**  163:*14*
**total**  15:7, *14*
**totaled**  136:*11*
**totally**  5:*13*  70:7
163:*13*
**touched**  70:*21*
**towers**  144:*23*
**town**  33:*10*  164:2
**track**  153:*1*  158:*18*
167:7
**tracking**  3:*19*  133:2
137:*19, 24*  138:*12, 25*
151:*10, 17*
**trade-in**  99:*17*
**trailer**  102:7
**train**  26:2  50:*10, 12*
**trained**  25:*16*  50:3
91:7
**training**  19:*21*  20:*21*
25:*17*
**transaction**  15:9, *12*
18:*20*  26:9  41:8, *23*
44:*3, 6*  50:22  58:*1*
75:8  80:*17*  81:*17*
82:*24*  87:*16*  102:*20*
106:*19, 21*  110:*14*
115:*15*  162:*21*
**transcript**  177:*12*

179:8
**transcription**  179:*9*
**transfer**  45:7  75:*15,*
*18, 25*  77:23  78:9
80:*13*  99:*11*  108:*23*
171:*20*
**transferred**  75:22
99:*15, 24*
**transition**  111:*6*
**transmission**  25:2
32:3  34:*1*
**transmit**  49:*21*
**transparty**  58:*15*
**transport**  37:*10*
57:*21, 22*  58:9, *15, 18,*
*19*  67:8
**transportation**  58:*17*
**transported**  57:*23*
66:6
**treated**  166:*21*
**tried**  157:3  163:8, *19*
**trouble**  28:*10*
**troubles**  28:8
**true**  74:*16, 20*  87:*15,*
*21*  88:3  93:*21*  102:5,
*8*  104:5  105:5
106:*22*  111:*23*  128:2
130:*21*  137:9  158:5
171:*21*  179:8
**truly**  107:3
**trust**  18:*19*
**trustworthy**  175:*1, 7*
**truth**  5:*4*
**truthful**  6:*17*  7:*16*
71:22
**truthfully**  64:*13*
130:24
**truths**  113:*15*
**try**  7:8  11:*11*  28:*21*
31:*4*  62:*19, 18*  157:5
164:*18*  170:6
**trying**  29:25  30:*21*
52:*1*  55:22  62:24
82:*15*  95:5  107:*16*
128:*15*  133:23  136:5
137:3  148:3  151:22
157:*10*  162:*14*  167:6
**tunnel**  29:6  38:22
39:*4*  82:*4*  112:7
116:23

**turn**  11:8  28:*14*
62:8  74:23
**turned**  105:*14*  107:3
137:*11*  164:*23*
165:*14*
**Turning**  80:*16*
**turnover**  50:*20*
**twice**  36:*19*  143:*9*
**two**  19:*23*  26:*13*
45:2  47:*11*  67:*19, 23*
68:*24*  69:*1*  73:*21*
74:2  87:*17*  98:*10*
106:*22, 23*  113:*4, 11*
116:6  119:*1, 4*
127:*17*  149:24  150:6
151:7  155:*16, 25*
156:*19*  157:24
169:*16*  173:*21*
**type**  23:25  24:*9*
159:*23*  161:9
**typed**  123:3
**typical**  23:*24*
**typically**  40:2

< U >
**U.S**  4:*14*
**Uh-huh**  77:*25*  134:*1*
**uh-uhs**  6:8
**ultimately**  57:25
**Un**  75:3  173:*1*
**unable**  27:*13*  64:*19*
68:*10, 16*  77:*19, 20*
81:*16*  86:7  127:5
147:*14, 15*  161:*12*
**unaware**  68:9
**uncertain**  119:2
**unclear**  5:*23*
**undercarriage**  31:25
**undersigned**  178:6
**understand**  6:*18*
17:5  30:*20*  38:7
51:*23*  99:*23*  110:*19,*
*20*  125:5, *6, 11*
126:*19*  148:2  151:22
159:*25*  170:*3*
**understanding**  55:*24*
100:*18*  113:*12*  136:7
**understood**  5:*25*
21:*11*  159:*18*  170:*1*

ISIAH ROBINSON vs. FPL AUTOMOTIVE PROMOTION
CR of NATIONAL PROMOTION (BYLER-RAMAGHI)

Case 3:24-cv-00948-WWB-PDB    Document 69-8    Filed 09/30/25    Page 203 of 204 5/2025
PageID 2397

24

177:13
**unfortunately** 73:11
**UNITED** 1:1
**unpack** 25:12
**unsuccessful** 143:10, 11
**unsure** 33:13, 19
51:11 56:3 57:10
58:5, 9 59:2 63:25
66:10 67:18 71:25
72:20 75:3, 4, 6
87:21 102:15 108:2
110:23 114:22 116:8
135:15 137:8 139:9
150:3, 5, 7 155:18, 20
157:23, 25 168:21
173:3, 8
**unusual** 60:20
**unwilling** 68:10
77:14 78:14 114:15
**updated** 20:11, 22
**use** 22:1 23:21 33:4
45:6 53:8 65:22
85:24 93:8 102:14, 18, 20 103:9 111:6
115:12 134:6 137:6
144:21 155:10 164:2, 4, 10, 12
**uses** 93:13
**USPS** 40:11
**usually** 20:22 22:20
37:13 40:25 41:25
43:4 44:15 45:16
46:8

< V >
**vague** 40:19
**valid** 87:19, 21
130:21
**value** 164:20
**various** 21:24 27:19
149:15 164:13
**vast** 26:5
**vastly** 176:6
**vehi** 81:24
**vehicle** 8:24 19:4
22:19, 22 23:7, 9, 12, 25 24:21, 23 25:4, 5, 7, 9 27:20 30:8
31:14, 15, 17, 18, 21,

25 32:1, 2, 11, 17, 18, 19, 25 35:3, 11, 14, 23, 25 36:4, 5, 20, 24
37:3, 8, 9, 23 38:8
40:13, 16 42:17, 19
43:8, 10 46:3 50:23
51:5 54:3, 4, 12 55:3, 23, 25 56:24, 25
57:14, 16, 20, 25 58:3, 20, 23 59:3, 15 63:14, 18, 24 64:8, 16 65:23
66:5, 9 67:7, 10, 13, 16, 19, 23 68:3, 6, 7, 17 79:17 80:18 81:5, 19, 20, 21, 24 83:8, 23
84:2, 10 85:5, 6, 10, 12, 23 88:2, 15, 18
90:7 92:3 94:8, 21
96:7, 15, 17 99:14
100:22 102:6, 18
108:4 132:5, 8, 10
134:15 135:7, 10, 17
136:13, 15, 20 138:25
139:1 142:8 145:6, 10, 18, 21 146:1, 2, 9, 13 147:2, 18 148:7
151:23, 25 153:2, 7
154:1, 14, 20 155:1
156:18 157:1 158:4
160:6, 15 162:20, 25
163:10, 11, 12 175:16
176:1
**vehicles** 16:13, 23
17:22 18:4, 7 19:6, 9, 10 20:24 21:9, 15, 23
22:3, 4, 6 23:19, 22
24:4, 5, 10, 12 30:2
31:11 33:1 34:18
37:14, 18 38:11, 25
39:13 40:3 48:6
55:5 56:3, 7, 8 67:4, 11 78:21 82:2, 24
83:1, 5, 10 84:7 85:1
92:9 102:16, 24
103:1, 22 104:11
105:15 114:21
134:13 152:1 156:17
158:18 168:16, 20
**vehicle's** 39:17
53:16, 18 135:19, 22

136:17 137:10, 13
153:8, 15 155:15
175:21, 25 176:18
**verbally** 25:16
**verify** 23:18, 20
126:20 175:20, 25
176:18, 22
**versus** 4:13 34:23
141:17
**vessel** 102:6, 7
**VF102** 72:11
**VIDEO** 1:18, 22 4:9, 10 28:14 43:24 44:2
61:20 111:14 177:11, 15
**videographer** 2:10
4:8, 18 29:10, 13, 15
39:8, 10 61:14, 17, 20
71:3, 8, 10, 13 111:11, 13 148:22 149:1, 3
170:24 171:1 177:9, 13
**videos** 43:25
**videotaped** 4:1 12:1
**view** 72:2 79:16
**viewed** 175:1, 7
**VIN** 23:23 56:6
84:14 85:8, 24 86:1
99:14 140:12
**visible** 94:1 126:22
**visiting** 84:19
**visual** 91:17
**voice** 38:22
**voltage** 136:18, 19, 21
153:8, 15 154:1, 8, 15, 21 155:2, 15
**volts** 155:16
**volume** 28:17 62:9, 23
**vs** 1:4, 13

< W >
**wait** 6:4 32:14 43:2
**walk** 42:14 46:10
**walking** 42:2 75:1
**walks** 41:24
**want** 7:12 23:7
46:2 71:9 77:17
82:21 93:25 99:19
107:9 108:22 126:18

127:10 130:19
131:23 148:22
163:10 171:4
**wanted** 14:5, 9
51:20 52:11 61:7
104:14 163:12 177:7
**wanting** 16:10
**wants** 20:23
**watched** 122:11
**water** 5:10 6:23
**wave** 42:13, 14
**way** 16:13 18:3
64:13 78:20 91:8
134:22 138:2 146:1, 8 152:22 159:7
160:7, 25
**Wayne** 49:14 165:17, 20
**wears** 47:16
**web** 85:21 138:4, 5
**website** 84:15, 17, 18, 21, 25 85:12, 19, 23
86:1
**Wednesday** 126:4
**week** 5:13 12:13
32:22 49:5, 6, 7 64:5
66:6
**well** 32:7 52:3, 8
56:6 69:10 71:6
72:13 84:17 104:25
105:1 115:3 120:20
126:17 144:4 148:2
160:7 175:16
**Wendy** 4:18 28:10
70:8
**went** 12:5 29:22
77:6 98:15
**We're** 29:18 31:20
55:21 56:25 61:18, 24 83:11 108:20
110:5 112:11 131:15
**wet** 118:10, 12, 13
**we've** 33:6 43:9
46:18 108:9 135:14
150:18, 24
**whichever** 47:5
**Wholesale** 3:10
21:24 22:6, 19, 22
51:7 53:1, 23 55:1

59:5  60:19, 21  61:1
63:20
**Wilkerson**  77:22
**willing**  34:23  76:8
176:15
**window**  25:10
152:14  161:11
**withheld**  13:20
**withhold**  11:8
**WITNESS**  3:2  4:22
11:18, 23  14:14
28:19  29:2, 5, 8, 16
30:25  31:7, 9  34:13
38:18, 21  39:1  52:7
60:14  62:11, 17, 21,
24  63:1  70:2, 4, 18
71:5  76:10, 13, 15
92:25  93:9, 11, 14
97:3, 16, 18, 20  112:7
116:22  119:25  120:7,
11  125:6, 11  127:8,
12  149:13  165:6
167:13  176:12
178:10  179:10
**word**  28:20  90:5
161:10  162:14
**words**  74:2
**work**  32:10  49:6
73:8  103:11  104:12
110:6, 11  114:18, 19,
23  116:10  136:10
173:7, 8, 14, 17  174:2,
10
**worked**  8:18
**working**  47:12
135:23  138:11
**works**  11:10  34:3
174:16
**world**  55:12
**worries**  31:9  120:10
126:10  167:6
**worry**  140:10, 11
**worse**  38:19  76:15
**worth**  35:12  56:8
**wrecked**  136:11
**written**  25:13  49:23
50:6, 8  54:14  120:18
124:8  127:20

**wrote**  119:13, 15
120:23  121:13  122:7
128:25

**< Y >**
**y'all**  11:14  61:7
62:5  63:6  166:24
**Yeah**  5:14  11:20
14:15  17:7  23:14
28:2, 16  29:3, 9, 19
35:8  46:22  52:8
60:12, 15, 16  62:7
71:7  105:7  111:9
120:8  148:25  149:14
151:14  152:10
153:18  165:7  168:24
175:5
**year**  15:16  20:4
35:16  56:5  102:21,
22  152:21
**years**  19:15, 23  24:2
27:5  33:7, 16  36:19
37:17, 20  41:7  47:13
54:6  56:7  67:19, 23
73:10  83:14  102:12
119:4  137:7  149:17
151:7  157:24  173:21
174:1
**yellow**  153:17
**Yep**  119:12  163:6
**yesterday**  173:22

**< Z >**
**zero**  73:21
**ZOOM**  1:18, 22  4:1
116:1
**zooming**  11:21, 22