UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ISIAH ROBINSON, and, LISA CLAYTON
ROBINSON, Each an Individual,

       Plaintiffs,

vs.

NATIONAL AUTOMOTIVE, INC., a Florida
corporation, and ROBIN RAMAGHI, an
individual,

       Defendants.

Case No. 3:24-cv-00948

---

**COUNTER-PLAINTIFF NATIONAL AUTOMOTIVE, INC.'S RESPONSE IN
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON
DEFENDANT'S COUNTERCLAIM**

COMES NOW Defendant, NATIONAL AUTOMOTIVE, INC., a Florida corporation ("NAI"), by and through its undersigned counsel, and files its Response in Opposition to Plaintiffs' Motion for Summary Judgment on Defendant's Counterclaim, Incorporated Statement of Material Facts, and Memorandum of Law (D.E. 68), and in support hereof states:

**STATEMENT OF MATERIAL FACTS FOR WHICH THERE EXISTS A GENUINE
ISSUE FOR TRIAL/MATERIAL FACTS IN DISPUTE**

1.      On March 28, 2025, Plaintiffs filed their Amended Complaint. (D.E. 30). Each count of the Amended Complaint incorporates the general allegations contained in Paragraphs 1-59. *See* D.E. 30 at ¶¶ 61, 73, 79, 84 and 90. Within the "Factual Allegations" section (paragraphs 14-59), Plaintiffs alleged that they signed a variety of documents in relation to the purchase of a used 2011 Chevrolet Equinox, VIN ending in 4389 (the "Vehicle") from NAI:

(a)     a Retail Installment Sales Contract ("RISC") (*see* ¶¶ 18-19);

(b)     an Odometer Disclosure Statement (*see* ¶¶ 22-24, 27);

(c)     a Separate Odometer Disclosure Statement (*see* ¶¶ 25-27);

(d)     an Unsecure Power of Attorney (*see* ¶¶ 27-28); and

(e)     "Lastly,"[1] an Application for Certificate of Motor Vehicle Title (*see* ¶¶ 29-30).

3.      On April 29, 2025, NAI filed its Answer and Affirmative Defenses to the Verified Amended Complaint for Damages and Incidental Relief and Amended Counterclaim (the "Counterclaim"). (D.E. 39). The Counterclaim asserts a single cause of action against Plaintiffs for breach of contract. Within Count I, NAI identified and attached documents that govern the parties:

(a)     a Retail Installment Contract and Security Agreement (*see* ¶ 8 and Exh. A);

(b)     a Bill of Sale Buyer's Order (*see* ¶ 9 and Exh. B);

(c)     an As Is – Sold Without Warranty agreement (*see* ¶ 10 and Exh. C);

(d)     a Customer Consent to Contact Via Telephone and Wireless Device (*see* ¶ 11 and Exh. D);

(e)     a Federal Risk Based Pricing Notice (*see* ¶ 12 and Exh. E);

---

[1] In verifying the Amended Complaint, Plaintiffs declared "under penalty of perjury" their allegations were true and correct, thereby claiming that the identified documents were the only ones they signed to purchase the Vehicle. NAI disagrees in two respects – first, NAI identified and attached to its Amended Counterclaim additional documents that Plaintiffs signed; second, NAI maintains that Plaintiffs executed a second set of contract documents upon their return to NAI on September 14, 2025, resulting in a genuine issue of material facts in dispute between the parties on the threshold issue of which are the applicable contract documents. *See* paragraphs 3 and 4 below.

(f)     a Separate Odometer Disclosure Statement and Acknowledgement (*see* ¶ 13 and Exh. F);

(g)     a Buyers Guide (*see* ¶ 14 and Exh. G);

(h)     a Power of Attorney for a Motor Vehicle, Mobile Home, Vessel or Vessel with Trailer (*see* ¶ 15 and Exh. H);

(i)     an Application for Certificate of Motor Vehicle Title (*see* ¶ 16 and Exh. I);

(j)     an Odometer Disclosure Statement (*see* ¶ 17 and Exh. J);

(k)     an Acknowledgement of Purchase of Vehicle Containing Past Due Starter Interrupt and/or Electronic Tracking (GPS) Device as Condition of Sale (the "GPS Acknowledgement") (*see* ¶ 18 and Exh. K); and

(l)     a Repossession Agreement (*see* ¶ 19 and Exh. L).[2]

4.     On June 3, 2025, Plaintiffs filed their Answer and Defenses to NAI's Counterclaim. (D.E. 40). Plaintiffs admitted having executed all of the various documents described by NAI but denied that the copies of the documents attached to NAI's Counterclaim as Exhibits A-L are true and correct representations of the documents they signed. (D.E. 40 at ¶¶ 8-19).

5.     On September 29, 2025, Plaintiffs filed their Motion for Summary Judgment on Defendant's Counterclaim, Incorporated Statement of Material Facts, and Memorandum of Law (the "Motion"), in which Plaintiffs claim that "The only lapse in GPS activity…was due to the vehicle losing power." (D.E. 68, ¶ 4).  First, the SVR Tracking records are not "interpreted" nor testified to by SVR Tracking to reach such a

---

[2] *See also* the Affidavit of Robin Ramaghi in Support of National Automotive, Inc.'s Motion for Summary Judgment previously filed at D.E. 70, Exh. "A", at ¶¶ 13-19, which NAI also relies on in support of this Response.

conclusion, and second, NAI disputes Plaintiffs' characterization of Mrs. Ramaghi's testimony on this issue, all of which is addressed below.

7.      In the Motion, Plaintiffs claim that "Defendant's discovery responses were never verified," (D.E. 68, ¶ 10) which is untrue, disputed and addressed below.

8.      In addition, NAI has produced evidence of its repeated efforts to inspect the Vehicle, and the GPS unit installed on it, to no avail due to Plaintiffs' refusal to comply, as well as evidence of its damages related to Plaintiffs' breach. *See* the Affidavit of Robin Ramaghi attached as Exhibit "A;" the Affidavit of Christopher Caldwell attached as Exhibit "B;" and the Affidavit of Jim Schumacher attached as Exhibit "C."

9.      Plaintiffs now seek to exploit their refusal to allow NAI to inspect the Vehicle and GPS unit at NAI's business location, despite NAI's repeated requests to do so, which in and of itself is a breach of contract (in particular, the RISC (D.E. 39, Exh. K, p. 4), which is referenced in multiple places in the GPS Acknowledgement).

10.      NAI's demand for attorney's fees stems from language contained in the RISC attached to the Counterclaim in the event of a default (D.E. 39, Exh. K, p. 4), which default occurred prior to the filing of the Counterclaim and is ongoing. NAI addresses the "functionally intertwined" nature of the contract documents identified in paragraph 4 above more fully below.

## ARGUMENT

Plaintiffs' Motion should respectfully be denied in all respects as there are genuine issues of material fact in dispute precluding the entry of summary judgment in Plaintiffs' favor as to NAI's Counterclaim.

I.    <u>**Standard of Review**</u>

In the Eleventh Circuit, "[s]ummary judgment is appropriate only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Wright v. Sumter Cnty. Bd. of Elections and Registration*, 657 Fed. Appx. 871, 872 (11th Cir. 2016) (internal citations omitted) (quoting Fed. R. Civ. P. 56(a)). "In determining whether the moving party has satisfied the burden of proof, the court considers all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party." *800 Adept, Inc. v. Murex Sec., Ltd.,* No. 6:02-cv-1354-Orl-28DAB, 2006 WL 5359053, at *3 (M.D. Fla. Aug. 25, 2006) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "A court 'may not weigh conflicting evidence or make credibility determinations of [its] own.'" *Buending v. Town of Redington Beach*, 10 F. 4th 1125, 1130 (11th Cir. 2021) (citing *Jones v. UPS Ground Freight*, 683 F. 3d 1283, 1292 (11th Cir. 2012)); *Wright*, 657 Fed. Appx. at 872 (citing *Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F. 3d 1149, 1159 (11th Cir. 2015); *800 Adept, Inc.,* 2006 WL 5359053, at *3 ("The court may not weigh conflicting evidence or weigh the credibility of the parties."). "If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then a court must not grant summary judgment." *800 Adept, Inc.,* 2006 WL 5359053, at *3. In this instance, Plaintiffs have not satisfied their burden, and the Motion should respectfully be denied.

## II.  <u>NAI has provided evidence of breach of contract.</u>

Plaintiffs argue that NAI failed to produce competent evidence that Plaintiffs disabled or removed the GPS unit and assert that the documents "confirm that the vehicle merely lost power." *See* the Motion, p. 4.  NAI disputes both assertions.

First, Plaintiffs' reliance on SVR Tracking's records is misplaced because there is no evidence – whether an affidavit from SVR Tracking or deposition testimony – interpreting its voluminous reports.  The Certification of Domestic Records of Regularly Conducted Activity included with Exhibit B to the Motion merely authenticates the documents. There is no corresponding testimony interpreting the records, e.g. what the data shows or means.  Even if the Court were to try to decipher what the reports mean, there are multiple references to "Power Disconnected," which in and of itself would suggest an affirmative act of disconnecting the power to the GPS unit (and, by extension, that the GPS unit was tampered with, disabled or removed). *See, e.g.* the Motion, Exh. B, at pp. 53, 54, 674 and 675 of 901.  Mr. Schumacher confirms this is indeed a possibility. *See* Exh. C at ¶ 8.

Second, during her deposition as the corporate designee of NAI, Mrs. Ramaghi was asked whether the GPS unit would provide a notification if it were tampered with. She said yes and testified that NAI received a notification indicating the device had been disconnected. *See* the Motion, Exh. C, at 140:14-141:3.[3]  She was then asked if the GPS unit could have reported as disconnected when the battery died, and she said "No." *Id.* at 141:4-6. She further testified that the GPS unit would have stated that it lost

---

[3] References to Mrs. Ramaghi's deposition testimony attached to Plaintiffs' Motion as Exhibit C will follow this format - page number:line numbers.  Also, attached hereto as Exhibit "D" is Mrs. Ramaghi's Errata Sheet corresponding with her deposition testimony.

power, as the unit provides different alerts when it has been disconnected versus when it loses power. *Id.* at 141:15-18. When asked if Mrs. Ramaghi had proof that the device was disconnected, she answered, "Yes," and as she tried to continue with her answer, Plaintiffs' counsel cut her off and did not allow her to finish, instead asking her whether she had inspected the Vehicle. *Id.* at 141:19-142:2. Mrs. Ramaghi explained that NAI had not inspected the GPS unit because Plaintiffs refused to make the Vehicle available for inspection. *Id.* at 142:8-25. Mrs. Ramaghi's testimony regarding NAI's inability to inspect the GPS unit because Plaintiffs have steadfastly refused to bring the Vehicle to NAI to inspect it is also supported by her Affidavit at Exhibit "A", NAI's verified interrogatory answers attached thereto as Exhibit 2,[4] and Mr. Caldwell's Affidavit at Exhibit "B," ¶ 18. Moreover, Mr. Schumacher, who is familiar with NAI's account, has reviewed the reports for the GPS unit installed on the Vehicle and said the GPS device could have been removed and/or tampered with by Plaintiffs. *See* Exhibit "C" at ¶¶ 8-9.

The GPS Acknowledgement states, in pertinent part:

- "I/We understand and agree that the Lien Holder or Holder of the Motor Vehicle Retail Installment Contract (if assigned), may use the GPS Unit to locate the Vehicle. The Starter Interrupt Device may prevent the Vehicle from starting, subject to any Rights I may have to Cure a Default."
- "I/We agree not to tamper with the Device and that it remains the Property of the Lien Holder or Holder of the Motor Vehicle Retail Installment Contract (if assigned)."
- "I/We understand the GPS unit is being used to secure collection of monies I hereby acknowledge I/we owe and, where allowed, to repossess the Vehicle as allowed."

*See* D.E. 39, at Exh. K; D.E. 70, Exh. A at ¶¶13-14. Plaintiffs initialed next to each of these statements, signaling their understanding and agreement to be bound. *Id.*

---

[4] To ensure completeness, Exhibit 2 also includes the corresponding cover/service e-mails that transmitted NAI's signed interrogatory answers to Plaintiffs' counsel.

Moreover, the RISC (D.E. 39, Exh. K) states, in pertinent part:[5]

- Under the sub-heading "Default," "You will be in default on this Contract if any one of the following occurs (except as prohibit by law): You fail to perform any obligation that you have undertaken in this Contract. We, in good faith, believe that you cannot, or will not, pay or perform the obligations you have agreed to in this Contract." (pp. 25-26 of 53).
- Under the sub-heading "Remedies," "If you are in default on this Contract, we have all of the remedies provided by law and this Contract. Those remedies include:...We may require you to make the Property available to us at a place we designate that is reasonably convenient to you and us. We may immediately take possession of the Property by legal process or self-help..." (p. 26).
- "If the Property has an electronic tracking device, you agree that we may use the device to find the vehicle." (p. 26 of 53).
- Under the heading "Security Agreement," "To secure your payment and performance under the terms of this Contract, you give us a security interest in the Vehicle, all accessions, attachments, accessories, and equipment placed in or on the Vehicle and in all other Property." (p. 26 of 53).
- "By giving us a security interest in the Property, you represent and agree to the following:...You will keep the Property in your possession and in good condition and repair...You will provide us reasonable access to the Property for the purpose of inspection." (p. 26 of 53).

Plaintiffs breached the above-referenced provisions of the RISC, which is expressly referenced and incorporated in the GPS Acknowledgement, by failing to keep the Vehicle (and all equipment, including *but not limited* to the GPS unit) in "good condition and repair,"[6] by precluding NAI from being able to locate the Vehicle through the GPS unit, by refusing to allow NAI to inspect the Vehicle at a place that it designated, by failing to provide NAI with reasonable access to the Vehicle for the purpose of inspection, and by failing to timely make payments to NAI. *See* Exh. "A"; Exh. "B"; Exh. "C"; D.E. 70, Exh. A.  Plaintiffs defaulted on payments to NAI in particular, and have remained in default, since April 21, 2025. *See* Exh. "A" at ¶ 6.  As

---

[5] The same language is in the RISC attached to Plaintiffs' Complaint (D.E. 30, Exh. A), so it does not matter which "version" of the RISC is used on this issue.

[6] In his Declaration, Mr. Robinson admitted that between May 4, 2024, and September 6, 2024, the vehicle had "mechanical defects" and the battery lost power, so it was clearly not in "good condition and repair" as contractually required. (D.E. 68-4, ¶¶ 3-4).

of today, Plaintiffs remain forty days past due on their payments. *Id.* Under the RISC, NAI was entitled, and remains entitled, to require Plaintiffs to make the Vehicle available to NAI for the purpose of inspection at its request. *See* D.E. 39, Exh. K; and D.E. 70, Exh. A, ¶¶ 13-14.

NAI tried to communicate with Plaintiffs multiple times to discuss the GPS unit's status and to request an inspection of the Vehicle. *See* Exh. "A," including Exh. 2 thereto; and Exh. "B."  NAI even offered a free oil change or a gas card to incentivize Plaintiffs to bring the Vehicle in so that NAI could properly inspect the GPS unit. *See* Exh. "A" at ¶ 10 and Exh. 2; and Exh. "B.*"* Despite NAI's repeated requests, and Plaintiffs' obligation under the RISC to make the Vehicle available to NAI for inspection, Plaintiffs have refused to comply.  *See* Exh. "A," including Exh. 2 thereto; and Exh. "B"; and the Motion, Exh. C at 142:8-25.

Mr. Schumacher's testimony confirms that the GPS unit has shown as disconnected since October 1, 2024. *See* Exhibit "C" at ¶ 6.  Before that, the Vehicle was untraceable for several months. *Id.* Because NAI did not have possession of the Vehicle during that time, Mr. Schumacher said there was either a loose connection, or that Plaintiffs disconnected the GPS unit, then reconnected it on September 6, 2024, before disconnecting it again on October 1, 2024. *Id* at ¶¶ 8-9.

In sum, as to Plaintiffs' first argument, NAI has not only produced evidence of their breach of the contract with NAI, but there are several genuine issues of material fact in dispute, and Plaintiffs are not entitled to summary judgment as a matter of law.

III.    **NAI has standing to bring the Counterclaim and has incurred damages.**

Plaintiffs assert that NAI "has failed to allege or establish any concrete injury stemming from the alleged GPS disablement." *See* the Motion, p. 6.  A litigant has Article III standing if it has incurred *either* tangible *or* intangible injury.  "A concrete injury can be tangible – like a physical or monetary harm – or intangible – like harm to one's reputation. (internal citations omitted)…For purposes of the concrete injury analysis under Article III, [the Eleventh Circuit] ha[s] recognized three kinds of harm: 1) tangible harms, like physical or monetary harms; 2) intangible harms, like injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts; and, finally, 3) a material risk of future harm when a plaintiff is seeking injunctive relief. (internal citation omitted)." *DiPierro v. Florida Health Sciences Ctr., Inc.*, Case No. 8:23-cv-01864-KKM-NHA, 2024 WL 3051320, at *4 (M.D. Fla. June 18, 2024).

In *Attias v. Carefirst, Inc.*, 346 F.R.D. 1, 9 (D.D.C. 2024), the district court held:

> "No analogue is even required here, however, because American courts dating back to the Founding have permitted plaintiffs to bring suit based on the exact injury Plaintiffs have alleged: a breach of contract. That was true regardless of whether the plaintiff incurred actual damages or, as here, sought to recover only nominal damages. All the same, the breach of a contractual obligation to perform some duty has always been understood as a concrete injury that enables the aggrieved contracting party to proceed in an American court."

*See also, Marine Depot, Int'l, Inc. v. James River Group, Inc.*, Case No. 19-CV-24821-CANNON/LOUIS, 2021 WL 4848921, at *4 (S.D. Fla. July 2, 2021), *report and recommendation adopted*, No. 19-24821-CIV, 2021 WL 4189587 (S.D. Fla. Sept. 15, 2021) ("As a party to the alleged agreement, and the party to benefit from the alleged

agreement, [plaintiff] has a legally protected interest and suffered concrete harm from
Defendant's breach...and therefore has standing to sue," *citing Hershey Co. v. Cadiz*,
No. 05-60999-CIV, 2006 WL 8431511, at *2 (S.D. Fla. May 9, 2006) ("as a party to the
contract, [plaintiff] has standing to bring claims for breach of that contract")).

Plaintiffs state that NAI has failed to allege "that the vehicle was in default, that it
sought to repossess the vehicle, or that any effort to enforce its rights was impaired."
*See* the Motion, p. 6. First, the "vehicle" is not what would be in default, the contract
would be, and NAI's evidence demonstrates that the contract is indeed in default. *See*
Exh. "A" and Exh. "B." Second, pursuant to the GPS Acknowledgement, Plaintiffs
agreed to and were aware that the GPS unit remains the property of NAI, that NAI may
use the GPS unit to locate the Vehicle and that the GPS unit is being used to secure the
collection of money due and owing to NAI. (D.E. 39, Exh. K). In the RISC, Plaintiffs
likewise agreed that NAI may use the GPS unit to find the Vehicle and that, by giving
NAI a security interest in the Vehicle, Plaintiffs represented and agreed that they would
keep the Vehicle in their possession and in good condition and repair. *See* D.E. 39,
Exh. A; D.E. 70, Exh. A, at ¶¶ 13-14. NAI attached all of the contract documents as
exhibits to its Counterclaim, not just the GPS Acknowledgement, and as such, the
contents of each document was incorporated therein. NAI has demonstrated that its
contract rights and remedies have been impaired. Third, the GPS Acknowledgement
itself references and incorporates the RISC. Fourth, there is no requirement – whether
by contract or law - that NAI must repossess the Vehicle to prove that it has been
damaged. In short, the evidence submitted by NAI (including Mrs. Ramaghi's deposition
testimony that NAI owns the GPS unit (*see* the Motion, Exh. C at 133:3-4), the invoice

attached as Exhibit 1 to Exh. "A" hereto, and Mr. Schumacher's Affidavit at Exh. "C", ¶ 4) demonstrates that Plaintiffs have breached their contract with NAI and have caused NAI damages as a result, by depriving NAI of not only its ownership of the GPS unit itself but NAI's ability to protect its security interest in its collateral (the Vehicle). *See Rossi v. Darden*, No. 16-21199-CIV, 2016 WL 9254640, at *4 (S.D. Fla. Nov. 16, 2016) (holding that damages pertaining to ownership and property interests are sufficient to establish standing to sue for breach of contract). Plaintiffs' allegation that NAI failed to "follow-up" (*see* the Motion, p. 6) is not only factually unsupported but directly contradicted by NAI's evidence (and even contradicted by the Ramaghi deposition testimony filed by Plaintiffs).  NAI made numerous attempts to have Plaintiffs bring in the Vehicle for inspection. *See* Exhibits "A" and "B"; and the Motion, Exh. C at 142:8-25. Plaintiffs now try to exploit their refusal to comply with their contractual obligations and NAI's requests to inspect the Vehicle, disregarding the fact that, due to the parties' *ongoing* contractual relationship, Plaintiffs' obligation to comply is likewise ongoing.

Next, Plaintiffs attempt to undermine the GPS Acknowledgment's validity and/or enforcement by relying on the RISC's integration clause and claiming the GPS Acknowledgement constitutes parol evidence. *See* the Motion, p. 7. Plaintiffs' reliance on *Jenkins v. Eckerd Corp.,* 913 So. 2d 43, 53 n. 1 (Fla. 1st DCA 2005), is misplaced. Footnote 1 in *Jenkins* merely defines a merger or integration clause, nothing more. The definition itself notes that a written contract "supersedes all informal understandings and oral agreements." In this instance, however, NAI is not relying on "informal understandings and oral agreements" between the parties. The GPS Acknowledgement is one of several binding and enforceable contracts that are "functionally intertwined" as

part of the purchase and sale of the Vehicle, including the RISC. "'Under Florida law, where two or more documents are executed by the same parties, at or near the same time and concerning the same transaction or subject matter, the documents are generally construed together as a single contract.' *Clayton v. Howard Johnson Franchise Systems, Inc.,* 954 F.2d 645, 648 (11th Cir. 1992); *Quix Snaxx., Inc. v. Sorensen,* 710 So. 2d 152, 153 (Fla 3d DCA 1998)." *Bragg v. Bill Heard Chevrolet, Inc.,* 374 F. 3d 1060, 1067 (11th Cir. 2004). *See also, Ballou v. Talari,* Case No.: 8:16-cv-0598-T-MAP, 2017 WL 11473714, at *7 (M.D. Fla. Nov. 29, 2017) (holding the same and relying on *Bragg*); *Morris v. Sheehan Buick Pontiac GMC, Inc.,* Case No. 10-80796-CIV-ZLOCH/ROSENBAUM, 2012 WL 12894289, at *8 (S.D. Fla. March 10, 2012) (also noting "Where provisions of a contract may be harmonized, the court has a duty to so read them." (internal cite omitted)); *Audiology Dist., LLC v. Simmons,* Case No. 8:12-cv-02427-JDW-AEP, 2014 WL 7672536, at *5 (M.D. Fla. May 27, 2014) (holding the same in reliance on *Bragg* and holding, "In other words, if two or more contracts are 'functionally intertwined,' they must be 'read and construed together.'" (internal citations omitted)); and *Kearney Const. Co LLC v. Travelers Casualty & Surety Co. of America,* Case No. 8:09-cv-1850-T-30TMB, 2016 WL 1425803, at *17 (M.D. Fla. March 17, 2016) ("the intent of the parties may be determined by looking at interrelated documents"). The GPS Acknowledgement (a) identifies Plaintiffs as the Buyers; (b) identifies NAI as the Seller/Creditor; (c) describes the Vehicle as the same one identified in *every other* document signed by Plaintiffs; (d) uses the same account number (4762) as the one listed on the RISC and Exhibits B and C to the Counterclaim (D.E. 39); (e) contains the

same Vehicle Stock Number 28439 as listed on Exhibits B and G to the Counterclaim;[7] and (f) expressly references the RISC in multiple places. *See* D.E. 39 at Exh. K; D.E. 70, Exh. "A" at ¶ 13. As such, the GPS Acknowledgement and RISC are so functionally intertwined they should be construed as one contract and can easily be harmonized.

Finally, Plaintiffs allege that NAI lacks standing because it "has not produced or disclosed any computation of damages under Rule 26(a)(1)(A)(iii), nor has it supported its Counterclaim with verified discovery responses or evidence." *See* the Motion, p. 8. But it is not necessary that NAI provide a computation of damages to prove standing. "Victims of a breach of contract need not wait for a full accounting of their damages before gaining standing or ripeness. *See Swipe for Life, LLC v. XM Labs, LCC,* No. 10-22337-CIV, 2012 WL 1289726, at *5 (S.D. Fla. Apr. 16, 2012) (rejecting standing argument because 'a cause of action exists for every breach of contract, even for an aggrieved party who has suffered no damage'). Indeed, under Florida law, a plaintiff can pursue nominal damages for breach of contract even without actual damages. *Id.*" *Briscoe v. Transamerica Premier Life Ins. Co.,* Case No. 23-CV-81577-McCabe, 2024 WL 4381984, at *3 (S.D. Fla. Mar. 14, 2024).

Regardless, NAI has in fact demonstrated a financial injury (or monetary harm) due to Plaintiffs' breach of the GPS Acknowledgement, which expressly states that the

---

[7] In other examples, the RIC states, "You authorize us to correct any clerical error or omissions in this Contract *or in any related document*" (D.E. 39, Exh. A, p. 3 under "Governing Law") and "Warranty information is provided to you separately" (D.E. 39, Exh. A, p. 4 under "Warranty"); the Bill of Sale Buyer's Order references a "retail installment contract for the financing of the purchase of the Vehicle" (D.E. 39, Exh. B, p. 2 under "Retail Installment Contract") and "the written *agreements* you are signing today" (*Id.* under "Vehicle Inspection"); the Buyers Guide states, "IMPORTANT: The information on this form *is part of any contract to buy this vehicle.*" (D.E. 39, Exh. G, p. 2); and the Repossession Agreement repeatedly references the RISC (D.E. 39, Exh. L) (all italicized emphasis added).

device "remains the property of the Lien Holder", and because Plaintiffs have failed to keep the Vehicle in "good condition and repair" as required by the RISC, which has resulted in NAI being unable to locate the Vehicle through the GPS unit and, by extension, unable to use the GPS unit to secure collection of monies owed to it by Plaintiffs. *See* Exhibits "A"; "B" and "C."   Damage to personal property is a classic example of monetary or financial damage, which NAI not only alleged it has incurred but has testified to as well. *See* the Motion, Exh. C at 133:3-4; Exhibit "A" at ¶ 7; Exhibit "C"; and NAI's answers to interrogatory numbers 1 and 5 in Counter-Plaintiff's Answers and Objections to Counter-Defendant Isiah Robinson's First Interrogatories at Exhibit 2 to Exh. "A".

That said, even to the extent the damage to NAI's property were somehow insufficient (which NAI does not concede), "in Florida where a contract has been breached but for one reason or another recoverable damages were not proven," the party is still entitled to nominal damages. *Zayre Corp. v. Creech*, 497 So. 2d 706, 708 (Fla. 4th DCA 1986); *Land & Sea Petroleum Holdings, Inc. v. Leavitt*, 321 So. 3d 810, 815 (Fla. 4th DCA 2021); *Indian River Colony Club, Inc. v. Schopke Const. & Engineering, Inc.*, 619 So. 2d 6, 8 (Fla. 5th DCA 1993); and *Continuum Condo. Ass'n, Inc. v. Continuum VI, Inc.*, 549 So. 2d 1125, 1127 (Fla. 3d DCA 1989).   "General damages, that is, those damages which naturally flow or result from the injuries alleged need not be specifically pleaded." *Hutchison v. Tompkins*, 259 So. 2d 129, 132-133 (Fla. 1972); *Land & Sea Petroleum Holdings, Inc.*, 321 So. 3d at 815; *Mims Investments, LLC v. Mosaic Fertilizer, LLC*, Case No. 8:11-cv-1093-T-TBM, 2013 WL 12155932, at *8, n. 10 (M.D. Fla. July 17, 2013).

In this instance, regardless of any entitlement it has to monetary damages due to damage/loss to its property (the GPS unit) while it was in Plaintiffs' exclusive possession and control, NAI has also incurred damages due to Plaintiffs' breach of the GPS Acknowledgement in that NAI is unable to protect and preserve its security interest in the Vehicle, and its corresponding remedy of repossession of the Vehicle (as may be needed, especially given Plaintiffs' ongoing default – *see* Exh. "A"), if NAI is unable to locate the Vehicle and/or unable to utilize the data that is ordinarily tracked, compiled and reported by the GPS unit located on the Vehicle when Plaintiffs bought it.  Contrary to Plaintiffs' assertion, NAI has alleged and demonstrated an "impairment to [an] enforceable legal interest," NAI has incurred damages (tangible and/or intangible), and therefore NAI has standing to pursue a breach of contract claim under Article III.

As to Plaintiffs' repeated accusation that NAI failed to sign (and serve) notarized interrogatory answers (*see* the Motion at pp. 8-9), it is both surprising and troubling that Plaintiffs made this representation to the Court, when this is demonstrably false. Despite Plaintiffs' co-counsel having been served with verified answers to interrogatories in January 2025, Plaintiffs attached an unverified set to their Motion (which notably also intentionally omitted the cover/service e-mail from NAI's counsel's office). *See* the Motion, Exh. F.  On January 9, 2025, Plaintiffs' counsel was served with NAI's verified Answers and Objections to Plaintiff's First Interrogatories and Counter-Plaintiff's Answers and Objections to First Interrogatories.[8] As noted above, a copy of NAI's

---

[8] On January 26, 2025, NAI also served its verified amended answers to Plaintiff Isiah Robinson's First Interrogatories (Interrogatories 7 and 8) on Plaintiffs' counsel. *See* Exhibit "A" at Exh. 2.  No specific objections were asserted to any of the interrogatories across all three sets of answers. Mrs. Ramaghi physically appeared before the notary public, an NAI employee, and swore to the truth of the answers. *See* Exh. "A" at ¶ 12.

January 9th signed and notarized interrogatory answers, and counsel's corresponding service e-mail, are attached as Exhibit 2 to Exh. "A."[9] NAI is unclear why Plaintiffs claimed that NAI did not serve verified answers on their counsel but obviously disagrees based on its own evidence. Notably, Plaintiffs' counsel did not ask Mrs. Ramaghi any questions about NAI's interrogatory answers (nor mark any of them as exhibits) at the deposition in August 2025, including if they were true and correct and/or why they were never signed, if he legitimately believed he had not received signed/notarized answers.[10] *See* the Motion, Exh. C.  For all of these reasons, Plaintiffs are not entitled to summary judgment as a matter of law, and the Motion should be denied.

## IV.    Mrs. Ramaghi's testimony complies with the Federal Rules.

NAI's Counterclaim alleges that Plaintiffs "breached the GPS Acknowledgement by tampering with and/or disabling the GPS unit that was placed on the subject vehicle and which was required to remain intact throughout the duration of their payments to NAI", and that Plaintiffs "tampered with, permanently disabled and/or removed the GPS unit from the subject vehicle on or about May 4, 2024." *See* D.E. 39 at ¶¶ 24-25. Yet, Plaintiffs argue that Mrs. Ramaghi "had no personal knowledge of any tampering." *See* the Motion, p. 10. First, Plaintiffs limit the Counterclaim to an allegation of "tampering," although that is not how it was pled, and more importantly, the Counterclaim asserts a claim for breach of contract of the GPS Acknowledgement, which must be read and interpreted in conjunction with the other contracts between the parties, including the

---

[9] In Plaintiffs' Amended Motion to Amend Complaint (D.E. 26), Plaintiffs' counsel referenced service of the interrogatories and did not claim that he had not received verified answers from NAI. NAI addressed this discovery in its Response too. (D.E. 27).
[10] In fact, Mrs. Ramaghi even referenced the interrogatories herself a few times during the deposition. *See* the Motion, Exh. C at 10:20-23, 68:7-15 and 139:4-13.

RISC. Mrs. Ramaghi's personal knowledge of any tampering of the GPS unit is not the end of the inquiry. In fact, under Rule 30(b)(6), Mrs. Ramaghi need not have personal knowledge of the designated subject matter. *See* Fed. R. Civ. P. 30(b)(6); *Critchlow v. Sterling Jewelers Inc.,* No. 8:18-CV-96-T-30JSS, 2019 WL 13062636, at *2 (M.D. Fla. Feb. 26, 2019) ("a Rule 30(b)(6) witness need not have personal knowledge of the designated subject matter."). Under the Rule, the corporate designee must testify about facts within the corporation's collective knowledge, as well as its position, beliefs, and opinions. *Id.* This is precisely what Mrs. Ramaghi did in compliance with Rule 30(b)(6). *See also,* the Motion, Exh. C at pp. 140-142, wherein Mrs. Ramaghi testified that NAI received notice that the GPS unit had been disconnected and that Plaintiffs failed to make the GPS unit available for NAI's inspection. Finally, to support their assertion, Plaintiffs cite to *Rosen v. Provident Life and Accident Ins. Co.,* 308 F. Supp. 2d 1304, 1307 (S.D. Fla. 2004). But that is not the citation for *Rosen,* nor is it a case from the Southern District of Florida, and it does not appear that *Rosen* in any way supports Plaintiffs' stated proposition. Mrs. Ramaghi's testimony did not "foreclose[] any genuine issue" as Plaintiffs claim. To the contrary, Mrs. Ramaghi's testimony creates multiple disputed issue of material fact that preclude the entry of summary judgment.

## V.    NAI's Demand for Attorney's Fees and Fla. Stat. §57.105

For the purposes of this response, NAI asserts that it is premature for the Court to make a determination regarding any party's entitlement to attorney's fees, as the case is not at its conclusion, and agrees with Plaintiffs that the Court should reserve jurisdiction on any party's request for attorney's fees, which cannot be determined until such time as the substantive claims are decided.

## VI.    Conclusion

For all of the foregoing reasons, NAI has demonstrated that genuine issues of material fact are in dispute precluding the entry of summary judgment in Plaintiffs' favor as to NAI's Counterclaim. NAI's evidence demonstrates that NAI not only has standing to sue and pursue its claim for breach of contract but also that it has suffered a concrete injury, caused directly by Plaintiffs' breach of contract, and as such, is entitled to relief, even if an award of nominal damages.  Plaintiffs' Motion should respectfully be denied.

WHEREFORE Counter-Plaintiff, NATIONAL AUTOMOTIVE INC., respectfully requests that the Court enter an Order denying Plaintiffs' Motion for Summary Judgment on Defendant's Counterclaim, and grant such further relief as the Court deems just and proper.

Respectfully submitted,

**McGLINCHEY STAFFORD**

*/s/ Kimberly Held Israel*
Kimberly Held Israel, Esq.
Florida Bar # 47287
10375 Centurion Parkway N., Suite 420
Jacksonville, FL 32256
(904) 224-4449 (Telephone)
(904) 485-8083 (Facsimile)
Primary E-mail: kisrael@mcglinchey.com
Secondary E-mails:
jeldemire@mcglinchey.com
cgipson@mcglinchey.com
***Counsel    for    Defendant,    NATIONAL AUTOMOTIVE, INC.***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing has been served, via the Court's e-Portal, this **29th** day of **October, 2025**, to: **Josh Feygin, Esq.**, josh@sueyourdealer.com, and **Michael Citron, Esq.**, michael@maclegalpa.com, *Counsel for Plaintiffs*.

*/s/ Kimberly Held Israel*
ATTORNEY

**EXHIBIT "A"**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ISIAH ROBINSON, and LISA
CLAYTON ROBINSON, Each an
Individual,

CASE NO. 3:24-cv-00948-WWB-PDB

      Plaintiffs,

v.

NATIONAL AUTOMOTIVE, INC.,
a Florida corporation,

      Defendant.

_____

### AFFIDAVIT OF ROBIN RAMAGHI

STATE OF FLORIDA
COUNTY OF DUVAL

      BEFORE ME this day personally appeared ROBIN BYLER RAMAGHI, who, first being duly sworn, deposes and says:

    1. I am over the age of 18 and am competent to testify to the matters contained herein.

    2. I am the President of National Automotive, Inc. ("NAI") and was the President at the time of the events surrounding this litigation.

    3. As the President of NAI, I am familiar with the business records maintained by NAI in relation to the purchase and sale of vehicles, including but not limited to the various documents that the parties enter into, such as the Retail Installment Contract and Security Agreement and the Acknowledgement of Purchase of Vehicle Containing Past Due Starter Interrupt and/or Electronic Tracking (GPS) Device as Condition of Sale (the "GPS Acknowledgement"). These business records are made at or near the time of the

1

occurrences or transactions recorded therein by a person with knowledge, or from information provided by a person with knowledge, and are kept in the course of NAI's regularly-conducted business activities.

4. In conjunction with their purchase of a used 2011 Chevrolet Equinox, VIN ending in 4389 (the "Vehicle"), the Robinsons signed the GPS Acknowledgement and put their initials next to each of the following statements:

- "I/We understand and agree that the Lien Holder or Holder of the Motor Vehicle Retail Installment Contract (if assigned), may use the GPS Unit to locate the Vehicle. The Starter Interrupt Device may prevent the Vehicle from starting, subject to any Rights I may have to Cure a Default."
- "I/We agree not to tamper with the Device and that it remains the Property of the Lien Holder or Holder of the Motor Vehicle Retail Installment Contract (if assigned)."
- "I/We understand the GPS unit is being used to secure collection of monies I hereby acknowledge I/we owe and, where allowed, to repossess the Vehicle as allowed."

5. The Robinsons also signed the Retail Installment Contract and Security Agreement (the "RISC"), which states that they will be in default if: "You fail to perform any obligation that you have undertaken in this Contract [and/or] [w]e, in good faith, believe that you cannot, or will not, pay or perform the obligations you have agreed to in this Contract." Under the RISC, if the Robinsons went into default, "[w]e may require you to make the Property available to us at a place we designate that is reasonably convenient to you and us." The RISC identified the "Property" as the Vehicle.

6. On April 21, 2025, the Robinsons defaulted on their payment obligations to NAI, and they have remained in default (behind in their payments) ever since. As of the date of this Affidavit, and based on their bi-weekly payment schedule, the Robinsons' account remains 40 days past due, with an overdue balance of $488.61.

7.   NAI is the owner of the GPS Unit (Device No. 016060002982011) that was installed in the Vehicle before the Robinsons' bought it.  NAI bought the GPS Unit as part of a purchase of multiple GPS units and paid approximately $84 plus shipping for the device installed in the Vehicle. A true and correct copy of the invoice for the GPS Unit is attached hereto as Exhibit 1.

8.   Because the GPS Unit stopped sending locate signals and transmitting data to NAI, I consulted Jim Schumacher, the owner of GPS Vehicle Finder, who NAI bought the GPS Unit from, for advice. He told me that it was possible that there was an issue with the GPS Unit's installation, such as a loose connection, or that our customers, the Robinsons, disconnected it from the Vehicle. He recommended that NAI inspect the GPS Unit.

9.   NAI has repeatedly asked the Robinsons to bring the Vehicle to NAI so that it – and the GPS Unit – could be inspected, but they have refused to do so, despite the language in the RISC requiring the Robinsons to make the Vehicle available to NAI at a place that NAI designates that is reasonably convenient to the parties. NAI's business location is the place that NAI designated because not only is it reasonably convenient to the parties (especially given that the Robinsons drove to Jacksonville to purchase the Vehicle in the first place) but also because NAI has a service bay and lift, as well as the necessary equipment, that would enable NAI's employee to conduct a safe and thorough inspection without the risk of harm or injury to NAI's employee or the risk of damage to the Vehicle itself.

10. NAI even offered the Robinsons a gas card (a credit to use at a gas station to cover their gas) in exchange for them bringing the Vehicle to NAI for an inspection, but even that did not result in them bringing the Vehicle back to NAI.

11. The Robinsons have defaulted under their contract with NAI (including the RISC and the GPS Acknowledgement) by failing to make timely payments, by refusing to bring the Vehicle to NAI for inspection, by intentionally preventing NAI's ability to use the GPS Unit to locate the Vehicle, and by preventing NAI from using the GPS Unit to secure collection of monies owed by the Robinsons to NAI.

12. In addition, in January 2025, I signed three different sets of interrogatory answers, including one set of amended interrogatory answers (collectively, the "Interrogatory Answers"). When I signed the Interrogatory Answers, I was physically in the presence of Erin Mikell, who is an NAI employee and a licensed Notary Public in Florida. Ms. Mikell notarized each of the Interrogatory Answers, copies of which are attached as Composite Exhibit 2. When I signed each of the Interrogatory Answers, I swore that they were true and correct to the best of my knowledge and belief, which is also printed in the notary block for each set of answers.

FURTHER AFFIANT SAYETH NAUGHT.

_____

ROBIN BYLER RAMAGHI

STATE OF FLORIDA
COUNTY OF DUVAL

Sworn to and subscribed before me this _29th_ day of October, 2025, by ROBIN RAMAGHI, as the President of National Automotive, Inc., who appeared before me by means of physical presence and is personally known to me.

NOTARY PUBLIC, STATE OF FLORIDA
My Commission Expires:

5

**EXHIBIT 1**

**GPS VEHICLE FINDER**
9610 ELDORA ST
ARVADA, CO  80007-8113 US
+5740024
info@gpsvehiclefinder.com
www.gpsvehiclefinder.com

# Invoice

| BILL TO | SHIP TO |
|---|---|
| Robin Ramaghi<br>National Automotive Inc<br>6600 Blanding Blvd<br>Jacksonville, FL  32244 US | Robin Ramaghi<br>National Automotive Inc<br>6600 Blanding Blvd<br>Jacksonville, FL  32244 US |

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
|---|---|---|---|---|---|
| 3726 | 06/12/2023 | $0.00 | 07/12/2023 | Net 30 | |

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Airtime**<br>2 Years Airtime<br>016060000177382 | 1 | 46.00 | 46.00 |
| **Airtime**<br>2 Years Airtime<br>015875000307510<br>016060000182259 | 2 | 46.00 | 92.00 |
| **Airtime**<br>351996100869324<br>351996100873482<br>351996100916208<br>016060000982963<br>016060000986352<br>016060000988283<br>016060000999744<br>016060000999827 | 8 | 18.00 | 144.00 |
| **SVR950BZMT**<br>016060003470719<br>016060003497233<br>016060003501448<br>016060002968416<br>016060002993281<br>016060002969257<br>016060002971030<br>016060002982011<br>016060002978779<br>016060002966733<br>016060002972137<br>016060002987697<br>016060002990097<br>016060002994222<br>016060002986004 | 15 | 84.00 | 1,260.00 |
| **Shipping**<br>Shipping Saturday Overnight | 1 | 133.86 | 133.86 |

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Airtime**<br>866315030318443<br>351996100882160<br>016060000430039<br>351996100963069<br>016060000467585<br>016060000449674<br>016060000450466<br>016060000449484<br>016060000468021<br>016060000430666<br>016060000439790 | 11 | 18.00 | 198.00 |
| **Airtime**<br>351996100870223 | 1 | 20.00 | 20.00 |
| **Airtime**<br>016060000994950<br>351996100912363<br>351996101040859 | 3 | 23.00 | 69.00 |
| **Airtime**<br>015875000282721<br>015875000307692<br>016060000177580 | 3 | 23.00 | 69.00 |

| | PAYMENT | 2,031.86 |
|---|---|---|
| | BALANCE DUE | **$0.00** |

Pay invoice

**COMPOSITE EXHIBIT 2**

**Israel, Kim**

| | |
|---|---|
| **From:** | Gipson, Christine |
| **Sent:** | Thursday, January 9, 2025 4:10 PM |
| **To:** | josh@sueyourdealer.com |
| **Cc:** | Israel, Kim; Travis, Kathleen |
| **Subject:** | SERVICE OF COURT DOCUMENT: Isiah Robinson, et al. v. National Automotive, Inc.; Case. No. 3:24-cv-00948 |
| **Attachments:** | NAI verified Interrog answers (1).pdf; NAI verified Interrog answers (2).pdf |

# NOTICE OF ELECTRONIC SERVICE OF COURT DOCUMENT

| | |
|---|---|
| Court: | United States District Court<br>Middle District of Florida<br>Jacksonville Division |
| Case Number: | 3:24-cv-00948 |
| Case Name: | Isiah Robinson, et al. v. National Automotive, Inc. |
| Document Filed: | 1. Defendant's Answers and Objections to Plaintiff's First Interrogatories; and<br>2. Counter-Plaintiff's Answers and Objections to First Interrogatories. |
| Attorney: | Kimberly H. Israel |
| Email: | kisrael@mcglinchey.com |
| Telephone: | 904-224-4485 |

**Christine B. Gipson**
Legal Assistant
*Legal Assistant to Will Grimsley, Kim Israel, and Amy Kisz*



cgipson@mcglinchey.com
10407 Centurion Pkwy N, Ste 200, Jacksonville, FL 32256
T (904) 224-4452  F (904) 339-9037

mcglinchey.com



Alabama  California  Florida  Louisiana  Massachusetts  Mississippi  New York  Ohio  Tennessee  Texas  Washington, DC

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

ISIAH ROBINSON, and LISA
CLAYTON ROBINSON, Each an
Individual,

        Plaintiffs/Counter-Defendants,

v.

NATIONAL AUTOMOTIVE, INC.,
a Florida corporation,

        Defendant/Counter-Plaintiff.

CASE NO. 3:24-cv-00948-WWB-PDB

---

## DEFENDANT'S ANSWERS AND OBJECTIONS TO PLAINTIFF ISIAH ROBINSON'S FIRST INTERROGATORIES

COMES NOW Defendant, NATIONAL AUTOMOTIVE, INC. ("NAI"), by and through its undersigned counsel, and pursuant to Rule 33, Fed. R. Civ. P., hereby serves its answers and objections to Plaintiff Isiah Robinson's First Interrogatories as follows:

### GENERAL ANSWERS AND OBJECTIONS

Because the applicable Federal Rules of Civil Procedure permits discovery of certain information, documents, or things which would otherwise be inadmissible at trial or evidentiary hearing, NAI does not waive its rights to object to the admission into evidence of any information contained in these answers on any proper grounds.

NAI objects to each Interrogatory to the extent that it may be read to seek information that is immune from discovery under the attorney/client privilege, the work product doctrine, or that is otherwise privileged or protected from disclosure.

NAI reserves the right to supplement and/or modify these answers as may be needed.

1

## SPECIFIC ANSWERS AND OBJECTIONS TO INTERROGATORIES

1.    **Affiant**.  Please identify the person(s) who participated in the preparation of the answers to these Interrogatories.  As to any such person, identify which Interrogatory such assistance was provided as well as the source of information for such assistance.

**RESPONSE:** Robin Byler Ramaghi, President of NAI, along with NAI's counsel, Kimberly Held Israel, Esq.  To the extent applicable, NAI objects to the portion of the interrogatory that seeks the disclosure of attorney-client communications between Mrs. Ramaghi and counsel, e.g. the "source of information" for the assistance rendered by counsel. Mrs. Ramaghi and counsel conferred regarding each of the interrogatories and NAI's corresponding responses.

2.    **Potential Witness(es)**.  Please identify all persons who are believed or known by National Automotive, its agents or attorneys, to have any knowledge concerning any of the issues or matters raised in the pleadings herein and specify the subject matter about which the witness has knowledge.

**RESPONSE:**    (1) Robin Byler Ramaghi – NAI's defenses to Plaintiffs' claims, interactions between Plaintiffs and NAI related to the purchase and sale of the Vehicle, and the allegations in NAI's Counterclaim; (2) Christopher Caldwell – interactions between Plaintiffs and NAI related to the purchase and sale of the Vehicle (which may bear on NAI's defenses to Plaintiffs' claims) and potentially certain allegations in NAI's Counterclaim; (3) Pierson Satterwauske – the inspection of the Vehicle upon NAI's receipt of same and the installation of the GPS device on the Vehicle; (4) Plaintiffs – the allegations of their verified Complaint, interactions between them and NAI related to the purchase and sale of the Vehicle, and the allegations of NAI's Counterclaim; (5) a corporate representative of Murray Ford – information related to the Vehicle while it was in its possession, including but not limited to its receipt of the Vehicle and the transfer of title to the Vehicle; and (6) potentially a corporate representative of Manheim, who conducted the auction of the Vehicle, as Manheim may have information about the Vehicle, including its reported mileage.

3.    **Expert Witness(es) – Trial**.    In regard to any expert witness(es) that National Automotive intends to call at the trial of this case, please set forth the following:

(a)    Identify each such witness;

(b)    Describe his or her qualifications as an expert;

2

(c)  State the subject matter upon which he or she is expected to testify;

(d)  State the substance of the facts and opinions to which he or she is expected to

testify; and

(e)  Provide a summary of the grounds of each such opinion.

**RESPONSE:** Unknown at this time.

4.  **Expert Witness(es) – Consultation**.  Identify any and all experts with whom

National Automotive has consulted in regard to this case.

**RESPONSE:** None.

5.  **Statements by Plaintiffs**.  Identify each and every person believed or known by

National Automotive, its agents and/or attorneys, to have heard the Plaintiffs, their agents, or their

representatives, make any statement, remark, or comment concerning any matters or issues raised

in the pleadings herein, and state the substance of any such statement, remark, or comment.

**RESPONSE:** On or around September 8, 2023, Plaintiffs came to NAI's location to look at vehicles and asked if they could have a blank set of contract documents to take with them so they could read everything over first before making a purchase. Christopher Caldwell was present at the time, discussed this with Plaintiffs, and gave them a blank set of documents to review, per their request. Some time later, Plaintiffs returned to NAI's location to purchase the Vehicle.

On September 14, 2023, Robin Byler Ramaghi and Christopher Caldwell spoke to Plaintiffs in person at NAI's office. They discussed the mileage on the Vehicle following NAI's receipt of the actual Certificate of Title, which reflected the mileage was not actual. During that conversation, NAI gave Plaintiffs the option to surrender the Vehicle and terminate the contract, and to receive a return of their deposit. Plaintiffs said they didn't want to do that and instead wanted to keep the Vehicle. Based on their decision to keep the Vehicle, Plaintiffs then signed new paperwork that clearly was marked as "TMU" in multiple places. Robin Byler Ramaghi specifically explained to Plaintiffs what "TMU" meant before Plaintiffs signed the new paperwork. Mr. Robinson in particular was concerned about Mrs. Robinson having a vehicle to drive due to her job. Mrs. Robinson expressed no concerns at all during this conversation. NAI was also told that Mrs. Robinson is a realtor and was "always working," whereas Mr. Robinson was retired and worked part time at Volkswagen, so he had a more flexible schedule.

6.    **Witness Statement(s)**.  State whether National Automotive, its agents, attorneys, or anyone acting on National Automotive's behalf, have obtained statements in any form from any person(s) regarding any issue raised in this lawsuit.  If so, state the following:

    (a)    Identify the person(s) giving the statement(s);

    (b)    The date when such statement(s) was taken;

    (c)    The name and address of the person(s) taking the statement; and

    (d)    Whether a copy of such statement(s) was given to the person(s) from whom it was taken.

    **RESPONSE:**  None at this time, other than the statements identified in paragraph 5 above and Mrs. Robinson's comments on the phone in response to Mrs. Ramaghi's request to bring the Vehicle to NAI so it could inspect the GPS device.  Those statements are referenced in response to Interrogatory number 7 below and in the other set of Interrogatories related to the Counterclaim (*see* the response to Interrogatory 5 in that set).

7.    **Identification of Actors as to Vehicle**.  Identify each person (including the Transferee Party) known to National Automotive who performed any activity with respect to the repair, servicing, marketing, sale, transfer, assignment, or disposition of the Vehicle (regardless of whether the person is an employee or agent of National Automotive). As to any such person, identify:

    (a)    The activity performed;

    (b)    Whether the person knew the mileage displayed on the Vehicle's odometer was inaccurate; and

    (d)[sic] All communications (both written and oral) between National Automotive and the person concerning the instant action.

    **RESPONSE:**  Murray Ford had the Vehicle in its possession, custody and control before NAI did, and NAI believes that Travis Ward had the Vehicle prior to Murray Ford.  NAI does not know what activities were performed by Mr. Ward or Murray Ford, if any; nor is NAI able to

answer the remaining questions as to Mr. Ward or Murray Ford. Manheim picked up the Vehicle from Murray Ford's wholesale lot, transported the Vehicle to the auction lot and then transported the Vehicle to NAI. NAI is not able to speak for Manheim as to whether it performed any other activities and/or whether it had any knowledge of the mileage of the Vehicle. NAI has not communicated with Manheim about this.

On behalf of NAI, Christopher Caldwell sold the Vehicle to Plaintiffs. Mr. Caldwell would have been dependent on the estimated mileage provided by Murray Ford and is not believed to have spoken to anyone at Murray Ford about the sale of the Vehicle to Plaintiffs. After September 8, 2023, Mr. Caldwell and Mrs. Ramaghi spoke to the Plaintiffs in person, as described above. Mrs. Ramaghi also repeatedly attempted to contact Plaintiffs about the disabled GPS unit attached to the Vehicle after NAI discovered that it was no longer sending any data about the Vehicle to NAI. Mr. Robinson refused to return NAI's phone calls. During one phone call between Mrs. Ramaghi and Mrs. Robinson, Mrs. Robinson cursed at Mrs. Ramaghi, saying, "We aren't bringing the damn vehicle back to the fucking dealership two hours away so you can track us. You'll hear from our attorney," at which point she hung up on Mrs. Ramaghi.


8.    **Disposition of Vehicle**. Describe the step-by-step process by which National Automotive marketed, sold, transferred, assigned, inspected or disposed of the Vehicle. In responding to this request, state with particularity how the title transfer documents were executed, who signed the transfer documents on behalf of National Automotive and who signed on behalf of the Plaintiffs.

**RESPONSE:** NAI bought the Vehicle from Murray Ford as part of a wholesale lot of vehicles at auction. Manheim transported the Vehicle from the auction to NAI. NAI inspected the Vehicle for any engine, transmission, and/or any other potential mechanical or operational issues. The Vehicle was cleaned, had a GPS device installed on it, and then stickered and photographed to be marketed for sale on Facebook. NAI then sold the Vehicle to Plaintiffs. When NAI received the title from Murray Ford, NAI promptly contacted Plaintiffs about the mileage information on the title. Plaintiffs returned to NAI to discuss the situation, and review their options. Despite being given the opportunity to surrender the Vehicle, terminate the contract and receive the return of their deposit, Plaintiffs chose to keep the Vehicle and sign new paperwork with "TMU" clearly marked in multiple places. Murray Ford assigned/transferred the title to the Vehicle to NAI, who in turn assigned the title to Plaintiffs through the Clay County DMV. NAI identified those documents as exhibits to its Counterclaim.


9.    **Acquisition of Vehicle**. Describe the step-by-step process by which National Automotive acquired the Vehicle and had its title transferred to it. Identify any pre-purchase

inspections that occurred and the individual(s) involved in the inspection along with all documents

that were executed to transfer title to National Automotive.

      **RESPONSE:** NAI bought the Vehicle from Murray Ford as part of a wholesale lot of vehicles at auction. Manheim transported the Vehicle from the auction to NAI. NAI does not know if anyone at Murray Ford or Manheim inspected the Vehicle before NAI purchased it. NAI inspected the Vehicle following its purchase at auction. As described in response to Interrogatory number 8 above, Murray Ford assigned/transferred the title to the Vehicle to NAI, who in turn assigned the title to Plaintiffs through the Clay County DMV. NAI identified those documents as exhibits to its Counterclaim.

                                 **NATIONAL AUTOMOTIVE, INC.**

                                 By: _____

                                    Robin Ramaghi

                                Its: President

STATE OF FLORIDA
COUNTY OF DUVAL

      Sworn to and subscribed before me this ____ day of January, 2025, by ROBIN RAMAGHI, as the President of NATIONAL AUTOMOTIVE, INC., and who is personally known to me or who produced _____ as identification and said that the interrogatory answers are true and correct to the best of her knowledge and belief.

                              *Erin Mikell*
                              _____
                              Notary Public, State of Florida
                              My Commission expires:



ERIN MIKELL
Notary Public - State of Florida
Commission # HH 288790
My Comm. Expires Jul 17, 2026
Bonded through National Notary Assn.

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

ISIAH ROBINSON, and LISA
CLAYTON ROBINSON, Each an
Individual,

      CASE NO. 3:24-cv-00948-WWB-PDB

      Plaintiffs/Counter-Defendants,

v.

NATIONAL AUTOMOTIVE, INC.,
a Florida corporation,

      Defendant/Counter-Plaintiff.

---

## COUNTER-PLAINTIFF'S ANSWERS AND OBJECTIONS TO COUNTER-DEFENDANT ISIAH ROBINSON'S FIRST INTERROGATORIES

COMES NOW Counter-Plaintiff, NATIONAL AUTOMOTIVE, INC. ("NAI"), by and through its undersigned counsel, and pursuant to Rule 33, Fed. R. Civ. P., hereby serves its answers and objections to Counter-Defendant Isiah Robinson's First Interrogatories as follows:

## GENERAL ANSWERS AND OBJECTIONS

Because the applicable Federal Rules of Civil Procedure permits discovery of certain information, documents, or things which would otherwise be inadmissible at trial or evidentiary hearing, NAI does not waive its rights to object to the admission into evidence of any information contained in these answers on any proper grounds.

NAI objects to each Interrogatory to the extent that it may be read to seek information that is immune from discovery under the attorney/client privilege, the work product doctrine, or that is otherwise privileged or protected from disclosure.

NAI reserves the right to supplement and/or modify these answers as may be needed.

1

## SPECIFIC ANSWERS AND OBJECTIONS TO INTERROGATORIES

1.      Describe in detail each category of damages National Automotive claims to have

sustained as a result of the alleged disablement of the GPS device by Counter-Defendants. Include

the amounts for each category of damages and the methodology used to calculate them.

**RESPONSE:** NAI has not yet calculated the damages it has incurred due to Plaintiffs'
breach of the contracts, but the GPS Acknowledgement makes clear that NAI is the owner of the
GPS device, not Plaintiffs. Because Plaintiffs refused to allow NAI to inspect the GPS device,
NAI does not know where it is (if it's even still located on the vehicle), if it is repairable or if it
has to be replaced in its entirety. NAI's inability to protect its security interest in the Vehicle is
also an element of its damages because Plaintiffs granted NAI a security interest in the Vehicle,
and the GPS device is intended to enable NAI to monitor the Vehicle's location (e.g. to ensure the
Vehicle has not left the state), to ensure that the Vehicle is not being used for commercial purposes,
to locate the Vehicle in the event of a default resulting in repossession, to locate the Vehicle in the
event it were stolen (and to avoid further damage and to aid in recovery by law enforcement). In
essence, NAI has been damaged in its ability to protect its security interest and to mitigate its losses
in the event of a default, theft, insurance claim, etc. NAI is also at risk of additional damages if it
is not able to exercise its security interest against the Vehicle.

2.      Identify all documents, electronic data, or other evidence in National Automotive's

possession that support its claim for damages, and describe how each piece of evidence support

National Automotive's claim.

**RESPONSE:** See all of the exhibits attached to the Counterclaim, all of which are self-
explanatory. NAI also had, prior to the GPS device being disabled/removed/tampered with, the
ability to track the location of the vehicle, through the GPS device, among other pieces of
information that it provided. The spreadsheet that NAI maintained with the information provided
by the GPS device supports NAI's claim because the GPS stopped submitting information as of
May 4, 2024, which means that it was either disabled, removed or tampered with, and Plaintiffs
have refused to allow NAI to inspect it despite multiple requests to do so.

3.      State the specific date and time when National Automotive first became aware that

the GPS device allegedly installed on the Vehicle was disabled, and explain how National

Automotive discovered the disablement.

2

**RESPONSE:** NAI first became aware that the GPS device installed on the Vehicle was no longer sending a signal with any data on or about May 4, 2024. NAI discovered this through its regular/routine review of the data transmitted electronically to NAI from the device itself.

4.      Identify any third parties, including contractors, vendors, or monitoring services, that were involved in installing, maintaining, or monitoring the GPS device on the Vehicle. Provide their names, addresses, and roles in connection with the GPS device.

**RESPONSE:** Verizon is the network that is used for GPS monitoring. SVR is the GPS company. The GPS device was installed on the Vehicle by NAI's mechanic. Other than Verizon, routine monitoring of the GPS device was handle internally by employees of NAI, all of whom are still employed by NAI and can be contacted solely through NAI's counsel of record.

5.      Explain how the alleged disablement of the GPS device resulted in any financial loss, missed payments, repossession complications, or other adverse impacts to National Automotive. For each, describe in detail how the disablement caused the loss, the amount of the loss and the date the loss was incurred.

**RESPONSE:** NAI has been unable to locate the Vehicle, and therefore protect and preserve its security interest in the Vehicle, because the GPS device was disabled, removed and/or tampered with, which has a direct adverse impact on NAI's ability to repossess the Vehicle if necessary. NAI is also the owner of the GPS device. When NAI discovered that the GPS device was not providing the Vehicle's location, NAI reached out to Plaintiffs offering a free oil change and reported to Plaintiffs that the GPS appeared to be having issues. Mrs. Robinson screamed at Mrs. Ramaghi that it was "none of our fucking business" and that she wasn't going to drive 2+ hours so that we could "track her" and "play Big Brother." Mr. Robinson would not take NAI's phone calls. This is particularly frustrating because, when Plaintiffs purchased the Vehicle, Mrs. Ramaghi and Plaintiffs had a very in-depth conversation about the fact that NAI does not typically finance vehicle purchases outside of the Jacksonville area. In response, Plaintiffs reassured Mrs. Ramaghi/NAI that if any issues arose, they would be dealt with swiftly, they had no problem bringing the Vehicle to Jacksonville and no problems communicating with NAI. They played on Mrs. Ramaghi's sympathies about being a couple that just "needed a chance," and then refused to cooperate and be responsive as soon as it was actually needed.

6.      Identify any instances where National Automotive attempted to repossess or locate the Vehicle, specifying dates, actions taken, and the role of the GPS device (if any) in those efforts.

3

**RESPONSE:** Following Plaintiffs' purchase of the Vehicle, NAI would occasionally review the GPS data to see where the Vehicle was located. Those specific dates were not written down, but in each instance, prior to the GPS device no longer sending data to NAI, the GPS device was sending information to NAI via satellite. NAI has not attempted to repossess the Vehicle.

7.    Identify all individuals with knowledge of the alleged disablement of the GPS device, including their names, job titles, contact information, and the nature of their knowledge.

**RESPONSE:** See NAI's response to Interrogatory number 4 above. Also, Plaintiffs would have knowledge of the disablement of the GPS device, and NAI's corresponding efforts to communicate with Plaintiffs about that.

8.    Describe in detail any actions National Automotive has taken to repair, replace, or reactivate the GPS device since the alleged disablement, including the costs associated with those actions.

**RESPONSE:** Between May and July 2024, NAI reached out to Plaintiffs numerous times by telephone to try to discuss this with them and to address it, including even offering free oil changes if they would bring the Vehicle to NAI and requesting that an inspection be done as soon as possible. Despite NAI's repeated requests, Plaintiffs consistently refused to bring the Vehicle to NAI so it could inspect it and/or try to determine if the GPS device was malfunctioning, had been removed, or if something else had happened to it.

9.    Explain whether National Automotive contends that the disablement of the GPS device has caused harm to its reputation, business operations, or customer relations. For each, describe the harm and the evidence supporting such claims.

**RESPONSE:** NAI has suffered harm to its business operations in the sense that its ability to protect its security interest in the Vehicle has been damaged. Also, NAI has tried numerous times to get Plaintiffs' cooperation in the inspection of the GPS device, which Plaintiffs have refused to do, so that would constitute "harm" to NAI's customer relations, in particular with Plaintiffs. The fact that Plaintiffs have refused to comply with NAI's repeated requests to allow it to inspect the Vehicle and GPS device has caused further harm to its customer relations.

10.    Identify all communications, written or oral, between National Automotive and Counter-Defendants or any third parties regarding the GPS device, its disablement, or any damages National Automotive claims to have suffered as a result.

**RESPONSE:** See NAI's answer to Interrogatory number 5 above.

11.    State whether National Automotive conducted any physical inspection of the Vehicle to confirm that the GPS device was disabled. If so, provide the date, location, individuals present, and the results of that inspection. If no inspection was conducted, explain why not.

**RESPONSE:** See NAI's answer to Interrogatory number 5 above. NAI has been unable to conduct a physical inspection of the Vehicle (and/or the GPS device) because Plaintiffs have failed and refused to cooperate with NAI's repeated requests, and efforts, to conduct an inspection.

12.    Identify any individuals or third-party entities who inspected, tested, or attempted to repair the GPS device. For each, provide their names, job titles, contact information, and the date and findings of their inspections or tests.

**RESPONSE:** None known.

13.    Describe in detail the condition of the GPS device at the time National Automotive allegedly determined it was disabled, including whether it was damaged, removed, or otherwise altered, and how National Automotive attributed this condition to Counter-Defendants.

**RESPONSE:** NAI does not know the condition of the GPS device because Plaintiffs have failed and refused to allow NAI to inspect it. See NAI's response to Interrogatory number 5 above. NAI attributes the condition, whatever it may be, to Plaintiffs because they were the only ones in possession, custody and control of the Vehicle (and therefore the GPS device) at the time the GPS device stopped sending data electronically to NAI.

14.    State whether National Automotive has any evidence showing that Counter-Defendants tampered with, removed, or otherwise disabled the GPS device. If so, identify all such evidence and provide a detailed description of how this evidence implicates Counter-Defendants individually.

**RESPONSE:** NAI has a spreadsheet that reflects when the GPS device last functioned, e.g. last transmitted data to NAI. This "implicates" Plaintiffs because they were the only ones in possession, custody and control of the Vehicle (and the attached GPS device) at the time the GPS device stopped sending data to NAI. When NAI notified Plaintiffs of the issue and asked them to bring the Vehicle in so that NAI could inspect the Vehicle and the GPS device, Mrs. Robinson cursed at Mrs. Ramaghi, refused to cooperate with her request, refused to bring the Vehicle to NAI for inspection, and hung up on her abruptly. Mr. Robinson ignored additional efforts by NAI to get them to cooperate with NAI's request for an inspection.

15.    State whether National Automotive attempted to contact Counter-Defendants regarding the alleged disablement of the GPS device. If so, describe all such communications, including dates, methods, and responses from Counter-Defendants.

**RESPONSE:** Yes, more than once. See NAI's answers to Interrogatories 5 and 14 above.

16.    Identify all repair, maintenance, or service records for the GPS device on the Vehicle, including the date of installation, any subsequent inspections or repairs, and the names and contact information of the individuals or entities who performed the work.

**RESPONSE:** The GPS device was installed on the Vehicle by NAI's mechanic, Pierson Satterwauske, on or about early September 2023. He can be contacted solely through NAI's counsel of record. NAI does not have any repair, maintenance or service records for the GPS device after it was installed on the Vehicle. In terms of any subsequent inspections, see NAI's answers to Interrogatories 5 and 14 above.

17.    Describe any training, protocols or procedures National Automotive has in place for its employees to verify the status of GPS devices installed in consumer vehicles. State whether these procedures were followed in this case and, if so, how they were applied.

**RESPONSE:** NAI does not know what is meant by "verify[ing] the status" of GPS devices. But generally, NAI receives data transmitted by the GPS devices through satellite, which data will indicate if the GPS device is functioning or not. NAI does not have its own "training, protocols or procedures" in place to "verify the status of GPS devices" but has the ability to use customer service assistance through SVR as needed. SVR representative(s) have come to NAI's office from time to time. NAI has also attempted several times to reboot the GPS device in the Vehicle and/or to have the GPS device remotely reset, without success.

18.    Explain whether National Automotive possesses any logs, reports, or other records from its GPS monitoring system that indicate when the alleged disablement occurred or provide evidence of the device's functionality prior to the alleged disablement.

**RESPONSE:**   Yes, NAI has a spreadsheet that reflects when the alleged disablement occurred.

19.    State whether National Automotive attempted to recover the GPS device from the Vehicle after determining it was allegedly disabled. If so, describe the actions taken, dates, and the results of those actions.

**RESPONSE:** NAI is not sure what is mean by "recover the GPS device," but as noted in its answers to Interrogatories 5 and 14 above, NAI has repeatedly asked Plaintiffs to allow NAI to inspect the GPS device once NAI became aware that it was no longer transmitting data, but Plaintiffs have failed and refused to allow NAI to do so.

20.    Identify all communications between National Automotive and any third parties, including contractors, vendors, or GPS manufacturers, regarding the alleged disablement of the GPS device or efforts to confirm that Counter-Defendants were responsible.

**RESPONSE:**   None known, because Plaintiffs have repeatedly refused to cooperate with NAI's efforts to inspect the GPS device, as described more fully above.

21.    Describe in detail whether National Automotive obtained or attempted to obtain an independent expert opinion, inspection, or analysis of the GPS device prior to filing its

Counterclaim to determine the cause of the alleged disablement. If not, explain why no such efforts were made.

**RESPONSE:** Not yet.

22.    State whether National Automotive has any photographic, video, or written documentation of the GPS device as it existed prior to the alleged disablement. If such documentation exists, describe its contents and the date it was created.

**RESPONSE:** NAI is not entirely clear on what is meant by "as it existed prior to the alleged disablement." NAI does not have pictures of the GPS device once Plaintiffs drove off with the Vehicle. NAI has a spreadsheet that reflects when the GPS device last functioned, e.g. last transmitted data to NAI. It was not created on a specific date though because it was intended to track data over the life of Plaintiffs' loan for the Vehicle.

NATIONAL AUTOMOTIVE, INC.

By:_____
     Robin Ramaghi
Its: President

STATE OF FLORIDA
COUNTY OF DUVAL

The foregoing was acknowledged before me this ____ day of January, 2025, by ROBIN RAMAGHI, as the President of NATIONAL AUTOMOTIVE, INC., and who is personally known to me or who produced _____ as identification and said that the interrogatory answers are true and correct to the best of her knowledge and belief.

Sworn to and subscribed before me this _____ day of January, 2025.

_____
Notary Public, State of Florida
My Commission expires:



8

**Israel, Kim**

| | |
|---|---|
| **From:** | Israel, Kim |
| **Sent:** | Sunday, January 26, 2025 1:51 PM |
| **To:** | JOSHUA FEYGIN |
| **Cc:** | Gipson, Christine; Travis, Kathleen |
| **Subject:** | SERVICE OF COURT DOCUMENT - Robinson v. National Automotive, Inc. - Case No. 3:24-cv-948 |
| **Attachments:** | Robinson v NAI - verified amended answers to Interrogs 7 and 8.pdf |
| | |
| **Importance:** | High |

## NOTICE OF ELECTRONIC SERVICE OF COURT DOCUMENT

| | |
|---|---|
| Court: | U.S. District Court, Middle District of Florida, Jacksonville Division |
| Case Number: | 3:24-cv-948 |
| Case Name: | Isiah Robinson, etc. v. National Automotive, Inc. |
| Document Served: | Defendant's Amended Answers to Plaintiff Isiah Robinson's First Interrogatories (Interrogatories 7 and 8) with verification |
| Attorney: | Kimberly Held Israel |
| E-mail: | kisrael@mcglinchey.com |
| Telephone: | 904.224.4485 |

Good afternoon - please see the verified amended answers to interrogatories 7 and 8 attached.
Kim

**Kimberly "Kim" Held Israel** (she/her/hers)
Attorney at Law

kisrael@mcglinchey.com
10407 Centurion Pkwy N, Ste 200, Jacksonville, FL 32256
T (904) 224-4485  F (904) 485-8083

bio | vCard | mcglinchey.com



Alabama California Florida Louisiana Massachusetts Mississippi New York
Ohio Rhode Island Tennessee Texas Washington Washington, DC

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ISIAH ROBINSON, and LISA
CLAYTON ROBINSON, Each an
Individual,

CASE NO. 3:24-cv-00948-WWB-PDB

       Plaintiffs/Counter-Defendants,

v.

NATIONAL AUTOMOTIVE, INC.,
a Florida corporation,

       Defendant/Counter-Plaintiff.

---

### DEFENDANT'S AMENDED ANSWERS TO PLAINTIFF ISIAH ROBINSON'S FIRST INTERROGATORIES

COMES NOW Defendant, NATIONAL AUTOMOTIVE, INC. ("NAI"), by and through its undersigned counsel, and pursuant to Rule 33, Fed. R. Civ. P., hereby serves its amended answers to Plaintiff Isiah Robinson's First Interrogatories numbered 7 and 8 as follows:[1]

### SPECIFIC ANSWERS TO INTERROGATORIES

7.    **Identification of Actors as to Vehicle**.  Identify each person (including the Transferee Party) known to National Automotive who performed any activity with respect to the repair, servicing, marketing, sale, transfer, assignment, or disposition of the Vehicle (regardless of whether the person is an employee or agent of National Automotive). As to any such person, identify:

    (a)    The activity performed;

---

[1] NAI incorporates its General Answers and Objections previously served in conjunction with its original answers and objections to Plaintiff Isiah Robinson's First Interrogatories as though fully set forth herein.

(b)    Whether the person knew the mileage displayed on the Vehicle's odometer was

inaccurate; and

(d)[sic] All communications (both written and oral) between National Automotive and the

person concerning the instant action.

**RESPONSE:** Murray Ford had the Vehicle in its possession, custody and control before NAI did, and NAI believes that Travis Ward had the Vehicle prior to Murray Ford. NAI does not know what activities were performed by Mr. Ward or Murray Ford, if any; nor is NAI able to answer the remaining questions as to Mr. Ward or Murray Ford. Manheim picked up the Vehicle from Murray Ford's wholesale lot, transported the Vehicle to the auction lot and then transported the Vehicle to NAI. NAI is not able to speak for Manheim as to whether it performed any other activities and/or whether it had any knowledge of the mileage of the Vehicle. NAI has not communicated with Manheim about this.

On behalf of NAI, Christopher Caldwell sold the Vehicle to Plaintiffs. Mr. Caldwell would have been dependent on the estimated mileage provided by Murray Ford and is not believed to have spoken to anyone at Murray Ford about the sale of the Vehicle to Plaintiffs. Mrs. Ramaghi signed the Certificate of Title on behalf of NAI, as reflected on the copy attached to NAI's Counterclaim.

After September 8, 2023, Mr. Caldwell and Mrs. Ramaghi spoke to the Plaintiffs in person, as described above. Mrs. Ramaghi also repeatedly attempted to contact Plaintiffs about the disabled GPS unit attached to the Vehicle after NAI discovered that it was no longer sending any data about the Vehicle to NAI. Mr. Robinson refused to return NAI's phone calls. During one phone call between Mrs. Ramaghi and Mrs. Robinson, Mrs. Robinson cursed at Mrs. Ramaghi, saying, "We aren't bringing the damn vehicle back to the fucking dealership two hours away so you can track us. You'll hear from our attorney," at which point she hung up on Mrs. Ramaghi.

8.    **Disposition of Vehicle**. Describe the step-by-step process by which National

Automotive marketed, sold, transferred, assigned, inspected or disposed of the Vehicle. In

responding to this request, state with particularity how the title transfer documents were executed,

who signed the transfer documents on behalf of National Automotive and who signed on behalf of

the Plaintiffs.

**RESPONSE:** NAI bought the Vehicle from Murray Ford as part of a wholesale lot of vehicles at auction. Manheim transported the Vehicle from the auction to NAI. NAI inspected the Vehicle for any engine, transmission, and/or any other potential mechanical or operational issues. The Vehicle was cleaned, had a GPS device installed on it, and then stickered and photographed to be marketed for sale on Facebook. NAI then sold the Vehicle to Plaintiffs. When

NAI received the title from Murray Ford, NAI promptly contacted Plaintiffs about the mileage information on the title. Plaintiffs returned to NAI to discuss the situation, and review their options. Despite being given the opportunity to surrender the Vehicle, terminate the contract and receive the return of their deposit, Plaintiffs chose to keep the Vehicle and sign new paperwork with "TMU" clearly marked in multiple places. Murray Ford assigned/transferred the title to the Vehicle to NAI, who in turn assigned the title to Plaintiffs through the Clay County DMV. Mrs. Ramaghi signed the Certificate of Title on behalf of NAI, a copy of which is attached to the Counterclaim. NAI identified those documents as exhibits to its Counterclaim.

**NATIONAL AUTOMOTIVE, INC.**

By:_____
     Robin Ramaghi
Its: President

STATE OF FLORIDA
COUNTY OF DUVAL

     Sworn to and subscribed before me this ____ day of January, 2025, by ROBIN RAMAGHI, as the President of NATIONAL AUTOMOTIVE, INC., and who is personally known to me or who produced _____ as identification and said that the interrogatory answers are true and correct to the best of her knowledge and belief.


_____
Notary Public, State of Florida
My Commission expires:

3

NAI received the title from Murray Ford, NAI promptly contacted Plaintiffs about the mileage information on the title. Plaintiffs returned to NAI to discuss the situation, and review their options. Despite being given the opportunity to surrender the Vehicle, terminate the contract and receive the return of their deposit, Plaintiffs chose to keep the Vehicle and sign new paperwork with "TMU" clearly marked in multiple places. Murray Ford assigned/transferred the title to the Vehicle to NAI, who in turn assigned the title to Plaintiffs through the Clay County DMV. Mrs. Ramaghi signed the Certificate of Title on behalf of NAI, a copy of which is attached to the Counterclaim. NAI identified those documents as exhibits to its Counterclaim.

NATIONAL AUTOMOTIVE, INC.

By: _____

Robin Ramaghi

Its: President

STATE OF FLORIDA
COUNTY OF DUVAL

Sworn to and subscribed before me this 23 day of January, 2025, by ROBIN RAMAGHI, as the President of NATIONAL AUTOMOTIVE, INC., and who is personally known to me or who produced ___FL DL___ as identification and said that the interrogatory answers are true and correct to the best of her knowledge and belief.

Erin Mikell
Notary Public, State of Florida
My Commission expires:

# EXHIBIT "B"

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ISIAH ROBINSON, and LISA
CLAYTON ROBINSON, Each an
Individual,

     Plaintiffs,

v.

NATIONAL AUTOMOTIVE, INC.,
a Florida corporation,

     Defendant.

CASE NO. 3:24-cv-00948-WWB-PDB

_____

### AFFIDAVIT OF CHRISTOPHER CALDWELL

STATE OF FLORIDA
COUNTY OF DUVAL

     BEFORE ME this day personally appeared CHRISTOPHER CALDWELL, who, first being duly sworn, deposes and says:

     1. I am over the age of 18 and am competent to testify to the matters contained herein.

     2. I am an employee of National Automotive, Inc. ("NAI") and have been an employee for three years.

     3. As an employee of NAI, and in particular in my role as a salesman, I am familiar with the business records maintained by NAI in relation to the purchase and sale of vehicles, including but not limited to the various documents that the parties enter into, such as the Retail Installment Contract and Security Agreement, the Odometer Disclosure Statement, the Bill of Sale, the Warranty Disclaimer, the Separate Odometer Disclosure Statement and Acknowledgment, the Buyer's Guide, the Power of Attorney, and the Application for Certificate of Motor Vehicle Title.

1

4. On September 8, 2023, Isiah Robinson and Lisa Clayton Robinson (the "Robinsons") came to NAI's location to look at, and test drive, a 2011 Chevrolet Equinox (the "Vehicle") in order to potentially buy it.

5. I was the salesman on behalf of NAI that spoke with the Robinsons on September 8th regarding the Vehicle.

6. The Robinsons asked me if they could have a blank set of all of the contract documents to review while they took the Vehicle for a test drive. I asked my direct supervisor, Robin Ramaghi, for permission to give the Robinsons a blank/unsigned set of documents, and Mrs. Ramaghi gave me that permission, so I gave the Robinsons a set of the contract documents for their review.

7. Following their test drive of the Vehicle, the Robinsons came back to NAI and bought the Vehicle. I am the one that sold them the Vehicle that day – September 8th – and I don't recall the Robinsons speaking to Mrs. Ramaghi that day.

8. At the time of sale on September 8th, NAI didn't have the original Certificate of Title from Murray Ford yet. So when preparing the actual contract documents for the Robinsons to sign, I used the mileage of 118,245 that was shown on the Vehicle's odometer itself. On September 8th, I didn't have – or have access to - any other information from which to identify and/or disclose the Vehicle's mileage.

9. Before the Robinsons signed each of the contract documents, I reviewed and explained to them each and every document. As the Robinsons were signing the contrct documents, I signed the ones that required a signature on behalf of NAI.

10. NAI discovered for the first time that the mileage on the odometer of the Vehicle was reported to be "not actual" after September 8th, when NAI received the original

2

Certificate of Title from Murray Ford, and immediately called the Robinsons to notify them of the issue and to discuss their options.

11. To the best of my recollection, NAI received the original Certificate of Title from Murray Ford on or around September 11, 2023.

12. On September 14, 2023, the Robinsons returned to NAI's office, but did not drive the Vehicle. Instead, they showed up in a purple Volkswagen. Mrs. Ramaghi and I met with and talked to the Robinsons in person in NAI's office to disclose that the Certificate of Title for the Vehicle reflected that the mileage was "not actual." Mrs. Ramaghi explained to the Robinsons what "not actual" meant regarding the mileage.

13. During this conversation, Mrs. Ramaghi, on behalf of NAI, gave the Robinsons the choice to return the Vehicle to NAI, to terminate the contract (which would mean that they wouldn't have any further financial obligation to pay for the Vehicle), and to get a refund of their $2,000 down payment. Despite being given this option, the Robinsons told me and Mrs. Ramaghi that they didn't want to return the Vehicle, terminate the contract and get their down payment back, but instead wanted to keep the Vehicle.

14. During this same meeting, and because the Robinsons chose to keep the Vehicle rather than return it, the Robinsons re-signed the contract documents in front of me and Mrs. Ramaghi. Then, in front of the Robinsons and with their permission, Mrs. Ramaghi put the notation of "TMU" on each contract document that included the Vehicle's mileage.

15. Once the Robinsons had signed the contract documents, I then signed the Retail Installment Contract and Security Agreement, the Odometer Disclosure Statement, the Bill of Sale, the Warranty Disclaimer, the Separate Odometer Disclosure Statement and

3

Acknowledgment, Condition of Sale, Repossession Agreement, and the Application for Certificate of Motor Vehicle Title on behalf of NAI.

16. The documents were re-signed on September 14, 2023, but were backdated to reflect the original sale date of September 8, 2023, because NAI had already issued a temporary tag for the Vehicle and would not have been able to issue another/second temporary tag.

17. I did not know, nor did I have any reason to suspect or believe, that the odometer reading on the Vehicle was inaccurate at the time that the Robinsons purchased the Vehicle. But, as soon as NAI became aware of what the Certificate of Title said, which was just a few days following the September 8th sale, we immediately reached out to the Robinsons to notify them of the issue, to ask them to come back to NAI to discuss it and to present them with their options when they did come back.

18. In 2024, after the GPS device installed on the Vehicle stopped working, e.g. NAI became unable to locate the Vehicle because the GPS device was either not sending any data at all or was intermittently sending data, I tried to reach the Robinsons by phone to ask them to bring the Vehicle to NAI so we could inspect it. To my recollection, I was not able to reach the Robinsons, and they never brought the Vehicle back to NAI after they bought it to allow or enable NAI to perform an inspection of the Vehicle and the GPS device.

FURTHER AFFIANT SAYETH NAUGHT.

_____
CHRISTOPHER CALDWELL

STATE OF FLORIDA
COUNTY OF DUVAL

4

Sworn to and subscribed before me this 29 day of October, 2025, by CHRISTOPHER CALDWELL, who appeared before me by means of physical presence and is personally known to me.

ROBIN LYNN BYLER-RAMAGHI
NOTARY
PUBLIC
Comm. # HH 635908
My Comm. Expires
Mar 6, 2029
STATE OF FLORIDA

NOTARY PUBLIC, STATE OF FLORIDA
My Commission Expires:

5

**EXHIBIT "C"**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ISIAH ROBINSON, and LISA                    CASE NO. 3:24-cv-00948-WWB-PDB
CLAYTON ROBINSON, Each an
Individual,

   Plaintiffs,

v.

NATIONAL AUTOMOTIVE, INC.,
a Florida corporation,

   Defendant.

_____

## AFFIDAVIT OF JIM SCHUMACHER

STATE OF FLORIDA
COUNTY OF DUVAL

  BEFORE ME this day personally appeared JIM SCHUMACHER, who, first being duly sworn, deposes and says:

  1. I am over the age of 18 and am competent to testify to the matters contained herein.

  2. I am the owner of GPS Vehicle Finder and have been the owner for 21 years.

  3. I was employed by GPS Vehicle Finder in 2024, when issues arose regarding GPS device number 016060002982011 that was installed on a vehicle with VIN #2GNALBEC1B1284389 (the "GPS Unit").

  4. The GPS Unit is owned by National Automotive, Inc. ("NAI"). The GPS Unit was purchased by NAI from SVR Tracking.

  5. Through the performance of my duties for GPS Vehicle Finder, I am familiar with the operation of the GPS devices that SVR Tracking sells to my customers, including NAI,

1

including how the devices function and how to read, analyze, and interpret the data the devices produce.

6. The reports indicate that the GPS Unit was not able to be located for several months in 2024, beginning in early May. The reports also indicate that the GPS Unit started to locate again on September 6, 2024, but on October 1, 2024, the GPS Unit stopped locating and it is reported as being disconnected ever since.

7. After reviewing records from the time periods from 2024, I can confirm that the GPS Unit reported numerous power-related events and a complete loss of external voltage readings from the Vehicle prior to September 6, 2024 and went offline again on October 1, 2024 due to a power loss.

8. There could be several reasons that the GPS Unit is no longer sending any locate signal, including that it was physically disconnected from the vehicle, it was removed from the vehicle or it was tampered with.

9. Based on the GPS Unit's inconsistent reporting in 2024, I told NAI it is possible that there could be an issue with the GPS Unit's installation, such as a loose connection, or that its customers, the Robinsons, disconnected it from the Vehicle.

FURTHER AFFIANT SAYETH NAUGHT.

JIM SCHUMACHER

2

STATE OF (olorado

COUNTY OF Jefferson

    The foregoing instrument was acknowledged before me this _\_2\_l\__ day of _october_, 2025, by JIM SCHUMACHER, who is personally known to be or who has produced _Colorado ID_ as identification.

[STAMP/SEAL]

                              NOTARY PUBLIC

                              My Commission Expires:

**GABRIEL ISAIAH SCHABLE**
NOTARY PUBLIC - STATE OF COLORADO
Notary ID #20234019310
My Commission Expires 5/23/2027

3

**EXHIBIT "D"**

**Florida Court Reporting**

Robinson v. National Automotive, Inc., Case No. 3:24-cv-00948
Deposition of Robin Ramaghi on behalf of National Automotive, Inc., taken on 8/15/25
**Deposition Errata Sheet**

---

Page No.  11    Line No.  8    Change:  Change "withhold" to "hold"

Reason for change:  Court reporter misheard me/typographical error

---

Page No.  24    Line No.  25    Change:  Change "base" to "bay"

Reason for change:  Court reporter misheard me/typographical error

---

Page No.  28    Line No.  1    Change:  Change "bleaking" to "breaking"

Reason for change:  Typographical error

---

Page No.  29    Line No.  2    Change:  Change "Fuzz" to "Phase"

Reason for change:  Court reporter misheard me/typographical error

---

Page No.  29    Line No.  24    Change:  Delete entire answer

Reason for change:  I didn't hear the question and misunderstood what was being asked.  He asked
the question again at p. 29, li. 5 – p. 30, li. 2 and I answered it at p. 30, li. 3.

---

Page No.  32    Line No.  5    Change:  Replace "safety issue, law issue" with "for safety issues,
brake issues"

Reason for change:  Clarifying and correcting my answer as the way it was transcribed is not what I
recall saying.

---

Page No.  32    Line No.  7    Change:  Delete "gliding"

Reason for change:  Court reporter misheard me/correcting my answer as I do not recall using the
word "gliding" nor does it make sense in the context of the rest of my answer.

---

Robinson v. National Automotive, Inc., Case No. 3:24-cv-00948
Deposition of Robin Ramaghi on behalf of National Automotive, Inc., taken on 8/15/25
**Deposition Errata Sheet**

---

Page No.   33   Line No.   10   Change:  Replace "very local to" with "local in"

Reason for change:  Clarifying and correcting my answer.

---

Page No.   33   Line No.   16   Change:  Replace "any real issue of things" with "something"

Reason for change:  Clarifying and correcting my answer as the way it was transcribed does not
make sense.

---

Page No.   34   Line No.   15   Change:  Replace "old-skill" with "old-school"

Reason for change: Typographical error.

---

Page No.   39   Line No.   24   Change:  Replace "which is the majority" with "which is what the
majority"

Reason for change: Typographical error.

---

Page No.   40   Line No.   9    Change:  Replace "a lot of times me" with "a lot of times not me"

Reason for change:  Clarifying and correcting my answer as the way it was transcribed is not what I
recall saying.

---

Page No.   42   Line No.   13   Change:  Replace "get us their – get us" with "get our"

Reason for change:  Clarifying my answer as the way it was transcribed is confusing and unclear.

---

Page No.   42   Line No.   14   Change:  Replace "Sometimes walk up to us. Sometimes wave at
us" with "Sometimes they walk up to us. Sometimes they wave at us."

Reason for change:  Clarifying my answer.

---

Page No.   44   Line No.   22   Change:  Replace "do" with "go"

Reason for change: Typographical error.

---

Robinson v. National Automotive, Inc., Case No. 3:24-cv-00948
Deposition of Robin Ramaghi on behalf of National Automotive, Inc., taken on 8/15/25
**Deposition Errata Sheet**

---

Page No. 58    Line No. 13    Change: Replace "Four" with "Road"

Reason for change: Typographical error.

---

Page No. 96    Line No. 13    Change: Replace "$177.89, sir" with "$177.89 is their biweekly payment so $177.89 times two"

Reason for change: Clarifying and correcting my answer.

---

Page No. 96    Line No. 17    Change: Replace "technicality" with "technically"

Reason for change: Typographical error or incorrect word choice.

---

Page No. 107    Line No. 21    Change: Add "Mr. and" to "Mrs. Robinson"

Reason for change: Clarifying and correcting my answer.

---

Page No. 107    Line No. 22    Change: Replace "her" with "their"

Reason for change: Clarifying and correcting my answer.

---

Page No. 114    Line No. 18    Change: Replace "tight" with "title"

Reason for change: Typographical error.

---

Page No. 132    Line No. 16    Change: Replace "at" with "as"

Reason for change: Typographical error.

---

Page No. 134    Line No. 21    Change: Replace "preposition" with "preparation"

Reason for change: Typographical error.

---

Page No. 162    Line No. 13-14    Change: Add "do not" so that the answer reads "And I do not appreciate you trying to word it as such."

Robinson v. National Automotive, Inc., Case No. 3:24-cv-00948
Deposition of Robin Ramaghi on behalf of National Automotive, Inc., taken on 8/15/25
**Deposition Errata Sheet**

Reason for change: Clarifying and correcting my answer as the way it was transcribed is not what I recall saying.

_____

Page No. 164   Line No. 19   Change: Replace "morale" with "moral"

Reason for change: Typographical error/misspelled word.

_____

Page No. 176   Line No. 24   Change: Add "if there is a customer to be contacted" to the end of the sentence

Reason for change: Clarifying my answer as not every instance would involve a car that has already been sold.

_____




_____          DATE: __10/21/25__
ROBIN RAMAGHI

4